Dean A. Hanley, Esq.   (State Bar No. 169507)
Deborah R. Rosenthal, Esq. (State Bar No. 184241)
PAUL & HANLEY LLP
1608 Fourth Street, Suite 300
Berkeley, California 94710
Telephone:  (510) 559-9980
Facsimile:   (510) 559-9970
dhanley@paulandhanley.com
drosenthal@paulandhanley.com

Attorneys for Plaintiff(s)

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DISTRICT

|  |  |
|---|---|
| JERI REDMAN, individually and as successor-in-interest to RONALD REDMAN, deceased; and JERI REDMAN, AMY REDMAN, DAVID C. REDMAN, MARK REDMAN and PAUL REDMAN, as legal heirs of RONALD REDMAN, deceased,<br><br>      Plaintiffs,<br><br>vs.<br><br>A.W. CHESTERTON, et al.,<br><br>      Defendants. | Case No.: 08-cv-03013-BZ<br><br>**DECLARATION OF DEBORAH R. ROSENTHAL IN SUPPORT OF PLAINTIFFS' MOTION FOR REMAND AND FOR COSTS AND EXPENSES INCURRED AS A RESULT OF REMOVAL**<br><br>**[28 USC § 1447(c); F.R.C.P. 7(b); ND CA Local Rules 7-2, 7-4 & 7-5]**<br><br>Date:      September 5, 2008<br>Time:     9:00 a.m.<br>Courtroom: 2, 17th Floor<br>Judge:    Jeffrey White |

I, Deborah R. Rosenthal, declare as follows:

1.     I am an attorney admitted to practice law before this Court and all the courts of the State of California and am an associate of Paul & Hanley LLP, attorneys of record for plaintiff herein.  The matters stated herein are true to my own personal knowledge, except as otherwise stated.  If called upon as a witness, I could and would testify to the following facts.

DECLARATION OF DEBORAH R. ROSENTHAL IN SUPPORT OF PLAINTIFFS' MOTION FOR REMAND AND FOR COSTS AND EXPENSES INCURRED AS A RESULT OF REMOVAL

S:\Clients\Plaintiffs\R\Redman, Ronald 10267\Fed Court Action\VIAD remand motion - DRR doc.doc

PAGE 1

2.      I was admitted to practice law in 1996.  My professional activities have primarily involved personal injury litigation.  Since April 2005, the focus of my work has been on legal research and writing of motions, briefs, and memoranda for asbestos personal injury and wrongful death cases in litigation, trial, and appeals.

2.      I have reviewed, prepared, and/or assisted in the preparation of the pleadings in this case and am personally familiar with all of the records on file in this action, as well as the discovery and correspondence exchanged between this office and the office of Viad's counsel, Charter Davis LLP.

3.      On April 16, 2008, the surviving spouse and heirs of decedent Ronald Redman filed a survival, wrongful death, and loss of consortium action in the Superior Court of the State of California, County of San Francisco, against Viad Corporation and nine other defendants, alleging that the products and activities of the defendants exposed Mr. Redman to asbestos and thereby caused his injuries.  No federal law is involved.  Attached hereto as **Exhibit A** is a true and correct copy of Plaintiffs' Complaint for Survival/Wrongful Death and Loss of Consortium – Asbestos filed in *Jeri Redman et. al. v. A. W. Chesterton Co. et. al.,* San Francisco Superior Court Case No. 274617.

4.      Plaintiffs' Complaint incorporates by reference portions of the Paul & Hanley LLP Master Complaint, filed on September 7, 2000, in *In re Complex Asbestos Litigation,* SFSC Case No. 828684, pursuant to SFSC General Order 55 re Master Pleadings of the San Francisco General Orders Governing Asbestos Litigation.  Attached hereto as **Exhibit B** is a true and correct copy of relevant portions of the Paul & Hanley Master Complaint.

5.      Attached hereto as **Exhibit C** is a true and correct copy of Defendants' Standard Interrogatories to Plaintiff (Wrongful Death, Set Two), propounded pursuant to General Order 129 of the San Francisco Superior Court General Orders Governing Asbestos Litigation.

6.      Attached hereto as **Exhibit D** is a true and correct copy of relevant portions of Plaintiffs' Responses to Defendants' Standard Interrogatories to Plaintiff (Wrongful Death, Set Two), served on defendant Viad Corporation in the *Redman* state court action on May 23, 2008.

DECLARATION OF DEBORAH R. ROSENTHAL IN SUPPORT OF PLAINTIFFS' MOTION FOR REMAND AND FOR COSTS AND EXPENSES INCURRED AS A RESULT OF REMOVAL

S:\Clients\Plaintiffs\R\Redman, Ronald 10267\Fed Court Action\VIAD remand motion - DRR dec.doc

PAGE 2

7.      Attached hereto as **Exhibit E** is a true and correct copy of the 1961 Baldwin-Lima-Hamilton Annual Report.

8.      Attached hereto as **Exhibit F** is a true and correct copy of the 1962 Baldwin-Lima-Hamilton Annual Report.

9.      Attached hereto as **Exhibit G** is a true and correct copy of "Description of and Operating Instructions for Soloshell L.P. Distilling Plant," published by The Griscom-Russell Company for use with its distilling plants installed on DD 666 Class Destroyers.

10.      Attached hereto as **Exhibit H** is a true and correct copy of "Instructions for Operation, Care and Maintenance of Griscom-Russell Navy Type Low Pressure Distilling Plants," published by The Griscom Russell Company for use with its commercially available distilling plants.

11.      Attached hereto as **Exhibit I** is a true and correct copy of MIL-M-15071D(SHIPS), the U.S. Navy Military Specification for Manual, Service (Instruction Books) for Shipboard Electrical and Mechanical Equipment, effective June 6, 1961.

12.      Attached hereto as **Exhibit J** is a true and correct copy of Proof of Service of Summons and Complaint and of Plaintiff's Response to Defendant's Standard Interrogatories – Set Two, on Defendant Viad Corporation's Agent for Service by personal service on May 23, 2008.

13.      Attached hereto as **Exhibit K** is a true and correct copy of the June 2, 2008, letter from Viad counsel Mia Rosenfeld of the law firm of Charter Davis, LLP, to plaintiffs' counsel Carlos Guzman of the law firm of Paul & Hanley LLP.

14.      On June 16, 2008, I spoke by telephone with Ms. Rosenfeld regarding Viad's request for a dismissal or waiver of claims and intended removal and explained why the *Redman* state court action was not removable.  After our telephone conversation, I sent a letter to Ms. Rosenfeld confirming the substance of our telephone conversation and explaining in greater detail based on the specific facts of this case and applicable law why the *Redman* state court

---

DECLARATION OF DEBORAH R. ROSENTHAL IN SUPPORT OF PLAINTIFFS' MOTION FOR REMAND AND FOR COSTS AND EXPENSES INCURRED AS A RESULT OF REMOVAL

S:\Clients\Plaintiff\R\Redman, Ronald 10267\Fed Court Action\VIAD remand motion - DRR dec.doc

PAGE 3

1    action is not removable.  Attached hereto as **Exhibit L** is a true and correct copy of my June 16,

2    2008, letter to Ms. Rosenfeld and proof of fax-service of the letter that same day.

3        15.    Attached hereto as **Exhibit M** is a true and correct copy of advertisements in the

4    trade magazine Marine Engineering Log, published in the 1960s, by Baldwin-Lima-Hamilton,

5    successor to Griscom Russell Company and predecessor to Viad Corporation.

6        16.    Attached hereto as **Exhibit N** is a true and correct copy of relevant portions of the

7    "Naval Machinery" handbook, 1941 edition, published by the United States Naval Institute.

8        17.    Attached hereto as **Exhibit O** is a true and correct copy of the Declaration of

9    Dean A. Hanley In Support Of Plaintiffs' Motion For Remand and For Costs And Expenses

10   Incurred As A Result of Removal.

11       18.    After Viad counsel notified this office of its intent to remove this action if

12   plaintiffs did not dismiss or waive its claims against Viad, I met and conferred with Carlos

13   Guzman, the attorney in this office primarily in charge of handling the *Redman* action, and with

14   Dean A. Hanley, with regard to Viad's request and removal threat.  In the past year, I have spent

15   substantial time researching the issue of federal subject matter jurisdiction based on the federal

16   officer statute.  I assisted in the drafting of the *Redman* complaint.

17       19.    After Viad counsel removed this case to federal court, I spent additional time

18   meeting and conferring with Dean Hanley with regard to Viad's removal.  From June 21, 2008,

19   to June 26, 2008, I spent approximately 24.5 hours researching the law; drafting and revising

20   plaintiffs' motion; marshaling facts and evidence; and preparing this Declaration and the

21   attached exhibits.

22       20.    On June 25, 2008, I telephoned Ms. Rosenfeld to inquire as to whether Viad

23   would consent to proceed before the Magistrate Judge to which this case had been assigned and

24   further, whether Viad would stipulate to an expedited briefing and hearing schedule.  I left these

25   queries in a voicemail message to Ms. Rosenfeld.  She did not return my call, and Viad

26   subsequently declined to proceed before the Magistrate Judge.

27

28   **DECLARATION OF DEBORAH R. ROSENTHAL IN SUPPORT OF PLAINTIFFS' MOTION FOR REMAND AND FOR COSTS AND EXPENSES INCURRED AS A RESULT OF REMOVAL**

S:\Clients\Plaintiffs\R\Redman, Ronald 10267\Fed Court Action\VIAD remand motion - DRR dec.doc

21.    I anticipate spending at least eight hours reviewing defendant's Opposition and researching and preparing plaintiffs' Reply brief.

22.    My hourly rate is $350 per hour.

I declare under the penalty of perjury under the laws of the State of California and of the United States that the foregoing is true and correct.  Executed on July 3, 2008, in Berkeley, California.

Deborah R. Rosenthal

DECLARATION OF DEBORAH R. ROSENTHAL IN SUPPORT OF PLAINTIFFS' MOTION FOR REMAND AND FOR COSTS AND EXPENSES INCURRED AS A RESULT OF REMOVAL

PAGE 5

S:\Clients\Plaintiffs\R\Redman, Ronald 10267\Fed Court Action\VIAD remand motion - DRR dec.doc



1  Dean A. Hanley, Esq.   (State Bar No. 169507)
   Deborah R. Rosenthal, Esq. (State Bar No. 184241)
2  PAUL AND HANLEY LLP
   1608 Fourth Street, Suite 300
3  Berkeley, California 94710
   Telephone:  (510) 559-9980
4  Facsimile:   (510) 559-9970
   dhanley@paulandhanley.com
5  drosenthal@paulandhanley.com

6  Attorneys for Plaintiffs

7

8

9              UNITED STATES DISTRICT COURT

10            NORTHERN DISTRICT OF CALIFORNIA

                  SAN FRANCISCO DIVISION
11

12 JERI REDMAN, individually and as        ) Case No.: 08-cv-03013-BZ
   successor-in-interest to RONALD REDMAN, )
13 deceased; and JERI REDMAN, AMY          ) **EXHIBITS A-C TO DECLARATION OF**
   REDMAN, DAVID C. REDMAN, MARK           ) **DEBORAH R. ROSENTHAL IN**
14 REDMAN and PAUL REDMAN, as legal        ) **SUPPORT OF PLAINTIFFS' MOTION**
   heirs of RONALD REDMAN, deceased,       ) **FOR REMAND AND FOR COSTS AND**
15                                         ) **EXPENSES INCURRED AS A RESULT**
                                           ) **OF REMOVAL**
16        Plaintiffs,                      ) _____
                                           ) [28 U.S.C. § 1447(c); FRCP 7(b); ND CA Local Rules
17 vs.                                     ) 7-2, 7-4 & 7-5]
                                           )
18 A.W. CHESTERTON, et al.,                )
                                           ) Date:        September 5, 2008
19        Defendants.                      ) Time:        9:00 a.m.
                                           ) Courtroom:   2, 17th Floor
20 _____ ) Judge:       Jeffrey White

21

22

23

24 //
   //
25 //
   //
26 //
   //
27 //
   //
28
   **NOTICE OF MOTION AND MOTION FOR REMAND AND FOR COSTS AND EXPENSES INCURRED AS A RESULT OF**
   **REMOVAL**                                                                          **PAGE 1**
   S:\Clients\Plaintiffs\R\Redman, Ronald 10267\Fed Court Action\VIAD remand motion - Exh A-C.doc

**EXHIBIT "A"**

1 | Dean A. Hanley, Esq. (State Bar No. 169507)
Carlos J.E. Guzman, Esq. (State Bar No. 219185)
2 | PAUL & HANLEY LLP
1608 Fourth Street, Suite 300
3 | Berkeley, California 94710
Telephone: (510) 559-9980
4 | Facsimile: (510) 559-9970

**ENDORSED**
Superior Court of California
County of San Francisco

APR 16 2008

GORDON PARK-LI, Clerk
BY: CRISTINA E. BAUTISTA
Deputy Clerk

CASE MANAGEMENT CONFERENCE SET
THIS CASE IS SUBJECT TO
MANDATORY ELECTRONIC FILING
PURSUANT TO AMENDED G.O. 158

APR 1 5 2009

5 | Attorneys for Plaintiffs

DEPARTMENT 206

7 | SUPERIOR COURT OF THE STATE OF CALIFORNIA

8 | COUNTY OF SAN FRANCISCO – COURT OF UNLIMITED JURISDICTION

10 | JERI REDMAN, individually and as successor-in-
11 | interest to RONALD REDMAN, deceased; and
JERI REDMAN, AMY REDMAN, DAVID C.
12 | REDMAN, MARK REDMAN and PAUL
REDMAN, as legal heirs of RONALD REDMAN,
13 | deceased,
14 |       Plaintiffs,
15 | vs.
16 | A.W. CHESTERTON COMPANY,
ALSTOM POWER, INC. individually and as
17 |       successor-in-interest to GRISCOM-
             RUSSELL-SCHACK COMPANY, INC.,
18 | FOSTER WHEELER USA CORPORATION,
HOPEMAN BROTHERS, INC.,
19 | IMO INDUSTRIES, INC. fka DE LAVAL
             TURBINE, INC.; DELAVAL TURBINE,
20 |       INC.; IMO DELAVAL INC.; and
             SHARPLES, INC.,
21 | METALCLAD INSULATION CORPORATION,
NATIONAL STEEL AND SHIPBUILDING
22 |       COMPANY,
PLANT INSULATION COMPANY,
23 | SYD CARPENTER, MARINE CONTRACTOR,
             INC.,
24 | VIAD CORP. fka and as successor-in-interest to
             DIAL CORPORATION and GRISCOM
25 |       RUSSELL,
26 | and DOES 1 - 820,
27 |       Defendants

Case No. CGC-08-274617

**COMPLAINT FOR
SURVIVAL / WRONGFUL
DEATH AND LOSS
OF CONSORTIUM-
ASBESTOS**

1.     Decedent RONALD REDMAN died on October 21, 2007, as a result of mesothelioma, which is attributable to exposure to asbestos.

2.     Plaintiff JERI REDMAN, the surviving wife of RONALD REDMAN (hereinafter "Decedent"), brings the survival claims in this action pursuant to Section 377.31 of the Code of Civil Procedure.

3.     The wrongful death claims in this action are brought by Plaintiffs JERI REDMAN, AMY REDMAN, DAVID C. REDMAN, MARK REDMAN and PAUL REDMAN, as legal heirs of Decedent, pursuant to Section 377.60 of the Code of Civil Procedure.

4.     Plaintiff JERI REDMAN and decedent RONALD REDMAN were married on or about June 26, 2004.

5.     Decedent RONALD REDMAN is survived by his spouse, plaintiff JERI REDMAN, and his adult children, plaintiffs AMY REDMAN, DAVID C. REDMAN, MARK REDMAN and PAUL REDMAN. At all relevant times herein, decedent was a faithful and dutiful spouse and parent.

6.     All claims against defendants FOSTER WHEELER USA CORPORATION; IMO INDUSTRIES, INC. fka DE LAVAL TURBINE, INC., DELAVAL TURBINE, INC., IMO DELAVAL INC., and SHARPLES, INC.; NATIONAL STEEL AND SHIPBUILDING COMPANY; and VIAD CORP. fka and as successor-in-interest to DIAL CORPORATION and GRISCOM RUSSELL are limited to claims for failure to warn, both negligence and strict product liability as defined in Anderson v. Owens-Corning Fiberglas (1991) 53 Cal.3d 987 and in CACI. Plaintiffs will not pursue any other theory of liability against these defendants.

7.     Plaintiffs expressly disclaim any cause of action or recovery against defendants FOSTER WHEELER USA CORPORATION; IMO INDUSTRIES, INC. fka DE LAVAL TURBINE, INC., DELAVAL TURBINE, INC., IMO DELAVAL INC., and SHARPLES, INC.; NATIONAL STEEL AND SHIPBUILDING COMPANY; and VIAD CORP. fka and as

successor-in-interest to DIAL CORPORATION and GRISCOM RUSSELL for any injuries resulting from exposure to asbestos containing dust caused by any acts or omissions of a party committed at the direction of an officer of the United States Government.

8.     Plaintiffs expressly disclaim any cause of action or recovery for any injuries caused by any exposure to asbestos dust that occurred in a federal enclave.

9.     The Paul & Hanley, Master Complaint - Asbestos was filed with the Court on September 7, 2000. A copy of the Master Complaint and General Order No. 55 may be obtained upon request from Paul & Hanley LLP, and designated portions of the Master Complaint are incorporated by reference herein pursuant to the authority conferred by General Order No. 55. Plaintiffs' claims are as set forth in said Master Complaint against defendants herein as follows:

| CAUSE OF ACTION | Defendants on Exhibit | | | | | |
|---|---|---|---|---|---|---|
| | B | C | D | E | F | G |
| **First** (Negligence) | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| **Second** (Strict Liability) | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| **Third** (False Representation Under Restatement of Torts Section 402-B) | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| **Fourth** (Intentional tort) | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| **Fifth** (Premises Owner/ Contractor Liability) | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| **Sixth** (Respiratory Safety Devices - Negligence) | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| **Seventh** (Respiratory Safety Devices - Strict Liability) | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| **Eighth - Eleventh** | **As Alleged in Paul & Hanley Master Complaint** | | | | | |
| **Twelfth** (Negligence [33 U.S.C. §905(b)]) | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| **Thirteenth** (Unseaworthiness) | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |

| CAUSE OF ACTION | Defendants on Exhibit | | | | | |
|---|---|---|---|---|---|---|
| | B | C | D | E | F | G |
| **Fourteenth** (Negligence [Jones Act]) | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| **Fifteenth** (Maintenance and Cure) | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| **Sixteenth** (Loss of Consortium) | ☒ | ☒ | | | | ☒ |
| **Seventeenth** (Survival - Negligence) | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| **Eighteenth** (Survival - Strict Liability) | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| **Nineteenth** (False Representation Under Restatement of Torts Section 402-B - Survival) | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| **Twentieth** (Survival - Intentional Tort) | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| **Twenty-First** (Wrongful Death - Negligence) | ☒ | ☒ | ☐ | ☐ | ☐ | ☐ |
| **Twenty-Second** (Wrongful Death - Strict Liability) | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |

## TWENTY-THIRD CAUSE OF ACTION
### (Premise Owner/Contractor Liability)

AS AND FOR THE TWENTY-THIRD, SEPARATE, FURTHER DISTINCT CAUSE OF ACTION FOR SURVIVAL AND WRONGFUL DEATH, PLAINTIFFS COMPLAIN OF DEFENDANTS ON EXHIBIT C, DOES 301-500, THEIR "ALTERNATIVE ENTITIES," AND EACH OF THEM, AND ALLEGE AS FOLLOWS:

10.     Plaintiffs incorporate herein by reference, as though fully set forth herein, each and every allegation contained in paragraphs 1-5 above, paragraphs 17-23 of the First Cause of Action, and each and every allegation contained in the Fifth (replacing "plaintiff" with "decedent" throughout) and Seventeenth Causes of Action.

11.     As a direct and proximate result of the conduct of defendants, and each of them, plaintiffs have sustained the injuries and damages previously alleged.

## TWENTY-FOURTH CAUSE OF ACTION
### (Negligence – Clutch & Brake Components [Survival and Wrongful Death])

**AS AND FOR A FURTHER AND TWENTY-FOURTH SEPARATE AND DISTINCT CAUSE OF ACTION FOR PRODUCTS LIABILITY (NEGLIGENCE) FOR CLUTCH COMPONENTS AND BRAKE ASSEMBLIES, MECHANISMS AND LININGS, PLAINTIFFS COMPLAIN OF DOES 250-275, AND ALLEGES AS FOLLOWS:**

12.     Plaintiffs, by this reference, incorporate the allegations contained in paragraphs 1-5 above, and the First and Seventeenth Causes of Action as though fully set forth herein.

13.     DOES 250-275, manufactured or supplied defective clutch components and brake assemblies or mechanisms which were incorporated into various makes and models of automobiles, trucks and vehicles manufactured, sold or supplied by said defendants.  Said clutch components and brake assemblies or mechanisms were negligently manufactured sold or supplied in that:

a)     The design of said clutch components and brake assemblies or mechanisms incorporated the use of asbestos-containing clutch facings/plates and brake linings;

b)     Asbestos clutch components brake linings wear and/or deteriorate during regular and ordinary use thus creating friable asbestos dust, which accumulates in the clutch brake assemblies and/or mechanisms;

c)     The design of said clutch components brake assemblies require as a part of their normal operation, use and maintenance that the asbestos clutch components and brake linings be removed and replaced;

d)     Said defendants required the use of asbestos-containing clutch components and brake linings throughout the time period 1940-1985;

e)     During the removal and replacement of asbestos-containing clutch components and brake linings, asbestos-containing dust was inherently generated because of the design of the clutch components and brake assemblies and/or mechanisms;

f)     Defendants knew or should have known that the asbestos-containing dust would be generated during the regular use and maintenance of the clutch components and brake assemblies, mechanisms and linings, and that such dust created an increased risk of asbestos disease for all users, consumers, or others who breathed said asbestos-containing dust;

g)     The defendants, and each of them, failed to warn and/or properly instruct users, consumers, or others of the asbestos-containing dust hazard which existed at the time of regular maintenance or replacement of asbestos clutch components and brake linings.  Such failure includes, but is not limited to:

a.     Failure to place prominent and adequate warnings or instructions in and on the clutch components and brake pads and wheel drums;

b.     Failure to place adequate warnings or instructions in the owners' manuals accompanying said automobiles, trucks and vehicles;

c.     Failure to place adequate warnings or instructions on various repair manuals and instructions published by defendants; and

d.     Failure to provide adequate information regarding the asbestos hazards associated with the regular use and maintenance of the clutch components and brake mechanisms, assemblies and/or linings.

14.     The clutch components and brake assemblies, mechanisms and/or linings manufactured, sold or supplied by defendants failed to perform as safely as the ordinary consumer would expect, even though they performed as designed.

15.     Defendants' use and design of asbestos-containing clutch components and brake linings, both as original equipment and as replacement parts, created unreasonable inherent risks which outweighed the benefits of said use and/or design.

16.     The dangers inherent in asbestos-containing clutch components and brake linings were unknown and unforeseeable to the decedent.

17.     Decedent's exposure to asbestos-containing dust, which caused his injury, was from his use and maintenance of defendants' clutch components and brake mechanisms, assemblies and/or linings.  Said work produced the release of asbestos dust, which decedent inhaled, thus increasing his risk for all asbestos-related disease.

18.     Defendants' negligence and defective products as described in this cause of action were a direct cause of decedent's injuries and subsequent death, and the injuries and damages thereby sustained by plaintiff.

19.     Nothing hereinabove claimed seeks to impose liability on the defendants named in this cause of action for the products or actions of any third party that may have supplied replacement brake linings used in the hereinabove described brake assemblies.

WHEREFORE, plaintiff prays judgment against defendants, their "alternate entities," and each of them, as previously set forth in Paul & Hanley Master Complaint.

## TWENTY-FIFTH CAUSE OF ACTION
### (Strict Liability – Clutch & Brake Components [Survival and Wrongful Death])

**AS AND FOR A FURTHER AND TWENTY-FIFTH SEPARATE AND DISTINCT CAUSE OF ACTION FOR PRODUCTS LIABILITY (STRICT LIABILITY) FOR CLUTCH COMPONENTS AND BRAKE ASSEMBLIES, MECHANISMS AND LININGS, PLAINTIFFS COMPLAIN OF DOES 250-275, AND ALLEGES AS FOLLOWS:**

20.     Plaintiffs, by this reference, incorporate the allegations contained in the Second, Eighteenth and Twenty-Fourth Causes of Action as though fully set forth herein, excepting therefrom allegations of negligence.

21.     Defendants' defective products as described in this cause of action did not perform as safely as an ordinary consumer would have expected at time of decedent's use.

22.     Defendants' defective products as described in this cause of action were used in a manner foreseeable by defendants.

23.     The gravity of the potential harm resulting from the use of defendants' defective products as described in this cause of action, and the likelihood such harm would occur, outweighed the cost of feasible alternative designs, including providing adequate warning of such potential harm, including asbestos-related disease.

24.     Defendants' conduct and defective products as described in this cause of action were a direct cause of decedent's injuries and subsequent death, and the injuries and damages thereby sustained by plaintiffs.

25.     Nothing hereinabove claimed seeks to impose liability on the defendants named in this cause of action for the products or actions of any third party that may have supplied replacement brake linings used in the hereinabove described brake assemblies.

WHEREFORE, plaintiff prays judgment against defendants, their "alternate entities," and each of them, as previously set forth in Paul & Hanley Master Complaint.

DATED: April __, 2008                    PAUL & HANLEY LLP


By: _____
Carlos J.E. Guzman
Attorneys for Plaintiffs

1

<u>EXHIBIT "A"</u>

2

3    Decedent RONALD REDMAN's exposure stemmed from occupational exposure to
asbestos and asbestos-containing products while working as a Pipefitter and Steamfitter.
4    Decedent was exposed to asbestos and asbestos-containing thermal insulation materials while
present at Decedent's jobsites, which include but are not limited to the sites listed below.
5    Decedent RONALD REDMAN suffered and died from asbestos-related disease, including
6    mesothelioma, on October 21, 2007.

| Jobsite | Employer | BD | ED |
|---------|----------|-----|-----|
| SANTA PAULA | NEWPORT NEWS SHIPBUILDING & DRYDOCK COMPANY | 1/1/1957 | 12/31/1958 |
| SANTA ROSA (now known as THE EMERALD) | NEWPORT NEWS SHIPBUILDING & DRYDOCK COMPANY | 1/1/1957 | 12/31/1958 |
| USS SHARK | NEWPORT NEWS SHIPBUILDING & DRYDOCK COMPANY | 1/1/1957 | 12/31/1961 |
| Newport News Shipbuilding and Drydock, Newport News, VA | Newport News Shipbuilding and Drydock, Newport News VA | 1/1/1957 | 12/31/1967 |
| USS ROBERT E. LEE | NEWPORT NEWS SHIPBUILDING & DRYDOCK COMPANY | 1/1/1958 | 12/31/1960 |
| USS JOHN MARSHALL | NEWPORT NEWS SHIPBUILDING & DRYDOCK COMPANY | 1/1/1960 | 12/31/1962 |
| USS THOMAS JEFFERSON | NEWPORT NEWS SHIPBUILDING & DRYDOCK COMPANY | 1/1/1961 | 12/31/1963 |
| USS JOHN C. CALHOUN - SSBN 630 | NEWPORT NEWS SHIPBUILDING & DRYDOCK COMPANY | 1/1/1962 | 12/31/1964 |
| USS LEWIS & CLARK | NEWPORT NEWS SHIPBUILDING & DRYDOCK COMPANY | 1/1/1963 | 12/31/1964 |

7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28   / / /

| Jobsite | Employer | BD | ED |
|---------|----------|-----|-----|
| USS GEORGE C. MARSHALL | NEWPORT NEWS SHIPBUILDING & DRYDOCK COMPANY | 1/1/1964 | 12/31/1966 |
| USS JOHN F. KENNEDY | NEWPORT NEWS SHIPBUILDING & DRYDOCK COMPANY | 1/1/1965 | 12/31/1967 |
| USS LAPON | NEWPORT NEWS SHIPBUILDING & DRYDOCK COMPANY | 1/1/1965 | 12/31/1967 |
| Newport News Shipbuilding and Drydock, Newport News, VA | Newport News Shipbuilding and Drydock, Newport News VA | 1/1/1967 | 12/31/1974 |
| USS NIMITZ | NEWPORT NEWS SHIPBUILDING & DRYDOCK COMPANY | 1/1/1968 | 12/31/1974 |
| USS CALIFORNIA | NEWPORT NEWS SHIPBUILDING & DRYDOCK COMPANY | 1/1/1970 | 12/31/1974 |
| USS SOUTH CAROLINA | NEWPORT NEWS SHIPBUILDING & DRYDOCK COMPANY | 1/1/1970 | 12/31/1974 |
| USS SOUTH CAROLINA | NEWPORT NEWS SHIPBUILDING & DRYDOCK COMPANY | 1/1/1970 | 12/31/1974 |
| USS JOHN F. KENNEDY | Norfolk Naval Shipyard | 1/1/1971 | 12/31/1984 |
| Norfolk Naval Shipyard, Portsmouth, VA | Norfolk Naval Shipyard | 1/1/1974 | 12/31/1984 |
| San Diego Naval Shipyard, 32nd Street, San Diego CA | Norfolk Naval Shipyard | 1/1/1974 | 12/31/1984 |
| USNS CONCORD | Norfolk Naval Shipyard | 1/1/1974 | 12/31/1984 |
| USS ALFRED A CUNNINGHAM | Norfolk Naval Shipyard | 1/1/1974 | 12/31/1984 |
| USS AMERICA (CV-66) | Norfolk Naval Shipyard | 1/1/1974 | 12/31/1984 |
| USS ANCHORAGE | Norfolk Naval Shipyard | 1/1/1974 | 12/31/1984 |

| | Jobsite | Employer | BD | ED |
|---|---|---|---|---|
| 1 | | | | |
| 2 | SS ARTHUR W. RADFORD | Norfolk Naval Shipyard | 1/1/1974 | 12/31/1984 |
| 3 | USS AUSTIN | Norfolk Naval Shipyard | 1/1/1974 | 12/31/1984 |
| 4 | USS BARNEY - DDG 6 | Norfolk Naval Shipyard | 1/1/1974 | 12/31/1984 |
| 5 | USS BELLEAU WOOD | Norfolk Naval Shipyard | 1/1/1974 | 12/31/1984 |
| 6 | USS BRISCOE | Norfolk Naval Shipyard | 1/1/1974 | 12/31/1984 |
| 7 | USS CALIFORNIA | Norfolk Naval Shipyard | 1/1/1974 | 12/31/1984 |
| 8 | USS CANISTEO | Norfolk Naval Shipyard | 1/1/1974 | 12/31/1984 |
| 9 | USS CARON | Norfolk Naval Shipyard | 1/1/1974 | 12/31/1984 |
| 10 | USS CLAUDE V RICKETTS | Norfolk Naval Shipyard | 1/1/1974 | 12/31/1984 |
| 11 | USS CLAUDE V RICKETTS | Norfolk Naval Shipyard | 1/1/1974 | 12/31/1984 |
| 12 | USS COMTE DE GRASSE | Norfolk Naval Shipyard | 1/1/1974 | 12/31/1984 |
| 13 | USS CONYNGHAM | Norfolk Naval Shipyard | 1/1/1974 | 12/31/1984 |
| 14 | USS COONTZ - DLG 9 | Norfolk Naval Shipyard | 1/1/1974 | 12/31/1984 |
| 15 | USS CORONADO | Norfolk Naval Shipyard | 1/1/1974 | 12/31/1984 |
| 16 | USS DU PONT | Norfolk Naval Shipyard | 1/1/1974 | 12/31/1984 |
| 17 | USS DWIGHT D. EISENHOWER | Norfolk Naval Shipyard | 1/1/1974 | 12/31/1984 |
| 18 | USS FARRAGUT | Norfolk Naval Shipyard | 1/1/1974 | 12/31/1984 |
| 19 | USS FORESTAL (CVA-59) | Norfolk Naval Shipyard | 1/1/1974 | 12/31/1984 |
| 20 | USS GLOVER | Norfolk Naval Shipyard | 1/1/1974 | 12/31/1984 |
| 21 | USS GUADALCANAL | Norfolk Naval Shipyard | 1/1/1974 | 12/31/1984 |
| 22 | USS HARLAN COUNTY | Norfolk Naval Shipyard | 1/1/1974 | 12/31/1984 |
| 23 | USS HARRY E YARNELL | Norfolk Naval Shipyard | 1/1/1974 | 12/31/1984 |
| 24 | USS INCHON (LPH 12) | Norfolk Naval Shipyard | 1/1/1974 | 12/31/1984 |
| 25 | USS INDEPENDENCE | Norfolk Naval Shipyard | 1/1/1974 | 12/31/1984 |
| 26 | | | | |
| 27 | | | | |
| 28 | | | | |

| Jobsite | Employer | BD | ED |
|---------|----------|-----|-----|
| USS INGRAHAM | Norfolk Naval Shipyard | 1/1/1974 | 12/31/1984 |
| USS IWO JIMA | Norfolk Naval Shipyard | 1/1/1974 | 12/31/1984 |
| USS JOHN KING | Norfolk Naval Shipyard | 1/1/1974 | 12/31/1984 |
| USS JOHN R PERRY | Norfolk Naval Shipyard | 1/1/1974 | 12/31/1984 |
| USS JOSEPHUS DANIELS | Norfolk Naval Shipyard | 1/1/1974 | 12/31/1984 |
| USS KEARNY | Norfolk Naval Shipyard | 1/1/1974 | 12/31/1984 |
| USS KNOX | Norfolk Naval Shipyard | 1/1/1974 | 12/31/1984 |
| USS LASALLE | Norfolk Naval Shipyard | 1/1/1974 | 12/31/1984 |
| USS LAWRENCE | Norfolk Naval Shipyard | 1/1/1974 | 12/31/1984 |
| USS MANITOWOC | Norfolk Naval Shipyard | 1/1/1974 | 12/31/1984 |
| USS MOBILE | Norfolk Naval Shipyard | 1/1/1974 | 12/31/1984 |
| USS MOUNT WHITNEY LCC 20 | Norfolk Naval Shipyard | 1/1/1974 | 12/31/1984 |
| USS NASSAU CVE-16 | Norfolk Naval Shipyard | 1/1/1974 | 12/31/1984 |
| USS NEOSHO | Norfolk Naval Shipyard | 1/1/1974 | 12/31/1984 |
| USS NEWPORT | Norfolk Naval Shipyard | 1/1/1974 | 12/31/1984 |
| USS NIMITZ | Norfolk Naval Shipyard | 1/1/1974 | 12/31/1984 |
| USS PHARRIS | Norfolk Naval Shipyard | 1/1/1974 | 12/31/1984 |
| USS PONCE | Norfolk Naval Shipyard | 1/1/1974 | 12/31/1984 |
| USS PORTLAND | Norfolk Naval Shipyard | 1/1/1974 | 12/31/1984 |
| USS RALEIGH | Norfolk Naval Shipyard | 1/1/1974 | 12/31/1984 |
| USS REUBEN JAMES | Norfolk Naval Shipyard | 1/1/1974 | 12/31/1984 |
| USS RICHARD E. BYRD | Norfolk Naval Shipyard | 1/1/1974 | 12/31/1984 |
| USS SAGINAW | Norfolk Naval Shipyard | 1/1/1974 | 12/31/1984 |
| USS SAN DIEGO (AFS6) | Norfolk Naval Shipyard | 1/1/1974 | 12/31/1984 |

| | Jobsite | Employer | BD | ED |
|---|---|---|---|---|
| 1 | | | | |
| 2 | USS SARATOGA | Norfolk Naval Shipyard | 1/1/1974 | 12/31/1984 |
| 3 | USS SOUTH CAROLINA | Norfolk Naval Shipyard | 1/1/1974 | 12/31/1984 |
| 4 | USS SPIEGEL GROVE | Norfolk Naval Shipyard | 1/1/1974 | 12/31/1984 |
| 5 | USS SPRUANCE | Norfolk Naval Shipyard | 1/1/1974 | 12/31/1984 |
| 6 | USS SUMTER | Norfolk Naval Shipyard | 1/1/1974 | 12/31/1984 |
| 7 | USS SYLVANIA | Norfolk Naval Shipyard | 1/1/1974 | 12/31/1984 |
| 8 | USS TARAWA | Norfolk Naval Shipyard | 1/1/1974 | 12/31/1984 |
| 9 | USS TRUCKEE | Norfolk Naval Shipyard | 1/1/1974 | 12/31/1984 |
| 10 | USS VIRGINIA | Norfolk Naval Shipyard | 1/1/1974 | 12/31/1984 |
| 11 | USS VULCAN | Norfolk Naval Shipyard | 1/1/1974 | 12/31/1984 |
| 12 | USS WAINWRIGHT (DLG-28) | Norfolk Naval Shipyard | 1/1/1974 | 12/31/1984 |
| 13 | USS YELLOWSTONE | Norfolk Naval Shipyard | 1/1/1974 | 12/31/1984 |
| 14 | Supervisor of Shipbuilding, Newport News, VA | Supervisor of Shipbuilding | 8/1/1984 | 8/31/1987 |

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1 | <u>EXHIBIT "B"</u>

2 | A.W. CHESTERTON COMPANY,
ALSTOM POWER, INC. individually and as successor-in-interest to GRISCOM-RUSSELL-
3 |      SCHACK COMPANY, INC.,
FOSTER WHEELER USA CORPORATION,
4 | HOPEMAN BROTHERS, INC.,
IMO INDUSTRIES, INC. fka DE LAVAL TURBINE, INC.; DELAVAL TURBINE, INC.;
5 |      IMO DELAVAL INC.; and SHARPLES, INC.,
METALCLAD INSULATION CORPORATION,
6 | PLANT INSULATION COMPANY,
SYD CARPENTER, MARINE CONTRACTOR, INC.,
7 | VIAD CORP. fka and as successor-in-interest to DIAL CORPORATION and GRISCOM
     RUSSELL,

8 | and DOES 1 – 300.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

<div align="center">EXHIBIT "C"</div>

2

FOSTER WHEELER USA CORPORATION,
HOPEMAN BROTHERS, INC.,

3

IMO INDUSTRIES, INC. fka DE LAVAL  TURBINE, INC.; DELAVAL TURBINE, INC.;
    IMO DELAVAL INC.; and SHARPLES, INC.,

4

METALCLAD INSULATION CORPORATION,
NATIONAL STEEL AND SHIPBUILDING COMPANY,

5

PLANT INSULATION COMPANY,
SYD CARPENTER, MARINE CONTRACTOR, INC.,

6

and DOES 301 – 500.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## EXHIBIT "D"

DOES 551 – 600.

## EXHIBIT "E"

[Erroneously misstated as Exhibit D defendants in Master Complaint]

DOES 501 – 550.

## EXHIBIT "G"

DOES 621 – 650.

**EXHIBIT "B"**

1   Dean A. Hanley, Esq. (State Bar No. 169507)
    J. Bruce Jackson, Esq. (State Bar No. 173215)
2   Young S. Lee, Esq. (State Bar No. 184506)
    PAUL & HANLEY, LLP
3   4905 Central Avenue, Suite 200
    Richmond, California 94804
4   Telephone:    (510) 559-9980
    Facsimile:    (510) 559-9970
5
6   Attorneys for Plaintiffs

**ENDORSED**
**F I L E D**
San Francisco County Superior Court

SEP 7 ~ 2000

GORDON PARK-LI, Clerk
BY: ___STEVEN DOUGLAS___
            Deputy Clerk

7

8                SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                        COUNTY OF SAN FRANCISCO

10                     COURT OF UNLIMITED JURISDICTION

11

12  IN RE COMPLEX ASBESTOS LITIGATION          )  Case No. 828684
                                               )
13  _____ )
                                                  **PAUL & HANLEY, LLP'S**
14                                                **MASTER COMPLAINT -**
                                                  **ASBESTOS**
15
                                                  (Negligence, Strict Liability,
16                                                False Representation
                                                  [Restatement §402-B],
17                                                Intentional Tort, Premises
                                                  Owner/Contractor Liability,
18                                                Respiratory Safety Devices-
                                                  Negligence, Respiratory Safety
19                                                Devices-Strict Liability, Fraud
                                                  and Deceit/Concealment, Fraud
20                                                and Deceit/ Negligent
                                                  Misrepresentation, Intentional
21                                                Tort by Means of
                                                  Conspiracy/Concert of Action,
22                                                Negligent
                                                  Misrepresentation/Failure to
23                                                Warn by Means of
                                                  Conspiracy/Concert of Action,
24                                                Negligence, Unseaworthiness,
                                                  Negligence [Jones Act],
25                                                Maintenance and Cure, Loss of
                                                  Consort, Wrongful Death-
26                                                Negligence, Wrongful Death-
                                                  Strict Liability)
27

28

*COMPLAINT FOR PERSONAL INJURY AND LOSS OF CONSORTIUM - ASBESTOS*
S:\Clients\Forms\Complaint Master.wpd

1        COME NOW PLAINTIFFS (hereinafter "Plaintiffs" or "Plaintiff") COMPLAIN AND

2    ALLEGE AS FOLLOWS:

3        1. The true names and capacities, whether individual, corporate, associate, governmental or

4    otherwise, of defendants DOES 1 through 800, are unknown to plaintiff at this time, who therefore

5    sues said defendants by such fictitious names.   When the true names and capacities of said

6    defendants have been ascertained, plaintiff will amend this complaint accordingly.  Plaintiff is

7    informed and believes, and thereon alleges, that each defendant designated herein as a DOE is

8    responsible, negligently or in some other actionable manner, for the events and happenings

9    hereinafter referred to, and caused injuries and damages thereby to the plaintiff, as hereinafter

10    alleged.

11

12       2. At all times herein mentioned, each of the defendants was the agent, servant, employee

13    and/or joint venturer of his co-defendants, and each of them, and at all said times, each defendant

14    was acting in the full course and scope of said agency, service, employment and/or joint venture.

15

16       3. Plaintiff is informed and believes, and thereon alleges that at all times herein mentioned,

17    defendants on Exhibits "B" - "G" and DOES 1 through 800, inclusive, were and are corporations,

18    partnerships, unincorporated associations, sole proprietorships and/or other business entities

19    organized and existing under and by virtue of the laws of the State of California, or the laws of some

20    other state or foreign jurisdiction, and that said defendants, and each of them, were and are

21    authorized to do and are doing business in the State of California, and that said defendants have

22    regularly conducted business in the County of San Francisco, State of California.

23    ///

24    ///

25    ///

26    ///

27    ///

28    ///

<div align="center">

**FIRST CAUSE OF ACTION**
(Negligence)

</div>

**PLAINTIFF COMPLAINS OF DEFENDANTS ON EXHIBITS "B" AND "D" -**
**"G", AND DOES 1-300, THEIR "ALTERNATE ENTITIES," AND EACH OF THEM,**
**AND FOR A CAUSE OF ACTION FOR NEGLIGENCE ALLEGES AS FOLLOWS:**

4. At all times herein mentioned, each of the named defendants and DOES 1 through 300 was the successor, successor in business, successor in product line or a portion thereof, assign, predecessor, predecessor in business, predecessor in product line or a portion thereof, parent, subsidiary, wholly or partially owned by, or the whole or partial owner of or member in an entity researching, studying, manufacturing, fabricating, designing, modifying, labeling, assembling, distributing, leasing, buying, offering for sale, supplying, selling, inspecting, servicing, installing, contracting for installation, repairing, marketing, warranting, re-branding, manufacturing for others, packaging and advertising a certain product, namely asbestos, and other products containing asbestos. Said entities shall hereinafter collectively be called "alternate entities." Each of the herein named defendants is liable for the tortious conduct of each successor, successor in business, successor in product line or a portion thereof, assign, predecessor in product line or a portion thereof, parent, subsidiary, whole or partial owner, or wholly or partially owned entity, or entity that it was a member of, or funded, that researched, studied, manufactured, fabricated, designed, modified, labeled, assembled, distributed, leased, bought, offered for sale, supplied, sold, inspected, serviced, installed, contracted for installation, repaired, marketed, warranted, re-branded, manufactured for others and advertised a certain product, namely asbestos, and other products containing asbestos. The following defendants, and each of them, are liable for the acts of each and every "alternate entity", and each of them, in that there has been a virtual destruction of plaintiff's remedy against each such "alternate entity"; defendants, and each of them, have acquired the assets, product line, or a portion thereof, of each such "alternate entity"; such "alternate entity"; defendants, and each of them, caused the destruction of plaintiff's remedy against each such "alternate entity"; each such defendant has the ability to assume the risk-spreading role of each such "alternate entity"; and that each such defendant

1  | enjoys the goodwill originally attached to each such "alternate entity."

2

| DEFENDANT | ALTERNATE ENTITY |
|---|---|
| ACandS, INC. | ARMSTRONG CORK CO. |
| | ARMSTRONG WORLD INDUSTRIES, INC. |
| | ARMSTRONG CONTRACTING & SUPPLY CORP. |
| A.H. VOSS COMPANY | VOSS INTERNATIONAL |
| | PACIFIC-VOSS CORPORATION |
| | ALCOBRA COMPANY |
| ALLIED SIGNAL, INC. | THE BENDIX CORPORATION |
| | ALLIED CORPORATION |
| AMCORD, INC. | RIVERSIDE CEMENT COMPANY |
| | AMERICAN CEMENT CORPORATION |
| AMERICAN CYANAMID COMPANY | BLOOMINGDALE RUBBER COMPANY |
| | BLOOMINGDALE RUBBER PRODUCTS |
| | CYTEC ENGINEERED MATERIALS |
| | CHEMICALS GROUP |
| | INDUSTRIAL CHEMICAL PRODUCTS  DIVISION |
| | AMERICAN HOME PRODUCTS CORPORATION |
| AMERICAN ENERGY PRODUCTS CORP. | SPRAYON RESEARCH CORP. |
| | SPRAYED INSULATION, INC. |
| | SPRAYON INSULATION AND ACOUSTICS, INC. |
| AMERICAN PACIFIC ROOFING COMPANY | ASBESTOS PRODUCTS COMPANY OF  SAN DIEGO |
| AMERICAN STANDARD, INC. | U.S. RADIATOR |
| | AMERICAN RADIATOR |
| | WESTINGHOUSE AIR BRAKE CORP |
| | WABCO |
| ANDRECO REFRACTORY SERVICES | A. E. ANDERSON CONSTRUCTION |
| A. P. GREEN INDUSTRIES, INC. | BIGELOW-LIPTAK CORPORATION |
| | A. P. GREEN REFRACTORIES |
| A. P. GREEN REFRACTORIES | BIGELOW-LIPTAK CORPORATION |
| | A. P. GREEN INDUSTRIES, INC. |
| A.P. GREEN SERVICES, INC. | BIGELOW-LIPTAK CORPORATION |

| | |
|---|---|
| APEX MECHANICAL | OCEAN SHORE BOILER WORKS |
| | KRAFT BOILER WORKS |
| | OCEAN SHORE IRON WORKS |
| AQUA-CHEM, INC. | CLEAVER BROOKS |
| ARMSTRONG WORLD INDUSTRIES, INC. | ARMSTRONG CORK CO. |
| | ARMSTRONG CONTRACTING & SUPPLY CORP. |
| | ASBESTOS SUPPLY CO. |
| ASBESTOS CLAIMS MANAGEMENT CORPORATION | NATIONAL GYPSUM COMPANY |
| ASBESTOSPRAY CORPORATION | PHILIP CAREY |
| | SMITH AND KANZLER CO., INC. |
| | SMITH AND KANZLER CORPORATION |
| | SPRAYED INSULATION, INC. |
| | S.K. INSULROCK CORPORATION |
| | SPRAYON RESEARCH CORPORATION |
| | SPRAYON INSULATION AND ACOUSTICS, INC. |
| | SPRAYED INSULATION INC. |
| | ASBESTOS PRODUCTS MANUFACTURING CORPORATION |
| | ASBESTOSPRAY APPLICATORS, INC. |
| | SPRAYCRAFT CORPORATION |
| ASBESTOS PRODUCTS MANUFACTURING CORPORATION | ASBESTOSPRAY CORPORATION |
| | ASBESTOSPRAY APPLICATORS, INC. |
| | ASBESTOSPRAY CORPORATION OF NEWARK, NEW JERSEY |
| ASSOCIATED INSULATION OF CALIFORNIA | OSCAR E. ERICKSON, INC. |
| ATLAS HEATING & VENTILATING | ATLAS HEATING AND AIR CONDITIONING |
| AUBURN TECHNOLOGIES, INC. | WHITE MOTOR COMPANY |
| | BOMBARDIER, INC. |
| | ALCO PRODUCTS, INC. |
| AVATAR HOLDINGS, INC. | AETNA STEEL PRODUCTS CORPORATION |
| | GAC CORPORATION |
| | GAC PROPERTIES, INC. |
| | GAC CREDIT, INC. |
| | GENERAL ACCEPTANCE CORPORATION |
| BALTIMORE ENNIS LAND CO. | GIBSON-HOMANS COMPANY |
| BIGGE CRANE AND RIGGING CORPORATION | BIGGE DEVELOPMENT COMPANY |

| | |
|---|---|
| THE BOLSTER COMPANY | C.F. BOLSTER COMPANY |
| BOMBARDIER, INC. | DRESSER INDUSTRIES, INC. |
| | M. W. KELLOGG |
| | AMERICAN LOCOMOTIVE COMPANY (ALCO) |
| | ALCO PRODUCTS, INC. |
| | WHITE MOTOR COMPANY |
| | AUBURN TECHNOLOGY, INC. |
| | U.S. MONTREAL LOCOMOTIVE WORKS |
| BORG-WARNER AUTOMOTIVE, INC. | BORG-WARNER CORPORATION |
| B.P. CHEMICALS (HITCO) INC. | HITCO |
| | U.S. POLYMERIC |
| | ARMCO |
| BELL ASBESTOS MINES, LTD. | ATLAS TURNER, INC. |
| | TURNER & NEWALL, PLC. |
| BRAGG INVESTMENT COMPANY, INC., | BAY CITIES CRANE & RIGGING, INC. |
| dba BAY CITIES CRANE & RIGGING, INC. | BRAGG CRANE & RIGGING NORTHERN |
| | OPERATIONS INC. |
| BRIDGESTONE/FIRESTONE, INC. | FIRESTONE TIRE & RUBBER CORP. |
| B.T. MANCINI CO., INC. | THE BROOKMAN CO., INC. |
| CALAVERAS CEMENT COMPANY | CBR CEMENT CORPORATION |
| | FLINTKOTE COMPANY |
| | CALAVERAS PORTLAND CEMENT COMPANY |
| CALAVERAS ASBESTOS LTD. | PACIFIC ASBESTOS CORP. |
| | JEFFERSON LAKE ASBESTOS CORP. |
| | JEFFERSON LAKE SULPHUR CORP. |
| | OCCIDENTAL PETROLEUM INVESTMENT COMPANY |
| CALIFORNIA STUCCO COMPANY | PEERLESS STUCCO |
| CALMAT COMPANY | CONSOLIDATED ROCK |
| | PORTLAND CEMENT |
| | RIVERSIDE CEMENT |
| | SOUTHWESTERN CEMENT |
| | CALIFORNIA PORTLAND CEMENT COMPANY |
| CASSIAR MINING CORP. | CASSIAR ASBESTOS COMPANY |

*PAUL & HANLEY, LLP'S MASTER COMPLAINT- ASBESTOS*
S:\Clients\Forms\Complaint Master.wpd

| | |
|---|---|
| CBR CEMENT CORPORATION | CALAVERAS CEMENT COMPANY |
| | CALAVERAS PORTLAND CEMENT COMPANY |
| | MONOLITH PORTLAND CEMENT COMPANY |
| C.D. ERICSON COMPANY, INC. | C DUANE ERICSON COMPANY, INC., |
| | CD ERICSON CO., INC. |
| CENTRAL SUPPLY COMPANY | GRANITE ROCK COMPANY |
| CERTAIN-TEED CORPORATION | KEASBEY & MATTISON |
| | GUSTIN BACON MANUFACTURING CO. |
| C.F. BOLSTER COMPANY | THE BOLSTER COMPANY |
| CHAMPLAIN CABLE CORPORATION | HAVEG INDUSTRIES |
| | REINHOLD INDUSTRIES |
| | HARVEY INDUSTRIES |
| CHARLES AYRES | CHARLES AYRES COMPANY |
| | CHARLES AYRES SUPPLY COMPANY |
| CITY LIGHTS | CALIFORNIA ELECTRIC SUPPLY CO. |
| CHRYSLER CORPORATION | AMERICAN MOTORS CORPORATION |
| COLTEC INDUSTRIES, INC. | FAIRBANKS-MORSE LOCOMOTIVES |
| | COLT INDUSTRIES |
| | GARLOCK, INC. |
| | THE ANCHOR PACKING COMPANY |
| | BELMONT PACKING |
| COMBUSTION ENGINEERING, INC. | M.H. DETRICK COMPANY |
| COMPLETE AUTO PARTS | EAST BAY AUTO SUPPLY |
| COOPER INDUSTRIES, INC. | ALCO PRODUCTS, INC. |
| | McGRAW-EDISON COMPANY |
| | STUDEBAKER-WORTHINGTON CORP. |
| CORNING INCORPORATED | CORNING GLASS CO. |
| COURTAULDS GRAFIL, INC. | HYSOL |
| CROWN COACH INCORPORATED | GENERAL ELECTRIC RAILCAR SERVICES |
| | CORPORATION |

| | |
|---|---|
| CYPRUS INDUSTRIAL MINERALS CORPORATION | SIERRA TALC AND CLAY COMPANY |
| | SIERRA TALC COMPANY |
| | PACIFIC COAST TALC COMPANY |
| | INYO TALC COMPANY |
| D. CUMMINS CORPORATION | VALLEY ASBESTOS COMPANY |
| DANA CORPORATION | VICTOR MANUFACTURING AND GASKET COMPANY |
| | SMITH AND KANZLER CO., INC. |
| | SMITH AND KANZLER CORPORATION |
| | SPRAYED INSULATION, INC. |
| | S.K.INSULROCK CORPORATION |
| | SPRAYON RESEARCH CORPORATION |
| | SPRAYON INSULATION & ACOUSTICS, INC. |
| | SPRAYED INSULATION INC. |
| DANIEL SMITH PLASTERING, INC. | DANIEL SMITH PLASTERING |
| DICALITE HOLDING, INC. | GREFCO, INC. |
| | GREAT LAKES CARBON CORPORATION |
| DRESSER INDUSTRIES, INC. | PULLMAN, INC. |
| | HARBISON WALKER REFRACTORIES |
| | M. W. KELLOGG |
| | PACIFIC PUMP WORKS |
| | WORTHINGTON PUMP & MACHINERY CO. |
| | AMERICAN LOCOMOTIVE COMPANY (ALCO) |
| DOVER CORPORATION | KAHR BEARING CORPORATION |
| | ARNOT MARINE CORPORATION |
| E. F. MITCHLER COMPANY | LODI READY MIX & BUILDING MATERIALS |
| ERICSSON RADIO SYSTEMS, INC. | ANACONDA WIRE & CABLE COMPANY |
| | THE ANACONDA COMPANY |
| | CONTINENTAL WIRE & CABLE COMPANY |
| | L.M. ERICSSON TELEPHONE COMPANY |
| ETERNIT, INC. | ETERNIT, KAPELLE |
| | KAPELLE ETERNIT |
| FAMILIAN CORPORATION | FAMILIAN PIPE & SUPPLY |
| FIBERITE, INC. | ICI COMPOSITES, INC. |
| | FIBERITE CORPORATION |
| FIBREX, INC. | FORTY-EIGHT INSULATORS, INC. |

*PAUL & HANLEY, LLP'S MASTER COMPLAINT- ASBESTOS*
S:\Clients\Forms\Complaint Master.wpd

| | |
|---|---|
| FLETCHER CONSTRUCTION NORTH AMERICA | DINWIDDIE CONSTRUCTION COMPANY |
| FLINTKOTE COMPANY | FLINTKOTE MINES, LTD. - QUEBEC |
| | CALAVERAS CEMENT COMPANY |
| | BLUE DIAMOND CORPORATION |
| | GENSTAR COMPANY |
| | BOTSWANA FIBERS, LTD. |
| | CAPASCO, LTD. |
| | PIONEER-FLINTKOTE |
| | PIONEER CORP. |
| FMC CORPORATION-TURBO PUMP OPERATION | COFFIN TURBO PUMP, INC. |
| FRASER'S BOILER SERVICE, INC. | FRASER BOILER WORKS |
| FYAR INDUSTRIES, INC. | VALLEJO BUILDING MATERIALS |
| GAF CORPORATION | RUBEROID CO. |
| | VERMONT ASBESTOS |
| GARLOCK, INC. | COLTEC INDUSTRIES, INC. |
| | FAIRBANKS-MORSE |
| | BELMONT PACKING & RUBBER CO. |
| | GARLOCK PACKING CO. |
| | U.S. GASKET CO. |
| GENERAL MOTORS CORPORATION | CHEVROLET |
| GENUINE AUTO PARTS | NAPA AUTO PARTS |
| | GENUINE PARTS COMPANY OF MICHIGAN, INC. |
| | AUTHORIZED MOTOR PARTS CORP. |
| | THE AUTOMOTIVE PARTS COMPANY |
| | GENUINE PARTS COMPANY OF WISCONSIN, INC. |
| | AUTOMOTIVE PARTS COMPANY |
| | COLYEAR MOTOR SALES COMPANY |
| | GENUINE AUTOMOTIVE PARTS COMPANY |
| | STANDARD UNIT PARTS COMPANY |
| GRANITE ROCK COMPANY | CENTRAL SUPPLY COMPANY |
| GREAT LAKES CARBON CORPORATION | DICALITE HOLDING, INC. |
| | GREFCO, INC. |
| GREFCO, INC. | DICALITE HOLDING, INC. |
| | GREAT LAKES CARBON CORPORATION |

| | | |
|---|---|---|
| 1 | H & A CONSTRUCTION | SPRAYCRAFT CORPORATION |
| 2 | | ASBESTOS PRODUCT MANUFACTURING CORP. |
| | | ASBESTOSPRAY CORP. |
| 3 | | ASBESTOSPRAY APPLICATORS, INC. |
| 4 | HAMON CORPORATION | HAMON COOLING TOWERS |
| 5 | | HAMON-SOBELCO INTERNATIONAL, INC. |
| 6 | HARWICK CHEMICAL CORPORATION | STANDARD CHEMICAL COMPANY |
| | | HARWICK STANDARD CHEMICAL COMPANY |
| 7 | | HARWICK, INC. |
| 8 | | CHEMETRON CORPORATION |
| 9 | HOFMANN CONSTRUCTION CO. | THE HOFMANN COMPANY |
| | | H&C PLASTERING |
| 10 | | H&Y PLASTICS/PREHUNG DOOR SHOPS |
| | | COMPU-TECH LUMBER COMPANY |
| 11 | | DB PETROLEUM |
| 12 | HOWDEN FAN COMPANY | B.F. STURTEVANT |
| 13 | ICI COMPOSITES, INC. | FIBERITE CORPORATION |
| 14 | INDUSTRIAL & FOUNDRY SUPPLY | PACIFIC GRAPHITE |
| 15 | | AJAX MAGNOTHERM--WARREN OH |
| 16 | | PILLAR-MILWAUKEE WI |
| | | INDUSTRIAL SAFETY SUPPLY |
| 17 | J& H MARINE & INDUSTRIAL | WILLARD MARINE DECKING CO. |
| 18 | ENGINEERING COMPANY | LORELITE |
| 19 | J. H. POMEROY & COMPANY, INC. | SANTA FE-POMEROY, INC. |
| 20 | | SANTA FE INTERNATIONAL |
| 21 | J. P. SIMPLOT COMPANY | BEST FERTILIZER |
| | | VALLEY NITROGEN |
| 22 | JIM WALTER CORP. | THE CELOTEX CORPORATION |
| 23 | | PHILIP CAREY COMPANY |
| 24 | | PANACON CORP. |
| 25 | JOHN CRANE, INC. | CRANE PACKING CO. |
| 26 | KAHR BEARING CORPORATION | AETNA STEEL PRODUCTS CORPORATION |
| | | ARNOT MARINE |
| 27 | | |
| 28 | | |

*PAUL & HANLEY, LLP'S MASTER COMPLAINT- ASBESTOS*
S:\Clients\Forms\Complaint Master.wpd

| | | |
|---|---|---|
| 1 | KEASBEY-MATTISON COMPANY | CERTAINTEED PRODUCTS CORPORATION |
| 2 | | NICOLET, INC. |
| | | TURNER & NEWALL, PLC. |
| 3 | KEENE CORPORATION | THE EHRET MAGNESIA MANUFACTURING CO. |
| 4 | | BALDWIN HILL COMPANY |
| | | BALDWIN EHRET HILL, INC. |
| 5 | | KEENE BUILDING PRODUCTS CORPORATION |
| 6 | | CROWN CORK & SEAL |
| | | MUNDET CORK COMPANY |
| 7 | | |
| 8 | KINGSFORD | C.B. HOBBS CORP. |
| 9 | KRAGEN AUTO SUPPLY CO. | NORTHERN AUTOMOTIVE CORPORATION |
| 10 | LA HABRA PRODUCTS, INC. | LA HABRA STUCCO |
| 11 | L. D. REEDER CO. | L.D. REEDER CO. OF LOS ANGELES |
| | | L.D. REEDER CO. OF SAN FRANCISCO |
| 12 | | L.D. REEDER CO. OF SACRAMENTO |
| 13 | LEAR-SIEGLER, INC. | WORLD BESTOS CO. |
| 14 | LORAL CORPORATION | GOODYEAR AEROSPACE CORPORATION |
| 15 | LORD CORPORATION | HUGHSON CHEMICALS |
| 16 | MALTBY ELECTRIC SUPPLY COMPANY, INC. | MALTBY ELECTRICAL SUPPLY COMPANY |
| 17 | MARSHCO AUTO PARTS, INC. | NATIONAL AUTO PARTS |
| 18 | | MOTOR PARTS CO. |
| 19 | McGRAW-EDISON COMPANY | TURBODYNE-EDISON POWER CORP. |
| | | WORTHINGTON CORPORATION |
| 20 | METALCLAD INSULATION COMPANY | NORTHERN CALIFORNIA INSULATION, INC. |
| 21 | | |
| 22 | MONOLITH PORTLAND CEMENT COMPANY | CBR CEMENT CORPORATION |
| | MORRISON KNUDSON CORPORATION | BANK OF AMERICA TRUST COMPANY OF NEW YORK |
| 23 | | BANK OF AMERICA NT&SA |
| 24 | | HK-FERGUSON COMPANY |
| | | MORRISON KNUDSON FOREST PRODUCTS |
| 25 | | WESTERN AIRCRAFT MAINTENANCE, INC. |
| 26 | | WESTMORELAND RESOURCES, INC. |
| | | MORRISON KNUDSON ENGINEERS, INC. |
| 27 | | MORRISON KNUDSON INTERNATIONAL CO., INC. |
| 28 | MOTOR PARTS DISTRIBUTOR, INC. | MOTOR PARTS DISTRIBUTORS OF MODESTO, INC. |

| | |
|---|---|
| NATIONAL DYNAMICS | NEBRASKA BOILER COMPANY |
| NATIONAL REFRACTORIES AND MINERAL CORPORATION | KAISER REFRACTORIES |
| | MEXICO REFRACTORIES |
| NAVISTAR INTERNATIONAL | INTERNATIONAL HARVESTER COMPANY |
| TRANSPORTATION CORPORATION | NAVISTAR INTERNATIONAL CORPORATION |
| NEBRASKA BOILER COMPANY | NATIONAL DYNAMICS |
| NORTH SAFETY | WELSH TEXTON |
| | MORTON SAFETY |
| N. V. MORAN PLUMBERS SUPPLY, INC. | MORAN SUPPLY |
| | PLUMBERS SUPPLY |
| OAKFABCO, INC. | KEWANEE BOILER CO., INC. |
| OSCAR E. ERICKSON, INC. | ASSOCIATED INSULATION OF CALIFORNIA |
| OWENS CORNING | OWENS-CORNING FIBERGLAS CORPORATION |
| | FENCO |
| | MARINE ENGINEERING |
| | FESCO |
| | FIBERGLAS ENGINEERING AND SUPPLY COMPANY |
| | FIBERGLAS ENGINEERING AND SUPPLY COMPANY OF NORTHERN CALIFORNIA |
| | OWENS-ILLINOIS, INC. |
| | OWENS-ILLINOIS GLASS COMPANY |
| | WILLIAM LANE COMPANY |
| | SILICARE INSULATION |
| | ASBESTOS ENGINEERING & SUPPLY CO. |
| PACCAR, INC. | PETERBILT TRUCK CENTER, INC. |
| PACIFIC SUPPLY | PACIFIC COAST |
| PETERSON LUMBER COMPANY | PETERSON BROTHERS SAWMILL |
| PFIZER, INC. | SOUTHERN CALIFORNIA MINERALS COMPANY |
| | C. K. WILLIAMS COMPANY |
| | KENNEDY MINERALS COMPANY |
| | DESERT MINERALS, INC. |
| | CONTINENTAL MINERALS CORPORATION |
| | GRANTHAM MINES |
| | BLUE STAR MINES |
| PHILIP CAREY CORPORATION | SMITH & KANZLER COMPANY |

| | |
|---|---|
| PIERCE ENTERPRISES | FRANK D. SMITH COMPANY |
| | LOS ANGELES LATHING |
| | PIERCE LATHING CO. |
| PILKINGTON AEROSPACE, INC. | SWEDLOW PLASTICS COMPANY |
| | PILKINGTON HOLDINGS, INC. |
| | SWEDLOW, INC. |
| PITTSBURGH-CORNING CORPORATION | UNARCO |
| PLANT INSULATION COMPANY | ASBESTOS COMPANY OF CALIFORNIA |
| | PLANT ASBESTOS COMPANY |
| PORTER WARNER INDUSTRIES,INC. | INDUSTRIAL & FOUNDRY SUPPLY |
| PPG INDUSTRIES, INC. | PITTSBURGH PLATE GLASS COMPANY |
| PUBLISHER'S PAPER CO. | PUBLISHER'S FOREST PRODUCTS |
| PULLMAN, INC. | PULLMAN TRANSPORTATION COMPANY |
| | M. W. KELLOGG |
| | DRESSER INDUSTRIES, INC. |
| QUAD C CORPORATION | FIREPROOFING, INC. |
| | STRUCTURAL FIREPROOFING, INC. |
| | YOHANAN CORPORATION |
| QUIGLEY, INC. | QUIGLEY COMPANY, INC. |
| RAPID-AMERICAN CORP. | THE PHILIP CAREY MANUFACTURING COMPANY |
| | PANACON CORPORATION |
| | PHILIP CAREY CORPORATION |
| | CAREY CANADA, INC. |
| RAYMOND INTERIOR SYSTEMS - NORTH | JAMES L. WHITTAKER |
| | WHITTAKER PLASTERING |
| | JAMES WHITTAKER, INC. |
| | GEORGE M. RAYMOND CO. - NORTH |
| | JAMES L. WHITTAKER ACOUSTICAL |
| RICH PLUMBING SUPPLY | GENERAL PLUMBING SUPPLY COMPANY |
| ROCKETDYNE | NO. AMERICAN AVIATION |
| ROCKWELL INTERNATIONAL CORPORATION | NORTH AMERICAN AVIATION |
| ROHR, INC. | ROHR INDUSTRIES, INC. |

| | |
|---|---|
| R. T. VANDERBILT COMPANY | WESTERN TALC COMPANY |
| | INTERNATIONAL TALC COMPANY |
| SAN FRANCISCO GRAVEL CO, INC. | SAN FRANCISCO SAND & GRAVEL |
| SANTA FE BRAUN, INC. | J. H. POMEROY & COMPANY, INC. |
| | SANTA FE DRILLING |
| | SANTA FE-POMEROY |
| | SANTA FE INTERNATIONAL |
| SCANDURA, INC. | THE SCANDINAVIA BELTING COMPANY |
| | SCANDURA, INCORPORATED |
| SEARIVER MARITIME, INC. | EXXON SHIPPING COMPANY |
| SIMPSON REDWOOD CO. | DOVER LUMBER CO. |
| SOUTHWESTERN PORTLAND CEMENT COMPANY | SOUTHWESTERN CEMENT ENT., INC. |
| SPRAYON RESEARCH CORPORATION | SPRAYED INSULATION INC. |
| | SPRAYON INSULATION & ACOUSTICS, INC. |
| STOCKTON BOX | AMERICAN RIVER PINE |
| STRUCTURAL COATING, INC. | AMERICAN ENERGY PRODUCTS |
| STRUCTURAL FIREPROOFING, INC. | FIREPROOFING, INC. |
| | QUAD C CORPORATION |
| SUNSET HOMES, INC. | SUNSET DEVELOPMENT |
| TELEDYNE, INC. | RYAN AERONAUTICAL CO. |
| THE HOFMAN COMPANY | HOFMANN BUILDERS |
| | HOFMAN CONSTRUCTION CO., INC. |
| THORPE INSULATION LUMBER CO. | J. T. THORPE & SON |
| | THE THORPE COMPANY |
| | ASBESTOS PRODUCTS COMPANY OF SAN DIEGO |
| | PLANT INSULATION CO. |
| | PLANT MANUFACTURING CO. |
| | THORPE PRODUCTS CO. |
| THE THORPE COMPANY | THORPE INSULATION |
| | J. T. THORPE & SON |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| | | |
|---|---|---|
| 1 | T&N PLC | TURNER ASBESTOS FIBERS, LTD. |
| 2 | | TURNER & NEWALL INTERNATIONAL, LTD. |
| | | TURNER & NEWALL, PLC. |
| 3 | | TURNER & NEWALL, LTD. |
| 4 | | KEASBEY & MATTISON COMPANY |
| | | BELL ASBESTOS MINES, LTD. |
| 5 | | TURNER BROTHERS ASBESTOS |
| 6 | | J.W. ROBERTS |
| | | HAVELOCK ASBESTOS MINES (SWAZILAND), LTD. |
| 7 | | SHABANI & MASHABA MINES (PVT), LTD. |
| 8 | | FLEXITALLIC GASKET COMPANY, INC. |
| | | NUTURN CORPORATION |
| 9 | | TURNER & NEWALL INDUSTRIES, INC. |
| 10 | | TURNER & NEWALL HOLDINGS (PTY), LTD. |
| | | CORK MANUFACTURING COMPANY |
| 11 | | KEASBEY-MATTISON COMPANY |
| 12 | | CERTAINTEED PRODUCTS CORPORATION |
| | | ATLAS-TURNER COMPANY, LTD. |
| 13 | | ATLAS ASBESTOS COMPANY, LTD. |
| 14 | | BELL ASBESTOS MINES, LTD. |
| | | CASSIAR ASBESTOS COMPANY, LTD. |
| 15 | | KEASBEY & MATTISON, INC. |
| 16 | | ATLAS TURNER, INC. |
| | | CONTINENTAL PRODUCTS CORP. |
| 17 | TURBODYNE ELECTRIC POWER CORPORATION | TURBODYNE-EDISON POWER CORP. |
| 18 | UNION PACIFIC RESOURCES COMPANY | CHAMPLIN PETROLEUM |
| 19 | UNITED STATES GYPSUM COMPANY | SPRAYON RESEARCH CORP. |
| 20 | | SMITH AND KANZLER CO., INC. |
| 21 | | SMITH AND KANZLER CORPORATION |
| | | SPRAYED INSULATION, INC. |
| 22 | | S.K. INSULROCK CORPORATION |
| 23 | | SPRAYON RESEARCH CORPORATION |
| | | SPRAYON INSULATION AND ACOUSTICS, INC. |
| 24 | | SPRAYED INSULATION INC. |
| 25 | | DURABOND |
| 26 | | |
| 27 | | |
| 28 | | |

*PAUL & HANLEY, LLP'S MASTER COMPLAINT- ASBESTOS*
S:\Clients\Forms\Complaint Master.wpd

| | | |
|---|---|---|
| 1 | UNITED STATES MINERAL PRODUCTS COMPANY | PHILIP CAREY |
| 2 | | SMITH AND KANZLER CO., INC. |
| | | SMITH AND KANZLER CORPORATION |
| 3 | | SPRAYED INSULATION, INC. |
| | | S.K. INSULROCK CORPORATION |
| 4 | | SPRAYON RESEARCH CORPORATION |
| 5 | | SPRAYON INSULATION AND ACOUSTICS, INC. |
| | | SPRAYED INSULATION INC. |
| 6 | | |
| 7 | VAN ARSDALE-HARRIS LUMBER COMPANY | VAN ARSDALE-HARRIS COMPANY |
| | | VANARCO |
| 8 | VANARCO | VAN ARSDALE-HARRIS COMPANY |
| 9 | | VAN ARSDALE-HARRIS LUMBER COMPANY |
| 10 | VENTON PLASTERING | VENTON PLASTERING, INC. |
| 11 | VON HOUSEN AUTO PARTS | VON HOUSEN MOTORS, INC. |
| 12 | | GRINZEWITSCH ENTERPRIZES, INC. |
| 13 | WEBCO, INC. | WESTERN BOILER CO. |
| 14 | WESTBURNE SUPPLY, INC. | P.E. O'HAIR & CO. |
| | | OAKLAND PLUMBING SUPPLY |
| 15 | | |
| 16 | WESTERN BRAKE | FRICTION, INC. |
| 17 | WESTERN BOILER CO. | WEBCO, INC. |
| 18 | WESTERN BUILDING PRODUCTS | G. A. R. TANK CO. |
| | | WESTERN ASBESTOS CO. |
| 19 | WESTERN MAC ARTHUR COMPANY | WESTERN ASBESTOS CO. |
| 20 | | MAC ARTHUR COMPANY |
| | | BAY CITIES ASBESTOS COMPANY |
| 21 | | |
| 22 | WEYERHAEUSER CORPORATION | WEYERHAEUSER COMPANY |
| | | WEYERHAEUSER COMPANY OF TACOMA WA |
| 23 | WILLARD MARINE DECKING CO. | J & H MARINE & INDUSTRIAL ENGINEERING |
| 24 | | COMPANY |
| | | LORELITE |
| 25 | | |
| 26 | WHITE MOTOR COMPANY | ALCO PRODUCTS, INC. |
| | | STUDEBAKER-WORTHINGTON CORP. |
| 27 | | |
| 28 | | |

| | |
|---|---|
| 1  YRUETA DRYWALL & PAINTING COMPANY | YRUETA-BASKO COMPANY |
| 2 | CARLOS YRUETA |
| | FRED YRUETA |
| 3 | HORACIO YRUETA |
| 4  YRUETA-BASKO COMPANY | YRUETA DRYWALL & PAINTING COMPANY |
| 5 | CARLOS YRUETA |
| | FRED YRUETA |
| 6 | HORACIO YRUETA |
| 7  ZURN INDUSTRIES, INC. | BUMSTEAD-WOOLFORD COMPANY |
| 8 | ERIE CITY IRON WORKS |
| | ERIE CITY BOILERS |
| 9 | KEYSTONE BOILER WORKS |

5.   At all times herein mentioned, defendants, their "alternate entities," and each of them, were and/or are engaged in the business of researching, manufacturing, fabricating, designing, modifying, labeling, assembling, distributing, leasing, buying, offering for sale, supplying, selling, inspecting, servicing, installing, contracting for installation, repairing, marketing, warranting, re-branding, manufacturing for others, packaging and advertising a certain product, namely asbestos and other products containing asbestos.

6.   At all times herein mentioned, defendants, their "alternate entities" and each of them, singularly and jointly, negligently and carelessly researched, manufactured, fabricated, designed, modified, tested or failed to test, abated or failed to abate, warned or failed to warn of the health hazards, labeled, assembled, distributed, leased, bought, offered for sale, supplied, sold, inspected, serviced, installed, contracted for installation, repaired, marketed, warranted, re-branded, manufactured for others, packaged and advertised, a certain product, namely asbestos, and other products containing asbestos, in that said products caused personal injuries to users, consumers, workers, bystanders and others, including the plaintiff herein, (hereinafter collectively called "exposed persons"), while being used in a manner that was reasonably foreseeable, thereby rendering said products unsafe and dangerous for use by "exposed persons".

///

*PAUL & HANLEY, LLP'S MASTER COMPLAINT- ASBESTOS*
S:\Clients\Forms\Complaint Master.wpd

7. Defendants, their "alternate entities," and each of them, had a duty to exercise due care in the pursuance of the activities mentioned above and defendants, and each of them, breached said duty of due care.

8. Defendant MacARTHUR COMPANY is and at all times herein was a corporation organized and existing under the laws of the State of Minnesota with its principal place of business in St. Paul, County of Ramsey, Minnesota.

9. Defendant WESTERN MacARTHUR COMPANY is a corporation organized and existing under the laws of the State of California with its principal place of business in Hayward, County of Alameda, California.

10. Defendant MacARTHUR COMPANY from May 1967 to present was the parent corporation of WESTERN MacARTHUR COMPANY and the owner of 100% of all shares of stock of WESTERN MacARTHUR COMPANY.

11. There exists, and at all times herein mentioned there existed, a unity of interest and ownership between MacARTHUR COMPANY and WESTERN MacARTHUR COMPANY such that any individuality and separateness between MacARTHUR COMPANY and WESTERN MacARTHUR COMPANY have ceased and MacARTHUR COMPANY is the alter ego of WESTERN MacARTHUR COMPANY in that:

a. WESTERN MacARTHUR COMPANY is and at all times herein mentioned was a mere shell or sham without adequate capital assets or stockholders. WESTERN MacARTHUR COMPANY was conceived, intended and used by defendant MacARTHUR COMPANY as a device to avoid liability and for the purpose of substituting a financially insolvent corporation in the place of defendant MacARTHUR COMPANY;

b. WESTERN MacARTHUR COMPANY is and at all times herein mentioned was so inadequately capitalized that compared with the business done by WESTERN MacARTHUR COMPANY and the risks of loss attendant thereto, this capitalization was illusory or trifling;

1     c.    MacARTHUR COMPANY used the assets of WESTERN MacARTHUR

2 COMPANY for its own uses and caused assets of WESTERN MacARTHUR COMPANY to be

3 transferred without adequate consideration and withdrew funds from WESTERN MacARTHUR

4 COMPANY's bank accounts for its own use;

5     d.    MacARTHUR COMPANY completely controlled, dominated, managed and operated

6

7 both WESTERN MacARTHUR COMPANY and MacARTHUR COMPANY, intermingled the

8 assets of each unit to suit the convenience of MacARTHUR COMPANY which resulted in the

9 concentration of assets in MacARTHUR COMPANY and the liabilities in WESTERN

10 MacARTHUR COMPANY to the detriment of plaintiff and creditors;

11     e.    WESTERN MacARTHUR COMPANY was a mere shell, instrumentality and conduit

12 through which MacARTHUR COMPANY carried on its business in the corporate name of

13 WESTERN MacARTHUR COMPANY exactly as it had conducted the previous incorporation,

14
exercising complete control and dominance of WESTERN MacARTHUR COMPANY to such an

15
extent that any individuality or separateness of WESTERN MacARTHUR COMPANY and

16

17 MacARTHUR COMPANY does not and at all times herein mentioned, did not exist.

18     12.   WESTERN MacARTHUR COMPANY is and at all times herein was controlled,

19 dominated and operated by MacARTHUR COMPANY as its own business and alter ego in that the

20 activities and business of WESTERN MacARTHUR COMPANY were carried on without the

21 holding of directors' or shareholders' meetings, no records or minutes of any corporate proceedings

22 were maintained, and defendant MacARTHUR COMPANY entered into beneficial transactions with

23 WESTERN MacARTHUR COMPANY without the approval of its directors.

24
     13.   Adherence to the fiction of the separate existence of WESTERN MacARTHUR

25 COMPANY as an entity distinct from MacARTHUR COMPANY would permit abuse of the

26 corporate privilege and would produce an inequitable result in that MacARTHUR COMPANY made

27

28 loans to WESTERN MacARTHUR COMPANY and guaranteed certain of its obligations thereby

1    enabling WESTERN MacARTHUR COMPANY to continue active business without adequate

2    financing and without capital stock which business continuation invited the public generally to deal

3    with defendant WESTERN MacARTHUR COMPANY and allowed it to continue in business as a

4    going concern.

5        14.    Defendants ABEX CORPORATION; ALLIED SIGNAL, INC.; THE BUDD

6    COMPANY; CARLISLE CORPORATION; CHRYSLER CORPORATION; DANA

7    CORPORATION; FORD MOTOR COMPANY; GENERAL MOTORS CORPORATION;

8    BRIDGESTONE/FIRESTONE, INC.; LEAR-SIEGLER, INC.; MAREMONT CORPORATION;

9    THIOKOL CORPORATION and WAGNER ELECTRIC produced a substantial share of the market

10   for asbestos-containing friction brake products, which products were defective as alleged herein,

11   during the time in question. Brake products produced by each of said defendants were fungible, in

12   that they were interchangeable with brake products produced by the other said defendants. Plaintiff's

13   primary exposure to asbestos fibers from brake products came during inspection and replacement

14   of worn brake products, and the producers of the brake products that caused plaintiff's injuries cannot

15   be identified, through no fault of plaintiff.

16

17

18       15.    The aforementioned asbestos-containing brake products were toxic and carcinogenic

19   and were used in conjunction with one another, all resulting in cumulative injury and harm to the

20   plaintiff herein. Plaintiff therefore alleges it is the burden of the defendants, their "alternate entities",

21   and each of them, to prove the asbestos and asbestos-containing products manufactured, sold,

22   supplied, applied or distributed by them were not the cause of plaintiff's injury in accordance with

23   the holdings of Sindell v. Abbott Laboratories (1980) 26 Cal.3d 588; Wheeler v. Raybestos-

24   Manhattan (1992) 8 Cal.App. 4th 1152 and Pereira v. Dow Chemical Company, Inc. (1982) 129

25   Cal.App.3d 865.

26

27       16.    Defendants, their "alternate entities" and each of them, knew, or should have known,

28   and intended that the aforementioned asbestos and products containing asbestos would be

1  transported by truck, rail, ship and other common carriers, that in the shipping process the products

2  would break, crumble or be otherwise damaged; and/or that such products would be used for

3  insulation, construction, plastering, fireproofing, soundproofing, automotive, aircraft and/or other

4  applications, including, but not limited to sawing, chipping, hammering, scraping, sanding, breaking,

5  removal, "rip-out", and other manipulation, resulting in the release of airborne asbestos fibers, and

6
7  that through such foreseeable use and/or handling "exposed persons", including plaintiff herein,

8  would use or be in proximity to and exposed to said asbestos fibers.

9      17.  Plaintiff has used, handled or been otherwise exposed to asbestos and asbestos-

10 containing products referred to herein in a manner that was reasonably foreseeable. Plaintiff's

11 exposure to asbestos and asbestos-containing products occurred at various locations as set forth in

12 Exhibit "A", attached to plaintiff's complaint and incorporated by reference herein.

13     18.  As a direct and proximate result of the conduct of the defendants, their "alternate

14
15 entities," and each of them, as aforesaid, plaintiff's exposure to asbestos and asbestos-containing

   products caused severe and permanent injury to the plaintiff, the nature of which, along with the date
16
17 of plaintiff's diagnosis, are set forth in Exhibit "A", attached to plaintiff's complaint and incorporated

18 by reference herein.

19     19.  Plaintiff is informed and believes, and thereon alleges, that progressive lung disease,

20 cancer and other serious diseases are caused by inhalation of asbestos fibers without perceptible

21 trauma and that said disease results from exposure to asbestos and asbestos-containing products over

22 a period of time.

23     20.  Plaintiff suffers from a condition related to exposure to asbestos and asbestos-containing

24
25 products. Plaintiff was not aware at the time of exposure that asbestos or asbestos-containing

   products presented any risk of injury and/or disease.
26
27     21.  As a direct and proximate result of the aforesaid conduct of defendants, their "alternate

28 entities", and each of them, plaintiff has suffered, and continues to suffer, permanent injuries and/or

1  future increased risk of injuries to his person, body and health, including, but not limited to,

2  asbestosis, other lung damage, and cancer, and the mental and emotional distress attendant thereto,

3  from the effect of exposure to asbestos fibers, all to his general damage in the sum in excess of the

4  jurisdictional limits of a limited civil case in the Superior Court.

5

6      22.  As a direct and proximate result of the aforesaid conduct of the defendants, their

7  "alternate entities," and each of them, plaintiff has incurred, is presently incurring, and will incur in

8  the future, liability for physicians, surgeons, nurses, hospital care, medicine, hospices, x-rays and

9  other medical treatment, the true and exact amount thereof being unknown to plaintiff at this time,

10  and plaintiff prays leave to amend this complaint accordingly when the true and exact cost thereof

11  is ascertained.

12      23.  As a further direct and proximate result of the said conduct of the defendants, their

13  "alternate entities," and each of them, plaintiff has incurred, and will incur, loss of income, wages,

14  profits and commissions, a diminishment of earning potential, and other pecuniary losses, the full

15  nature and extent of which are not yet known to plaintiff; and leave is requested to amend this

16  complaint to conform to proof at the time of trial.

17

18      24.  Defendants, their "alternate entities", and each of them, and their officers, directors and

19  managing agents participated in, authorized, expressly and impliedly ratified, and had full knowledge

20  of, or should have known of, each of the acts set forth herein.

21      25.  Defendants, their "alternate entities," and each of them, are liable for the fraudulent,

22  oppressive, and malicious acts of their "alternate entities", and each of them, and each defendant's

23  officers, directors and managing agents participated in, authorized, expressly and impliedly ratified,

24  and had full knowledge of, or should have known of, the acts of each of their "alternate entities" as

25  set forth herein.

26

27      26.  The herein-described conduct of said defendants, their "alternate entities", and each of

28  them, was and is willful, malicious, fraudulent, outrageous and in conscious disregard and

Page 22

1  indifference to the safety and health of "exposed persons". Plaintiff, for the sake of example and by

2  way of punishing said defendants, seeks punitive damages according to proof.

3      WHEREFORE, plaintiff prays judgment against defendants, their "alternate entities," and

4  each of them, as hereinafter set forth.

5
                          ## SECOND CAUSE OF ACTION
6                              (Strict Liability)

7      **AS AND FOR A SECOND, SEPARATE, FURTHER AND DISTINCT CAUSE OF
   ACTION FOR STRICT LIABILITY, PLAINTIFF COMPLAINS OF DEFENDANTS ON
8  EXHIBITS "B" AND "G", DOES 1-300, THEIR "ALTERNATE ENTITIES", AND
9  EACH OF THEM, AND ALLEGES AS FOLLOWS:**

10     27.  Plaintiff incorporates herein by reference, as though fully set forth herein, the

11  allegations contained in Paragraphs 4-5 and 8-26 of the First Cause of Action herein.

12     28.  Defendants, their "alternate entities", and each of them, knew and intended that the

13  above-referenced asbestos and asbestos-containing products would be used by the purchaser or user

14  without inspection for defects therein or in any of their component parts and without knowledge of

15  the hazards involved in such use.

16
17     29.  Said asbestos and asbestos-containing products were defective and unsafe for their

18  intended purpose in that the inhalation of asbestos fibers causes serious disease and/or death. The

19  defect existed in the said products at the time they left the possession of defendants, their "alternate

20  entities," and each of them. Said products did, in fact, cause personal injuries, including asbestosis,

21  other lung damage, and cancer to "exposed persons", including plaintiff herein, while being used in

22  a reasonably foreseeable manner, thereby rendering the same defective, unsafe and dangerous for

23  use.

24
25     30.  "Exposed persons" did not know of the substantial danger of using said products. Said

26  dangers were not readily recognizable by "exposed persons". Said defendants, their "alternate

27  entities", and each of them, further failed to adequately warn of the risks to which plaintiff and others

28  similarly situated were exposed.

*PAUL & HANLEY, LLP'S MASTER COMPLAINT- ASBESTOS*
S:\Clients\Forms\Complaint Master.wpd

31. In researching, manufacturing, fabricating, designing, modifying, testing or failing to test, warning or failing to warn, labeling, assembling, distributing, leasing, buying, offering for sale, supplying, selling, inspecting, servicing, installing, contracting for installation, repairing, marketing, warranting, re-branding, manufacturing for others, packaging and advertising asbestos and asbestos-containing products, defendants, their "alternate entities", and each of them, did so with conscious disregard for the safety of "exposed persons" who came in contact with said asbestos and asbestos-containing products, in that said defendants, their "alternate entities", and each of them, had prior knowledge that there was a substantial risk of injury or death resulting from exposure to asbestos or asbestos-containing products, including, but not limited to, asbestosis, other lung damages and cancer. Said knowledge was obtained, in part, from scientific studies performed by, at the request of, or with the assistance of, said defendants, their "alternate entities", and each of them, and which knowledge was obtained by said defendants, their "alternate entities", and each of them on or before 1930, and thereafter.

32. On or before 1930, and thereafter, said defendants, their "alternate entities" and each of them, were aware that members of the general public and other "exposed persons", who would come in contact with their asbestos and asbestos-containing products, had no knowledge or information indicating that asbestos or asbestos-containing products could cause injury, and said defendants, their "alternate entities", and each of them, knew that members of the general public and other "exposed persons", who came in contact with asbestos and asbestos-containing products, would assume, and in fact did assume, that exposure to asbestos and asbestos-containing products was safe, when in fact said exposure was extremely hazardous to health and human life.

33. With said knowledge, said defendants, their "alternate entities", and each of them, opted to research, manufacture, fabricate, design, modify, label, assemble, distribute, lease, buy, offer for sale, supply, sell, inspect, service, install, contract for installation, repair, market, warrant, re-brand, manufacture for others, package and advertise said asbestos and asbestos-containing products

1  without attempting to protect "exposed persons" from or warn "exposed persons" of, the high risk

2  of injury or death resulting from exposure to asbestos and asbestos-containing products. Rather than

3  attempting to protect "exposed persons" from, or warn "exposed persons" of, the high risk of injury

4  or death resulting from exposure to asbestos and asbestos-containing products, defendants, their

5  "alternate entities", and each of them, intentionally failed to reveal their knowledge of said risk, and

6
7  consciously and actively concealed and suppressed said knowledge from "exposed persons" and

8  members of the general public, thus impliedly representing to "exposed persons" and members of

9  the general public that asbestos and asbestos-containing products were safe for all reasonably

10  foreseeable uses. Defendants, their "alternate entities", and each of them, engaged in this conduct

11  and made these implied representations with the knowledge of the falsity of said implied

12  representations.

13      34. The above-referenced conduct of said defendants, their "alternate entities", and each of

14  them, was motivated by the financial interest of said defendants, their "alternate entities", and each

15  of them, in the continuing, uninterrupted research, design, modification, manufacture, fabrication,

16
17  labeling, assembly, distribution, lease, purchase, offer for sale, supply, sale, inspection, installation,

18  contracting for installation, repair, marketing, warranting, re-branding, manufacturing for others,

19  packaging and advertising of asbestos and asbestos-containing products. In pursuance of said

20  financial motivation, said defendants, their "alternate entities", and each of them, consciously

21  disregarded the safety of "exposed persons" and in fact were consciously willing and intended to

22  permit asbestos and asbestos-containing products to cause injury to "exposed persons" and induced

23  persons to work with and be exposed thereto, including plaintiff.

24      35.  Plaintiff alleges that the aforementioned defendants, their "alternate entities", and each

25  of them impliedly warranted their asbestos and asbestos-containing products, to be safe for their

26  of them impliedly warranted their asbestos and asbestos-containing products, to be safe for their

27  intended use but that their asbestos and asbestos-containing products, created an unreasonable risk

28  of bodily harm to exposed persons.

36. Plaintiff further alleges his injuries are a result of cumulative exposure to asbestos and various asbestos-containing products manufactured, fabricated, inadequately researched, designed, modified, inadequately tested, labeled, assembled, distributed, leased, bought, offered for sale, supplied, sold, inspected, serviced, installed, contracted for installation, repaired, marketed, warranted, re-branded, manufactured for others, packaged and advertised by the aforementioned defendants, their "alternate entities", and each of them and that plaintiff cannot identify precisely which asbestos or asbestos-containing products caused the injuries complained of herein.

37. Plaintiff relied upon defendants', their "alternate entities' ", and each of their representations, lack of warnings, and implied warranties of fitness of asbestos and their asbestos-containing products. As a direct, foreseeable and proximate result thereof, plaintiff has been injured permanently as alleged herein.

38. As a direct and proximate result of the actions and conduct outlined herein, plaintiff has suffered the injuries and damages previously alleged.

WHEREFORE, plaintiff prays judgment against defendants, their "alternate entities", and each of them, as hereinafter set forth.

### THIRD CAUSE OF ACTION
#### (False Representation Under Restatement of Torts Section 402-B)

**AS AND FOR A FURTHER, THIRD, SEPARATE AND DISTINCT CAUSE OF ACTION FOR FALSE REPRESENTATION UNDER RESTATEMENT OF TORTS SECTION 402-B, PLAINTIFF COMPLAINS OF DEFENDANTS ON EXHIBITS "B" AND "G", DOES 1-300, THEIR "ALTERNATE ENTITIES", AND EACH OF THEM, AND ALLEGES AS FOLLOWS:**

39. Plaintiff hereby incorporates by reference, as though fully set forth herein, each and every allegation contained in the First and Second Causes of Action.

40. At the aforementioned time when defendants, their "alternate entities", and each of them, researched, manufactured, fabricated, designed, modified, tested or failed to test, inadequately warned or failed to warn, labeled, assembled, distributed, leased, bought, offered for sale, supplied,

## SEVENTEENTH CAUSE OF ACTION
### (Negligence - Survival)

**PLAINTIFF(S) AS LEGAL HEIRS TO DECEDENT COMPLAIN OF DEFENDANTS ON EXHIBITS "B" AND "D" - "G", AND DOES 1-300, THEIR "ALTERNATE ENTITIES," AND EACH OF THEM, AND FOR A CAUSE OF ACTION FOR NEGLIGENCE (SURVIVAL) AND ALLEGE AS FOLLOWS:**

146. Plaintiffs bring this action pursuant to Section 377.30 of the Code of Civil Procedure.

147. Plaintiff, by this reference, incorporates as though fully set forth herein, each and every paragraph of the First Cause of Action.

148.    By reason of the foregoing, plaintiff is entitled to receive from said defendants, their "alternate entities," and each of them, maintenance and cure from the time plaintiff became disabled from work by reason of his injuries, illnesses, disabilities, and damages, at a reasonable rate per day.

WHEREFORE, plaintiff prays judgment against defendants, their "alternate entities," and each of them, as hereinafter set forth.

## EIGHTEENTH CAUSE OF ACTION -- STRICT LIABILITY
### (Survival)

**AS AND FOR AN EIGHTEENTH, SEPARATE, FURTHER AND DISTINCT CAUSE OF ACTION FOR STRICT LIABILITY, PLAINTIFF, AND THE LEGAL HEIRS TO DECEDENT, COMPLAIN OF DEFENDANTS ON EXHIBITS "B" AND "G", DOES 1-300, THEIR "ALTERNATE ENTITIES", AND EACH OF THEM, AND ALLEGE AS FOLLOWS:**

149. Plaintiffs incorporate herein by reference, as though fully set forth herein, the allegations contained in Paragraphs 1-5 and 8-27 of the First Cause of Action herein and the allegations contained in the Second Cause of Action..

150. As a direct and proximate result thereof, decedent suffered the injuries, death and damages previously alleged.

1    WHEREFORE, plaintiffs pray judgment against defendants, their "alternate entities", and

2  each of them, as hereinafter set forth.

3
### NINETEENTH CAUSE OF ACTION -- FALSE REPRESENTATION UNDER
4          ### RESTATEMENT OF TORTS SECTION 402-B
5                    **(Survival)**

**AS AND FOR A FURTHER, NINETEENTH, SEPARATE AND DISTINCT CAUSE**
6  **OF ACTION FOR FALSE REPRESENTATION UNDER RESTATEMENT OF TORTS**
7  **SECTION 402-B, PLAINTIFF AND LEGAL HEIRS TO DECEDENT  COMPLAIN OF**
   **DEFENDANTS ON EXHIBITS "B" AND "G", DOES 1-300, THEIR "ALTERNATE**
8  **ENTITIES", AND EACH OF THEM, AND ALLEGE AS FOLLOWS:**

9    151.  Plaintiff hereby incorporates by reference, as though fully set forth herein, each and
10
11  every allegation contained in the First and Second Causes of Action.

12    152.  As a direct and proximate result of said false representations by defendants, their

13  "alternate entities", and each of them, decedent  sustained the injuries, death  and damages herein
14
15  above set forth.

16    WHEREFORE, plaintiffs pray judgment against defendants, their "alternate entities", and

17  each of them, as hereinafter set forth.

18
### TWENTIETH CAUSE OF ACTION -- INTENTIONAL TORT
19                    **(Survival)**
20
**AS AND FOR A FURTHER, TWENTIETH, SEPARATE AND DISTINCT CAUSE**
21  **OF ACTION FOR AN INTENTIONAL TORT UNDER CIVIL CODE SECTIONS 1708**
   **THROUGH 1710, PLAINTIFF AND THE LEGAL HEIRS TO DECEDENT , COMPLAIN**
22  **OF DEFENDANTS ON  EXHIBITS "B" AND "G", DOES 1-300, THEIR "ALTERNATE**
23  **ENTITIES," AND EACH OF THEM, AND ALLEGE AS FOLLOWS:**

24    153.  Plaintiff, by this reference, hereby incorporates by reference, as though fully set forth
25
26  herein, each and every allegation contained in the First and Third Causes of Action herein excepting

27  therefrom allegations pertaining to negligence.

28    WHEREFORE, plaintiff prays judgment as is hereinafter set forth.

*PAUL & HANLEY, LLP'S MASTER COMPLAINT- ASBESTOS*
S:\Clients\Forms\Complaint Master.wpd

## TWENTY-FIRST CAUSE OF ACTION -- NEGLIGENCE
### (Wrongful Death)

AS AND FOR A FURTHER, TWENTY-FIRST, SEPARATE AND DISTINCT CAUSE OF ACTION FOR WRONGFUL DEATH, PLAINTIFFS, COMPLAIN OF DEFENDANTS ON EXHIBIT "B" - "G", DOES 1-300, THEIR "ALTERNATE ENTITIES" AND EACH OF THEM AND ALLEGES AS FOLLOWS:

154. Plaintiff incorporates by reference Paragraphs 2-23 of the First Cause of Action as though fully set forth herein.

155. Plaintiff brings this action as specified in Section 377.60 of the Code of Civil Procedure.

156. The heirs at law of the decedent and their relationship to the decedent is set forth in paragraph 4.

157. The individuals set forth as heirs constitute all of the surviving heirs of decedent pursuant to Section 377.60 of the California Code of Civil Procedure.

158. Defendants DOES 801-820 are, in fact, heirs of plaintiff's decedent entitled to recover damages under California Code of Civil Procedure Section 377.60. Plaintiff has not at this time ascertained the true names of said defendants and, therefore, name them as nominal defendants pursuant to California Code of Civil Procedure Section 382. Plaintiff will seek leave of this Court to realign said defendants as plaintiffs at the time of the trial of this action.

159. As a direct and proximate result of the conduct of the defendants, their "alternate entities," and each of them, as aforesaid, the exposure to asbestos and asbestos-containing products caused decedent to develop diseases from which condition decedent died. Plaintiff was unaware that death was caused by asbestos-related disease until within one year of filing complaint.

160. At all times prior to his death, decedent was a faithful and dutiful spouse to

1  plaintiff and a dutiful parent to plaintiffs.

2      161. As a direct and proximate result of the conduct of defendants, and each of them,

3
4  and the death of decedent, decedent's heirs have sustained pecuniary loss resulting from the loss of

5  care, society, comfort, attention, services, and support of decedent all to the damage of decedent's

6  heirs.

7      162. As a further direct and proximate result of the conduct of defendants, and each

8
9  of them, and the death of decedent, decedent's heirs have incurred funeral expenses in an amount

10  currently not ascertained.

11      WHEREFORE, plaintiff prays judgment against defendant, and each of them, as is

12
13  hereinafter set forth.

14  ## TWENTY-SECOND CAUSE OF ACTION - STRICT LIABILITY
15  ### (Wrongful Death)

16  **AS AND FOR A TWENTY-SECOND, SEPARATE, FURTHER AND DISTINCT
17  CAUSE OF ACTION FOR WRONGFUL DEATH, PLAINTIFFS COMPLAIN OF
   DEFENDANTS ON EXHIBITS "B" - "G", DOES 1-300, THEIR "ALTERNATE ENTITIES",
18  AND EACH OF THEM, AND ALLEGE AS FOLLOWS:**

19      163. Plaintiff incorporates herein by reference, as though fully set forth herein,

20
21  Paragraphs 1-6 and 9-24 of the First Cause of Action, Paragraphs 29-38 of the Second Cause of

22  Action, and Paragraphs 51-58 of the Fifth Cause of Action herein.

23      164. As a direct and proximate result of the conduct of defendants, and each of them,

24
25  decedent's heirs have sustained the injuries and damages previously alleged.

26  ///

27  ///

28

*PAUL & HANLEY, LLP'S MASTER COMPLAINT- ASBESTOS*
S:\Clients\Forms\Complaint Master.wpd

WHEREFORE, plaintiffs pray judgment against defendants, their "alternate entities", and each of them in an amount to be proved at trial in each individual case, as follows:

      1.    For plaintiff's general damages according to proof;

      2.    For plaintiff's loss of income, wages and earning potential according to proof;

      3.    For plaintiff's medical and related expenses according to proof;

      4.    For plaintiff's spouse's damages for loss of consortium according to proof;

      5.    For plaintiffs' cost of suit herein;

      6.    For exemplary or punitive damages according to proof;

      7.    For damages for fraud according to proof; and

      8.    For such other and further relief as the Court may deem just and proper, including costs and prejudgment interest as provided in C.C.P. §998, C.C.P. §1032 and related provisions of law

DATED: September 7, 2000           PAUL & HANLEY, LLP


By: _____
           Dean A. Hanley, Esq.
           Attorney for Plaintiffs

## EXHIBIT "C"

# Superior Court of California, County of San Francisco

LISTEN
TEXT ONLY
PRINT
A
A
A

## Defendants' Standard Set 2 (Wrongful Death)

Plaintiff(s),

vs.

Defendant(s).

NO.

**DEFENDANTS' STANDARD INTERROGATORIES TO PLAINTIFF**

**(Wrongful Death), Set 2**

_____/

PROPOUNDING PARTY:

RESPONDING PARTY:

SET NUMBER:

Defendants.

Two

### INTRODUCTION

Pursuant to San Francisco General Order No. 129 each plaintiff in the abovecaptioned asbestos litigation is required to respond to the following standard interrogatories, Set 2, separately and fully in writing, under oath, pursuant to Code of Civil Procedure section 2030 no less than 30 days before commencement of the deposition of the plaintiff or in the event of notice of the plaintiff's deposition by the plaintiff's attorney, contemporaneous with plaintiff's service of the notice of deposition. In responding to these standard interrogatories, Set 2, YOU are required to furnish all information that is available to YOU, except that where specified, you are also required to include information available to YOUR attorney(s). If YOU cannot answer a supplemental standard interrogatory completely, answer it to the fullest extent possible and specify the reason(s) for YOUR inability to respond fully.

If any defendant objects to the responses to these supplemental interrogatories, any one defendant may move to compel appropriate responses under the applicable California Code of Civil Procedure sections and after complying with California Rules of Court and Local Rules of Court.

### DEFINITIONS

1. "AREA" means the name of the specific structure, building, building number, floor of the building, ship compartment, process line, unit, piece of equipment or other specific place within the WORKSITE.

2. "ASBESTOSCONTAINING MATERIAL" means a material or product which consists of, or contains the mineral asbestos.

3. "CONTROL" means the act(s) of directing the manner and/or methods of conducting the work at a WORKSITE.

4. "DECEDENT" means the deceased individual whose claimed asbestos exposure forms the basis of the allegations underlying this lawsuit.

5. "DESCRIBE" as it relates to material means provide a complete description of the material including but not limited to: the material name, manufacturer, supplier, distributor, color, texture, consistency, shape, size and any markings; a description of the material's container including size, color and all writing on that container; and a description of how the material was used.

6. "DOCUMENTS" means any writing, as defined in Evidence Code Section 250, and includes the original or a copy of handwriting, typewriting, printing, photostating, photographing, computer printout, and every other means of recording upon any tangible thing or form of communication or representation including letters, words, pictures, sounds or symbols or combinations of them.

7. "IDENTIFY" as it relates to a DOCUMENT means provide the title of the DOCUMENT, the date the DOCUMENT was generated, the name of the author of the DOCUMENT, a description of the DOCUMENT (e.g., letter, memorandum, report, book, photograph, etc.) and any other information which would be required to specify the DOCUMENT in a request for production of DOCUMENTS issued pursuant to Code of Civil Procedure Section 2031.

8. "IDENTIFY" as it relates to an employer means to state the employer's name, address and telephone number.

9. "IDENTIFY" as it relates to a person means to provide the name, place of employment, job title, address and telephone number for each person.

10. "IDENTIFY" as it relates to a ship means to state the name of the ship, the owner of the ship, the operator of the ship, the type of ship, and the hull number of the ship.

11. "LOCATION" means the city, state, country, street address, intersection or shipyard. For work aboard ship, please IDENTIFY the ship and where it was located during the time DECEDENT worked on board.

12. "OCCASION" refers to a day, any part of a day, or a series of day(s), week(s), month(s) or year(s) during which DECEDENT worked continuously at a WORKSITE.

13. "RAW ASBESTOS" means asbestos fiber mined or milled, either packaged or in bulk, but not compounded with other substances and essentially pure with the exception of naturally occurring trace amounts of other substances.

14. "RESPONSIBLE PARTY" means any person, business organization, or enterprise, including but not limited to the defendants in this action.

15. "SAFETY PRECAUTION" means respirators, masks, fans, air blowers, tarps, wetdown procedures, isolation and any other equipment and/or methods used to limit or prevent exposure to dust.

16. "WORKSITE" means any LOCATION where DECEDENT worked at any time.

17. "YOU" and "YOUR" refer to the person who is named above as the responding party. If more than one responding party is named, "YOU" and "YOUR" refer to each responding party separately, not jointly.

## INTERROGATORIES

1. For each of DECEDENT'S WORKSITES, please state:

A. The name of the WORKSITE;

B. The LOCATION of the WORKSITE;

C. As precisely as possible, the time period you worked at the WORKSITE, including the total number of days you worked at the WORKSITE.

D. The name and address of each of DECEDENT'S employers;

E. DECEDENT'S job title(s);

F. Each kind of work DECEDENT performed at the WORKSITE;

G. Whether there was one or more OCCASIONS when DECEDENT worked with or around RAW ASBESTOS or ASBESTOSCONTAINING MATERIAL(S) at the WORKSITE. For subsequent OCCASIONS at a given WORKSITE, information which is unchanged need not be repeated. If "yes" for each OCCASION, please state:

1. The specific AREA within the WORKSITE where DECEDENT worked with or around RAW ASBESTOS or ASBESTOSCONTAINING MATERIAL(S);

2. As precisely as possible, the time period of each such OCCASION, including the total number of days of each such

3. IDENTIFY all person(s) who directed DECEDENT's daytoday work activity and that person(s) employer;

4. IDENTIFY all persons who were DECEDENT'S coworkers on this OCCASION;

5. IDENTIFY all persons who have information regarding DECEDENT'S work with or around RAW ASBESTOS or ASBESTOSCONTAINING MATERIAL(S) on this OCCASION;

6. List each contractor YOU and/or YOUR attorney allege installed and/or removed ASBESTOSCONTAINING MATERIAL(S) during YOUR work at that site;

7. List each contractor YOU and/or YOUR attorney allege installed and/or removed ASBESTOSCONTAINING MATERIAL(S) prior to YOUR work at that site;

8. IDENTIFY all documents in YOUR possession or under YOUR control relating to DECEDENT'S work on this OCCASION including but not limited to: travel logs, diaries, work logs, calendars, time sheets, photographs, drawings, and union logs or summaries;

9. IDENTIFY all other DOCUMENTS of which YOU or YOUR attorneys are aware relating to DECEDENT'S work on this OCCASION, including but not limited to: time sheets, invoices, purchase orders, contracts, specifications, photographs, drawings, job logs, work requests and union dispatch slips;

10. State whether DECEDENT installed, removed, disturbed or handled RAW ASBESTOS or ASBESTOSCONTAINING MATERIAL(S) during the OCCASION. If "yes":

a. DESCRIBE each RAW ASBESTOS or ASBESTOSCONTAINING MATERIAL(S) DECEDENT installed, removed, disturbed or handled during the OCCASION;

b. DESCRIBE specifically the work DECEDENT performed regarding each RAW ASBESTOS or ASBESTOSCONTAINING MATERIAL including whether the work was performed indoors or outside;

c. State whether DECEDENT'S employer took any SAFETY PRECAUTIONS to protect DECEDENT from breathing dust. If "yes", describe each SAFETY PRECAUTION taken;

d. State whether DECEDENT'S union or employee association took any SAFETY PRECAUTIONS to protect DECEDENT from breathing dust. If "yes", describe each SAFETY PRECAUTION taken; and

e. State whether DECEDENT took any SAFETY PRECAUTIONS to protect him/her from

breathing dust. If "yes", describe each SAFETY PRECAUTION taken.

l1. State whether YOU allege any exposure to asbestos from RAW ASBESTOS or ASBESTOSCONTAINING MATERIAL(S) other than those DECEDENT personally installed, removed, disturbed or handled himself/herself during the OCCASION. If "yes":

a. Describe specifically the work DECEDENT performed during the OCCASION, including whether the work was performed inside or outside;

b. DESCRIBE each RAW ASBESTOS or ASBESTOSCONTAINING MATERIAL(S) that released the asbestos fibers to which YOU allege exposure to DECEDENT;

c. List the trade(s) using the RAW ASBESTOS or ASBESTOSCONTAINING MATERIAL(S) and IDENTIFY the employer of each trade;

d. Describe the manner in which each trade used the RAW ASBESTOS or ASBESTOSCONTAINING MATERIAL(S) (for example: installed, removed, disturbed or handled);

e. Describe

i. The AREA where the trades using the RAW ASBESTOS or ASBESTOSCONTAINING MATERIAL(S) worked, and;

ii. The approximate distance from that AREA to the area where DECEDENT worked;

f. State whether DECEDENT'S employer took any SAFETY PRECAUTIONS to protect DECEDENT from breathing dust (for example, work segregation, ventilation, wetdown, hazard education, working signs, respiratory protection). If "yes", describe each SAFETY PRECAUTION taken;

g. State whether DECEDENT'S union or employee association took any SAFETY PRECAUTIONS to protect DECEDENT from breathing dust. If "yes", describe each SAFETY PRECAUTION taken; and

h. State whether DECEDENT took any SAFETY PRECAUTIONS to protect himself/herself from breathing dust. If "yes", describe each SAFETY PRECAUTION taken.

2. If you are aware that any person YOU have identified in Supplemental Standard Interrogatory No. 1 has had his or her deposition taken, identify the deposition by the name of the deponent, the date the deposition was taken, the caption and number of the action in which it was taken, the court which had jurisdiction over the action in which it was taken (including state and county), and either the name and address of the court reporting agency which took the deposition or the name and address of deponent's counsel of record.

3. Either (1) attach all DOCUMENTS evidencing the information sought in these interrogatories and their subparts to your answers to these interrogatories, or (2) attach disks containing such data, or (3) describe such DOCUMENTS with sufficient particularity that they may be made the subject of a request for production of documents.

1  Dean A. Hanley, Esq.   (State Bar No. 169507)
   Deborah R. Rosenthal, Esq. (State Bar No. 184241)
2  PAUL AND HANLEY LLP
   1608 Fourth Street, Suite 300
3  Berkeley, California 94710
   Telephone:  (510) 559-9980
4  Facsimile:   (510) 559-9970
   dhanley@paulandhanley.com
5  drosenthal@paulandhanley.com

6  Attorneys for Plaintiffs

7

8

9            UNITED STATES DISTRICT COURT

10          NORTHERN DISTRICT OF CALIFORNIA

11             SAN FRANCISCO DIVISION

12  JERI REDMAN, individually and as          ) Case No.: 08-cv-03013-BZ
    successor-in-interest to RONALD REDMAN,   )
13  deceased; and JERI REDMAN, AMY            ) **EXHIBITS D-E TO DECLARATION OF**
    REDMAN, DAVID C. REDMAN, MARK             ) **DEBORAH R. ROSENTHAL IN**
14  REDMAN and PAUL REDMAN, as legal          ) **SUPPORT OF PLAINTIFFS' MOTION**
    heirs of RONALD REDMAN, deceased,         ) **FOR REMAND AND FOR COSTS AND**
15                                            ) **EXPENSES INCURRED AS A RESULT**
                                              ) **OF REMOVAL**
16         Plaintiffs,                        )
                                              ) [28 U.S.C. § 1447(c); FRCP 7(b); ND CA Local Rules
17  vs.                                       ) 7-2, 7-4 & 7-5]
                                              )
18  A.W. CHESTERTON, et al.,                  )
                                              ) Date:        September 5, 2008
19         Defendants.                        ) Time:        9:00 a.m.
                                              ) Courtroom:   2, 17th Floor
20  _____      ) Judge:       Jeffrey White

21

22

23

24  //
25  //
    //
26  //
    //
27  //
    //
28
   **NOTICE OF MOTION AND MOTION FOR REMAND AND FOR COSTS AND EXPENSES INCURRED AS A RESULT OF**
   **REMOVAL**                                                                              PAGE 1
   S:\Clients\Plaintiffs\R\Redman, Ronald 10267\Fed Court Action\VIAD remand motion - Exh D-E.doc

**EXHIBIT "D"**

1 | Dean A. Hanley, Esq.   (State Bar No. 169507)
Carlos J.E. Guzman, Esq.  (State Bar No. 219185)
2 | PAUL & HANLEY LLP
1608 Fourth Street, Suite 300
3 | Berkeley, California 94710
Telephone:  (510) 559-9980
4 | Facsimile:   (510) 559-9970

5 | Attorneys for Plaintiff(s)

6

7

8 | SUPERIOR COURT OF THE STATE OF CALIFORNIA

9 | COUNTY OF SAN FRANCISCO-COURT OF UNLIMITED JURISDICTION

10

11 | JERI REDMAN, individually and as ) Case No.: 274617
12 | successor-in-interest to RONALD REDMAN, )
deceased; and JERI REDMAN, AMY ) **PLAINTIFF'S RESPONSES TO**
13 | REDMAN, DAVID C. REDMAN, MARK ) **DEFENDANTS' STANDARD**
REDMAN and PAUL REDMAN, as legal ) **INTERROGATORIES - SET TWO**
14 | heirs of RONALD REDMAN, deceased, )
) **(Wrongful Death)**
15 | Plaintiffs, )
)
16 | vs. )
)
A.W. CHESTERTON COMPANY, et al. )
17 | )
Defendants. )
18 | )

19 | **PROPOUNDING PARTY:** Defendants

20 | **RESPONDING PARTY:**   Plaintiff Jeri  Redman

21 | **SET NUMBER:**        Two

22 | **RESPONSE TO INTERROGATORY No. 1:**

23 | 1A.   Newport News Shipbuilding and Drydock, Newport News VA
1B.   Plaintiff Jeri Redman incorporates plaintiff's response to Interrogatory No. 1(A), above,
24 |       as though fully stated herein.
1C.   Decedent worked at this jobsite from approximately sometime during the dates January,
25 |       1957 to approximately December, 1967. Plaintiff Jeri  Redman's best present estimation
        of the Decedent's total cumulative time at this jobsite is 10 years.  Plaintiff Jeri  Redman
26 |       's best present estimation of DecedentRONALD D. REDMAN's total number of different
        jobs or projects at this jobsite is 1.
27 | 1D.   Decedent RONALD D. REDMAN's employer at this jobsite was Newport News
28 |       Shipbuilding and Drydock, Newport News VA.  Decedent RONALD D. REDMAN's

11. Decedent RONALD D. REDMAN worked in close proximity to persons who were installing, removing, handling and otherwise disturbing asbestos-containing materials while employed at this site.

a. Plaintiff Jeri Redman incorporates Response to Interrogatory No. 20(F) and Interrogatory No. 20(G)(10)(a), above, as though fully stated herein.

b. Plaintiff Jeri Redman identifies persons in decedent's close proximity installing, removing, handling and/or otherwise disturbing various asbestos-containing materials in close proximity to Decedent's work area while Decedent was employed at this site, including but not necessarily limited to, that itemized in plaintiff's Responses to Interrogatory Nos. 20(F) and 20(G)(10)(a), above. Plaintiff incorporates plaintiff's Responses to Interrogatory Nos. 20(F) and 20(G)(10)(a), above, as though fully stated herein. Plaintiff Jeri Redman is not an expert in the identification of asbestos-containing materials and may not be aware of all of the asbestos-containing materials at this worksite which Decedent or others installed, removed, disturbed and/or handled.

c. To the extent that plaintiff Jeri Redman knows such information, it is itemized in plaintiff's Responses to Interrogatory Nos. 20(F) and 20(G)(10)(a), above. Plaintiff incorporates plaintiff's Responses to Interrogatory Nos. 20(F) and 20(G)(10)(a), above, as though fully stated herein. Such information is more available to defendants than plaintiff. Decedent RONALD D. REDMAN worked in close proximity to various trades that were disturbing asbestos-containing materials, including, but not limited to, the following: boilermakers, drillers, drywall installers, electricians, HVAC installers, insulators, laborers, machinists, joiners, masons, painters, pipefitters, plumbers, riggers, sandblasters, scalers, sheetmetal workers, steamfitters, tool room attendants, welders, carpenters, sheetrockers, tapers, sanders and other trades. All such trades were employed by the premise owner and other contractors, including but not necessarily limited to those itemized in plaintiff's Responses to Interrogatory Nos. 20(F) and 20(G)(10)(a), above. Plaintiff's investigation and discovery are continuing.

d. Such trades installed, removed, distributed, loaded, unloaded, cut, swept and/or otherwise disturbed asbestos-containing thermal insulation materials.

e. i. Such work occurred in virtually every area within the jobsite.
   ii. Decedent worked within approximately 1 to 50 feet from the area where such trades were working and disturbing asbestos-containing thermal insulation materials.
f. - h. No.

21A.   USS JOHN KING
21B.   Plaintiff Jeri Redman incorporates plaintiff's response to Interrogatory No. 21(A), above, as though fully stated herein.
21C.   Decedent worked at this jobsite from approximately sometime during the dates January, 1974 to approximately December, 1984. Plaintiff Jeri Redman's best present estimation of the Decedent's total cumulative time at this jobsite is 10 years. Plaintiff Jeri Redman 's best present estimation of DecedentRONALD D. REDMAN's total number of different jobs or projects at this jobsite is 1.
21D.   Decedent RONALD D. REDMAN's employer at this jobsite was Norfolk Naval Shipyard. Decedent RONALD D. REDMAN's employer's address is equally available

| | |
|---|---|
| 1 | to all parties through decedent's social security, union and other equally available records. All such documents have been sought by plaintiff Jeri Redman's counsel and made available to designated defense counsel by authorization. To the extent that any of these documents are in possession of counsel, they have been copied to designated defense counsel. |
| 2 | |
| 3 | |
| 4 | 21E. Plaintiff refers to and incorporates herein by reference response to 21G(10)(a) below. |
| | 21F. Plaintiff refers to and incorporates herein by reference response to 21G(10)(a) below. |
| 5 | 21G. Decedent RONALD D. REDMAN suffered occupational exposure to asbestos while working at this jobsite. |
| 6 | 1. Decedent RONALD D. REDMAN worked throughout the jobsite. |
| | 2. Plaintiff Jeri Redman incorporates response to Interrogatory No. 21(C), above. |
| 7 | 3. Decedent RONALD D. REDMAN was employed by Norfolk Naval Shipyard and his direct supervisor was an employee of his employer. The day-to-day work activities of all |
| 8 | such contractors were ultimately directed by the premises owner and other hiring contractors. To the extent that Plaintiff Jeri Redman is able to identify any supervisors |
| 9 | of Decedent RONALD D. REDMAN, they are identified in Response to Interrogatory No. 21(G)(4), below, incorporated herein by reference as though full stated. |
| 10 | 4. Other than information protected by the attorney-client privilege, Decedent's co-workers included, but are not limited to, all persons listed at this jobsite, if any, and in |
| 11 | Exhibit 'A', attached hereto. Decedent worked with the following co-workers: Darryl Flattum. Additionally, Decedent RONALD D. REDMAN worked with and around the |
| 12 | following coworkers, but plaintiff is unable at this time to identify all of the various locations where Decedent worked with them: Neff Matthews. |
| 13 | 5. Plaintiff Jeri Redman incorporates Response to Interrogatory No. 21(G)(3) and |
| 14 | 21(G)(4), above, as though fully stated herein. Numerous contractors installed and removed asbestos-containing thermal insulation materials at Decedent RONALD D. |
| 15 | REDMAN's worksites. Plaintiff's investigation and discovery are continuing and ongoing. |
| 16 | 6. See Exhibit 'A', attached hereto, for a list of contractors, if any, who performed work at this jobsite prior to or during Decedent RONALD D. REDMAN's employment at this |
| 17 | site. |
| | 7. Plaintiff Jeri Redman incorporates Response to Interrogatory No. 21(G)(6), above, as |
| 18 | though fully stated herein. |
| | 8. Plaintiff Jeri Redman incorporates Response to Defendants Standard Request for |
| 19 | Production and Identification of Documents and Things, previously served herein. Plaintiff's investigation and discovery are continuing and ongoing. |
| 20 | 9. Plaintiff Jeri Redman incorporates Response to Defendants Standard Request for Production and Identification of Documents and Things, previously served herein. |
| 21 | Plaintiff's investigation and discovery are continuing and ongoing. |
| | 10. Decedent RONALD D. REDMAN and others around him installed, removed, |
| 22 | handled, swept, and otherwise disturbed asbestos-containing materials while employed at this site. As a result, he and other around him were exposed to and breathed large |
| 23 | amounts of asbestos. These work activities, including those activities itemized in response 10(a) below, released respirable asbestos fibers into the air which Decedent |
| 24 | RONALD D. REDMAN breathed. |
| | a. Decedent RONALD D. REDMAN worked with and/or in close proximity to the |
| 25 | installation, removal, disturbance and/or handling of various asbestos-containing materials while employed at this site, including, but not limited to, the following: |
| 26 | Decedent was exposed to asbestos-containing blankets being used, cut, tattered, wrapped |
| 27 | about, handled and applied. Decedent was exposed to asbestos-containing floor tiles installed which were laid, cut, installed, applied with mastic and otherwise disturbed. |
| 28 | |

1   Decedent was exposed to asbestos-containing floor tiles being broken, pried-out, torn-up,
    dislodged, swept up and otherwise disturbed. Decedent was exposed to asbestos-
2   containing gasket materials, from the cutting, punching, installing and handling of the
    gasket material. Decedent was exposed to asbestos-containing gasket materials, being
3   replaced, removed, scraped out, dislodged, blown out, brushed out, swept up and
    otherwise disturbed. Decedent was exposed to asbestos-containing packing materials,
4   from the cutting, stuffing, installing and applying of the packing material to equipment
    and valves. Decedent was exposed to asbestos-containing packing materials, being
5   removed, scraped out, pulled out, dislodged, blown out, swept up and otherwise
    disturbed. Decedent was exposed to asbestos-containing refractory materials, including
6   mortar, mud, refractory brick, insulation, insulating cement, insulating compounds,
    vermiculite, refractory clay, block insulation, and cloth, being installed which were cut,
7   mixed, applied, handled and otherwise disturbed. Decedent was exposed to asbestos-
    containing refractory materials, including mortar, mud, refractory brick, insulation,
8   insulating cement, insulating compounds, vermiculite, refractory clay, block insulation,
    and cloth being removed, torn-out, dislodged, swept and otherwise disturbed. Decedent
9   worked on the shutdown, turnaround, maintenance, repair, remodel and demolition of the
    premises, including working around persons installing, sweeping, spraying, cutting,
10  ripping out, removing, demolishing, scraping, sanding, missing, using and otherwise
    disturbing asbestos-containing materials. Decedent worked on construction involving
11  tying in newly constructed areas into previously existing portions of the premises which
    involved working with and around the removal, installation, cutting, ripping out, repair,
12  patching, mixing and other disturbances of asbestos-containing construction materials.
    Decedent RONALD D. REDMAN was exposed to the following products being used at
13  this and other such jobsites: FOSTER WHEELER USA CORPORATION, IMO
    INDUSTRIES INC., VIAD CORP.. Between 1974-1984, while Plaintiff worked in the
14  design and engineering division at the NORFOLK NAVAL SHIPYARD in Portsmouth,
    Virginia (herein, "NORFOLK NAVAL"), plaintiff worked aboard this vessel either at
15  NORFOLK NAVAL or at the San Diego 32nd St. Naval Station in San Diego,
    California. Plaintiff's job during this time was in a engineering design group
16  investigating operational problems on the various systems and equipment aboard the
    numerous ships and vessels being overhauled and repaired at NORFOLK NAVAL.
17  These system and engineering conflicts arose in the midst of overhaul and repair aboard a
    vessel when a system, scheme or mechanical equipment/piping/system configure, ment
18  could not practically be put into operation aboard the vessel itself due to lack of space,
    mechanical conflicts, etc. Mr. REDMAN therefore investigated design drawings,
19  boarded the vessel, investigated the conflicts aboard the vessel, took measurements,
    received input from the ships' crews and went about resolving mechanical and design
20  issues aboard ship, particulalry throughout the propulsion systems and engineering spaces
    aboard this vessel, including the engine rooms, fire rooms and auxiliary machinery
21  spaces, in the shaft alleys, with/around steam systems, electrical systems, vent systems,
    the propulsion plant and structure throughout the ship. Mr. REDMAN then drafted
22  "Ship-Alts" (ship-alterations) which after department approval became part of the
    overhaul package of overhaul of the systems to be modified.
23
24  During his ship inspection and "Ship-Alt" work, Mr. REDMAN went aboard numerous
    ships and vessels on a daily basis, including this vessel while at NORFOLK NAVAL, in
25  the midst of ship checks, ship repairs and ongoing overhauls of this vessel.
26
27  Mr. REDMAN's "Ship-Alt" work duty took him to all parts of this particular vessel,
    including the engine rooms, boiler rooms, machinery and engineering spaces. Mr.
28

S:\Clients\Plaintiff\WR\Redman_Ronald 10267\Discovery\Defensive\ALLD GOROG2 rqs2.doc

REDMAN's own work variously required him to inspect engines, boilers and all auxiliary/supporting equipment (including, but not limited to, valves, pumps, piping, etc.) during his equipment inspections. During all of these overhauls while Mr. REDMAN was aboard ship performing his equipment inspections, both the ships' crew and outside contractors were working aboard these ships performing their routine duties, including overhauling the equipment and systems aboard the ships. The trades that worked around Mr. REDMAN included, but were not limited to, the following: pipefitters/shipfitters, boilermakers/boilertenders, insulators, electricians, machinists/mechanics, riggers, laborers, decking and/or bulkhead installers. The work of others around Mr. REDMAN variously included the installation, adjustment, overhaul and repair of all of the piping, equipment and systems aboard the ship for both main and auxiliary systems, including, but not limited to, the following: asbestos-containing valves; asbestos-containing compressors; asbestos-containing steam turbines; asbestos-containing pumps; forced draft blowers, feedheaters and distilling systems; as well as asbestos-containing gaskets; asbestos-containing packing. The work of the tradesmen around Mr. REDMAN disturbed the ships' equipment, systems and piping, including the various asbestos-containing components of each (including, but not limited to, asbestos-containing insulation, gaskets, packing, and electrical components), creating and releasing asbestos-containing dust, debris, fiber and particulate into and throughout these ships and their respective engineering spaces, passageways, and compartments, thereby contaminating the same with asbestos-containing dust, debris, fiber and particulate which Mr. REDMAN consequently breathed without warning or protection from the manufacturers of those asbestos containing ships'/vessels' equipment, systems and components

Per Navy archives docs, the USS JOHN KING (DDG-3) operated GRISCOLM-RUSSELL distilling plants by which plaintiffs claim decedent Mr. REDMAN was exposed to asbestos.

The following information is presently available regarding this vessel:

John King

* * *
(DDG-3: dp. 3,370; l. 437'; b. 47'; dr. 22'; s. over 30 k.; cpl. 354; a. Tartar missiles, 2 5", ASROC, 2 21" tt.; cl. Charles F. Adams)

John King (DDG-3) was laid down by Bath Iron Works Corp., Bath, Maine, 25 August 1958; launched 30 January 1960; sponsored by Mrs. Paul J. Kilday, wife of Representative Kilday of Texas; and commissioned 4 February 1961 at Boston, Comdr. A. M. Sackett in command.

Following shakedown training out of Guantanamo Bay, Cuba, John King carried out weapons tests on the East Coast before arriving Norfolk 7 September 1961 for regular duty. One of a new class of guided missile destroyers, she featured latest hull design with all-aluminum superstructure and mounted the very latest in modern armament and electronic equipment. Departing 27 November 1961, the ship cruised to England and Northern Europe until 1 January 1962, when she sailed from Dublin for the Mediterranean. There, John King joined the 6th Fleet in its constant role of peacekeeping in this troubled region. After her return to Norfolk in April, the ship conducted missile firing exercises and training in the Caribbean. She arrived Washington 10 July 1962 for a

4 day stay, entertaining a group of Senators and Congressmen as well as Secretary of the Navy Korth.

Following additional exercises, John King entered Norfolk Navy Yard 11 October. Soon afterward, the introduction of offensive missiles into Cuba precipitated a crisis; and, as Navy ships placed a quarantine around the island, the ship quickly finished her repairs and joined the blockade 6 November. After the crisis eased, the ship remained in the Caribbean operating with the Navy's newest and biggest carrier, the nuclear-powered Enterprise. She returned to Norfolk 8 December.

John King departed for her second Mediterranean cruise 6 February 1963. After visiting various ports on 6th Fleet maneuvers, she steamed to Kiel, Germany, 23 June, then returned to Norfolk 17 July. The next twelve months were spent on training and readiness exercises off the Virginia Capes and in the Caribbean, including a week at the Antisubmarine Warfare School, Key West, in April.

The destroyer sailed for the Mediterranean once more 3 August and joined the 6th Fleet 16 August near the strife-torn island of Cyprus. She remained in the Mediterranean until the end of 1964.

John King returned to Norfolk 29 January and operated along the East Coast until sailing for the "Med" 14 October. Following 4 months of operations with the 6th Fleet, she returned to Norfolk 7 March 1966. In the summer she visited the Mediterranean and recrossed the Atlantic on NATO Exercise "Straight Laced." Back at homeport in the fall she operated out of Norfolk until sailing for another 6th Fleet deployment 10 January 1967. Her movements were concentrated in the Western Mediterranean until she sailed for home 11 May. Arriving Norfolk on the 19th, John King entered the Norfolk Naval Shipyard 27 June for an overhaul to prepare for future service.

The following appears courtesy of http://en.wikipedia.org/wiki/Charles_F._Adams_class_destroyer:

Charles F. Adams class destroyer

The Charles F. Adams class of guided missile destroyers was a group of twenty-nine built between 1958 and 1967. Twenty-three of these ships were built for the United States Navy, three for the Royal Australian Navy, and three for the West German Bundesmarine. The ships were based on the existing Forrest Sherman class, but were the first destroyers designed to serve as missile destroyers. The destroyers of this class served in the Cuban blockade of 1962 and the Vietnam War.
The United States Navy decommissioned its last Charles F. Adams destroyer, the USS Goldsborough, on April 29, 1993. The Australian and German navies had also decommissioned their last ships of this class by 2003. Four ships of this class were transferred to the Hellenic Navy in 1992. All four have since been decommissioned.
The USS Charles F. Adams has been placed on inactive hold status and there are attempts by private groups to have it preserved as a museum ship. The USS Hoel has been sold to a private corporation which is attempting to use it as a power generating plant in Brazil. With the exception of these two ships and the Kimon, all of the ships in this class have been sunk as targets, sold for scrap, or are scheduled for one of the two fates.

Specifcation as built

Displacement: 3,277 tons standard; 4,526 tons full load
Length: 437ft(133.2m)
Beam: 47ft(14.3m)
Draught: 15ft(4.6m)
Propulsion: 2 shaft; geared steam turbines; 4 boilers; 70,000shp
Speed: 33 knots
Range: 4,500nm at 20 knots
Armament: 1x Twin-arm launcher for Tartar SAM system; 2x 5in(127mm); 1x ASROC
Launcher; 6x 12.8in(324mm) ASW TT
Complement: 333

Ships of the Charles F. Adams class:
- USS Charles F. Adams (DDG-2)
- USS John King (DDG-3)
- USS Lawrence (DDG-4)
- USS Claude V. Ricketts (DDG-5)
- USS Barney (DDG-6)
- USS Henry B. Wilson (DDG-7)
- USS Lynde McCormick (DDG-8)
- USS Towers (DDG-9)
- USS Sampson (DDG-10)
- USS Sellers (DDG-11)
- USS Robison (DDG-12)
- USS Hoel (DDG-13)
- USS Buchanan (DDG-14)
- USS Berkeley (DDG-15)
- USS Joseph Strauss (DDG-16)
- USS Conyngham (DDG-17)
- USS Semmes (DDG-18)
- USS Tattnall (DDG-19)
- USS Goldsborough (DDG-20)
- USS Cochrane (DDG-21)
- USS Benjamin Stoddert (DDG-22)
- USS Richard E. Byrd (DDG-23)
- USS Waddell (DDG-24)

The above is not an exhaustive description of plaintiffs' work, the work of others around him, the products, materials and equipment so used and encountered, or the ships/vessels aboard which that work occurred. Plaintiffs refer to and incorporate by reference herein the respective ship histories, muster rolls, and documents pertaining to each of the above-identified shipyards, ships and vessels, all equally available to defendants through the National Archives and other various sources.

Plaintiffs' investigation is continuing and ongoing. Plaintiffs reserve the right to supplement and/or amend their responses herein. Plaintiff Jeri Redman is not an expert in the identification of asbestos-containing materials at this worksite which Decedent or others installed, removed, disturbed and/or handled.

Plaintiff's investigation and discovery are continuing and ongoing.
b. Plaintiff Jeri Redman incorporates plaintiff's Responses to Interrogatory Nos. 21(F) and 21(G)(10)(a), above, as though fully stated herein.

c. - e. No.

11. Decedent RONALD D. REDMAN worked in close proximity to persons who were installing, removing, handling and otherwise disturbing asbestos-containing materials while employed at this site.

a. Plaintiff Jeri Redman incorporates Response to Interrogatory No. 21(F) and Interrogatory No. 21(G)(10)(a), above, as though fully stated herein.

b. Plaintiff Jeri Redman identifies persons in decedent's close proximity installing, removing, handling and/or otherwise disturbing various asbestos-containing materials in close proximity to Decedent's work area while Decedent was employed at this site, including but not necessarily limited to, that itemized in plaintiff's Responses to Interrogatory Nos. 21(F) and 21(G)(10)(a), above. Plaintiff incorporates plaintiff's Responses to Interrogatory Nos. 21(F) and 21(G)(10)(a), above, as though fully stated herein. Plaintiff Jeri Redman is not an expert in the identification of asbestos-containing materials and may not be aware of all of the asbestos-containing materials at this worksite which Decedent or others installed, removed, disturbed and/or handled.

c. To the extent that plaintiff Jeri Redman knows such information, it is itemized in plaintiff's Responses to Interrogatory Nos. 21(F) and 21(G)(10)(a), above. Plaintiff incorporates plaintiff's Responses to Interrogatory Nos. 21(F) and 21(G)(10)(a), above, as though fully stated herein. Such information is more available to defendants than plaintiff. Decedent RONALD D. REDMAN worked in close proximity to various trades that were disturbing asbestos-containing materials, including, but not limited to, the following: boilermakers, drillers, drywall installers, electricians, HVAC installers, insulators, laborers, machinists, joiners, masons, painters, pipefitters, plumbers, riggers, sandblasters, scalers, sheetmetal workers, steamfitters, tool room attendants, welders, carpenters, sheetrockers, tapers, sanders and other trades. All such trades were employed by the premise owner and other contractors, including but not necessarily limited to those itemized in plaintiff's Responses to Interrogatory Nos. 21(F) and 21(G)(10)(a), above. Plaintiff's investigation and discovery are continuing.

d. Such trades installed, removed, distributed, loaded, unloaded, cut, swept and/or otherwise disturbed asbestos-containing thermal insulation materials.

e. i.    Such work occurred in virtually every area within the jobsite.
   ii.   Decedent worked within approximately 1 to 50 feet from the area where such trades were working and disturbing asbestos-containing thermal insulation materials.

f. - h. No.

22A.   USS AMERICA (CV-66)
22B.   Plaintiff Jeri Redman incorporates plaintiff's response to Interrogatory No. 22(A), above, as though fully stated herein.
22C.   Decedent worked at this jobsite from approximately sometime during the dates January, 1974 to approximately December, 1984. Plaintiff Jeri Redman's best present estimation of the Decedent's total cumulative time at this jobsite is 10 years. Plaintiff Jeri Redman 's best present estimation of DecedentRONALD D. REDMAN's total number of different jobs or projects at this jobsite is 1.

PLAINTIFF'S RESPONSES TO DEFENDANTS' STANDARD INTERROGATORIES - SET TWO (Wrongful Death)

PAGE 102

S:\Clients\Plaintiff\6R\Redman  Ronald 1026\7\Discovery\Defenskw\ALLD GOROG2 rspa .doc

1    Responses to Interrogatory Nos. 42(F) and 42(G)(10)(a), above, as though fully stated
     herein. Plaintiff Jeri Redman is not an expert in the identification of asbestos-containing
2    materials and may not be aware of all of the asbestos-containing materials at this worksite
     which Decedent or others installed, removed, disturbed and/or handled.
3

4    c. To the extent that plaintiff Jeri Redman knows such information, it is itemized in
     plaintiff's Responses to Interrogatory Nos. 42(F) and 42(G)(10)(a), above. Plaintiff
5    incorporates plaintiff's Responses to Interrogatory Nos. 42(F) and 42(G)(10)(a), above, as
     though fully stated herein. Such information is more available to defendants than
6    plaintiff. Decedent RONALD D. REDMAN worked in close proximity to various trades
     that were disturbing asbestos-containing materials, including, but not limited to, the
7    following: boilermakers, drillers, drywall installers, electricians, HVAC installers,
     insulators, laborers, machinists, joiners, masons, painters, pipefitters, plumbers, riggers,
8    sandblasters, scalers, sheetmetal workers, steamfitters, tool room attendants, welders,
     carpenters, sheetrockers, tapers, sanders and other trades. All such trades were employed
9    by the premise owner and other contractors, including but not necessarily limited to those
     itemized in plaintiff's Responses to Interrogatory Nos. 42(F) and 42(G)(10)(a), above.
10   Plaintiff's investigation and discovery are continuing.

11   d. Such trades installed, removed, distributed, loaded, unloaded, cut, swept and/or
     otherwise disturbed asbestos-containing thermal insulation materials.
12

     e. i.   Such work occurred in virtually every area within the jobsite.
13     ii.   Decedent worked within approximately 1 to 50 feet from the area where such
          trades were working and disturbing asbestos-containing thermal insulation
14        materials.
     f. - h. No.
15

16
  43A.   USS DU PONT
17  43B.   Plaintiff Jeri Redman incorporates plaintiff's response to Interrogatory No. 43(A), above,
        as though fully stated herein.
18  43C.   Decedent worked at this jobsite from approximately sometime during the dates January,
        1974 to approximately December, 1984. Plaintiff Jeri Redman's best present estimation
19       of the Decedent's total cumulative time at this jobsite is 10 years. Plaintiff Jeri Redman
        's best present estimation of DecedentRONALD D. REDMAN's total number of different
20       jobs or projects at this jobsite is 1.
  43D.   Decedent RONALD D. REDMAN's employer at this jobsite was Norfolk Naval
21       Shipyard. Decedent RONALD D. REDMAN's employer's address is equally available
        to all parties through decedent's social security, union and other equally available
22       records. All such documents have been sought by plaintiff Jeri Redman's counsel and
        made available to designated defense counsel by authorization. To the extent that any of
23       these documents are in possession of counsel, they have been copied to designated
        defense counsel.
24  43E.   Plaintiff refers to and incorporates herein by reference response to 43G(10)(a) below.
  43F.   Plaintiff refers to and incorporates herein by reference response to 43G(10)(a) below.
25  43G.   Decedent RONALD D. REDMAN suffered occupational exposure to asbestos while
        working at this jobsite.
26       1. Decedent RONALD D. REDMAN worked throughout the jobsite.
27       2. Plaintiff Jeri Redman incorporates response to Interrogatory No. 43(C), above.

28
  **PLAINTIFF'S RESPONSES TO DEFENDANTS' STANDARD INTERROGATORIES - SET TWO (Wrongful Death)**
                                                                 **PAGE 230**

3. Decedent RONALD D. REDMAN was employed by Norfolk Naval Shipyard and his direct supervisor was an employee of his employer. The day-to-day work activities of all such contractors were ultimately directed by the premises owner and other hiring contractors. To the extent that Plaintiff Jeri Redman is able to identify any supervisors of Decedent RONALD D. REDMAN, they are identified in Response to Interrogatory No. 43(G)(4), below, incorporated herein by reference as though full stated.

4. Other than information protected by the attorney-client privilege, Decedent's co-workers included, but are not limited to, all persons listed at this jobsite, if any, and in Exhibit 'A', attached hereto. Decedent worked with the following co-workers: Darryl Flattum. Additionally, Decedent RONALD D. REDMAN worked with and around the following coworkers, but plaintiff is unable at this time to identify all of the various locations where Decedent worked with them: Neff Matthews.

5. Plaintiff Jeri Redman incorporates Response to Interrogatory No. 43(G)(3) and 43(G)(4), above, as though fully stated herein. Numerous contractors installed and removed asbestos-containing thermal insulation materials at Decedent RONALD D. REDMAN's worksites. Plaintiff's investigation and discovery are continuing and ongoing.

6. See Exhibit 'A', attached hereto, for a list of contractors, if any, who performed work at this jobsite prior to or during Decedent RONALD D. REDMAN's employment at this site.

7. Plaintiff Jeri Redman incorporates Response to Interrogatory No. 43(G)(6), above, as though fully stated herein.

8. Plaintiff Jeri Redman incorporates Response to Defendants Standard Request for Production and Identification of Documents and Things, previously served herein. Plaintiff's investigation and discovery are continuing and ongoing.

9. Plaintiff Jeri Redman incorporates Response to Defendants Standard Request for Production and Identification of Documents and Things, previously served herein. Plaintiff's investigation and discovery are continuing and ongoing.

10. Decedent RONALD D. REDMAN and others around him installed, removed, handled, swept, and otherwise disturbed asbestos-containing materials while employed at this site. As a result, he and other around him were exposed to and breathed large amounts of asbestos. These work activities, including those activities itemized in response 10(a) below, released respirable asbestos fibers into the air which Decedent RONALD D. REDMAN breathed.

a. Decedent RONALD D. REDMAN worked with and/or in close proximity to the installation, removal, disturbance and/or handling of various asbestos-containing materials while employed at this site, including, but not limited to, the following: Decedent was exposed to asbestos-containing blankets being used, cut, tattered, wrapped about, handled and applied. Decedent was exposed to asbestos-containing floor tiles installed which were laid, cut, installed, applied with mastic and otherwise disturbed. Decedent was exposed to asbestos-containing floor tiles being broken, pried-out, torn-up, dislodged, swept up and otherwise disturbed. Decedent was exposed to asbestos-containing gasket materials, from the cutting, punching, installing and handling of the gasket material. Decedent was exposed to asbestos-containing gasket materials, being replaced, removed, scraped out, dislodged, blown out, brushed out, swept up and otherwise disturbed. Decedent was exposed to asbestos-containing thermal insulation materials, including pipe covering, block and mud, being installed which were handled, cut, mixed, applied, and otherwise disturbed. Decedent was exposed to asbestos-containing thermal insulation materials, including pipe covering, block and mud, being removed, torn-out, dislodged, swept and otherwise disturbed. Decedent was exposed to asbestos-containing packing materials, from the cutting, stuffing, installing and applying

of the packing material to equipment and valves. Decedent was exposed to asbestos-containing packing materials, being removed, scraped out, pulled out, dislodged, blown out, swept up and otherwise disturbed. Decedent was exposed to asbestos-containing refractory materials, including mortar, mud, refractory brick, insulation, insulating cement, insulating compounds, vermiculite, refractory clay, block insulation, and cloth, being installed which were cut, mixed, applied, handled and otherwise disturbed. Decedent was exposed to asbestos-containing refractory materials, including mortar, mud, refractory brick, insulation, insulating cement, insulating compounds, vermiculite, refractory clay, block insulation, and cloth being removed, torn-out, dislodged, swept and otherwise disturbed. Decedent worked on the shutdown, turnaround, maintenance, repair, remodel and demolition of the premises, including working around persons installing, sweeping, spraying, cutting, ripping out, removing, demolishing, scraping, sanding, missing, using and otherwise disturbing asbestos-containing materials. Decedent worked on construction involving tying in newly constructed areas into previously existing portions of the premises which involved working with and around the removal, installation, cutting, ripping out, repair, patching, mixing and other disturbances of asbestos-containing construction materials. Decedent RONALD D. REDMAN was exposed to the following products being used at this and other such jobsites:  VIAD CORP.. Between 1974-1984, while Plaintiff worked in the design and engineering division at the NORFOLK NAVAL SHIPYARD in Portsmouth, Virginia (herein, "NORFOLK NAVAL"), plaintiff worked aboard this vessel either at NORFOLK NAVAL or at the San Diego 32nd St. Naval Station in San Diego, California. Plaintiff's job during this time was in a engineering design group investigating operational problems on the various systems and equipment aboard the numerous ships and vessels being overhauled and repaired at NORFOLK NAVAL. These system and engineering conflicts arose in the midst of overhaul and repair aboard a vessel when a system, scheme or mechanical equipment/piping/system configuration could not practically be put into operation aboard the vessel itself due to lack of space, mechanical conflicts, etc. Mr. REDMAN therefore investigated design drawings, boarded the vessel, investigated the conflicts aboard the vessel, took measurements, received input from the ships' crews and went about resolving mechanical and design issues aboard ship, particularly throughout the propulsion systems and engineering spaces aboard this vessel, including the engine rooms, fire rooms and auxiliary machinery spaces, in the shaft alleys, with/around steam systems, electrical systems, vent systems, the propulsion plant and structure throughout the ship. Mr. REDMAN then drafted "Ship-Alts" (ship-alterations) which after department approval became part of the overhaul package of overhaul of the systems to be modified.

During his ship inspection and "Ship-Alt" work, Mr. REDMAN went aboard numerous ships and vessels on a daily basis, including this vessel while at NORFOLK NAVAL, in the midst of ship checks, ship repairs and ongoing overhauls of this vessel.

Mr. REDMAN's "Ship-Alt" work duty took him to all parts of this particular vessel, including the engine rooms, boiler rooms, machinery and engineering spaces. Mr. REDMAN's own work variously required him to inspect engines, boilers and all auxiliary/supporting equipment (including, but not limited to, valves, pumps, piping, etc.) during his equipment inspections. During all of these overhauls while Mr. REDMAN was aboard ship performing his equipment inspections, both the ships' crew and outside contractors were working aboard these ships performing their routine duties, including overhauling the equipment and systems aboard the ships. The trades that worked around Mr. REDMAN included, but were not limited to, the following: pipefitters/shipfitters,

boilermakers/boilertenders, insulators, electricians, machinists/mechanics, riggers, laborers, decking and/or bulkhead installers. The work of others around Mr. REDMAN variously included the installation, adjustment, overhaul and repair of all of the piping, equipment and systems aboard the ship for both main and auxiliary systems, including, but not limited to, the following: asbestos-containing valves; asbestos-containing compressors; asbestos-containing steam turbines; asbestos-containing pumps; forced draft blowers, feedheaters and distilling systems; as well as asbestos-containing gaskets; asbestos-containing packing. The work of the tradesmen around Mr. REDMAN disturbed the ships' equipment, systems and piping, including the various asbestos-containing components of each (including, but not limited to, asbestos-containing insulation, gaskets, packing, and electrical components), creating and releasing asbestos-containing dust, debris, fiber and particulate into and throughout these ships and their respective engineering spaces, passageways, and compartments, thereby contaminating the same with asbestos-containing dust, debris, fiber and particulate which Mr. REDMAN consequently breathed without warning or protection from the manufacturers of those asbestos containing ships'/vessels' equipment, systems and components.

Per Navy archives docs, the USS DUPONT (DD-491) operated GRISCOLM-RUSSELL distilling plants by which plaintiffs claim decedent Mr. REDMAN was exposed to asbestos.

The following information is presently available regarding this vessel:

Du Pont

* * *

III

(DD-941: dp. 3,807 (f.); l. 418'5"; b. 45'1"; dr. 14'2"; s. 30 k.; cpl. 311; a. 3 5", 4 3", 4 21" tt, 1 dct.; cl. Forrest Sherman)

The third Du Pont (DD-941) was launched 8 September 1956 by Bath Iron Works Corp., Bath, Maine; sponsored by Mrs. H. B. Du Pont, great-great-grandniece of Rear Admiral Du Pont; and commissioned 1 July 1957, Commander W. J. Maddocks in command.

From 6 to 31 July 1958 Du Pont served on a midshipman cruise and antisubmarine exercises in the Atlantic, duty broken by a visit to New York. Du Pont sailed 2 September for a tour of duty with the 6th Fleet in the Mediterranean, during which she participated in highly realistic air defense and antisubmarine warfare problems. She returned to Norfolk 12 March 1959, to prepare for Operation "Inland Sea," the historic first passage of a naval task force into the Great Lakes through the Saint Lawrence Seaway. She escorted HMS Brittania with Queen Elisabeth II of England embarked during the dedicatory ceremonies of 26 June.

Du Pont crossed the Atlantic in August and September 1959, visiting Southhampton, England, after serving as plane guard for the transatlantic flight of President D. D. Eisenhower. On 28 January 1960 Du Pont sailed from Norfolk for a second tour of duty with the 6th Fleet in the Mediterranean, returning to Norfolk on 31 August for an overhaul in the Naval Shipyard where she remained through the end of 1960.

List of Commanding Officers.

Commanding Officer  Date assumed command
CDR William J. Maddocks    1 Jul 1957
LCDR Melvin W. Cassidy    14 Oct 1957
CDR Daniel M. Karcher    29 Oct 1957
CDR Joseph C. Spitler    7 Aug 1958
CDR Paul E. Arbo    24 Jul 1959
CDR L. L. Voiler    17 Jul 1961
CDR J. M. Hornbrook 14 Sep 1963
CDR E. P. Stilwell    9 Feb 1965
CDR Robert H. Small, Jr.    2 Dec 1966
Ship Decommissioned    16 May 1969
Ship Recommissioned 9 May 1970
CDR Winfred P. Allen    9 May 1970
LCDR Grant A. Sharp    6 Mar 1971
LCDR James A. Shreckengaust    1972
LCDR James E. Hancock    25 Jan 1974
CDR Charles D. Collis    22 Dec 1975
CDR John A. Carbone    18 Nov 1977
CDR Harlan K. Ullman    8 Jan 1980
CDR Billy G. Taylor  18 Dec 1981
CDR John S. Burrows III    circa 1982
Du Pont decommissioned on 4 March 1983 and was sold for scrap on 11 December 1992.

(Photo: USS DuPont (DD-941).)

The following appears courtesy of http://navysite.de/dd/dd941.htm.

USS Du Pont (DD 941)
- decommissioned -

USS DU PONT was a FORREST SHERMAN - class destroyer and the third ship in the Navy to bear the name. In the mid-1960s, the USS DU PONT was one of the eight FORREST SHERMAN - class destroyers chosen to receive an anti-submarine warfare capability upgrade which included the replacement of one of the Mk-42 5-inch guns with a Mk-16 ASROC missile launcher. The ships that underwent the conversion then formed the BARRY - class.

Decommissioned after almost of 26 years of service on March 4, 1983, the DU PONT was stricken from the Navy list on June 1, 1990, and on December 11, 1992, the destroyer was finally sold for scrapping.

General Characteristics:    Awarded: July 30, 1954
        Keel laid: May 11, 1955
        Launched: September 8, 1956
        Commissioned: July 1, 1957
        Decommissioned: March 4, 1983
        Builder: Bath Iron Works, Bath, Maine
        Propulsion system: four-1200 lb. boilers; two steam turbines; two shafts
        Propellers: two
        Length: 418.3 feet (127.5 meters)

PLAINTIFF'S RESPONSES TO DEFENDANTS' STANDARD INTERROGATORIES - SET TWO (Wrongful Death)

PAGE 234

S:\Clients\Plaintiffs\R\Rodman. Ronald 10267\Discovery\Defense\ALLD GOROG2.mps.doc

Beam: 45,3 feet (13.8 meters)
Draft: 22 feet (6.7 meters)
Displacement: approx. 4,000 tons full load
Speed: 32+ knots
Aircraft: none
Armament: two Mk-42 5-inch/54 caliber guns, Mk-32 ASW torpedo tubes (two triple mounts), one Mk-16 ASROC missile launcher
Crew: 17 officers, 287 enlisted

Accidents aboard USS DU PONT:
Date    Where Events
April 25, 1974 Yorktown, Va.USS DU PONT collides with the left swing span of a bridge at Yorktown, Va. The DU PONT suffers damage to the forward mast while the bridge is closed to traffic for approx. one hour.

(Photos)

The above is not an exhaustive description of plaintiffs' work, the work of others around him, the products, materials and equipment so used and encountered, or the ships/vessels aboard which that work occurred. Plaintiffs refer to and incorporate by reference herein the respective ship histories, muster rolls, and documents pertaining to each of the above-identified shipyards, ships and vessels, all equally available to defendants through the National Archives and other various sources.

Plaintiffs' investigation is continuing and ongoing. Plaintiffs reserve the right to supplement and/or amend their responses herein.Plaintiff Jeri  Redman is not an expert in the identification of asbestos-containing materials at this worksite which Decedent or others installed, removed, disturbed and/or handled.

Plaintiff's investigation and discovery are continuing and ongoing.
b. Plaintiff Jeri  Redman incorporates plaintiffs' Responses to Interrogatory Nos. 43(F) and 43(G)(10)(a), above, as though fully stated herein.

c. - e. No.
11. Decedent RONALD D. REDMAN worked in close proximity to persons who were installing, removing, handling and otherwise disturbing asbestos-containing materials while employed at this site.

a. Plaintiff Jeri  Redman incorporates Response to Interrogatory No. 43(F) and Interrogatory No. 43(G)(10)(a), above, as though fully stated herein.

b. Plaintiff Jeri  Redman identifies persons in decedent's close proximity installing, removing, handling and/or otherwise disturbing various asbestos-containing materials in close proximity to Decedent's work area while Decedent was employed at this site, including but not necessarily limited to, that itemized in plaintiff's Responses to Interrogatory Nos. 43(F) and 43(G)(10)(a), above. Plaintiff incorporates plaintiff's Responses to Interrogatory Nos. 43(F) and 43(G)(10)(a), above, as though fully stated herein. Plaintiff Jeri  Redman is not an expert in the identification of asbestos-containing materials and may not be aware of all of the asbestos-containing materials at this worksite which Decedent or others installed, removed, disturbed and/or handled.

S:\Clients\Plaintiffs\R\Redman, Ronald I0267\Discovery\Defensive\ALLD-OOROG2.rsps.doc

c. To the extent that plaintiff Jeri Redman knows such information, it is itemized in plaintiff's Responses to Interrogatory Nos. 43(F) and 43(G)(10)(a), above. Plaintiff incorporates plaintiff's Responses to Interrogatory Nos. 43(F) and 43(G)(10)(a), above, as though fully stated herein. Such information is more available to defendants than plaintiff. Decedent RONALD D. REDMAN worked in close proximity to various trades that were disturbing asbestos-containing materials, including, but not limited to, the following: boilermakers, drillers, drywall installers, electricians, HVAC installers, insulators, laborers, machinists, joiners, masons, painters, pipefitters, plumbers, riggers, sandblasters, scalers, sheetmetal workers, steamfitters, tool room attendants, welders, carpenters, sheetrockers, tapers, sanders and other trades. All such trades were employed by the premise owner and other contractors, including but not necessarily limited to those itemized in plaintiff's Responses to Interrogatory Nos. 43(F) and 43(G)(10)(a), above. Plaintiff's investigation and discovery are continuing.

d. Such trades installed, removed, distributed, loaded, unloaded, cut, swept and/or otherwise disturbed asbestos-containing thermal insulation materials.

e. i.   Such work occurred in virtually every area within the jobsite.
   ii.  Decedent worked within approximately 1 to 50 feet from the area where such trades were working and disturbing asbestos-containing thermal insulation materials.
f. - h.  No.

44A.  USS FARRAGUT
44B.  Plaintiff Jeri Redman incorporates plaintiff's response to Interrogatory No. 44(A), above, as though fully stated herein.
44C.  Decedent worked at this jobsite from approximately sometime during the dates January, 1974 to approximately December, 1984. Plaintiff Jeri Redman's best present estimation of the Decedent's total cumulative time at this jobsite is 10 years. Plaintiff Jeri Redman's best present estimation of Decedent RONALD D. REDMAN's total number of different jobs or projects at this jobsite is 1.
44D.  Decedent RONALD D. REDMAN's employer at this jobsite was Norfolk Naval Shipyard. Decedent RONALD D. REDMAN's employer's address is equally available to all parties through decedent's social security, union and other equally available records. All such documents have been sought by plaintiff Jeri Redman's counsel and made available to designated defense counsel by authorization. To the extent that any of these documents are in possession of counsel, they have been copied to designated defense counsel.
44E.  Plaintiff refers to and incorporates herein by reference response to 44G(10)(a) below.
44F.  Plaintiff refers to and incorporates herein by reference response to 44G(10)(a) below.
44G.  Decedent RONALD D. REDMAN suffered occupational exposure to asbestos while working at this jobsite.
   1. Decedent RONALD D. REDMAN worked throughout the jobsite.
   2. Plaintiff Jeri Redman incorporates response to Interrogatory No. 44(C), above.
   3. Decedent RONALD D. REDMAN was employed by Norfolk Naval Shipyard and his direct supervisor was an employee of his employer. The day-to-day work activities of all such contractors were ultimately directed by the premises owner and other hiring contractors. To the extent that Plaintiff Jeri Redman is able to identify any supervisors of Decedent RONALD D. REDMAN, they are identified in Response to Interrogatory No. 44(G)(4), below, incorporated herein by reference as though full stated.

11. Decedent RONALD D. REDMAN worked in close proximity to persons who were installing, removing, handling and otherwise disturbing asbestos-containing materials while employed at this site.

a. Plaintiff Jeri Redman incorporates Response to Interrogatory No. 44(F) and Interrogatory No. 44(G)(10)(a), above, as though fully stated herein.

b. Plaintiff Jeri Redman identifies persons in decedent's close proximity installing, removing, handling and/or otherwise disturbing various asbestos-containing materials in close proximity to Decedent's work area while Decedent was employed at this site, including but not necessarily limited to, that itemized in plaintiff's Responses to Interrogatory Nos. 44(F) and 44(G)(10)(a), above. Plaintiff incorporates plaintiff's Responses to Interrogatory Nos. 44(F) and 44(G)(10)(a), above, as though fully stated herein. Plaintiff Jeri Redman is not an expert in the identification of asbestos-containing materials and may not be aware of all of the asbestos-containing materials at this worksite which Decedent or others installed, removed, disturbed and/or handled.

c. To the extent that plaintiff Jeri Redman knows such information, it is itemized in plaintiff's Responses to Interrogatory Nos. 44(F) and 44(G)(10)(a), above. Plaintiff incorporates plaintiff's Responses to Interrogatory Nos. 44(F) and 44(G)(10)(a), above, as though fully stated herein. Such information is more available to defendants than plaintiff. Decedent RONALD D. REDMAN worked in close proximity to various trades that were disturbing asbestos-containing materials, including, but not limited to, the following: boilermakers, drillers, drywall installers, electricians, HVAC installers, insulators, laborers, machinists, joiners, masons, painters, pipefitters, plumbers, riggers, sandblasters, scalers, sheetmetal workers, steamfitters, tool room attendants, welders, carpenters, sheetrockers, tapers, sanders and other trades. All such trades were employed by the premise owner and other contractors, including but not necessarily limited to those itemized in plaintiff's Responses to Interrogatory Nos. 44(F) and 44(G)(10)(a), above. Plaintiff's investigation and discovery are continuing.

d. Such trades installed, removed, distributed, loaded, unloaded, cut, swept and/or otherwise disturbed asbestos-containing thermal insulation materials.

e. i.  Such work occurred in virtually every area within the jobsite.
   ii.  Decedent worked within approximately 1 to 50 feet from the area where such trades were working and disturbing asbestos-containing thermal insulation materials.

f. - h. No.

45A.  USS INGRAHAM
45B.  Plaintiff Jeri Redman incorporates plaintiff's response to Interrogatory No. 45(A), above, as though fully stated herein.
45C.  Decedent worked at this jobsite from approximately sometime during the dates January, 1974 through December, 1984. Plaintiff Jeri Redman's best present estimation of the Decedent's total cumulative time at this jobsite is 10 years. Plaintiff Jeri Redman's best present estimation of DecedentRONALD D. REDMAN's total number of different jobs or projects at this jobsite is 1.
45D.  Decedent RONALD D. REDMAN's employer at this jobsite was Norfolk Naval Shipyard. Decedent RONALD D. REDMAN's employer's address is equally available

to all parties through decedent's social security, union and other equally available records. All such documents have been sought by plaintiff Jeri Redman's counsel and made available to designated defense counsel by authorization. To the extent that any of these documents are in possession of counsel, they have been copied to designated defense counsel.

45E. Plaintiff refers to and incorporates herein by reference response to 45G(10)(a) below.

45F. Plaintiff refers to and incorporates herein by reference response to 45G(10)(a) below.

45G. Decedent RONALD D. REDMAN suffered occupational exposure to asbestos while working at this jobsite.

1. Decedent RONALD D. REDMAN worked throughout the jobsite.

2. Plaintiff Jeri Redman incorporates response to Interrogatory No. 45(C), above.

3. Decedent RONALD D. REDMAN was employed by Norfolk Naval Shipyard and his direct supervisor was an employee of his employer. The day-to-day work activities of all such contractors were ultimately directed by the premises owner and other hiring contractors. To the extent that Plaintiff Jeri Redman is able to identify any supervisors of Decedent RONALD D. REDMAN, they are identified in Response to Interrogatory No. 45(G)(4), below, incorporated herein by reference as though full stated.

4. Other than information protected by the attorney-client privilege, Decedent's co-workers included, but are not limited to, all persons listed at this jobsite, if any, and in Exhibit 'A', attached hereto. Decedent worked with the following co-workers: Darryl Flattum. Additionally, Decedent RONALD D. REDMAN worked with and around the following coworkers, but plaintiff is unable at this time to identify all of the various locations where Decedent worked with them: Neff Matthews.

5. Plaintiff Jeri Redman incorporates Response to Interrogatory No. 45(G)(3) and 45(G)(4), above, as though fully stated herein. Numerous contractors installed and removed asbestos-containing thermal insulation materials at Decedent RONALD D. REDMAN's worksites. Plaintiff's investigation and discovery are continuing and ongoing.

6. See Exhibit 'A', attached hereto, for a list of contractors, if any, who performed work at this jobsite prior to or during Decedent RONALD D. REDMAN's employment at this site.

7. Plaintiff Jeri Redman incorporates Response to Interrogatory No. 45(G)(6), above, as though fully stated herein.

8. Plaintiff Jeri Redman incorporates Response to Defendants Standard Request for Production and Identification of Documents and Things, previously served herein. Plaintiff's investigation and discovery are continuing and ongoing.

9. Plaintiff Jeri Redman incorporates Response to Defendants Standard Request for Production and Identification of Documents and Things, previously served herein. Plaintiff's investigation and discovery are continuing and ongoing.

10. Decedent RONALD D. REDMAN and others around him installed, removed, handled, swept, and otherwise disturbed asbestos-containing materials while employed at this site. As a result, he and other around him were exposed to and breathed large amounts of asbestos. These work activities, including those activities itemized in response 10(a) below, released respirable asbestos fibers into the air which Decedent RONALD D. REDMAN breathed.

a. Decedent RONALD D. REDMAN worked with and/or in close proximity to the installation, removal, disturbance and/or handling of various asbestos-containing materials while employed at this site, including, but not limited to, the following: Decedent was exposed to asbestos-containing blankets being used, cut, tattered, wrapped about, handled and applied. Decedent was exposed to asbestos-containing floor tiles installed which were laid, cut, installed, applied with mastic and otherwise disturbed.

Decedent was exposed to asbestos-containing floor tiles being broken, pried-out, torn-up, dislodged, swept up and otherwise disturbed. Decedent was exposed to asbestos-containing gasket materials, from the cutting, punching, installing and handling of the gasket material. Decedent was exposed to asbestos-containing gasket materials, being replaced, removed, scraped out, dislodged, blown out, brushed out, swept up and otherwise disturbed. Decedent was exposed to asbestos-containing thermal insulation materials, including pipe covering, block and mud, being installed which were handled, cut, mixed, applied, and otherwise disturbed. Decedent was exposed to asbestos-containing thermal insulation materials, including pipe covering, block and mud, being removed, torn-out, dislodged, swept and otherwise disturbed. Decedent was exposed to asbestos-containing packing materials, from the cutting, stuffing, installing and applying of the packing material to equipment and valves. Decedent was exposed to asbestos-containing packing materials, being removed, scraped out, pulled out, dislodged, blown out, swept up and otherwise disturbed. Decedent was exposed to asbestos-containing refractory materials, including mortar, mud, refractory brick, insulation, insulating cement, insulating compounds, vermiculite, refractory clay, block insulation, and cloth, being installed which were cut, mixed, applied, handled and otherwise disturbed. Decedent was exposed to asbestos-containing refractory materials, including mortar, mud, refractory brick, insulation, insulating cement, insulating compounds, vermiculite, refractory clay, block insulation, and cloth being removed, torn-out, dislodged, swept and otherwise disturbed. Decedent worked on the shutdown, turnaround, maintenance, repair, remodel and demolition of the premises, including working around persons installing, sweeping, spraying, cutting, ripping out, removing, demolishing, scraping, sanding, missing, using and otherwise disturbing asbestos-containing materials. Decedent worked on construction involving tying in newly constructed areas into previously existing portions of the premises which involved working with and around the removal, installation, cutting, ripping out, repair, patching, mixing and other disturbances of asbestos-containing construction materials. Decedent RONALD D. REDMAN was exposed to the following products being used at this and other such jobsites: IMO INDUSTRIES INC., VIAD CORP.. Between 1974-1984, while Plaintiff worked in the design and engineering division at the NORFOLK NAVAL SHIPYARD in Portsmouth, Virginia (herein, "NORFOLK NAVAL"), plaintiff worked aboard this vessel either at NORFOLK NAVAL or at the San Diego 32nd St. Naval Station in San Diego, California. Plaintiff's job during this time was in a engineering design group investigating operational problems on the various systems and equipment aboard the numerous ships and vessels being overhauled and repaired at NORFOLK NAVAL. These system and engineering conflicts arose in the midst of overhaul and repair aboard a vessel when a system, scheme or mechanical equipment/piping/system configuration could not practically be put into operation aboard the vessel itself due to lack of space, mechanical conflicts, etc. Mr. REDMAN therefore investigated design drawings, boarded the vessel, investigated the conflicts aboard the vessel, took measurements, received input from the ships' crews and went about resolving mechanical and design issues aboard ship, particulalry throughout the propulsion systems and engineering spaces aboard this vessel, including the engine rooms, fire rooms and auxiliary machinery spaces, in the shaft alleys, with/around steam systems, electrical systems, vent systems, the propulsion plant and structure throughout the ship. Mr. REDMAN then drafted "Ship-Alts" (ship-alterations) which after department approval became part of the overhaul package of overhaul of the systems to be modified.

1
2
During his ship inspection and "Ship-Alt" work, Mr. REDMAN went aboard numerous ships and vessels on a daily basis, including this vessel while at NORFOLK NAVAL, in the midst of ship checks, ship repairs and ongoing overhauls of this vessel.

3
4
5
6
7
8
9
10
11
12
13
14
15
16
Mr. REDMAN's "Ship-Alt" work duty took him to all parts of this particular vessel, including the engine rooms, boiler rooms, machinery and engineering spaces. Mr. REDMAN's own work variously required him to inspect engines, boilers and all auxiliary/supporting equipment (including, but not limited to, valves, pumps, piping, etc.) during his equipment inspections. During all of these overhauls while Mr. REDMAN was aboard ship performing his equipment inspections, both the ships' crew and outside contractors were working aboard these ships performing their routine duties, including overhauling the equipment and systems aboard the ships. The trades that worked around Mr. REDMAN included, but were not limited to, the following: pipefitters/shipfitters, boilermakers/boilertenders, insulators, electricians, machinists/mechanics, riggers, laborers, decking and/or bulkhead installers. The work of others around Mr. REDMAN variously included the installation, adjustment, overhaul and repair of all of the piping, equipment and systems aboard the ship for both main and auxiliary systems, including, but not limited to, the following: asbestos-containing valves; asbestos-containing compressors; asbestos-containing steam turbines; asbestos-containing pumps; forced draft blowers, feedheaters and distilling systems; as well as asbestos-containing gaskets; asbestos-containing packing. The work of the tradesmen around Mr. REDMAN disturbed the ships' equipment, systems and piping, including the various asbestos-containing components of each (including, but not limited to, asbestos-containing insulation, gaskets, packing, and electrical components), creating and releasing asbestos-containing dust, debris, fiber and particulate into and throughout these ships and their respective engineering spaces, passageways, and compartments, thereby contaminating the same with asbestos-containing dust, debris, fiber and particulate which Mr. REDMAN consequently breathed without warning or protection from the manufacturers of those asbestos containing ships'/vessels' equipment, systems and components.

17
18
19
Per Navy archives docs, the USS INGRAHAM (DD-604) operated DeLaval reduction gears by which plaintiffs claim decedent Mr. REDMAN was exposed to asbestos. Per Navy archives docs, the USS INGRAHAM (DD-604) operated GRISCOLM-RUSSELL distilling plants by which plaintiffs claim decedent Mr. REDMAN was exposed to asbestos.

20
The following information is presently available regarding this vessel:

21
Ingraham

22
* * *

23
III

24
(DD-694: dp. 2,200; l. 376'6"; b. 40'; dr. 15'8"; s. 34 k.; cpl. 336; a. 3 5", 12 40mm., 11 20mm., 2 dcp., 6 dcp., 10 21" tt.; cl. Allen M. Sumner)

25
26
27
The third Ingraham (DD-694) was launched 16 January 1944 by Federal Shipbuilding & Drydock Co., Kearny, N.J.; sponsored by Mrs. George Ingraham Hutchinson; and commissioned 10 March 1944, Comdr. H. W. Gordon in command.

28

After shakedown in Bermuda and training out of Norfolk, Ingraham sailed for duty with the Pacific Fleet, arriving Eniwetok 31 October in time to begin the final push of the enemy to its home islands. In mid-November she commenced screening carriers during strikes on Luzon in which considerable damage was done to the dwindling Japanese navy and air force. The destroyer continued patrol and antisubmarine duty until 12 December when she sailed for the assault and landings on Mindoro. Three days later in company with Barton, she sank a Japanese cargo ship off the southwest tip of Mindoro.

After a brief stay, she departed San Pedro 2 January 1945, for the operations in the Lingayen Gulf. Arriving off the Gulf on the sixth, she added her powerful antiaircraft fire to that of the invasion fleet, and bombarded shore targets behind the beaches.

At the end of January, Ingraham joined a fast carrier task force for strikes on the Japanese homeland. Following repair at Saipan 20 February, she joined the invasion fleet off Iwo Jima 23 February, and provided accurate call fire for the Marines ashore.

On 21 March the ship took up radar picket station in support of the Okinawa-Gunto operation. On 5 May, she came under concerted air attack, and shot down four of the enemy planes before a fifth crashed the ship above the waterline on the port side, its bomb exploding in the generator room. With only 1 gun operative, and with 51 casualties aboard, Ingraham retired to Hunter's Point, Calif., for repairs.

After repairs she operated along the East Coast until 7 May 1946 when she departed for the atomic bomb tests at Bikini (another example of the Navy's participation in technological development to strengthen America). After the tests and overhaul Ingraham departed San Diego 24 February 1947 for the Far East. The destroyer engaged in various exercises and in late June arrived Manila to act as official U.S. representative at the Philippine Independence anniversary. She returned to San Diego 8 October 1947.

Ingraham operated along California until 4 April 1949 when she departed San Diego for Norfolk, arriving 20 April. She participated in training exercises in the Atlantic until 24 November 1950 when she departed Norfolk for four months duty with the 6th fleet. Communist aggression in Korea once again threatened the peace of the world; and the U.S. Navy stood out as a symbol of strength to defeat this threat. She commenced exercises in the Atlantic during the summer of 1951, then made another cruise to the Mediterranean during the fall of 1951 and summer of 1952.

Ingraham departed Norfolk 24 April 1953 to escort carrier Lake Champlain to Japan via the Mediterranean and Suez Canal. She arrived Yokosuka 9 June and later that month joined the carrier task force providing air support to our forces in Korea. Her accuracy was excellent as she destroyed gun emplacements and supply areas. Following the truce, she operated on security patrol before returning to Norfolk 27 October. During 1954 the destroyer operated on hunter-killer operations, a cruise to South America, and NATO exercises out of Northern Ireland. She resumed training operations following overhaul in June 1955 and sailed on a summer training cruise to the Scandinavian countries, returning to Norfolk 6 September.

Ingraham departed Norfolk 28 July for duty with the 6th Fleet as trouble flared over the Suez Canal. The presence of the fleet was felt and the crisis was resolved without a major

conflict. She returned to Norfolk 4 December to begin a series of training cruises climaxed by a NATO exercise in September and October 1957.

The destroyer returned to 6th Fleet duty in February 1958 and operated on patrol and exercises in the Mediterranean and the Red Sea. She returned to Norfolk, Va., 2 July prior to the Lebanon crisis in which the 6thFleet played a major role in preserving the freedom of a small nation. Ingraham operated on the East Coast until 13 February 1959, when she departed for another tour with the 6th Fleet, and a crisis over Berlin was averted through our strong naval force. Departing the Mediterranean on 30 August, she returned to Portsmouth, Va., 7 September and began overhaul.

During 1960 she engaged in operations out of May-port, Fla., before embarking on another cruise with the 6th Fleet, beginning late September. She resumed readiness training out of May port in March 1961, before undergoing an extensive 8-month overhaul at Portsmouth. Ingraham arrived at her new homeport, Newport, R.I., 23 February 1962, then engaged in fleet operations in the Atlantic and in the Caribbean. In September and October she was assigned to the recovery area for the Project Mercury flight of "Sigma 7" and under more somber conditions took part in the Cuban blockade which ended in the removal of Russian missiles from that island. Once again this courageous ship helped participate in a series of crises resolved peacefully because of America's overwhelming naval power.

She continued operations along the East Coast until 1 October 1963, when she sailed for another deployment to the Mediterranean to strengthen our peace-keeping force in Europe.

Regular deployment with the Atlantic Fleet occupied Ingraham's time until 29 September 1965, when she departed Newport for the western Pacific, arriving 31 October at Yokosuka, Japan, for resupply before operations in the South China Sea. Though acting as a part of the screen for the carrier Ticonderoga (CVA-14), she also fired support missions for ground troops ashore.

On 12 November, Ingraham steamed 10 miles up the Saigon River to bombard an enemy supply base, and, by the 13th, shelled a guerrilla assembly area some 300 miles from the site of her action the previous day.

In early December, the ship kept regular surveillance on a Russian submarine off Hainan Island, bordering the Gulf of Tonkin. Ingra-ham's presence with the fleet of Vietnam underscores the determination of Americans to preserve the freedom of a small nation. From 1 January 1966 to 24 January, Ingraham operated with TF-77 in the South China Sea. She left for Newport 4 February by way of the Suez Canal.

Arriving 8 April off the East Coast, Ingraham began a repair and training period. From 14 June to 21 June she participated in Operation "Beachtime," an amphibious landing in the Caribbean. Ingraham spent 28 October to 28 November preparing for service in the Mediterranean. On 8 December she arrived at Gibraltar.

Ingraham received the Navy Unit Commendation for her action off Okinawa and four battle stars for service in World War II. She earned a fifth battle star for service in Korea.

(Photo: USS Ingraham (DD-694))

The above is not an exhaustive description of plaintiffs' work, the work of others around him, the products, materials and equipment so used and encountered, or the ships/vessels aboard which that work occurred. Plaintiffs refer to and incorporate by reference herein the respective ship histories, muster rolls, and documents pertaining to each of the above-identified shipyards, ships and vessels, all equally available to defendants through the National Archives and other various sources.

Plaintiffs' investigation is continuing and ongoing. Plaintiffs reserve the right to supplement and/or amend their responses herein. Plaintiff Jeri Redman is not an expert in the identification of asbestos-containing materials at this worksite which Decedent or others installed, removed, disturbed and/or handled.

Plaintiff's investigation and discovery are continuing and ongoing.
b. Plaintiff Jeri Redman incorporates plaintiff's Responses to Interrogatory Nos. 45(F) and 45(G)(10)(a), above, as though fully stated herein.

c. - e. No.
11. Decedent RONALD D. REDMAN worked in close proximity to persons who were installing, removing, handling and otherwise disturbing asbestos-containing materials while employed at this site.

a. Plaintiff Jeri Redman incorporates Response to Interrogatory No. 45(F) and Interrogatory No. 45(G)(10)(a), above, as though fully stated herein.

b. Plaintiff Jeri Redman identifies persons in decedent's close proximity installing, removing, handling and/or otherwise disturbing various asbestos-containing materials in close proximity to Decedent's work area while Decedent was employed at this site, including but not necessarily limited to, that itemized in plaintiff's Responses to Interrogatory Nos. 45(F) and 45(G)(10)(a), above. Plaintiff incorporates plaintiff's Responses to Interrogatory Nos. 45(F) and 45(G)(10)(a), above, as though fully stated herein. Plaintiff Jeri Redman is not an expert in the identification of asbestos-containing materials and may not be aware of all of the asbestos-containing materials at this worksite which Decedent or others installed, removed, disturbed and/or handled.

c. To the extent that plaintiff Jeri Redman knows such information, it is itemized in plaintiff's Responses to Interrogatory Nos. 45(F) and 45(G)(10)(a), above. Plaintiff incorporates plaintiff's Responses to Interrogatory Nos. 45(F) and 45(G)(10)(a), above, as though fully stated herein. Such information is more available to defendants than plaintiff. Decedent RONALD D. REDMAN worked in close proximity to various trades that were disturbing asbestos-containing materials, including, but not limited to, the following: boilermakers, drillers, drywall installers, electricians, HVAC installers, insulators, laborers, machinists, joiners, masons, painters, pipefitters, plumbers, riggers, sandblasters, scalers, sheetmetal workers, steamfitters, tool room attendants, welders, carpenters, sheetrockers, tapers, sanders and other trades. All such trades were employed by the premise owner and other contractors, including but not necessarily limited to those itemized in plaintiff's Responses to Interrogatory Nos. 45(F) and 45(G)(10)(a), above. Plaintiff's investigation and discovery are continuing.

d. Such trades installed, removed, distributed, loaded, unloaded, cut, swept and/or otherwise disturbed asbestos-containing thermal insulation materials.

e.  i.   Such work occurred in virtually every area within the jobsite.
   ii.   Decedent worked within approximately 1 to 50 feet from the area where such trades were working and disturbing asbestos-containing thermal insulation materials.

f. - h.  No.

46A.  USS KEARNY

46B.  Plaintiff Jeri Redman incorporates plaintiff's response to Interrogatory No. 46(A), above, as though fully stated herein.

46C.  Decedent worked at this jobsite from approximately sometime during the dates January, 1974 to approximately December, 1984. Plaintiff Jeri Redman's best present estimation of the Decedent's total cumulative time at this jobsite is 10 years. Plaintiff Jeri Redman 's best present estimation of DecedentRONALD D. REDMAN's total number of different jobs or projects at this jobsite is 1.

46D.  Decedent RONALD D. REDMAN's employer at this jobsite was Norfolk Naval Shipyard. Decedent RONALD D. REDMAN's employer's address is equally available to all parties through decedent's social security, union and other equally available records. All such documents have been sought by plaintiff Jeri Redman's counsel and made available to designated defense counsel by authorization. To the extent that any of these documents are in possession of counsel, they have been copied to designated defense counsel.

46E.  Plaintiff refers to and incorporates herein by reference response to 46G(10)(a) below.

46F.  Plaintiff refers to and incorporates herein by reference response to 46G(10)(a) below.

46G.  Decedent RONALD D. REDMAN suffered occupational exposure to asbestos while working at this jobsite.

1. Decedent RONALD D. REDMAN worked throughout the jobsite.

2. Plaintiff Jeri Redman incorporates response to Interrogatory No. 46(C), above.

3. Decedent RONALD D. REDMAN was employed by Norfolk Naval Shipyard and his direct supervisor was an employee of his employer. The day-to-day work activities of all such contractors were ultimately directed by the premises owner and other hiring contractors. To the extent that Plaintiff Jeri Redman is able to identify any supervisors of Decedent RONALD D. REDMAN, they are identified in Response to Interrogatory No. 46(G)(4), below, incorporated herein by reference as though full stated.

4. Other than information protected by the attorney-client privilege, Decedent's co-workers included, but are not limited to, all persons listed at this jobsite, if any, and in Exhibit 'A', attached hereto. Decedent worked with the following co-workers: Darryl Flattum. Additionally, Decedent RONALD D. REDMAN worked with and around the following coworkers, but plaintiff is unable at this time to identify all of the various locations where Decedent worked with them: Neff Matthews.

5. Plaintiff Jeri Redman incorporates Response to Interrogatory No. 46(G)(3) and 46(G)(4), above, as though fully stated herein. Numerous contractors installed and removed asbestos-containing thermal insulation materials at Decedent RONALD D. REDMAN's worksites. Plaintiff's investigation and discovery are continuing and ongoing.

6. See Exhibit 'A', attached hereto, for a list of contractors, if any, who performed work at this jobsite prior to or during Decedent RONALD D. REDMAN's employment at this site.

7. Plaintiff Jeri Redman incorporates Response to Interrogatory No. 46(G)(6), above, as though fully stated herein.

8. Plaintiff Jeri Redman incorporates Response to Defendants Standard Request for Production and Identification of Documents and Things, previously served herein. Plaintiff's investigation and discovery are continuing and ongoing.

9. Plaintiff Jeri Redman incorporates Response to Defendants Standard Request for Production and Identification of Documents and Things, previously served herein. Plaintiff's investigation and discovery are continuing and ongoing.

10. Decedent RONALD D. REDMAN and others around him installed, removed, handled, swept, and otherwise disturbed asbestos-containing materials while employed at this site. As a result, he and other around him were exposed to and breathed large amounts of asbestos. These work activities, including those activities itemized in response 10(a) below, released respirable asbestos fibers into the air which Decedent RONALD D. REDMAN breathed.

a. Decedent RONALD D. REDMAN worked with and/or in close proximity to the installation, removal, disturbance and/or handling of various asbestos-containing materials while employed at this site, including, but not limited to, the following: Decedent was exposed to asbestos-containing blankets being used, cut, tattered, wrapped about, handled and applied. Decedent was exposed to asbestos-containing floor tiles installed which were laid, cut, installed, applied with mastic and otherwise disturbed. Decedent was exposed to asbestos-containing floor tiles being broken, pried-out, torn-up, dislodged, swept up and otherwise disturbed. Decedent was exposed to asbestos-containing gasket materials, from the cutting, punching, installing and handling of the gasket material. Decedent was exposed to asbestos-containing gasket materials, being replaced, removed, scraped out, dislodged, blown out, brushed out, swept up and otherwise disturbed. Decedent was exposed to asbestos-containing thermal insulation materials, including pipe covering, block and mud, being installed which were handled, cut, mixed, applied, and otherwise disturbed. Decedent was exposed to asbestos-containing thermal insulation materials, including pipe covering, block and mud, being removed, torn-out, dislodged, swept and otherwise disturbed. Decedent was exposed to asbestos-containing packing materials, from the cutting, stuffing, installing and applying of the packing material to equipment and valves. Decedent was exposed to asbestos-containing packing materials, being removed, scraped out, pulled out, dislodged, blown out, swept up and otherwise disturbed. Decedent was exposed to asbestos-containing refractory materials, including mortar, mud, refractory brick, insulation, insulating cement, insulating compounds, vermiculite, refractory clay, block insulation, and cloth, being installed which were cut, mixed, applied, handled and otherwise disturbed. Decedent was exposed to asbestos-containing refractory materials, including mortar, mud, refractory brick, insulation, insulating cement, insulating compounds, vermiculite, refractory clay, block insulation, and cloth being removed, torn-out, dislodged, swept and otherwise disturbed. Decedent worked on the shutdown, turnaround, maintenance, repair, remodel and demolition of the premises, including working around persons installing, sweeping, spraying, cutting, ripping out, removing, demolishing, scraping, sanding, missing, using and otherwise disturbing asbestos-containing materials. Decedent worked on construction involving tying in newly constructed areas into previously existing portions of the premises which involved working with and around the removal, installation, cutting, ripping out, repair, patching, mixing and other disturbances of asbestos-containing construction materials. Decedent RONALD D. REDMAN was exposed to the following products being used at this and other such jobsites: IMO INDUSTRIES INC., VIAD CORP.. Between 1974-1984, while Plaintiff worked in the design and engineering division at the NORFOLK NAVAL SHIPYARD in Portsmouth, Virginia (herein, "NORFOLK NAVAL"), plaintiff worked aboard this vessel either at NORFOLK NAVAL or at the San Diego 32nd St. Naval Station in San Diego,

California. Plaintiff's job during this time was in a engineering design group investigating operational problems on the various systems and equipment aboard the numerous ships and vessels being overhauled and repaired at NORFOLK NAVAL. These system and engineering conflicts arose in the midst of overhaul and repair aboard a vessel when a system, scheme or mechanical equipment/piping/system configuration could not practically be put into operation aboard the vessel itself due to lack of space, mechanical conflicts, etc. Mr. REDMAN therefore investigated design drawings, boarded the vessel, investigated the conflicts aboard the vessel, took measurements, received input from the ships' crews and went about resolving mechanical and design issues aboard ship, particularly throughout the propulsion systems and engineering spaces aboard this vessel, including the engine rooms, fire rooms and auxiliary machinery spaces, in the shaft alleys, with/around steam systems, electrical systems, vent systems, the propulsion plant and structure throughout the ship. Mr. REDMAN then drafted "Ship-Alts" (ship-alterations) which after department approval became part of the overhaul package of overhaul of the systems to be modified.

During his ship inspection and "Ship-Alt" work, Mr. REDMAN went aboard numerous ships and vessels on a daily basis, including this vessel while at NORFOLK NAVAL, in the midst of ship checks, ship repairs and ongoing overhauls of this vessel.

Mr. REDMAN's "Ship-Alt" work duty took him to all parts of this particular vessel, including the engine rooms, boiler rooms, machinery and engineering spaces. Mr. REDMAN's own work variously required him to inspect engines, boilers and all auxiliary/supporting equipment (including, but not limited to, valves, pumps, piping, etc.) during his equipment inspections. During all of these overhauls while Mr. REDMAN was aboard ship performing his equipment inspections, both the ships' crew and outside contractors were working aboard these ships performing their routine duties, including overhauling the equipment and systems aboard the ships. The trades that worked around Mr. REDMAN included, but were not limited to, the following: pipefitters/shipfitters, boilermakers/boilertenders, insulators, electricians, machinists/mechanics, riggers, laborers, decking and/or bulkhead installers. The work of others around Mr. REDMAN variously included the installation, adjustment, overhaul and repair of all of the piping, equipment and systems aboard the ship for both main and auxiliary systems, including, but not limited to, the following: asbestos-containing valves; asbestos-containing compressors; asbestos-containing steam turbines; asbestos-containing pumps; forced draft blowers, feedheaters and distilling systems; as well as asbestos-containing gaskets; asbestos-containing packing. The work of the tradesmen around Mr. REDMAN disturbed the ships' equipment, systems and piping, including the various asbestos-containing components of each (including, but not limited to, asbestos-containing insulation, gaskets, packing, and electrical components), creating and releasing asbestos-containing dust, debris, fiber and particulate into and throughout these ships and their respective engineering spaces, passageways, and compartments, thereby contaminating the same with asbestos-containing dust, debris, fiber and particulate which Mr. REDMAN consequently breathed without warning or protection from the manufacturers of those asbestos containing ships'/vessels' equipment, systems and components.

Per Navy archives docs, the USS KEARNY (DD-432) operated DeLaval reduction gears; main condensate and booster pumps; cruise condensate and booster pumps; aux condensate and booster pumps; main feed pumps by which plaintiffs claim decedent Mr. REDMAN was exposed to asbestos.

Per Navy archives docs, the USS KEARNY (DD-432) operated GRISCOLM-RUSSELL distilling plants by which plaintiffs claim decedent Mr. REDMAN was exposed to asbestos.

The following information is presently available regarding this vessel:

Kearny

* * *Plaintiff Jeri Redman is not an expert in the identification of asbestos-containing materials at this worksite which Decedent or others installed, removed, disturbed and/or handled.

Plaintiff's investigation and discovery are continuing and ongoing.
b. Plaintiff Jeri Redman incorporates plaintiff's Responses to Interrogatory Nos. 46(F) and 46(G)(10)(a), above, as though fully stated herein.

c. - e. No.
11. Decedent RONALD D. REDMAN worked in close proximity to persons who were installing, removing, handling and otherwise disturbing asbestos-containing materials while employed at this site.

a. Plaintiff Jeri Redman incorporates Response to Interrogatory No. 46(F) and Interrogatory No. 46(G)(10)(a), above, as though fully stated herein.

b. Plaintiff Jeri Redman identifies persons in decedent's close proximity installing, removing, handling and/or otherwise disturbing various asbestos-containing materials in close proximity to Decedent's work area while Decedent was employed at this site, including but not necessarily limited to, that itemized in plaintiff's Responses to Interrogatory Nos. 46(F) and 46(G)(10)(a), above. Plaintiff incorporates plaintiff's Responses to Interrogatory Nos. 46(F) and 46(G)(10)(a), above, as though fully stated herein. Plaintiff Jeri Redman is not an expert in the identification of asbestos-containing materials and may not be aware of all of the asbestos-containing materials at this worksite which Decedent or others installed, removed, disturbed and/or handled.

c. To the extent that plaintiff Jeri Redman knows such information, it is itemized in plaintiff's Responses to Interrogatory Nos. 46(F) and 46(G)(10)(a), above. Plaintiff incorporates plaintiff's Responses to Interrogatory Nos. 46(F) and 46(G)(10)(a), above, as though fully stated herein. Such information is more available to defendants than plaintiff. Decedent RONALD D. REDMAN worked in close proximity to various trades that were disturbing asbestos-containing materials, including, but not limited to, the following: boilermakers, drillers, drywall installers, electricians, HVAC installers, insulators, laborers, machinists, joiners, masons, painters, pipefitters, plumbers, riggers, sandblasters, scalers, sheetmetal workers, steamfitters, tool room attendants, welders, carpenters, sheetrockers, tapers, sanders and other trades. All such trades were employed by the premise owner and other contractors, including but not necessarily limited to those itemized in plaintiff's Responses to Interrogatory Nos. 46(F) and 46(G)(10)(a), above. Plaintiff's investigation and discovery are continuing.

d. Such trades installed, removed, distributed, loaded, unloaded, cut, swept and/or otherwise disturbed asbestos-containing thermal insulation materials.

e. i.    Such work occurred in virtually every area within the jobsite.
   ii.   Decedent worked within approximately 1 to 50 feet from the area where such trades were working and disturbing asbestos-containing thermal insulation materials.

f. - h. No.

47A.   USS SPRUANCE
47B.   Plaintiff Jeri Redman incorporates plaintiff's response to Interrogatory No. 47(A), above, as though fully stated herein.
47C.   Decedent worked at this jobsite from approximately sometime during the dates January, 1974 to approximately December, 1984. Plaintiff Jeri Redman's best present estimation of the Decedent's total cumulative time at this jobsite is 10 years. Plaintiff Jeri Redman 's best present estimation of DecedentRONALD D. REDMAN's total number of different jobs or projects at this jobsite is 1.
47D.   Decedent RONALD D. REDMAN's employer at this jobsite was Norfolk Naval Shipyard. Decedent RONALD D. REDMAN's employer's address is equally available to all parties through decedent's social security, union and other equally available records. All such documents have been sought by plaintiff Jeri Redman's counsel and made available to designated defense counsel by authorization. To the extent that any of these documents are in possession of counsel, they have been copied to designated defense counsel.
47E.   Plaintiff refers to and incorporates herein by reference response to 47G(10)(a) below.
47F.   Plaintiff refers to and incorporates herein by reference response to 47G(10)(a) below.
47G.   Decedent RONALD D. REDMAN suffered occupational exposure to asbestos while working at this jobsite.
   1. Decedent RONALD D. REDMAN worked throughout the jobsite.
   2. Plaintiff Jeri Redman incorporates response to Interrogatory No. 47(C), above.
   3. Decedent RONALD D. REDMAN was employed by Norfolk Naval Shipyard and his direct supervisor was an employee of his employer. The day-to-day work activities of all such contractors were ultimately directed by the premises owner and other hiring contractors. To the extent that Plaintiff Jeri Redman is able to identify any supervisors of Decedent RONALD D. REDMAN, they are identified in Response to Interrogatory No. 47(G)(4), below, incorporated herein by reference as though full stated.
   4. Other than information protected by the attorney-client privilege, Decedent's co-workers included, but are not limited to, all persons listed at this jobsite, if any, and in Exhibit 'A', attached hereto. Decedent worked with the following co-workers: Darryl Flattum. Additionally, Decedent RONALD D. REDMAN worked with and around the following coworkers, but plaintiff is unable at this time to identify all of the various locations where Decedent worked with them: Neff Matthews.
   5. Plaintiff Jeri Redman incorporates Response to Interrogatory No. 47(G)(3) and 47(G)(4), above, as though fully stated herein. Numerous contractors installed and removed asbestos-containing thermal insulation materials at Decedent RONALD D. REDMAN's worksites. Plaintiff's investigation and discovery are continuing and ongoing.
   6. See Exhibit 'A', attached hereto, for a list of contractors, if any, who performed work at this jobsite prior to or during Decedent RONALD D. REDMAN's employment at this site.
   7. Plaintiff Jeri Redman incorporates Response to Interrogatory No. 47(G)(6), above, as though fully stated herein.

1   11. Decedent RONALD D. REDMAN worked in close proximity to persons who were

2   installing, removing, handling and otherwise disturbing asbestos-containing materials
    while employed at this site.

3   a. Plaintiff Jeri Redman incorporates Response to Interrogatory No. 53(F) and

4   Interrogatory No. 53(G)(10)(a), above, as though fully stated herein.

5   b. Plaintiff Jeri Redman identifies persons in decedent's close proximity installing,
    removing, handling and/or otherwise disturbing various asbestos-containing materials in

6   close proximity to Decedent's work area while Decedent was employed at this site,
    including but not necessarily limited to, that itemized in plaintiff's Responses to

7   Interrogatory Nos. 53(F) and 53(G)(10)(a), above. Plaintiff incorporates plaintiff's
    Responses to Interrogatory Nos. 53(F) and 53(G)(10)(a), above, as though fully stated

8   herein. Plaintiff Jeri Redman is not an expert in the identification of asbestos-containing
    materials and may not be aware of all of the asbestos-containing materials at this worksite

9   which Decedent or others installed, removed, disturbed and/or handled.

10  c. To the extent that plaintiff Jeri Redman knows such information, it is itemized in
    plaintiff's Responses to Interrogatory Nos. 53(F) and 53(G)(10)(a), above. Plaintiff

11  incorporates plaintiff's Responses to Interrogatory Nos. 53(F) and 53(G)(10)(a), above, as
    though fully stated herein. Such information is more available to defendants than

12  plaintiff. Decedent RONALD D. REDMAN worked in close proximity to various trades
    that were disturbing asbestos-containing materials, including, but not limited to, the

13  following: boilermakers, drillers, drywall installers, electricians, HVAC installers,
    insulators, laborers, machinists, joiners, masons, painters, pipefitters, plumbers, riggers,

14  sandblasters, scalers, sheetmetal workers, steamfitters, tool room attendants, welders,
    carpenters, sheetrockers, tapers, sanders and other trades. All such trades were employed

15  by the premise owner and other contractors, including but not necessarily limited to those
    itemized in plaintiff's Responses to Interrogatory Nos. 53(F) and 53(G)(10)(a), above.

16  Plaintiff's investigation and discovery are continuing.

17  d. Such trades installed, removed, distributed, loaded, unloaded, cut, swept and/or

18  otherwise disturbed asbestos-containing thermal insulation materials.

19  e. i.     Such work occurred in virtually every area within the jobsite.
       ii.    Decedent worked within approximately 1 to 50 feet from the area where such

20          trades were working and disturbing asbestos-containing thermal insulation
            materials.

21  f. - h. No.

22

23  54A.  USS REUBEN JAMES
    54B.  Plaintiff Jeri Redman incorporates plaintiff's response to Interrogatory No. 54(A), above,
          as though fully stated herein.

24  54C.  Decedent worked at this jobsite from approximately sometime during the dates January,
          1974 to approximately December, 1984. Plaintiff Jeri Redman's best present estimation

25        of the Decedent's total cumulative time at this jobsite is 10 years. Plaintiff Jeri Redman
          's best present estimation of DecedentRONALD D. REDMAN's total number of different

26        jobs or projects at this jobsite is 1.

27  54D.  Decedent RONALD D. REDMAN's employer at this jobsite was Norfolk Naval
          Shipyard. Decedent RONALD D. REDMAN's employer's address is equally available

28
    PLAINTIFF'S RESPONSES TO DEFENDANTS' STANDARD INTERROGATORIES - SET TWO (Wrongful Death)
                                                                        PAGE 297

to all parties through decedent's social security, union and other equally available records. All such documents have been sought by plaintiff Jeri Redman's counsel and made available to designated defense counsel by authorization. To the extent that any of these documents are in possession of counsel, they have been copied to designated defense counsel.

54E.   Plaintiff refers to and incorporates herein by reference response to 54G(10)(a) below.

54F.   Plaintiff refers to and incorporates herein by reference response to 54G(10)(a) below.

54G.   Decedent RONALD D. REDMAN suffered occupational exposure to asbestos while working at this jobsite.

1. Decedent RONALD D. REDMAN worked throughout the jobsite.

2. Plaintiff Jeri Redman incorporates response to Interrogatory No. 54(C), above.

3. Decedent RONALD D. REDMAN was employed by Norfolk Naval Shipyard and his direct supervisor was an employee of his employer. The day-to-day work activities of all such contractors were ultimately directed by the premises owner and other hiring contractors. To the extent that Plaintiff Jeri Redman is able to identify any supervisors of Decedent RONALD D. REDMAN, they are identified in Response to Interrogatory No. 54(G)(4), below, incorporated herein by reference as though full stated.

4. Other than information protected by the attorney-client privilege, Decedent's co-workers included, but are not limited to, all persons listed at this jobsite, if any, and in Exhibit 'A', attached hereto. Decedent worked with the following co-workers: Darryl Flattum. Additionally, Decedent RONALD D. REDMAN worked with and around the following coworkers, but plaintiff is unable at this time to identify all of the various locations where Decedent worked with them: Neff Matthews.

5. Plaintiff Jeri Redman incorporates Response to Interrogatory No. 54(G)(3) and 54(G)(4), above, as though fully stated herein. Numerous contractors installed and removed asbestos-containing thermal insulation materials at Decedent RONALD D. REDMAN's worksites. Plaintiff's investigation and discovery are continuing and ongoing.

6. See Exhibit 'A', attached hereto, for a list of contractors, if any, who performed work at this jobsite prior to or during Decedent RONALD D. REDMAN's employment at this site.

7. Plaintiff Jeri Redman incorporates Response to Interrogatory No. 54(G)(6), above, as though fully stated herein.

8. Plaintiff Jeri Redman incorporates Response to Defendants Standard Request for Production and Identification of Documents and Things, previously served herein. Plaintiff's investigation and discovery are continuing and ongoing.

9. Plaintiff Jeri Redman incorporates Response to Defendants Standard Request for Production and Identification of Documents and Things, previously served herein. Plaintiff's investigation and discovery are continuing and ongoing.

10. Decedent RONALD D. REDMAN and others around him installed, removed, handled, swept, and otherwise disturbed asbestos-containing materials while employed at this site. As a result, he and other around him were exposed to and breathed large amounts of asbestos. These work activities, including those activities itemized in response 10(a) below, released respirable asbestos fibers into the air which Decedent RONALD D. REDMAN breathed.

a. Decedent RONALD D. REDMAN worked with and/or in close proximity to the installation, removal, disturbance and/or handling of various asbestos-containing materials while employed at this site, including, but not limited to, the following: Decedent was exposed to asbestos-containing blankets being used, cut, tattered, wrapped about, handled and applied. Decedent was exposed to asbestos-containing floor tiles installed which were laid, cut, installed, applied with mastic and otherwise disturbed.

1   Decedent was exposed to asbestos-containing floor tiles being broken, pried-out, torn-up,
    dislodged, swept up and otherwise disturbed. Decedent was exposed to asbestos-
2   containing gasket materials, from the cutting, punching, installing and handling of the
    gasket material. Decedent was exposed to asbestos-containing gasket materials, being
3   replaced, removed, scraped out, dislodged, blown out, brushed out, swept up and
    otherwise disturbed. Decedent was exposed to asbestos-containing packing materials,
4   from the cutting, stuffing, installing and applying of the packing material to equipment
    and valves. Decedent was exposed to asbestos-containing packing materials, being
5   removed, scraped out, pulled out, dislodged, blown out, swept up and otherwise
    disturbed. Decedent was exposed to asbestos-containing refractory materials, including
6   mortar, mud, refractory brick, insulation, insulating cement, insulating compounds,
7   vermiculite, refractory clay, block insulation, and cloth, being installed which were cut,
    mixed, applied, handled and otherwise disturbed. Decedent was exposed to asbestos-
8   containing refractory materials, including mortar, mud, refractory brick, insulation,
    insulating cement, insulating compounds, vermiculite, refractory clay, block insulation,
9   and cloth being removed, torn-out, dislodged, swept and otherwise disturbed. Decedent
    worked on the shutdown, turnaround, maintenance, repair, remodel and demolition of the
10  premises, including working around persons installing, sweeping, spraying, cutting,
    ripping out, removing, demolishing, scraping, sanding, missing, using and otherwise
11  disturbing asbestos-containing materials. Decedent worked on construction involving
    tying in newly constructed areas into previously existing portions of the premises which
12  involved working with and around the removal, installation, cutting, ripping out, repair,
    patching, mixing and other disturbances of asbestos-containing construction materials.
13  Decedent RONALD D. REDMAN was exposed to the following products being used at
    this and other such jobsites: FOSTER WHEELER USA CORPORATION, IMO
14  INDUSTRIES INC., VIAD CORP.. Between 1974-1984, while Plaintiff worked in the
15  design and engineering division at the NORFOLK NAVAL SHIPYARD in Portsmouth,
    Virginia (herein, "NORFOLK NAVAL"), plaintiff worked aboard this vessel either at
16  NORFOLK NAVAL or at the San Diego 32nd St. Naval Station in San Diego,
    California. Plaintiff's job during this time was in a engineering design group
17  investigating operational problems on the various systems and equipment aboard the
    numerous ships and vessels being overhauled and repaired at NORFOLK NAVAL.
18  These system and engineering conflicts arose in the midst of overhaul and repair aboard a
    vessel when a system, scheme or mechanical equipment/piping/system configuration
19  could not practically be put into operation aboard the vessel itself due to lack of space,
    mechanical conflicts, etc. Mr. REDMAN therefore investigated design drawings,
20  boarded the vessel, investigated the conflicts aboard the vessel, took measurements,
    received input from the ships' crews and went about resolving mechanical and design
21  issues aboard ship, particularly throughout the propulsion systems and engineering spaces
    aboard this vessel, including the engine rooms, fire rooms and auxiliary machinery
22  spaces, in the shaft alleys, with/around steam systems, electrical systems, vent systems,
    the propulsion plant and structure throughout the ship. Mr. REDMAN then drafted
23  "Ship-Alts" (ship-alterations) which after department approval became part of the
    overhaul package of overhaul of the systems to be modified.
24
25  During his ship inspection and "Ship-Alt" work, Mr. REDMAN went aboard numerous
    ships and vessels on a daily basis, including this vessel while at NORFOLK NAVAL, in
26  the midst of ship checks, ship repairs and ongoing overhauls of this vessel.

27  Mr. REDMAN's "Ship-Alt" work duty took him to all parts of this particular vessel,
    including the engine rooms, boiler rooms, machinery and engineering spaces. Mr.
28
---

1
2
3
4
5
6
7
8
9
10
11
12
13
REDMAN's own work variously required him to inspect engines, boilers and all auxiliary/supporting equipment (including, but not limited to, valves, pumps, piping, etc.) during his equipment inspections. During all of these overhauls while Mr. REDMAN was aboard ship performing his equipment inspections, both the ships' crew and outside contractors were working aboard these ships performing their routine duties, including overhauling the equipment and systems aboard the ships. The trades that worked around Mr. REDMAN included, but were not limited to, the following: pipefitters/shipfitters, boilermakers/boilertenders, insulators, electricians, machinists/mechanics, riggers, laborers, decking and/or bulkhead installers. The work of others around Mr. REDMAN variously included the installation, adjustment, overhaul and repair of all of the piping, equipment and systems aboard the ship for both main and auxiliary systems, including, but not limited to, the following: asbestos-containing valves; asbestos-containing compressors; asbestos-containing steam turbines; asbestos-containing pumps; forced draft blowers, feedheaters and distilling systems; as well as asbestos-containing gaskets; asbestos-containing packing. The work of the tradesmen around Mr. REDMAN disturbed the ships' equipment, systems and piping, including the various asbestos-containing components of each (including, but not limited to, asbestos-containing insulation, gaskets, packing, and electrical components), creating and releasing asbestos-containing dust, debris, fiber and particulate into and throughout these ships and their respective engineering spaces, passageways, and compartments, thereby contaminating the same with asbestos-containing dust, debris, fiber and particulate which Mr. REDMAN consequently breathed without warning or protection from the manufacturers of those asbestos containing ships'/vessels' equipment, systems and components.

14
15
Per Navy archives docs, the USS RUEBEN JAMES (DE-153) operated GRISCOLM-RUSSELL distilling plants by which plaintiffs claim decedent Mr. REDMAN was exposed to asbestos.

16
The following information is presently available regarding this vessel:

17
Reuben James

18
* * *
II

19
20
21
(DE - 153: displacement 1,740 (full load); length 306'; beam 37'; draft 13'6"; speed 23.6 knots; complement 213; armament 2 5", 3 3", 2 40mm., 8 20mm., 2 depth charge tracks, 8 depth charge projectors, 1 depth charge projector (hedgehog-type), 3 21" torpedo tubes; class Buckley)

22
23
The second Reuben James (DE-153) was laid down on 7 September 1942 by the Navy Yard, Norfolk, Va.; launched 6 February 1943; sponsored by Mrs. Oliver Hiram Ward; and commissioned 1 April 1943, Lt. Comdr. Frank D. Giambattista in command.

24
25
26
First based at Miami, Fla., Reuben James conducted antisubmarine patrols and provided training in convoy escort and antisubmarine warfare. Departing Miami 14 October 1943, she escorted the torpedoed tanker Balls Bluff to Charleston, S.C. In March 1944, she shifted her base from Miami to Norfolk, Va. In June she escorted a convoy from New York to Norfolk.

27
28

Between 13 July and 7 November, she escorted two convoys to the Mediterranean, returning with westbound convoys. During her first eastbound voyage, nine German bombers attacked her convoy off Algeria on 1 August. Reuben James shot down one enemy bomber.

Returning to Boston 7 November 1944, she joined an antisubmarine group operating in the North Atlantic. Operating south of Newfoundland, she was present when Buckley (DE-51) sank German submarine U-879 on 19 April 1945.

Arriving at Houston, Tex., on 4 July, she completed conversion to a radar picket ship 25 November. Subsequently, she operated in the Atlantic and the Caribbean, out of Norfolk, Va. Entering the Charleston Naval Shipyard in July 1947, she decommissioned on 11 October. In 1949 she was designated DER, but was reclassified DE in 1954.

The above is not an exhaustive description of plaintiffs' work, the work of others around him, the products, materials and equipment so used and encountered, or the ships/vessels aboard which that work occurred. Plaintiffs refer to and incorporate by reference herein the respective ship histories, muster rolls, and documents pertaining to each of the above-identified shipyards, ships and vessels, all equally available to defendants through the National Archives and other various sources.

Plaintiffs' investigation is continuing and ongoing. Plaintiffs reserve the right to supplement and/or amend their responses herein.Plaintiff Jeri Redman is not an expert in the identification of asbestos-containing materials at this worksite which Decedent or others installed, removed, disturbed and/or handled.
Plaintiff's investigation and discovery are continuing and ongoing.
b. Plaintiff Jeri Redman incorporates plaintiff's Responses to Interrogatory Nos. 54(F) and 54(G)(10)(a), above, as though fully stated herein.

c. - e. No.
11. Decedent RONALD D. REDMAN worked in close proximity to persons who were installing, removing, handling and otherwise disturbing asbestos-containing materials while employed at this site.

a. Plaintiff Jeri Redman incorporates Response to Interrogatory No. 54(F) and Interrogatory No. 54(G)(10)(a), above, as though fully stated herein.

 b. Plaintiff Jeri Redman identifies persons in decedent's close proximity installing, removing, handling and/or otherwise disturbing various asbestos-containing materials in close proximity to Decedent's work area while Decedent was employed at this site, including but not necessarily limited to, that itemized in plaintiff's Responses to Interrogatory Nos. 54(F) and 54(G)(10)(a), above. Plaintiff incorporates plaintiff's Responses to Interrogatory Nos. 54(F) and 54(G)(10)(a), above, as though fully stated herein. Plaintiff Jeri Redman is not an expert in the identification of asbestos-containing materials and may not be aware of all of the asbestos-containing materials at this worksite which Decedent or others installed, removed, disturbed and/or handled.

c. To the extent that plaintiff Jeri Redman knows such information, it is itemized in plaintiff's Responses to Interrogatory Nos. 54(F) and 54(G)(10)(a), above. Plaintiff incorporates plaintiff's Responses to Interrogatory Nos. 54(F) and 54(G)(10)(a), above, as though fully stated herein. Such information is more available to defendants than

plaintiff. Decedent RONALD D. REDMAN worked in close proximity to various trades that were disturbing asbestos-containing materials, including, but not limited to, the following: boilermakers, drillers, drywall installers, electricians, HVAC installers, insulators, laborers, machinists, joiners, masons, painters, pipefitters, plumbers, riggers, sandblasters, scalers, sheetmetal workers, steamfitters, tool room attendants, welders, carpenters, sheetrockers, tapers, sanders and other trades. All such trades were employed by the premise owner and other contractors, including but not necessarily limited to those itemized in plaintiff's Responses to Interrogatory Nos. 54(F) and 54(G)(10)(a), above. Plaintiff's investigation and discovery are continuing.

d. Such trades installed, removed, distributed, loaded, unloaded, cut, swept and/or otherwise disturbed asbestos-containing thermal insulation materials.

e. i.    Such work occurred in virtually every area within the jobsite.
   ii.   Decedent worked within approximately 1 to 50 feet from the area where such trades were working and disturbing asbestos-containing thermal insulation materials.
f. - h.  No.

55A.  USS KNOX
55B.  Plaintiff Jeri Redman incorporates plaintiff's response to Interrogatory No. 55(A), above, as though fully stated herein.
55C.  Decedent worked at this jobsite from approximately sometime during the dates January, 1974 to approximately December, 1984. Plaintiff Jeri Redman's best present estimation of the Decedent's total cumulative time at this jobsite is 10 years. Plaintiff Jeri Redman 's best present estimation of DecedentRONALD D. REDMAN's total number of different jobs or projects at this jobsite is 1.
55D.  Decedent RONALD D. REDMAN's employer at this jobsite was Norfolk Naval Shipyard. Decedent RONALD D. REDMAN's employer's address is equally available to all parties through decedent's social security, union and other equally available records. All such documents have been sought by plaintiff Jeri Redman's counsel and made available to designated defense counsel by authorization. To the extent that any of these documents are in possession of counsel, they have been copied to designated defense counsel.
55E.  Plaintiff refers to and incorporates herein by reference response to 55G(10)(a) below.
55F.  Plaintiff refers to and incorporates herein by reference response to 55G(10)(a) below.
55G.  Decedent RONALD D. REDMAN suffered occupational exposure to asbestos while working at this jobsite.
      1. Decedent RONALD D. REDMAN worked throughout the jobsite.
      2. Plaintiff Jeri Redman incorporates response to Interrogatory No. 55(C), above.
      3. Decedent RONALD D. REDMAN was employed by Norfolk Naval Shipyard and his direct supervisor was an employee of his employer. The day-to-day work activities of all such contractors were ultimately directed by the premises owner and other hiring contractors. To the extent that Plaintiff Jeri Redman is able to identify any supervisors of Decedent RONALD D. REDMAN, they are identified in Response to Interrogatory No. 55(G)(4), below, incorporated herein by reference as though full stated.
      4. Other than information protected by the attorney-client privilege, Decedent's co-workers included, but are not limited to, all persons listed at this jobsite, if any, and in Exhibit 'A', attached hereto. Decedent worked with the following co-workers: Darryl Flattum. Additionally, Decedent RONALD D. REDMAN worked with and around the

PLAINTIFF'S RESPONSES TO DEFENDANTS' STANDARD INTERROGATORIES - SET TWO (Wrongful Death)

PAGE 302

S:\Clients\Plaintiff's\R\Redman. Ronald 10267\Discovery\Defcorn e\ALLD GOROG7 rspt .doc

**EXHIBIT "E"**





| | 1961 | 1960 |
|---|---|---|
| Net sales | $109,064,000 | $122,80... |
| Net income | $1,391,000 | $1,3... |
| Per share | $.33 | $... |
| Cash dividends declared | $1,703,000* | $2,... |
| Per share | $.40* | $... |
| Shareholders' book equity | $113,821,000 | $110... |
| Per share | $26.73 | $2... |
| Working capital | $79,633,000 | $73,... |
| Per share | $18.68 | |
| Additions and improvements to facilities | $1,751,000 | $1,0... |
| Depreciation and amortization charged to income | $2,918,000 | $3,10... |
| Orders received | $133,129,000 | $126,... |
| Orders unfilled | $83,785,000 | $66,9... |
| Number of shares outstanding | 4,256,050 | |
| Number of shareholders | 18,082 | |
| Number of employees—average | 6,596 | |

*Cash dividends paid in 1961 required is $1,914,000 or 45 cents per share

## TO THE SHAREHOLDERS

Although the dividend was not fully earned, the directors voted this dividend rate. As you will recall, we have always followed a conservative dividend policy, having in mind to maintain dividends, if possible, in bad years as in good years.

To comment briefly on certain salient facts pertaining to the company and shown on the opposite page under the caption SUMMARY: Sales amounted to $109,064,000 compared to $122,804,000 in the previous year. Backlog of orders at the year end was $83,785,000 compared to $66,695,000 at the end of the previous year.

Most important to both the immediate and long range prosperity of the corporation are our announced intent to diversify our activities by acquisition and product development, and our progress in this diversification.

Early last autumn we took the first two steps in this program by acquiring all rights to Bend-O-Matic machines and by organizing, with Industrial Process Engineers, Newark, N. J., the jointly owned Transjel International Corporation, Paramus, N. J.

In January, 1962, we acquired control of Hamilton-Thomas Corporation, Hamilton, Ohio, by purchasing substantially all of its capital stock. This acquisition gives us the products of the principal Hamilton-Thomas subsidiaries: C. H. Wheeler Manufacturing Company, Philadelphia and Ambler, Pennsylvania, and Griscom-Russell Company, Massillon, Ohio.

The Hamilton-Thomas products complement product lines already manufactured by BLH, and this is consistent with the philosophy of our diversification which is that our acquisitions must either enable us to broaden our participation in markets which we serve already or bring us into fields in which we can make worthwhile contributions.

The new products obtained through this acquisition—feedwater heaters, condensers and evaporators—provide BLH with additional equipment for the power industry to which we already supply hydraulic and pump turbines, forgings for steam and gas turbine rotors, force measuring equipment and materials handling cranes. To the BLH experience in building large pressure vessels, massive structural components and charging and discharging equipment for nuclear power plants, Hamilton-Thomas adds experience in building liquid-metal pumps and liquid-sodium heated steam generators.





William S. Gies, President



McClure Kelley, Chairman of the Board

2

With operating and equipment expenditures of $5 billion in 1961, these utilities will, according to projections made by ELECTRICAL WORLD, spend $6.5 billion in 1965; $9.2 billion in 1970.

Examine—Thomas products also augment the BLH marine product line, adding surface condensers, steering and materials handling equipment, and sea water distillers to our propeller, shafting and shipboard missile handling and launching equipment.

Of considerable interest among the new products are the evaporators for sea water distillation. Griscom-Russell Company, which has supplied distilling plants to well over half of all of the United States Ships in service, has designed and built land based distilling units which produce pure water from sea water. For continued research on this subject, Griscom-Russell operates a laboratory at Harbor Island, North Carolina.

Both governments and private companies throughout the world are keenly interested in obtaining pure water from the seas to irrigate arid lands and eliminate water shortages in semi-arid areas. This wide interest makes the exploration of large scale sea water distillation quite promising.

By astute procurement of foreign components, we were able, in 1961 to obtain the large, $15.5 million, contract for 13 turbines for the John Day and Lower Monumental Dams. While we will continue to pursue our cost-improvement program to maintain employment at our domestic plants, probably we will be obliged to continue to buy turbine components overseas. The percentage of such components that we must buy overseas will depend upon the effects of the recent changes in our government's international trade policy.

Our operating results have been adversely affected during the last several years by the cost-price squeeze in the heavy capital equipment field. We forecast that the recent acquisition, by providing more diversification, will allow us to serve a broader variety of industries and reduce our dependence on the individual health of specific markets.

In addition to our program for diversification, we will continue, vigorously, to push profit improvement programs in all of our divisions.

You will observe, when you read our balance sheet, that we are in a strong financial position. Our facilities are in excellent condition. As the progress report, which follows this letter, shows, we have been active in developing the products and services of our existing plants and divisions as well as in acquiring new plants and products.

Management again wishes to thank the officers and employees of the company for their wholehearted support in the year just ended.

*William S. Thomas*
President

*W. C. McCune*
Chairman of the Board

March 5, 1962

CREATIVE ENGINEERS AND BUILDERS FOR INDUSTRY AND DEFENSE





# PROGRESS REPORT

During 1961 the corporation began, continued or completed a variety of undertakings to add new products, broaden the usefulness of existing products, improve manufacturing facilities, increase the efficiency of management and sales, and anticipate, through research and development, new needs of existing markets and probable needs of new markets.

This progress report discusses some of the more important developments in the corporation.

## Financial

Reflecting the low ebb of the capital goods industry, BL-H sales for 1961 were $109,064,000 or 11% lower than 1960 sales. Despite the adverse sales trend, earnings for this transitional year 1961 were 6% higher than for 1960—and amounted to $1,391,106 or 31¢ per share compared with 31¢ per share for the preceding year. More significant was the steady improvement in quarterly earnings which for the first quarter of 1961 were 4¢ per share, followed by 8¢, then 9¢, and 11¢ for the final quarter. We hope to continue this trend of earnings.

Quarterly dividends of 10¢ per share were declared in 1961. As these dividends exceeded earnings the shareholders' equity declined slightly during the year to $26.73 for each of the 4,259,606 shares outstanding at year end.

Working capital, maintained at a high level in 1961, amounted at year end to $18.68 per share. Approximately $1,751,000—slightly more than in 1960—were spent on additions and improvements to facilities during 1961.

Orders of $111,179,000 received in 1961, exceeded 1960 orders, and included the John Day turbine order for $15.5 million received in December.

At year end, our cash and cash investments amounted to $18,502,000, a substantial increase from 1960. Payment to the company of mortgages and a tax refund, a total revenue of about $5.8 million, were the principal sources of this improvement.

In 1961, we invested $500,000 in our new 50% owned subsidiary, Translei International Corporation, Paramus, New Jersey. On January 30, 1962, we purchased, for cash, substantially all of the outstanding stock of Hamilton-Thomas Corporation, whose business is described elsewhere in this report.

## Capital Improvements

The most impressive achievement in capital improvement during 1961 occurred at the Standard Steel Division in Burnham, Pennsylvania. Over the past several years, we have been modernizing the facilities at Standard, undertaking to develop one of the highest quality, completely integrated, specialty steel facilities in the United States. With the installation of a new 150-ton ring rolling mill, built by the Industrial Equipment Division and in operation at Standard in the autumn of 1961, the Division became the only completely integrated producer of vacuum arc remelted superalloy rings and




**1** At site of the Experimental Gas Cooled Reactor, Oak Ridge, Tenn., Linn type Rigger... ton crane with 110 foot beam and 25 foot/jib assists erection work.

**2** New automatic rod mill at Standard Steel Division completes modernization program to make Standard fully integrated, super alloy ring maker.



**3** Electronic Division load measuring system weighs bulk milk at Sealtest Showcase Dairy, Pittsburgh, Pa.

**4** Dynamic balancer, built by Steel Rotors Division, checks balance of large ship propeller at Industrial Equipment Division.

**5** Steel Rotary snowplow, new attachment for Austin-Western graders, moves 20 to 25 tons of snow per minute, operates at elevations as great as 12,000 ft.

**6** Flanked by a huge, unfinished ring, is one of the large boring mills in Standard Steel's completely integrated ring production.




















**1**
BLH will build 13 turbines—
$15.5 million worth—for the
John Day dam which, when
completed, will be the world's
largest hydroelectric plant.

**2**
Sikorsky igloo for testing
helicopter rotors uses SR-4
strain gages and load cells
from Electronics Division for
all force measurement.

**3**
Austin-Western 210 hydrau-
lic crane handles heavy
masonry shape at building
demonstration.

**4**
One of the largest lathes
ever built, a 66 foot long,
139 inch swing monster,
built by Industrial Equipment
Division for Bethlehem Steel,
is electronically controlled.

**5**
A steady parade of extru-
sion presses, such as this
2600 ton aluminum press,
flow from the Industrial
Equipment Division to
American and foreign metal
fabricators. 23 have been
shipped this year.

**6**
New Lima 2501 crane with
70 foot boom moves large
tank in section site. Crane,
rated at 25 tons, is one of
new line the largest of
which has 45 ton capacity.



close control over the many production steps required in making parts for missiles and high-speed power-generating equipment.

We also completed an improvement at the Electronics Division during 1961 with the installation of a 250,000 pound load cell calibration facility, the largest such facility in existence.

At the other divisions, we continued to modernize our machining operations by installing new and more automatic tools and other facilities.

## New Products and New Progress in Product Fields

We have introduced a number of new products during 1961. The Construction Equipment Division has developed and begun to market a new line of truck mounted cranes built by the Lima plant. These cranes range in capacity from 25 to 45 tons, are notable for their high maneuverability and extreme sensitivity of lift and should fulfill the needs of a market in which a considerable and increasing demand appears to exist for cranes of this character.

The Austin-Western plant of the Construction Equipment Division has also commenced to market, as an attachment to widen the usefulness of Austin-Western power graders, the Sicard rotary snow plow. This new attachment, noted for its great snow moving capacity and ease of installation, is finding ready markets in heavy snow areas. The plant also introduced a new 9-wheel, 44-to-11-ton capacity rubber tired roller, a highly efficient compacting machine which prepares road beds for paving.

The Industrial Equipment Division is moving increasingly toward the development and manufacture of automatic production equipment.

The most noteworthy development, in this field during 1961 was the Bend-O-Matic, a tape actuated, automatic machine which can bend tubing to virtually any shape required by industry. The first Bend-O-Matics are designed to produce tubing configurations for the aircraft industry. This should be a promising application for equipment of this nature. As development proceeds we should be able to apply the tape actuated, automatic principle to other equipment, such as machine tools.

The Industrial Equipment Division has also progressed in the nuclear power field, having built pressure vessels, reactors, containers, accelerators and loading and unloading devices for several nuclear plants now in operation or under construction. We are just completing the pressure vessel for the Experimental Gas Cooled Reactor, which, so far as we can learn, will be the largest pressure vessel ever built. We have also supplied both interior nuclear components and normal marine components, such as couplings and propellers, for nuclear submarines.

The Electronics Division has added to its force-measuring equipment a complete line of instruments in order to supply integrated systems for all measuring purposes, semi-conductor and high temperature strain gages, a micro-miniature, solid state, differential amplifier, and a line of very sensitive micro-miniature thermocouples which have a broad application in temperature measurement.

The modernized specialty steel facilities at Standard are attracting increasing business from the missile and aircraft fields. The facilities also permit manufacturing complex alloys for rings and discs used in gas turbines for powering jet aircraft, and in large compressors and generators.

## Sales

In 1962, we will complete a reorganization for sales and service on Industrial and Utilities Equipment. A separate Industrial Sales Division will replace the previous manufacturing divisions. The reorganization will expand the from various manufacturing divisions. The reorganization will expand the regional sales office operation to provide a more complete coverage of our products and of the country. These new arrangements should increase sales and profits and provide better service to existing customers.

7



CREATIVE ENGINEERS AND BUILDERS FOR INDUSTRY AND DEFENSE

handling the products of the newly-acquired Hamilton-Thomas Corporation.

The Construction Equipment Division will continue to sell and service construction equipment through separate sales organizations which that division has always employed.

## Labor

We must renew several of our labor contracts during 1962. We are negotiating a new contract at the Electronics Division. The present contract at Standard Industrial Corporation, which should supply the... expires in August, 1962; those at Lima and Industrial Equipment end in early September. Each was a three-year contract. The Austin-Western contract, renewed in August, 1961 runs until August, 1963, and the Pelton contract, signed in April, 1961, runs until April, 1963.

## Research and Development

The BLH divisions and the new affiliate company, Transitel International Corporation, are engaging in research and development projects which should amplify products of promise and assist in diversifying the markets we serve. Some of these activities, such as those concerned with developing new markets, are directed toward broadening participation in existing markets. Others, such as the Transitel systems and the fuel cell, are directed toward providing new markets.

The Electronics Division has developed a line of semi-conductor strain gages which are sixty times as sensitive as current metallic units. These gages are being incorporated in pressure and force transducers to provide high signal levels for direct actuation of telemetry systems. The division has also developed a new line of load cells which provide higher output and greater accuracy.

The Industrial Equipment Division is engaged in a variety of developments in metal forming. An extrusion press for developing wide aluminum shapes, as wide as 120 inches and 4 inches deep; presses designed specifically to produce aluminum tubes, and presses for extruding and shaping such nuclear materials as plutonium and columbium. The division has also developed a method for crimping steel by a process of roll forming, which is an improvement over the conventional method of pressing or brake bending.

We have worked for several years on the development of a small, light-weight fuel cell which will be inexpensive to build, reasonable to operate, and suitable for stationary power plants. In the summer of 1961, we entered upon a contract with The Atlantic Refining Company to collaborate on the development of a fuel cell.

The function of a fuel cell is to convert the energy of combustion into electrical energy without the intermediate step of producing and transforming heat. Fuel cells can provide an efficiency of 75% compared to the 35% available from internal combustion engines. In the joint project, we have developed a novel approach to

... structure which appears to promise economies in the cost of construction and an attractive overall size and weight.

We continue to work in the nuclear field and, although almost all of our contracts to date have called, chiefly, for constructing complex components for reactors, this construction has required a good deal of research and development to obtain reliable sealing components and lubricants suited for the moving parts in the reactors and to devise means for treating materials so that it will withstand extremely corrosive influences.

The Metallurgy Department at Standard Steel, one of the finest in the United States, engages in continuing research and development and use of stainless steels and exotic alloys. This year Standard developed techniques for working with a whole new family of super-alloys required in components for solid fuel missiles. Advances in liquid fuel engines have required work with a new special alloy, Inconel X, and Standard has had the distinction of making the first heat of this space age alloy that was not produced by its inventor, the International Nickel Company.

At Transitel International, we are on the threshold of a large market for automatic systems. The Transitel products are designed to telemeter—that is, read data at a distance by electrical impulse—all varieties of electric, gas, water and other meters, credit control systems, traffic control devices, and a variety of other instruments and controls now handled mechanically.

Although the early stages of this development probably will be slow, we foresee good sales as the market develops.

The Industrial Equipment Division has always maintained a complete and excellent laboratory for research on water wheel turbines. It was one of the earliest companies to do research on pump turbines, having begun its efforts in the early 1930's, and this research is now beginning to produce business.

The pump turbine operates as a turbine when hydro-electric power is needed and as a pump to use the excess power from steam turbine plants when hydroelectric power is not needed. The turbine operation is similar to standard turbine operation. In the pump operation, the turbine pumps the water from a lower reservoir back into a higher reservoir so that it may be used again to operate the turbine.

It is too early to form an impression of the research which probably will be stimulated by our new acquisition, Hamilton-Thomas Corporation, but undoubtedly we shall look to make further explorations in the distillation of sea water and in the equipment which we shall be able to supply to the power industry.

## Summary

Our progress during 1961 has been steady and well-organized. We have accumulated worthwhile new products and have put ourselves in an excellent position to service broad industrial markets and to supply the needs of national defense.



| | 1961 | |
|---|---:|---:|
| Net sales | $109,064,209 | $122,6 |
| Royalties and licenses | 468,665 | 4 |
| Interest earned | 1,268,321 | 1,067 |
| Net profit on sale of property | 154,198 | 18 |
| Miscellaneous | 306,305 | 34 |
| **Total** | **$111,261,698** | **$124,6** |

**COSTS AND EXPENSES:**

| | | |
|---|---:|---:|
| Cost of products sold including engineering, selling and administrative expenses | $104,569,027 | $117,6 |
| Depreciation and amortization | 2,918,025 | 3,9 |
| Contributions for employees' retirement | 1,517,428 | 1,91 |
| Taxes on income (for 1960 see statement of retained earnings) | 865,000 | 80 |
| Interest and miscellaneous | 1,112 | 10 |
| **Total** | **$109,870,592** | **$123,0** |

| | | |
|---|---:|---:|
| **NET INCOME** | **$1,391,106** | **$1,9** |
| Per Share—Outstanding at end of year, 4,256,053 shares in 1961 and 4,252,800 shares in 1960 | $.33 | $.3 |

| | 1961 | |
|---|---:|---:|
| Balance, January 1 | $30,293,104 | $31 |
| Net income | 1,391,106 | 2,0 |
| Dividends declared | (1,702,530) | (2,5 |

Special (charges) and credits:

Unrequired income tax provision resulting from settlement of prior years' tax liabilities

Charges attributable to consolidation and rearrangement of operating facilities including losses, net of gains, from disposals of properties, equipment, and parts, less related income tax credit of $3,420,000

(this credit is after deducting a $330,000 Federal income tax provision, included in current liabilities, applicable to gain from disposal of properties deferred for income tax purposes; the income account has been charged with $330,000 of such credit, representing an amount equivalent to taxes on 1960 income, and the balance of $3,230,000 has been included in the balance sheet as Federal income tax refundable.)

| | | |
|---|---:|---:|
| Balance, December 31 | $29,981,680 | |





BALANCE SHEET DECEMBER 31, 1961 1960

| CURRENT ASSETS: | 1961 | 1960 |
|---|---|---|
| Cash | $6,475,603 | $5,51 |
| U.S. Treasury and other investments, at cost | 12,026,126 | 4,710 |
| Trade receivables (less reserve, $320,000 in 1961 and $210,000 in 1960) | 29,739,819 | 29,425 |
| Notes and mortgages receivable from sale of properties | 242,109 | 2,812 |
| Federal income tax refundable | — | 3,230 |
| Inventories at lower of cost or market (less reserve, $500,000 in 1961 and 1960) | 45,438,322 | 46,102 |
| Prepaid expenses | 193,486 | 23 |
| Total Current Assets | $94,115,465 | $92,02 |
| TRADE RECEIVABLES—Not due within one year | 7,411,593 | 6,544 |
| MORTGAGES RECEIVABLE—Not due within one year | 370,439 | 49 |
| INVESTMENTS—At cost | 973,875 | 56 |
| PROPERTY, PLANT AND EQUIPMENT—At cost (less reserve for depreciation and amortization, $45,760,782 in 1961 and $44,419,450 in 1960) | 26,092,468 | 27,580 |
| | $128,963,841 | $127,22 |

The Executive Stock Option Plan provides that the Company may grant options to key executives of the Company to purchase not in excess of 200,000 shares of the Company's common stock at prices not less than 95% of market value at the time the option is granted. At January 1, 1961, options were outstanding for 102,500 shares, options for 23,250 shares had been exercised and 74,250 unoptioned shares were available under the Plan. During 1961, options for 23,600 shares were granted, options for 3,300 shares were terminated, and options for 6,260 shares were exercised. At December 31, 1961, options to purchase 117,550 shares for an aggregate of $1,550,050 were outstanding and 53,950 unoptioned shares were available under the Plan.



| | 1961 | 1960 |
|---|---|---|
| **CURRENT LIABILITIES:** | | |
| Accounts payable, trade | $4,813,792 | $4,085,578 |
| Dividend payable | 426,005 | 637,920 |
| Advances on sales orders | 2,699,050 | 1,736,182 |
| Provision for taxes on income | 2,071,300 | 1,177,210 |
| Other taxes, wages, commissions, etc. | 4,572,595 | 4,808,314 |
| Total Current Liabilities | $14,582,743 | $12,495,704 |
| **RESERVES FOR PRODUCT GUARANTEES AND OTHER EXPENSES** | 560,000 | 660,000 |
| **SHAREHOLDERS' BOOK EQUITY:** | | |
| Common stock, $13 par: | | |
| Authorized, 5,000,000 shares | | |
| Issued, 4,782,778 shares | 62,176,114 | 62,176,114 |
| Capital in excess of par value | 26,836,298 | 26,836,298 |
| Retained earnings | 29,981,680 | 30,293,104 |
| | $118,994,092 | $119,305,516 |
| Less treasury common stock at cost, 524,728 shares in 1961 and 529,978 shares in 1960 | 5,172,994 | 5,233,215 |
| Total Shareholders' Book Equity | $113,821,098 | $114,072,301 |
| | $128,963,841 | $127,228,005 |

Reference is made to the accompanying report of the Chairman and the President and to the financial comments regarding the acquisition, in January 1962, of substantially all of the outstanding stock of Hamilton-Thomas Corporation.

13



LYBRAND, ROSS BROS. & MONTGOMERY
CERTIFIED PUBLIC ACCOUNTANTS

To the Shareholders of
Baldwin-Lima-Hamilton Corporation:

We have examined the balance sheet of Baldwin-Lima-Hamilton Corporation as of December 31, 1961, and the related statements of income and retained earnings for the year then ended. We were unable to obtain confirmation of certain amounts due from the United States Government but we satisfied ourselves as to such amounts by other auditing procedures. Our examination was made in accordance with generally accepted auditing standards, and accordingly included such tests of the accounting records and such other auditing procedures as we considered necessary in the circumstances.

In our opinion, the accompanying financial statements present fairly the position of Baldwin-Lima-Hamilton Corporation at December 31, 1961, and the results of its operations for the year then ended, in conformity with generally accepted accounting principles applied on a basis consistent with that of the preceding year.

Philadelphia, Penna.,
February 2, 1962.

**Executive Offices**

Philadelphia National Bank Building
Philadelphia 7, Pennsylvania

| | |
|---|---|
| Henry F. Barnhart | Lima, Ohio |
| H. E. Coombe | Cincinnati, Ohio |
| Francis L. Elmendorf | Shaker Heights, Ohio |
| Joseph M. Ewing | Valley Forge, Pennsylvania |
| William S. Ginn | Gladwyne, Pennsylvania |
| Edward Hopkinson, Jr. | Chestnut Hill, Pennsylvania |
| McClure Kelley | Glen Moore, Pennsylvania |
| Frederic A. Potts | Ambler, Pennsylvania |
| William Wood Prince | Chicago, Illinois |
| George A. Rentschler | New York, New York |
| William S. Rowe | Cincinnati, Ohio |
| Louis Fenn Sperry | Scarsdale, New York |
| Milton Steinbach | New York, New York |
| Ralph K. Stiles | Hillsborough, California |
| James M. White | Philadelphia, Pennsylvania |
| Perry A. White | Wallingford, Pennsylvania |

McClure Kelley          Chairman of the Board
George A. Rentschler    Chairman of the Operations Committee and
                        Chairman of the Executive Committee
                        President
William S. Ginn         Executive Vice President—Manufacturing
James M. White          Vice President—Sales—Construction Equipment
Henry F. Barnhart       Vice President—Finance, Secretary and Treasurer
Perry A. White

In Philadelphia    Fidelity-Philadelphia Trust Company
In New York        Bankers Trust Company
In Cincinnati      The Fifth Third Union Trust Company

William S. Ginn
James M. White
Henry F. Barnhart
Perry A. White

In Philadelphia    The First Pennsylvania Banking and Trust Company
In New York        First National City Bank
In Cincinnati      The Central Trust Company

15

16



This illustration and the other three like it in this report are from the corporate advertising campaign now running in U.S. NEWS AND WORLD REPORT and BUSINESS WEEK. Thirteen of these ads will run to give coverage for a full year and attention to thirteen industrial areas.





Vice President and General Manager

Foundry Products • Mechanical and Hydraulic Metalworking Presses • Plywood and Hardboard Presses • Large Industrial and Railroad Machine Tools • Missile Ground and Shipboard Handling and Launching Systems • Radio and Radar Detection and Guidance Structures • Pipe and Steel Mill Equipment • Nuclear Power Plant Equipment • Dump Cars • Diesel Engines • Accelerator Magnets for Nuclear Science.

**STANDARD STEEL DIVISION**
Burnham—Mifflin County, Pennsylvania
John D. Tyson
Vice President and General Manager

Forgings • Castings • Tires • Wheels • Springs • Weldless Rings and Flanges made of Carbon and Alloy Steels • Super Alloys • Non-Ferrous Alloys.

**ELECTRONICS DIVISION**
Waltham, Massachusetts
Robert D. Ballard
Vice President and General Manager

SR-4® Strain Gages and Micro-Miniature Thermocouples • Force Transducers • Instrumentation • Systems.

**PELTON DIVISION**
San Francisco 10, California
Morgan White
Vice President and General Manager

Water Power Turbines • Governors and Controllers for Water Power Turbines • Hydraulic Valves for Power Stations • Butterfly and Spherical Valves for Water Works • Surge Suppressors and Air Valves for Waterline Protection • Water Strainers • Balancing Machines • Flow-Indicator Alarms • Manned-Electric Valve Operators.

**INDUSTRIAL SALES DIVISION**
Philadelphia 42 (Eddystone), Pennsylvania
Frederick A. Fielder
Vice President

(Sales for all of the Industrial Divisions)

**CONSTRUCTION EQUIPMENT DIVISION**
Aurora, Illinois
Charles M. Lippincott
Vice President and General Manager

Road Graders • Hydraulic Cranes • Compaction Equipment • Street Sweepers.

Austin-Western Plant
Aurora, Illinois

Lima Plant
Lima, Ohio

Power Shovels • Cranes • Draglines • Pull Shovels • Rock Crushing Equipment • Road-packers • Asphalt Paving Plants • Aggregate Dryers • Dust Collectors.





1   Dean A. Hanley, Esq.   (State Bar No. 169507)
    Deborah R. Rosenthal, Esq. (State Bar No. 184241)
2   PAUL AND HANLEY LLP
    1608 Fourth Street, Suite 300
3   Berkeley, California 94710
    Telephone:  (510) 559-9980
4   Facsimile:   (510) 559-9970
    dhanley@paulandhanley.com
5   drosenthal@paulandhanley.com

6   Attorneys for Plaintiffs

7

8

9                  UNITED STATES DISTRICT COURT

10              NORTHERN DISTRICT OF CALIFORNIA

11                  SAN FRANCISCO DIVISION

12  JERI REDMAN, individually and as          )   Case No.: 08-cv-03013-BZ
    successor-in-interest to RONALD REDMAN,   )
13  deceased; and JERI REDMAN, AMY            )   EXHIBIT F TO THE DECLARATION OF
    REDMAN, DAVID C. REDMAN, MARK             )   DEBORAH R. ROSENTHAL IN
14  REDMAN and PAUL REDMAN, as legal          )   SUPPORT OF PLAINTIFFS' MOTION
    heirs of RONALD REDMAN, deceased,         )   FOR REMAND AND FOR COSTS AND
15                                            )   EXPENSES INCURRED AS A RESULT
                                              )   OF REMOVAL
16          Plaintiffs,                       )
                                              )   [28 U.S.C. § 1447(c); FRCP 7(b); ND CA Local Rules
17  vs.                                       )   7-2, 7-4 & 7-5]
                                              )
18  A.W. CHESTERTON, et al.,                  )   Date:        September 5, 2008
                                              )   Time:        9:00 a.m.
19          Defendants.                       )   Courtroom:   2, 17th Floor
                                              )   Judge:       Jeffrey White
20  _____

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

EXHIBIT F TO THE DECLARATION OF DEBORAH R. ROSENTHAL IN SUPPORT OF PLAINTIFFS' MOTION FOR REMAND
AND FOR COSTS AND EXPENSES INCURRED AS A RESULT OF REMOVAL
S:\Clients\Plaintiffs\R\Redman, Ronald 10267\Fed Court Action\VJAD remand motion - Exh A-C.doc

**EXHIBIT "F"**



1962 ANNUAL REPORT

BALDWIN · LIMA · HAMILTON

BLH

# FINANCIAL HIGHLIGHTS

| | 1962 | 1961 |
|---|---|---|
| Net sales | $125,290,000 | $109,064,000 |
| Net income | $1,906,000 | $1,391,000 |
| Per share | $.45 | $.33 |
| Cash dividends declared | $1,710,000 | $1,703,000 |
| Per share | $.40 | $.40 |
| Shareholders' book equity | $113,999,000 | $113,821,000 |
| Per share | $26.77 | $26.73 |
| Working capital | $74,736,000 | $79,925,000* |
| Per share | $17.55 | $18.77* |
| Additions and improvements to facilities | $4,539,000 | $1,751,000 |
| Depreciation and amortization charged to income | $3,180,000 | $2,918,000 |
| Orders received | $137,552,000 | $133,129,000 |
| Orders unfilled | $90,882,000 | $83,785,000 |
| Number of shares outstanding | 4,257,750 | 4,258,030 |
| Number of shareholders | 17,702 | 18,082 |
| Number of employees—average | 6,971 | 6,596 |

*Reclassified



4-3

## BOARD OF DIRECTORS

H. E. Coombs — Cincinnati, Ohio
Francis L. Elmendorf — Shaker Heights, Ohio
Joseph N. Ewing — Valley Forge, Pennsylvania
William S. Ginn — Gladwyne, Pennsylvania
Edward Hopkinson, Jr. — Chestnut Hill, Pennsylvania
McClure Kelley — Glen Moore, Pennsylvania
Arthur Littleton — Gladwyne, Pennsylvania
Frederic A. Potts — Ambler, Pennsylvania
William Wood Prince — Chicago, Illinois
George A. Rentschler — New York, New York
William S. Rowe — Cincinnati, Ohio
Louis Fenn Sperry — Scarsdale, New York
Milton Steinbach — New York, New York
Ralph K. Stiles — Hillsborough, California
Perry A. White — Wallingford, Pennsylvania

## EXECUTIVE COMMITTEE

George A. Rentschler — Chairman
McClure Kelley
William S. Ginn
Louis Fenn Sperry
William Wood Prince
Milton Steinbach

## EXECUTIVE OFFICERS

McClure Kelley — Chairman of the Board
William S. Ginn — President
James M. White — Vice President-Manufacturing
Perry A. White — Vice President-Finance, Secretary and Treasurer
Frank E. Stehlik — General Controller

## TRANSFER AGENTS

In Philadelphia — Fidelity-Philadelphia Trust Company
In New York — Bankers Trust Company
In Cincinnati — The Fifth Third Union Trust Company

## REGISTRARS

In Philadelphia — The First Pennsylvania Banking
and Trust Company
In New York — First National City Bank
In Cincinnati — The Central Trust Company

4-H



William S. Sear, President



McGraw Valley, Chairman of the Board

# TO THE SHAREHOLDERS

For most of our product lines, the markets continued to be steady during 1962, but not impressive. We encountered no major increases in product demand, and, as the cost-price squeeze, which we mentioned in the 1961 report, continued into 1962, our financial results did not improve as much as we had hoped they might.

The net income of Baldwin-Lima-Hamilton Corporation for 1962 did, however, amount to $1,905,990, or 45¢ per share, an increase of 37% over the $1,391,106, or 33¢, for 1961. Dividends of $1,709,660, amounting to 40¢ per share, were declared in 1962 at the rate of 10¢ per quarter. Net sales amounted to $125,289,579, or 15% higher than sales of $109,064,209 in the previous year: the increase resulting primarily from the acquisition of the Hamilton-Thomas Corporation and its products early in 1962 and from improved sales of our steel mill products.

The backlog of orders at the end of 1962 was $90,882,000 compared to $83,785,000 at the end of the previous year. The shareholders' book equity, which increased $17,814, at year end amounted to $26.77 per share for each of the 4,257,750 shares then outstanding. Working capital amounted to $17.55 per share at the end of 1962. The decrease of about $5,190,000 in total working capital results primarily from the $4,459,000 spent on improvements to our plant facilities, and the investment in the C. H. Wheeler Manufacturing Company, an unconsolidated subsidiary. At year end, the working capital of Wheeler was approximately $3,005,000, which amount is not reflected in the $74,736,000 working capital of BLH.

The corporation must constantly reappraise and redefine its objectives. During 1962, the management made intensive studies of the corporate objectives and decided that our best interests lay in those market areas to which our facilities and experience would allow us to make the best contributions at the best profits. We have been major suppliers to some of these markets for some time. In the others we propose to increase the vigor of our participation.

Five picture spreads, which follow the review of our 1962 operations, describe certain principal market areas and the equipment which we supply to them.

Supplying these markets engages the facilities of all of our divisions, as each market requires products from several divisions.

The newly organized Industrial Sales Division is responsible for sales to four of the five principal markets described and has greatly strengthened our field representation during the year by establishing a better, nationwide sales network on industrial products.

Early in 1962 the company acquired the Hamilton-Thomas Corporation, and the added volume derived from this company during 1962 increased our sales significantly over those of the previous year. Earnings also improved.

Despite the unimpressive activity in our markets, most of our divisions have had a year of encouraging growth and development owing to the introduction of new products and to the completion of capital improvements which have increased efficiency and broadened the flexibility of production.

S-H

The new products and the capital improvements, described in detail in the letter, are, briefly, these:

The Construction Equipment Division has added new items to nearly all of its product lines to achieve a better penetration of both the road-building and the general construction markets. At the Austin-Western plant we completed a new manufacturing building to permit key improvements in production flow.

The modernization program at Standard Steel continued with the installation of major capital equipment and the construction of a laboratory building. The division has developed new techniques for producing, forming, and finishing new superalloy and high alloy steels for aircraft, missiles and electrical generating equipment.

The Electronics Division has continued to broaden the range of measurement and control equipment which it builds, penetrating further this year into miniature measuring devices and those for high temperature measurement. The division has also established a west coast laboratory to provide sales, service and engineering to customers there.

Major steps were taken to improve operations at the Industrial Equipment Division. The manufacture of Griscom-Russell and C. H. Wheeler products was moved to the division. This permitted closing and disposing of the Griscom-Russell and C. H. Wheeler plants, increasing the production at the division, and eliminating certain unprofitable products. Although these moves were costly, they should produce beneficial, long-range results in the form of substantial cost reductions, greater penetration of such important markets as marine and electric utility, and, consequently, improved sales and earnings.

We have also strengthened the management at the division and instituted work effectiveness and cost control programs. Early results of these activities have already appeared in the improved operations of the division during 1962.

Our jointly owned affiliate, Transicol International Corporation, is completing equipment for three important test installations, all of which should indicate operational feasibilities during 1963. The particulars of these installations are described in the Review of Operations.

During the summer of 1962, we acquired the Ferguson Asphalt Paver to provide an important new product for the Construction Equipment Division. Toward the end of the year, we purchased The Green Fuel Economizer Co., Inc., of Beacon, New York. One of the nation's principal builders of industrial fans, this company's products should give us worldwide additional business in several of our important markets.

Like many other corporations, we have sold our products abroad for many years, but it has been borne in upon us more and more that we could share foreign markets to a much greater extent if we actually manufactured certain of our products abroad. During 1962, we have made further studies of this problem and are presently very close to consummating manufacturing arrangements with foreign manufacturing partners.

We have negotiated new labor contracts during the year and are pleased to be able to report that our labor relations continue to be harmonious.

As our balance sheet shows, we are in a strong financial position. Our facilities are in excellent condition. The Review of Operations describes our activities in developing the products and services of our existing plants and divisions and in acquiring new plants and products.

Management again wishes to thank the officers and employees of the company for their wholehearted support in the year just ended.

William A. ...
President

... ...
Chairman of the Board

9-H



New, mobile, tower crane can handle 10,000-pound load at maximum radius of 105 feet from 155-foot vertical mast.

A ring for a Minuteman missile is mandrel-forged at the Standard Steel Division. The forge shop's new 40-ton manipulator positions the ring for shaping.

The Construction Equipment Division has introduced new products and accessories for its hydraulic crane line, its grader line, and its large crane line and has begun production on a paver and a vibratory finisher.

A new, Model 510, hydraulic crane offers greater lifting capacity than the 11-ton, Model 410, previously the largest of these cranes. A small, 3¾-ton, tricycle crane, designated the Model 105, extends the lower end of the crane line. A new, 15-foot jib has been developed for the 410 crane and an optional, wide rear axle is available for the 110 crane.

The new, Pacer 500 is a 20,000-pound grader with four-wheel drive. This grader can compete in heavy construction work with machines rated at 35,000 pounds.

In the large crane line, the division has developed a mobile, tower crane, which provides our answer to the emplaced, tower cranes which have become so popular in construction work. This crane, with a 155-foot mast and a 100-foot jib, can handle 20,000-pound loads at heights as great as 255 feet. A new, 50-ton, truck crane, introduced in 1962, can provide 210 feet of boom for high altitude construction work and offers an additional advantage of being able to be stripped for travel in half an hour.

One of the most important products that the division has introduced is the new paver, the rights on which were acquired from the Ferguson Paving Company of Reno, Nevada. A substantial modification of the equipment purchased from Ferguson, the new paver completes the line of asphalt road building equipment which the division can offer. To complement the paver, the division has also introduced a vibratory, asphalt finisher. Called the Hot-Foot, this finisher is a small, self-propelled, one-man machine which can be used to finish surfaces in confined areas.

Our jointly owned affiliate, Transicel International Corporation, has made encouraging progress in the building of three test installations. One of these facilities, a telemetering system for industrial gas meters, is in operation at the Consumer Gas Company, Toronto, Canada. A system for reading domestic, electric meters for the Consumers Power Company of Jackson, Michigan, was partly installed in November, 1962, and will be fully installed early in 1963. First results of this operation are expected during the spring of 1963; final results should be available in September, 1963.

Equipment is being completed for a high speed, telemetering system for the Detroit Edison Company. The system, which will obtain information from three generating stations and three switching and transformer stations (for...

...ded and feed this data into a computer for automatic load dispatching, will be one of the highest speed systems extant. The system should be in service in March or April of 1963.

## Sales

The reorganization for sales and service on industrial and utilities equipment, announced in last year's report, has been completed. The sales organization of Hamilton-Thomas has been absorbed into this organization, the number of offices and sales representatives has been increased, and two new sales regions have been opened. These two regions are the Southeastern region, with a regional office in Birmingham, Alabama, and the Gulf Coast region, with a regional office in Houston, Texas. The entire sales force has been retrained to orient the personnel to markets rather than to products. This retraining will give our sales organization more flexibility in introducing new products of our own and those of acquisitions.

## Labor

All of our labor contracts, except that at Austin-Western, came up for renewal during 1962, and all of these contracts have been renewed satisfactorily. Two-year contracts were negotiated at the Electronics Division and at the Standard Steel Division. The contract at Lima was extended without change for an additional year, and the contract at the Industrial Equipment Division was re-negotiated for an additional year. The contract at Austin-Western, a two-year agreement, must be renewed during 1963.

Our relations with all of our unions have been harmonious and these unions have shown foresight in working with the corporation on operational problems.

## Research and Development

Our long-term research on pump turbines produced, during 1962, a $33 million contract with Jersey Central Power and Light Company for three of these turbines. The largest pump turbine ever built for an eastern utility, these units will be installed in the Yards Creek project in Warren County, New Jersey.

A pump turbine, as we explained in last year's report, is one which operates as a turbine when hydroelectric power is needed and as a pump to move water from a lower reservoir to a higher storage reservoir during off-peak periods.

The Sixth World Power Congress, held in Australia in 1962, foresaw a continuing and growing demand for pump turbine installations. Delegates to that confer-

ence stated that pump storage was the most promising technique for leveling peak electrical loads and that pump storage installations were ideal for use with nuclear power generators. The observations at this conference suggest that the market for pump turbines is one of the most promising in the power field.

In a sense, the two large land based sea water distillation units, for which we were awarded contracts in 1962, constitute development work, as many improvements in technique will unquestionably be developed in the building of these units.

Standard Steel has begun substantial production of explosive formed, thick wall rings. The division has acquired a site for this work and has obtained orders from large generator manufacturers which will require, during 1963, the explosive forming of some of the largest retaining rings in the world. Standard has also made major progress in the making, forming, and finishing of the high-strength, heat-resistant alloys, Inco 718 and Inconel X. These alloys are used in jet engine and missile components.

Continuing research and development at the Electronics Division has produced a full-bridge, weldable, strain gage, ceramic-backed gages, and self-temperature compensating, semi-conductor gages. All of these products contribute to the measurement of strain at elevated temperatures. The division has developed resistive temperature sensors which complement the microminiature thermocouple line and has developed heat transfer probes for use in missile nose cones during re-entry. A development of complete, signal conditioning units, incorporating the microminiature, differential amplifier, to satisfy critical missile and space applications, has led to the introduction of high output, pressure transducers which have a broad market potential.

Although Transitel is now producing product, as noted above, the activities of this affiliate must still be regarded as chiefly of a research and development nature. As the Transitel systems now on order are installed and proven, the company will develop a solid basis for offering such systems to a broad market.

## Summary

Our progress during 1962 has been encouraging. We have defined our objectives in order to sharpen our efforts.

So that you may see in pictorial form the products which we are able to offer in five promising markets which we have selected for close attention, we display these products and markets on the next ten pages of this report.

8-H



Centrifugal pumps installed at power utilities include vertical and horizontal circulating pumps. Tubular, air ejectors, condensate pumps and water box condensers. Vertical pump is shown above.

For electric utility applications, BLH produces heat exchangers which include shell-and-tube exchangers, feed-water heaters (above), deaerating heaters, evaporators, surface condensers and barometric and jet units.





b-H



Griscom-Russell sea water distilling plants, such as this one, are in use on more than half of all United States Ships in service. The units are now manufactured by BLH.





BLH builds heat exchangers, feedwater heaters, steam jet ejectors, circulating pumps, and condensers for marine power plants. Condenser shown here is of light weight construction and compact design.

21-H

aboard. Five of the products which BLH builds for ships are shown on this page. The marine markets is large and continuing one in which BLH has a strong position.



BLH designs and manufactures all types of deck handling equipment: winches, windlasses, and deck-mounted cranes. Typical are these cargo winches which were recently installed on the NS Savannah, first nuclear powered cargo ship.



BLH now builds all electric, electro-hydraulic, and manual steering gear originated by American Engineering Co. One of the more complex steering systems is the dual gear for controlling these twin rudders on the 106,000-ton tanker, Manhattan.

One of the world's principal manufacturers of large ship propellers and propeller shafts, BLH has also pioneered in developing propeller alloys and casting techniques. Nialte, a special alloy originated by BLH, provides propellers which are highly resistant to corrosion, erosion, and cavitation.



11-H



12

# CONSTRUCTION

BLH produces truck and tower cranes for building construction, hydraulic cranes for material handling, and large cranes, shovels, and draglines for logging, mining, and dredging. As an example, BLH builds every piece of equipment needed for grading, preparing the roadbeds of, and paving asphalt highways. The line of equipment also includes machines for mining and crushing gravel and screening for roadbeds, and for manufacturing asphalt. These two pages show BLH construction equipment and its uses.





**Power Shovels**

**Power Graders**



**Roadpackers**

21-H









h1-H

One of the many automatic systems BLH has built for aircraft and missiles is Computer-Planner and Aircraft Weighing Scales (designated CPAWS). With a minimum of time and effort, the unique electronic weighing system assures greater safety during take-off, flight and landing by determining an accurate gross weight and center of gravity for such aircraft as the B-58 Hustler.



Standard Steel is the only completely integrated specialty steel mill in the United States capable of producing vacuum arc remelted rings and closed die forgings from such high alloy steel. Precision, non-surgical specialties and critical services. Such products as superalloy missile case rings is part of BLH's regular production practice.



BLH works closely with its customers in developing the specialization, grain orientation, and techniques of forging and finishing required for steel components. Typical is the tough, strong, fatigue-resistant alloy used to strengthen and join 120-inch booster casing sections for Titan III.



For several years, the Electronics Division of BLH has been making force measurement equipment basic to the missile program: strain gages, pressure cells, torque cells, load cells, and entire measurement and control systems. The million and a half pound load cell, shown here, one of the largest of its kind, determines total weight and thrust of large missiles.



15.

S1-H



undoubtedly create a demand for equipment for supplementing and conserving water supplies.

Fresh water supplies can be supplemented by distilling sea water and brackish water and by purifying water for reuse, and can be conserved by storage and preservation. As nations expand their needs for water, the market for equipment for increasing and conserving supplies of fresh water should grow rapidly.

BLH builds specific equipment for distilling and purifying water, and machines for constructing water reservoirs and for using and reusing stored water.

One of the most important techniques for using and preserving stored water is the pump turbine plant, shown on this page, which constantly moves water between an upper and lower reservoir, generating electricity for peak loads when the water moves down, using off-peak power to pump the water back up.

91-H





**Land-based Water Purification Unit**



**Evaporator**



**Pull Shovel**

Fin-Fan Cooler

Equally as important as conserving water are methods for supplementing existing water supplies, substituting equipment which does not require water for equipment which does, and preserving water by prudent use.

The illustrations on this page show equipment which BLH builds for these methods of water usage.

The illustration of a land-based, sea water distillation plant, shown at the upper left, which BLH supplies to provide fresh water where local sources are inadequate or non-existent. One of these plants, recently contracted for, two of the largest sea water supply installation in Israel. One will produce 1,000,000 gallons per day; the other, 262,000 gallons per day.

Evaporators, such as the one shown, are used in power plants to produce boiler feedwater from raw water which is high in solids. Such an evaporator can also produce fresh drinking water as a by-product. Evaporators in marine power plants customarily produce drinking water as well as feedwater. BLH builds evaporators for utility, marine and industrial uses.

Often, even in areas where water is plentiful, cooling with air, rather than water, is more efficient and less expensive. For such operations as condensing moisture from manufactured gas, BLH supplies fin-fan coolers of the type shown below. In areas where no water is available, such condensers are the only ones that can be used. BLH Fin-Fan condensers conserve water by substituting air as the coolant.

In arid regions, crop cultivation is possible only if the available water is used discreetly and frugally. In controlled irrigation, access water supplies must be controlled, if crops are to be raised. Both situations require the precise ditching which BLH pull-shovels, such as the one shown, can supply. In addition to pull-shovels, BLH builds a complete line of earth moving equipment for constructing dams and reservoirs, dredging canals, and grading for water drainage and accumulation. To every phase of distilling, purifying, storing, and preserving the critical asset, water, BLH is an important contributor.

牛1-14

## ASSETS

| | 1962 | 1961* |
|---|---|---|
| **Current Assets:** | | |
| Cash | $5,470,980 | $6,475,60... |
| U.S. Treasury and other marketable securities at cost, which approximate market | 4,019,504 | 12,418,7... |
| Trade receivables (less reserve, $330,000 in 1962 and $320,000 in 1961) (Note 1) | 32,946,172 | 29,981,7... |
| Federal income tax refundable | 881,000 | |
| Inventories at lower of cost or market (less reserve, $280,000 in 1962 and $300,000 in 1961) | 45,853,463 | 45,438,12... |
| Prepaid expenses | 243,960 | 193,4... |
| Total Current Assets | $89,415,079 | $94,508,0... |
| Trade Receivables—Not due within one year (Note 1) | 7,505,576 | 1,782,... |
| Investments—At cost (Note 2) | 4,232,744 | 581,... |
| Property, Plant and Equipment—At cost (less reserve for depreciation and amortization, $46,885,049 in 1962 and $45,760,782 in 1961) | 27,594,9?5 | 26,092,46... |
| Unamortized Costs—Consolidation and rearrangement of facilities, net of tax benefit (Note 2) | 1,680,000 | |
| | $130,428,344 | $128,963,0... |

* Amounts reclassified for comparison.

81-H

## LIABILITIES

| | 1962 | 1961 |
|---|---|---|
| ...nt Liabilities: | | |
| ...unts payable, trade | $6,053,235 | $4,813,792 |
| ...dend payable | 425,775 | 426,005 |
| ...xes on sales orders | 2,075,048 | 2,699,050 |
| ...ion for taxes on income | 834,652 | 2,071,300 |
| ...d taxes, wages, commissions, etc. | 5,290,722 | 4,572,596 |
| Total Current Liabilities | $14,679,432 | $14,582,743 |
| ...es: | | |
| ...oduct guarantees and other expenses | $660,000 | $560,000 |
| ...erred taxes on income (Note 2) | 1,090,000 | |
| Total Reserves | $1,750,000 | $560,000 |
| ...eholders' Book Equity: | | |
| ...mmon stock, $13 par (Note 3): | | |
| Authorized, 5,000,000 shares | | |
| Issued, 4,782,778 shares | $62,176,114 | $62,176,114 |
| ...tal in excess of par value (including $8,202 arising in 1962 from sale of treasury stock under employee options) | 26,884,500 | 26,336,298 |
| ...ined earnings | 30,178,010 | 29,981,680 |
| | $119,238,624 | $118,994,092 |
| Treasury common stock at cost— 525,028 shares in 1962 and 524,728 shares 1961. | 5,239,712 | 5,172,994 |
| Total Shareholders' Book Equity | $113,998,912 | $113,821,098 |
| | $130,428,344 | $128,963,841 |

**1. Subsidiaries:**

At December 31, 1962, current trade receivables include $1,314,377 from subsidiaries. Investments at December 31, 1962 include investments in subsidiaries carried at a cost of $3,475,013 which approximates the underlying equity in this amount, approximately $3,000,000 is represented by working capital of subsidiaries.

The statement of income includes the results of operations of two subsidiaries from the date of their acquisition on January 30, 1962. The company's equity in the results of operations of other subsidiaries, including investments acquired in December, 1962, is not significant.

**2. Provision for Income Taxes:**

Tax depreciation deductions for certain fixed assets, which exceed corresponding book depreciation, are determined on the basis of guideline lives as promulgated by the Treasury Department in 1962. Further, certain costs incurred in connection with the consolidation and rearrangement of plant facilities are claimed for income tax purposes as incurred, but for book purposes are deferred and amortized over a period of approximately five years. The resulting income tax savings, of $1,294,400 applicable to depreciation and rearrangement costs are similarly deferred and are shown in the accompanying statement of income as deferred taxes on income.

**3. Stock Options:**

The Executive Stock Option Plan provides that the company may grant options to key executives of the company to purchase not in excess of 200,000 shares of its common stock at prices not less than 95% of market value at the time the option is granted. At January 1, 1962, options were outstanding for 117,550 shares, options for 28,500 shares had been exercised and 53,950 unoptioned shares were available under the Plan. During 1962, options for 46,000 shares were granted, options for 23,500 shares were exercised and options for 133,750 shares were outstanding at December 31, 1962. At aggregate of $1,787,300 were outstanding and 14,250 unoptioned shares were available under the Plan.

61-H

## Income:

| | | |
|---|---|---|
| Net sales | $125,289,679 | $109,064,209 |
| Royalties and licenses | 828,314 | 488,665 |
| Interest earned | 1,055,521 | 1,268,321 |
| Net profit on sale of property | 214,554 | 154,198 |
| Miscellaneous | 179,851 | 306,305 |
| **Total** | **$127,567,919** | **$111,281,698** |

## Costs and Expenses:

| | | |
|---|---|---|
| Cost of products sold, including engineering, selling, and administrative expenses | $118,878,534 | $104,569,027 |
| Depreciation and amortization (Note 2) | 3,180,209 | 2,918,025 |
| Contributions for employees' retirement | 1,559,693 | 1,517,428 |
| Taxes on income: | | |
| Current | (494,400) | 865,000 |
| Deferred (Note 2) | 2,484,400 | |
| Interest and miscellaneous | 53,493 | 1,112 |
| **Total** | **$125,661,929** | **$109,870,592** |
| Net income | $1,905,990 | $1,391,106 |
| Per share—Outstanding at end of year, 4,257,750 shares in 1962 and 4,258,050 shares in 1961 | $.45 | $.33 |

## STATEMENT OF RETAINED EARNINGS

| | | |
|---|---|---|
| Balance, January 1 | $29,981,680 | $30,293,104 |
| Net income | 1,905,990 | 1,391,106 |
| Dividends declared | (1,709,660) | (1,702,530) |
| Balance, December 31 | $30,178,010 | $29,981,680 |

See accompanying notes.

## AUDITORS' REPORT

To the Shareholders of Baldwin-Lima-Hamilton Corporation:

We have examined the balance sheet of Baldwin-Lima-Hamilton Corporation as of December 31, 1962, and the related statements of income and retained earnings for the year then ended. We were unable to obtain confirmation of certain amounts due from the United States Government but we satisfied ourselves as to such amounts by other auditing procedures. Our examination was made in accordance with generally accepted auditing standards, and accordingly included such tests of the accounting records and such other auditing procedures as we considered necessary in the circumstances.

In our opinion, the accompanying financial statements present fairly the position of Baldwin-Lima-Hamilton Corporation at December 31, 1962, and the results of its operation for the year then ended, in conformity with generally accepted accounting principles applied on a basis consistent with that of the preceding year.

Lybrand, Ross Bros. & Montgomery
Certified Public Accountants

Philadelphia, Penna.
February 4, 1963

02-N



| Division | Specialty | Industry |
|---|---|---|
| **Standard Steel Division**<br>Burnham—Mifflin County, Pa.<br>Robert J. Buckley<br>Vice President and General Manager | Nuclear Pressure Vessels<br>Heat Transfer Equipment | Water |
| | Specialty Steel:<br>Rings<br>Forgings<br>Wheels | Aerospace<br>Machinery Manufacturers<br>Transportation |
| **Electronics Division**<br>Waltham, Massachusetts<br>Robert O. Bullard<br>Vice President and General Manager | Instrumentation<br>Measuring Devices<br>and Equipment | All Industry |
| **Pelton Division**<br>San Francisco 10, California<br>Morgan White<br>Vice President and General Manager | Turbines<br>Water Works Equipment | Electric Utility<br>Water |
| **Subsidiary**<br>The Green Fuel Economizer Co., Inc.<br>Beacon, New York<br>James M. White, President | Industrial Fans | Electric Utility<br>Marine<br>Processing Industries |
| **Industrial Sales Division**<br>Philadelphia 42 (Eddystone), Pa.<br>Christopher T. Kastner<br>General Manager | (Sales for all of the Industrial Divisions) | |
| **Construction Equipment Division**<br>Charles M. Lippincott<br>Vice President and General Manager<br>Austin-Western plant, Aurora, Illinois<br>Lima plant, Lima, Ohio | Shovels<br>Cranes<br>Road Building and<br>Maintenance Equipment | Road Construction<br>Building Construction<br>Water<br>Logging<br>Mining<br>Aerospace |
| **Affiliated Company**<br>Transidel International Corporation<br>Paramus, New Jersey | Telemetering<br>Supervisory Controls | Electric and<br>Gas Utilities |

Dean A. Hanley, Esq.   (State Bar No. 169507)
Deborah R. Rosenthal, Esq. (State Bar No. 184241)
PAUL AND HANLEY LLP
1608 Fourth Street, Suite 300
Berkeley, California 94710
Telephone:  (510) 559-9980
Facsimile:   (510) 559-9970
dhanley@paulandhanley.com
drosenthal@paulandhanley.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| JERI REDMAN, individually and as successor-in-interest to RONALD REDMAN, deceased; and JERI REDMAN, AMY REDMAN, DAVID C. REDMAN, MARK REDMAN and PAUL REDMAN, as legal heirs of RONALD REDMAN, deceased,<br><br>          Plaintiffs,<br><br>vs.<br><br>A.W. CHESTERTON, et al.,<br><br>          Defendants. | Case No.: 08-cv-03013-BZ<br><br>**EXHIBIT G TO THE DECLARATION OF DEBORAH R. ROSENTHAL IN SUPPORT OF PLAINTIFFS' MOTION FOR REMAND AND FOR COSTS AND EXPENSES INCURRED AS A RESULT OF REMOVAL**<br><br>[28 U.S.C. § 1447(c); FRCP 7(b); ND CA Local Rules 7-2, 7-4 & 7-5]<br><br>Date:          September 5, 2008<br>Time:          9:00 a.m.<br>Courtroom:   2, 17th Floor<br>Judge:          Jeffrey White |

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

**EXHIBIT G TO THE DECLARATION OF DEBORAH R. ROSENTHAL IN SUPPORT OF PLAINTIFFS' MOTION FOR REMAND AND FOR COSTS AND EXPENSES INCURRED AS A RESULT OF REMOVAL**
S:\Clients\Plaintiffs\R\Redman, Ronald 10267\Fed Court Action\VIAD remand motion - Exh A-C.doc

**EXHIBIT "G"**

Description of and Operating Instructions
FOR
# SOLOSHELL L. P. DISTILLING PLANT
12,000 GALLONS PER DAY - RATED CAPACITY

INSTALLED ON

DD666 CLASS DESTROYERS

BUILT BY

# THE GRISCOM-RUSSELL COMPANY
285 MADISON AVENUE
NEW YORK, N. Y.

DEFENDANT'S
EXHIBIT
6KS 77

# Description of and Operating Instructions

### FOR

# SOLOSHELL L. P. DISTILLING PLANT

#### 12,000 GALLONS PER DAY — RATED CAPACITY

#### INSTALLED ON

#### DD666 CLASS DESTROYERS

### BUILT BY

# THE GRISCOM-RUSSELL COMPANY

#### 285 MADISON AVENUE

#### NEW YORK, N. Y.

*THE GRISCOM-RUSSELL COMPANY*                    *OPERATING INSTRUCTIONS*

# DISTILLING PLANT

## INDEX

|                                                          | Page |
|----------------------------------------------------------|------|
| GENERAL DESCRIPTION                                       | 1-1  |
|     Evaporator                        | 1-2  |
|     Vapor Feed Heater                 | 1-2  |
|     Distilling Condenser              | 1-2  |
|     Air Ejector Condenser             | 1-3  |
|     Air Ejector                       | 1-3  |
|     Flash Chamber                     | 1-3  |
|     Tube Nest Drain Regulator         | 1-3  |
|     Condensate Cooler                 | 1-3  |
|     List of Units                     | 1-4  |
|     List of Spare Parts and Tools     | 1-4  |
|     List of Plans                     | 1-5  |
| GENERAL OPERATING INSTRUCTIONS                            | 2-1  |
|     First Effect Tube Nest Temperatures and Pressures | 2-1 |
|     Second Effect Shell Pressures     | 2-1  |
|     Feed and Drain Levels             | 2-2  |
|     Venting of Evaporator Tube Nests  | 2-2  |
|     Brine Density                     | 2-2  |
|     Pump Operation                    | 2-3  |
|     Purity of Condensate              | 2-3  |
|     Chemical Test for Chlorine        | 2-3  |
|     Air Ejectors                      | 2-4  |
|     Instructions for Starting the Plant | 2-5 |
|     Procedure for Securing the Plant  | 2-6  |
| CARE AND MAINTENANCE                                      | 3-1  |
| ILLUSTRATIONS                                             |      |
|     Distilling Unit                   |      |
|         External Arrangement | 4-1 |
|         Internal Arrangement | 4-2 |
|     Diagrammatic Arrangement of Distilling Plant | 4-3 |
|     Heat Balance and Orifice Capacity Diagrams | 4-4 |
|     Condensate Cooler                 | 4-5  |
|     Air Ejector                       | 4-6  |
|     Air Ejector Condenser             | 4-7  |
|     Air Ejector Capacity Curve        | 4-8  |
|     Tube Expander                     | 4-9  |
|     Tool for Cleaning Evaporator Tubes | 4-10 |
|     Steam Tables                      | 4-11 |
|     Drain Regulator - Style "F"       | 4-12 |
|     Drain Regulator - Style "B"       | 4-13 |
| INSTALLATION DETAILS                                      | 5-1  |

*THE GRISCOM-RUSSELL COMPANY*                    *OPERATING INSTRUCTIONS*

<u>SOLOSHELL LOW PRESSURE TWO EFFECT DISTILLING PLANT</u>

<u>GENERAL DESCRIPTION</u> – The distilling plant is of the low pressure, two effect, soloshell, submerged tube type.

The rated capacity of the two effect unit is 12,000 gallons per day (clean tube capacity 15,600 gallons) of condensate having a chlorine content not exceeding one-fourth grain per gallon, from sea water, with first effect steam at a pressure not exceeding 5 lbs. gauge, distilling condenser vacuum 26" Hg. and brine overboard discharge density one and one-half thirty-seconds.

The two effect unit consists of a horizontal cylindrical shell, within which are incorporated the evaporating units, vapor feed heater, distilling condenser, baffles, vapor separators, etc.

A vertical longitudinal wall divides it into first and second effect chambers. The first effect chamber contains the first effect evaporating unit, vapor separator and vapor feed heater; the second effect chamber contains the second effect evaporating unit, vapor separator and distilling condenser.

Distilling condenser vacuum is maintained by a single stage air ejector discharging into a condenser externally mounted on the evaporator shell, and cooled by the evaporator feed.

Automatic control of the tube drains is maintained by externally mounted drain regulators.

The distilling condenser circulating pump draws from the sea and discharges through a condensate cooler to the cooling passes of the distilling condenser and thence overboard.

The evaporator feed pump takes its suction from the distilling condenser circulating water overboard discharge line and discharges the evaporator feed through feed heating passes in the distilling condenser and in series through the air ejector condenser and vapor feed heater into the first effect evaporator chamber.

An overboard discharge connection, with controlling valve, is provided in the evaporator feed circuit on the outlet side of the air ejector condenser to permit continuous circulation of cooling water for this unit when the normal flow of evaporator feed is reduced or stopped because of high first effect evaporator feed level.

The pressure differential between the first and second effect chambers permits the second effect feed to be discharged into the second effect chamber.

Brine is continuously discharged overboard from the second effect evaporator chamber by the brine discharge pump.

Steam for the first effect evaporator tubes is obtained from the auxiliary exhaust line through a regulating valve adjustable for an outlet pressure of 5#/sq. in. or less. An orifice plate is installed below this valve to permit operating with steam in tubes at a pressure below atmospheric. The condensate from these tubes drains to the drain pump which discharges through the regulator to the drain collecting system.

Vapor from the first effect chamber passes through a series of baffles and a vapor separator to the internal vapor feed heater; thence through an external vapor pipe, to the second effect tubes. Condensate from the second effect tubes is discharged through an automatic drain regulator to an externally mounted flash chamber, where its pressure is reduced to that of the distilling condenser; the resulting flash vapor discharges to the distilling condenser and the remaining condensate drains to the condensate pump.

Vapor from the second effect chamber passes through a series of baffles and a vapor separator to the distilling condenser. Condensate from the distilling condenser, combined with the flash chamber drains goes to the condensate pump which discharges it through the condensate cooler to the condensate test tank, from which it is pumped through the meter to the ship's fresh water or reserve feed tanks, as required.

March 1, 1942



1-1

*THE GRISCOM-RUSSELL COMPANY*                    *OPERATING INSTRUCTIONS*

The first and second effect tube nests have vent connections which connect through controlling valves to the second effect shell, and prevent air accumulation in the tubes.

Electrical salinity cells are fitted in the first and second effect tube nest drain lines, in the distilling condenser drain, in the fresh water pump discharge, and in the air ejector condenser drain line for determination of water purity. Test cocks are provided on the test tank for obtaining samples of condensate for chemical tests.

A test cock is provided in the brine discharge for salinometer test to determine density of brine in second effect shell.

Thermometers, gauges, etc., are provided as required to assist in the operation of the plant.

Motor driven centrifugal pumps are provided for distilling condenser circulating, condensate, brine discharge, first effect tube drains, evaporator feed services, and for distributing fresh water from test tanks. For complete data, relative to motors and motor control equipment refer to "Record of Electrical Appliances."

The evaporator division wall, shell, shell covers, regulator bodies, and tube sheet covers are of gun metal; other tube sheet covers are of valve bronze; the evaporator tube sheets, baffles and partition walls are of Naval rolled brass; the evaporator tubes are of Admiralty metal, all other tubes and tube sheets of copper nickel alloy; vapor separating elements are of copper and other items generally in accordance with the requirements of the General Specifications. Replaceable zincs are provided in all salt water heads, and in the condensate cooler shell.

The general construction of the distilling unit is shown on pages 4-1 and 4-2. The arrangement of the various parts comprising the distilling plant is shown diagrammatically on page 4-3.

EVAPORATOR - The evaporator tube bundles consist of 5/8" O.D. tubes, .065" thick,

expanded into a tube sheet at each end and supported by an intermediate support plate. The tubes are arranged for two passes of the heating steam.

The front tube sheet is fixed, being bolted to the front shell cover; the back tube sheet and cover, and the intermediate tube supporting plate are supported on rails in the shell so that the tube nest is free to expand. The air vent to the second effect shell is taken from the second pass compartment in the front tube sheet cover through a perforated baffle.

Baffles are fitted in the vapor space of each evaporator chamber, so arranged as to aid in preventing any heavy entrainment of salt water from reaching the vapor separators.

The vapor separators are of the hook baffle type, with large vapor areas, and are bolted directly over the vapor inlet connections to the vapor feed heater and distilling condenser.

Sight glasses are fitted in the exposed side of each evaporator chamber for observing the operating conditions within.

A large clean-out opening is provided at the bottom of each chamber directly under the steam chest.

Gauge glasses are provided for each evaporator chamber to show the feed level.

<u>VAPOR FEED HEATER</u> - The vapor feed heater is of the straight tube type, having 5/8" O.D., .049" thick tubes expanded into a tube sheet at each end and supported by an intermediate support plate. Expansion of the tubes is permitted through the use of a floating head resting on guides in the vapor feed heater chamber.

<u>DISTILLING CONDENSER</u> - The distilling condenser is of the straight tube type, having 5/8" O.D., .049" thick tubes expanded into a tube sheet at each end. A copper expansion joint between the back shell cover and back tube sheet allows for the expansion of the tubes.



A tube supporting plate is fitted about midway between the tube sheets. A portion of the condenser is arranged, by means of a suitable baffle, to serve as a pre-cooler for the air going through the air ejector suction.

The circulating water makes two passes through the condenser before discharging overboard. The portion of the circulating water required for evaporator feed is taken from the overboard discharge line by the evaporator feed pump and discharged back to the condenser through a separate connection, making three additional passes through the condenser before discharging to the air ejector condenser. The condensate is drained through a connection in the bottom of the condenser space.

AIR EJECTOR CONDENSER - The air ejector condenser is of a straight tube counterflow type, having 5/8" O.D., .049" thick tubes expanded into tube sheets at both ends. The general construction is shown on page 4-7. The cylindrical shell is of copper, and differential thermal expansion between the shell and the tubes is provided for by the flanged ends of the shell. The air ejector steam makes five passes through the shell and the evaporator feed makes three passes through the tubes. The air is discharged to atmosphere through a vent pipe. The condensate drains from the bottom of the condenser to the drain collecting system. A line is provided from the discharge of the air ejector condenser to permit additional circulating water to be discharged overboard when excess exhaust steam is discharged into the evaporator room through the ejector condenser shell vent.

AIR EJECTOR - An air ejector is provided to maintain the required vacuum at the distilling condenser by removing the non-condensable vapors and air which enter the system in solution in the feed water, and possibly by leakage at the various vacuum joints. Two air ejectors are provided, one for operating and one as a standby. The ejectors are so arranged that either or both may be used at any time. Either of the ejectors may be removed or otherwise taken apart while normal operation of the plant is maintained by the other.

The ejectors are of the single stage type, and their construction is shown on page 4-6. The gases entering the inlet of the ejector at the mixing chamber are entrained by the steam issuing from the nozzle and are carried through the diffuser, being compressed therein to atmospheric pressure. From the diffuser, the gases and steam are discharged into the after condenser in which the heat is absorbed by the evaporator feed.

FLASH CHAMBER - The flash chamber is essentially a receptacle within which the second effect drains are reduced to a pressure and temperature corresponding to the distilling condenser vacuum. It is attached to the second effect side of the evaporator shell.

TUBE NEST DRAIN REGULATOR - The first effect tube nest drain regulator is of the Style "B", ball float, design with external valve. The valve is located in the discharge line of the drain pump and is provided with a by-pass valve for operation in case the regulator becomes inoperative. Refer to page 4-13.

The tube nest drain regulator for the second effect is of the piston type balanced valve with ball float. Means are provided for locking regulator open in case of derangement and a stop valve is provided for manual control of the drain level when this condition occurs. The construction of this regulator is shown on page 4-12.

CONDENSATE COOLER - A condensate cooler is provided for cooling the condensate, and its general construction is shown on page 4-5. It is of the straight tube type, having 5/8" O.D. tubes, .049" thick, expanded into tube sheets at both ends. The distilling condenser circulating water serves as a cooling medium passing through the shell while condensate passes through the tubes.

*THE GRISCOM-RUSSELL COMPANY*                    *OPERATING INSTRUCTIONS*

## LIST OF UNITS – FOR EACH PLANT

Each two effect distilling plant consists of the following:

    Two (2) evaporators (1st & 2nd effects combined in single shell)
    One (1) distilling condenser
    One (1) vapor feed heater
    One (1) condensate cooler
    One (1) air ejector condenser
    Two (2) tube nest drain regulators
    Two (2) air ejectors
    One (1) flash chamber
    Two (2) 60 gallon test tanks
    One (1) electrical salinity meter with five cells
    Two (2) orifice plates (one for normal and one for overload)
    One (1) steam reducing valve
    One (1) salinometer set
    One (1) fresh water meter
    One (1) motor driven centrifugal distilling condenser
           circulating pump
    One (1) motor driven centrifugal first-effect drain pump
    One (1) motor driven centrifugal fresh water distributing pump
    One (1) motor driven centrifugal condensate pump
    One (1) motor driven centrifugal brine overboard pump
    Piping and valves
    Gauges and thermometers.

## LIST OF SPARE PARTS – FOR DISTILLING UNIT ONLY

    For Evaporators . . . . . . . . . . . . . 4 sight glasses
                                              2 gauge glasses

    For Distilling Condenser  . . . . . . . . 1 collar stud

    For Flash Chamber . . . . . . . . . . . . 1 gauge glass

    For Drain Regulators  . . . . . . . . . . 2 gauge glasses

    For Air Ejectors  . . . . . . . . . . . . 1 steam nozzle
                                              2 strainer assemblies

    For Tube Expanders  . . . . . . . . . . . 4 sets rolls

## LIST OF TOOLS – FOR DISTILLING UNIT ONLY

        2 expanders for #18 BWG tubes
        2 expanders for #16 BWG tubes
        1 nozzle reamer for air ejectors
        1 reseating tool for gauge glass fittings
        2 tube nest stops

Refer to operating instructions covering pumps and salinity indicators for
lists of spares and tools for that equipment.



LIST OF PLANS

| G-R Plan No. | Bu. Ships Plan No. DD445 - 85801 - | Title |
|---|---|---|
| NYE-1895 -23A . . . . . | | . . . . External Arrangement |
| " , -24A . . . . . | | . . . . Internal Arrangement |
| " - 3A . . . . . | 22 | . . . . Shell |
| " - 4A . . . . . | 23 | . . . . Front Cover |
| " - 5A . . . . . | 24 | . . . . Back Cover |
| " - 6A . . . . . | 25 | . . . . Wrapper Plates |
| " -25A . . . . . | | . . . . Tube Sheets, Covers & Supporting Plates |
| " -20A . . . . . | 36 | . . . . Vapor Separator - 1st Effect |
| " -21A . . . . . | 37 | . . . . Vapor Separator - 2nd Effect |
| " -10A . . . . . | 27 | . . . . Division Plate |
| " -11A . . . . . | 28 | . . . . Drain Regulator - 1st Effect |
| " -12A . . . . . | 29 | . . . . Vapor Baffles |
| " -14A . . . . . | 30 | . . . . Air Ejector Condenser |
| " -15A . . . . . | 31 | . . . . Condensate Cooler |
| " -16A . . . . . | 32 | . . . . Drain Regulator - 2nd Effect Assembly |
| " -17A . . . . . | 33 | . . . . Drain Regulator - 2nd Effect Details |
| " -18A . . . . . | 34 | . . . . Miscellaneous Details |
| " -22A . . . . . | 38 | . . . . Heat Balance Diagrams |
| C. H. WHEELER CO. Dwg. No. | DD445 - S5802 - | |
| 43506 . . . . . | 1 | . . . . Air Ejector |
| 43507 . . . . . | 2 | . . . . Air Ejector Relief Valve |

*THE GRISCOM-RUSSELL COMPANY*          *OPERATING INSTRUCTIONS*

## GENERAL OPERATING INSTRUCTIONS

Successful operation of the distilling plant depends largely upon steady operating conditions. Sufficient time must be allowed when starting the plant to permit the various heat exchangers to reach their normal operating temperatures. After the plant has reached normal operating temperatures, small adjustments can easily be made to produce the required quality and quantity of condensate for maximum economy.

The capacity of any evaporator depends chiefly upon the dry and saturated temperature difference between the steam in the tubes and vapor in the shell, and upon cleanliness of tube surface. Clean surfaces and full available temperature difference would produce excessive capacity and consequent priming.

Attention to the following factors is essential in operating the plant:

FIRST EFFECT TUBE NEST TEMPERATURES AND PRESSURES - Fluctuating first effect steam chamber pressures and corresponding temperatures cause fluctuations of pressures and temperatures throughout the entire plant. These fluctuations may cause entrainment with increased salinity of condensate as well as disturbance to feed levels. Proper operation of the automatic pressure regulators will insure <u>constant</u> steam conditions.

When clean and with 28" vacuum in distilling condenser, this distilling plant has sufficient heating surface to produce full overload capacity with <u>vacuum in the first effect tube nest.</u> This fact permits the use of an accurate control of capacity which consists of a restriction in the form of a circular orifice inserted in the exhaust steam line below the pressure regulating valve. With absolute pressures* beyond the orifice (in the tube nest) less than about 58% of the upstream absolute pressure, the quantity of steam flowing <u>is dependent only on the upstream pressure.</u>

* Absolute press.=gauge press. in pounds + 14.7 or = 14.7 - vacuum in inches of mercury x 0.49.

The plant output of distilled water is largely proportional to the quantity of steam supplied and is slightly affected by the circulating water temperature. Therefore, the capacity can be controlled accurately by maintaining a constant pre-determined pressure above the orifice by means of the pressure regulating valve.

The orifice control diagram (page 4-4) gives estimated valve settings for two different orifice diameters and for various circulating water temperatures. Orifice "A" was selected for operation under the 30% overload condition and orifice "B" for capacities near the normal load. Orifice diameters for still lower ranges of capacity may be determined by changing the orifice area in direct proportion to the capacity.

During operation, at any pre-determined capacity, the evaporator tube surfaces will gradually become coated with scale and cause the absolute pressure in the tube nest to slowly increase until higher than about 58% of the absolute pressure ahead of the orifice when the steam flow to the evaporators will be reduced and it will be necessary to increase the pressure above the plate to maintain the same output. When the pressure above the orifice has been increased to 5#/sq. in. gauge in order to obtain capacity, it is time to remove the tube nest and completely descale the tubes.

To permit operation with vacuum in the first-effect tube nest, it is essential that a drain pump be used or the drains discharged to a vacuum condenser.

SECOND EFFECT SHELL PRESSURES - It is necessary to maintain a constant second-effect shell pressure as a rapid fluctuation of this pressure has a strong tendency to cause priming. With an orifice installed in the steam line to the first-effect, variation of the shell pressure in the second effect will cause a similar variation in the pressure in the first effect tubes and in the first-effect shell as there will be a tendency to maintain an approximately constant temperature difference. The capacity,



*THE GRISCOM-RUSSELL COMPANY*                    *OPERATING INSTRUCTIONS*

through short periods of time, will not be affected unless an increase in the second effect shell pressure causes the first effect tube pressure to exceed 55% of the pressure above the orifice.

Ordinarily the second effect shell pressure will depend upon the temperature of the available circulating water, as well as its quantity, and upon the proper operation of the air ejectors. Under normal operation with a tight system, a vacuum of 25½" to 26½" will be obtained in the second effect shell. A vacuum of less than 25" indicates the probability of air leakage or insufficient circulating water, and this condition should be corrected. A vacuum higher than 26½" (obtained with cold circulating water) is usually not objectionable.

Operating at low temperatures, as described above, has the decided advantage of prolonged operation without cleaning as the rate of scale formation is minimum and the constant capacity obtained by orifice control contributes largely to purity of condensate.

However, when operating in regions where sea water is contaminated, such as harbors, it is necessary to increase the operating pressure in the first effect shell for bacteriological reasons. In this case, the second effect vapor pressure must be increased (vacuum decreased) by bleeding air into the air ejector suction or by recirculating a portion of the air ejector exhaust, from the ejector condenser, through the spare ejector. If insufficient capacity is obtained by backing up the pressure in this manner, with maximum pressure available ahead of the orifice, then the orifice must be by-passed or temporarily removed. This method has the disadvantages of more rapid scale accumulation on the heating surface and possibly unsteady capacity resulting in priming if not very carefully handled.

FEED & DRAIN LEVELS - The water level in the shell of each evaporator is controlled by hand regulated feed valves. This level can be observed through sight glasses provided on the sides of the shell.

For best operation, the tube bundle should be just covered by the boiling liquid. Higher levels cause a tendency to prime while lower levels tend to reduce capacity. It may be necessary to carry lower levels under some circumstances.

Standard gauge glasses are provided on each shell, and it will be noted that the apparent level in these glasses is several inches below the actual level observed through the sight glass. It will also be noted that when the evaporators are operated at full capacity the difference between the apparent level and the actual level will be greater than when operating at a low capacity. Furthermore, there may be a greater difference between apparent level and actual level in the first effect shell than in the second effect shell.

False water levels may be indicated in the gauge glass as a result of stoppage of the equalizers with scale.

The tube nest drain levels are maintained by automatic drain regulators, as described before, fitted with gauge glasses. These levels must be maintained to seal the tube nests.

VENTING OF EVAPORATOR TUBE NESTS - Improper venting of the evaporator tube nests either causes accumulation of air in the tubes, with loss of capacity, or excessive loss of tube nest steam to distilling condenser, with loss of efficiency.

Test results have indicated that the regulating valve in each tube nest vent line should only be opened a small amount under steady operating conditions.

BRINE DENSITY - Since the concentration of brine in the evaporator, within limits, has a direct bearing on the quality of the condensate, and since varying quantities of brine discharged overboard may effect conditions of operation, it is desirable to keep the brine discharge and brine density in the second effect shell as steady as possible.

If the brine concentration is too low there will be a loss in capacity and economy, and difficulty in proper feeding of the second effect shell; if it is too high it may impair the quality of



*THE GRISCOM-RUSSELL COMPANY*                    *OPERATING INSTRUCTIONS*

the condensate and increase the rate of scaling of the tube nests. Heavy layers of scale sometimes noted on the tubes is generally due to improper operation.

The brine density from the second effect shell should be maintained at a density at not more than one and one-half thirty seconds. This is easily accomplished with average sea water feed density of one thirty seconds. If sea water is more highly concentrated, the quantity of brine discharged must be increased and it may become necessary to decrease plant capacity in order to avoid excessive concentration. Samples of the brine may be obtained from the test cock in the brine pump discharge line; samples of the feed may be drawn off at various temperatures from the condenser, vapor feed heater, air ejector condenser, or the condensate cooler. The density of the sample may then be obtained by means of commercial salinometers calibrated to read directly in thirty-seconds. The salinometer reading is affected to a considerable extent by the temperature of the sample and for this reason commercial salinometers have several scales each of which is correct for one particular temperature. The salinometer should be selected for the proper temperature range, otherwise, a temperature correction should be made.

It should be noted that frequent manipulation of the brine pump discharge valve tends to offset the steady performance of the plant, and that very small changes in the opening of this valve have large effects on the brine densities.

PUMP OPERATION – Whether pumps are driven by constant or variable speed motors, any adjustment in pump capacity should be obtained by manipulation of the discharge valve only. No attempt should be made to control the condensate pump discharge so as to maintain a level in the flash chamber. It is satisfactory to operate without a level in this unit. All vacuum pumps should be water sealed in order to prevent air leakage which would cause pump to lose suction. These pumps should also be provided with air vents between pump suction and shell being drained.

PURITY OF CONDENSATE – The electrical salinity cells provided are calibrated to read directly in grains per gallon. In normal operation, the selector switch of the salinity indicator should be set to read the salinity of the condensate cooler discharge, which is the combined output of the distilling plant. If high salinity is indicated, the selector switch should be turned successively to the cells in the distilling condenser drain line and in the second effect coil drain, making the proper adjustment for temperature in each case.

If the cell in the distilling condenser drain line indicates high salinity, the vapor generated in the second effect shell has been contaminated. This may be due to priming in the second effect, which in turn may be due to high levels, high brine density, or unstable operating conditions. It may also be due to tube or tube joint leaks in the distilling condenser. Contamination of the vapor generated in the first effect will be reflected by a high reading of the cell in the second effect tube nest drain line. The trouble may be traced to high feed levels in the first effect, unstable operating conditions, or to leakage in the vapor feed heater.

The cells in the first effect tube nest drain and in the air ejector condenser drain lines are provided to prevent the return of contaminated condensate to the boiler system. Any such contamination is due to leakage.

The safe operating range of the meter from 0 to 0.5 grains per gallon is white, the range from 0.5 to 2 grains per gallon is green, and over the 2 grains per gallon, it is red. When the meter reads over 0.5 grains per gallon, the condensate must be discharged to the bilge and operating conditions properly adjusted to reduce the salinity to 0.5 grains per gallon or less. The proper operating range is 0.25 grains per gallon or less.

CHEMICAL TEST FOR CHLORINE CONTENT – The apparatus required for the chemical test for chlorine content of the condensate follows:

Aqueous solution of silver nitrate, chemically pure, containing 4.101 grams



*THE GRISCOM-RUSSELL COMPANY*                    *OPERATING INSTRUCTIONS*

of silver nitrate to the litre; 2% solution of potassium chromate, chemically pure; 2 burettes, capacity 40 cu. cm. graduated to 1/10 cu. cm.; evaporating dish, 250 cu. cm.; glass stirring rod.

Fifty cu. cm. of condensate to be tested is measured and poured into the evaporating dish, which must be perfectly clean. Five drops of potassium chromate are then added to the sample, after which silver nitrate solution from the burette is added drop by drop and the sample continuously stirred until the entire solution turns very faintly pink. The accurate volume of silver nitrate solution used, should be recorded. For each cu. cm. of silver nitrate used, the sample of condensate will contain 1 grain of chlorine per U.S. gallon.

<u>AIR EJECTORS</u> - In operation, the air ejectors require very little attention. However, the following points should be noted:

The steam pressure at the nozzle inlet must not be less than the value for which the ejector is designed. There may be a substantial pressure drop in the steam line, and if the steam pressure is not measured at the nozzle inlet, it may be necessary to carry a higher pressure on the gauge.

Trouble often results from either low steam pressure, wet steam, or from an obstructed nozzle or steam strainer. Such a condition may be detected by unstable operation or failure to obtain or maintain vacuum.

Should one ejector be operating and it be desired to place the spare in use, removing the other from service, the procedure should be as follows:

1. Open gate valve at discharge of spare ejector.
2. Open steam to nozzle of spare ejector.
3. Open gage valve to suction of spare ejector.
4. Close gate valve to suction of other ejector.
5. Shut off steam to nozzle of other ejector.
6. Close gate valve at discharge of other ejector.

It is important that the above sequence of operating valves be maintained. <u>The discharge gate valve on an ejector body should always be opened before admitting steam to the ejector nozzle. Steam to an ejector nozzle should always be shut off before closing the discharge gate valve.</u> Although these ejector bodies are protected from excessive pressure by relief valves, the observance of the above sequence will reduce the required maintenance on gaskets and pressure relief valve seats.



*THE GRISCOM-RUSSELL COMPANY*          *OPERATING INSTRUCTIONS*

## INSTRUCTIONS FOR STARTING THE PLANT

Examine piping, valves, gauges, etc., to become
familiar with the location and purpose of each.

1. Open all valves and air vent cocks in the circulating water system, and start the circulating water pump.

2. Adjust the spring loaded back pressure valve in the circulating water overboard line so as to maintain a pressure of approximately 5#/sq. in. at the discharge from the distilling condenser.

3. Open all valves and air cocks in the evaporator feed system and the brine overboard line, excepting the brine pump discharge valve and the air ejector condenser emergency circulating water overboard valve.

4. When a water level of 10 to 13 inches appears in the second effect shell gauge glass, start the brine overboard pump, and crack open the discharge valve on this pump. The brine overboard valve at ship's side and the valve in the suction to this pump should always be wide open during operation.

5. The air ejector may now be placed in operation by first making certain that the air vent from the after condenser to atmosphere is free of obstruction, and that the drain from the after condenser is open. Open the gate valve at the discharge from the ejector, then open the gate valve at the suction of the ejector; finally admit steam to the ejector nozzle.

6. All vents from the steam heads to the evaporator shell should be wide open.

7. When the second effect evaporator shell pressure indicates about 16" of vacuum, partially open the first effect steam supply valve. When condensate appears in the first effect drainer, open the suction valve to the first effect drain pump and start pump. Adjust discharge valves so that condensate will be discharged to drain collecting system.

8. When condensate appears in the second-effect automatic drainer gauge glass, open the discharge valve at the drainer so condensate will be carried to flash chamber.

9. Start the condensate pump and open all valves in the discharge line from this pump to the test tank.

10. When water appears in the gauge glass of the test tank, open all the required valves in the fresh water system except the fresh water pump discharge. Start the fresh water pump and regulate the discharge valve to maintain a desired level in the test tank. Close the bypass valves around the water meter so production can be recorded.

11. As the output of the plant is gradually increased, the feed levels should be adjusted to the desired position. The valves in all vent lines should be adjusted to their normal operating position (about one turn open). When the steam pressure above the orifice plate in the first effect, and the second-effect vacuum both have attained their desired values, the density of the brine pump discharge should be checked, and the control valve in the brine overboard line carefully manipulated until the brine density reaches approximately one and one-half thirty-seconds.

12. If the flow of evaporator feed through the air ejector condenser is temporarily stopped due to high feed level in the first effect evaporator shell, vapor may discharge into the evaporator room through the air ejector condenser vent pipe. This condition may be remedied by slightly opening the valve in the overboard line at the feed outlet of the ejector condenser to permit the circulation of water through the condenser and overboard. This valve should not be opened more than required in order to prevent an excessive amount of heated feed being discharged overboard.

13. When for any reason tests indicate the condensate contains excessive chlorine, immediately adjust the valves in the test tank discharge line so that the impure water is discharged to the



**THE GRISCOM-RUSSELL COMPANY**                    **OPERATING INSTRUCTIONS**

bilge instead of the fresh water tank. Impure condensate may be caused by:

(a) Admitting supply steam too rapidly when starting the plant in operation, particularly after the tube nests have been completely descaled.

(b) Too high water level in either the first effect or second effect evaporator, or too sudden a change of water levels.

(c) Sudden changes in steam pressure supplied to first effect evaporator or sudden changes in second effect shell vacuum due to faulty air ejector operation.

(d) Leakage of salt water into the condensate from the condensate cooler, distilling condenser, air ejector condenser, or vapor feed heater.

Control auxiliary steam supply to first-effect tube nest to prevent exceeding capacities shown on the heat flow diagram. At all times when starting the plant in operation, the steam supply to the first effect tube nest should be increased very slowly in order to prevent priming. Ordinarily a condition of impure condensate will clear up rapidly if it has been due to a fluctuating operating condition. However, if it does not clear up rapidly, the plant should be secured and each of the units tested for leakage.

PROCEDURE FOR SECURING THE PLANT – When it is desired to secure the evaporator plant, proceed as follows:

1. Secure exhaust steam to first effect tube nest.

2. Secure first effect drain pump.

3. Secure steam to air ejector and suction and discharge valves.

4. Secure condensate pump.

5. Secure fresh water pump and suction and discharge valves at water meter.

6. Open all air vents wide in order to equalize pressure in all units.

7. Allow the circulating pump and brine overboard pump to continue operating for a few minutes in order to cool down all parts of the distilling plant.

8. Secure the brine overboard pump.

9. Secure the circulating water pump after making sure that evaporator tube bundles are fully covered with water.

10. Close the sea injection valve and the brine overboard valve at ship's side and all suction and discharge valves at pumps.

11. Secure feed valves for each evaporator and discharge from second effect drain regulator.

12. Secure valve in drain line from air ejector condenser to drain collecting system and open valve to bilge.

13. Secure valves in vent lines between evaporator tube nests and shell.

*THE GRISCOM-RUSSELL COMPANY*                    *OPERATING INSTRUCTIONS*

## CARE AND MAINTENANCE

CONDITIONS OF HEAT EXCHANGER & CONDENSER EQUIPMENT - The capacity and economy of the plant are affected by the cleanliness of the various heat exchanger surfaces. The gain in capacity and economy obtained by the use of the feed heaters and condensate cooler is considerable.

Except for the evaporator tubes, the heat exchanger surfaces require cleaning only at infrequent intervals. The evaporator tubes may require much more frequent cleaning, the frequency of the cleaning depending to a great extent upon operating conditions. Periodic checking of feed and drain temperatures under similar operating conditions will indicate the efficiency of the various heat exchangers, including the condensers, and will provide indication of the cleaning requirement.

Experience has indicated that, when low pressure evaporators are operated in accordance with these instructions and when a vacuum of at least 25½" is carried in the second effect shell, complete removal of bundles for hand-cleaning will only be necessary at very infrequent intervals. Under these conditions, first effect units have generally been operated from three to six months without hand-cleaning. The second effect units will remain relatively clean much longer than the first effect, and reports indicate they have been maintained in continuous operation for six months to one year before being removed for hand-cleaning. The quality of sea water and harbor water varies considerably, and, therefore, scale deposits and maintenance will vary in accordance with location at which the vessel operates. When operating in tropical waters, for example, it may be found necessary to hand scale tubes as frequently as every two weeks.

Heavy layers of scale may be caused by:

(a) Excessive brine density due to improper operation of brine pump or stoppage in brine line. The strainer basket in the pump suction line should be examined frequently and emptied when necessary in order to keep it from becoming packed with loose scale.
(b) Carrying too low a water level.
(c) Operating at too high a temperature level (insufficient vacuum in second effect shell.)

CLEANING METHOD - The method of cleaning the inside surface of the heater and condenser units will depend upon the nature of the deposit. In all units operating at the lower temperatures, the deposit may be such that it can readily be flushed out with water at high velocity. In the hotter units (air ejector condenser, vapor feed heater) a harder deposit may accumulate requiring the use of an air driven revolving cutting tool, such tool to be so constructed that the cutting edge can not cut into the thin tube wall.

When the evaporator tubes require cleaning on the water side, a suitable vibrating tool should be used. This tool should be of such length that the outer surface of any tube in the tube nest may be reached. One end of the tool should be forged to a shape to fit the outside surface of the tube; all sharp edges should be eliminated to prevent cutting of the tube wall.

The tool may then be caused to vibrate against the tube wall by means of a light air hammer, effectively removing any scale accumulation. See illustration on page 4-10 for a proposed tool. Heat from a blow torch should not be used to clean scale from the tubes as this method often causes loose tube joints and distortion of tubing.

The cover of the clean-out opening at the bottom of each evaporator shell should be opened about once a week on the first effect and the loose scale raked out. The clean-out of the second effect may be opened at less frequent intervals depending upon operating conditions.

The feed lines and valves between evaporators and the perforated feed distri-



*THE GRISCOM-RUSSELL COMPANY*                              *OPERATING INSTRUCTIONS*

buting pipe in each evaporator should be examined occasionally because, if clogged with scale, improper feeding will result.

ELIMINATION OF ALL LEAKAGE - Periodic pressure tests should be made on all distilling plant apparatus including the distilling condenser, vapor feed heater, condensate cooler, air ejector condenser, and piping to make sure of a tight system.

Leaks between the evaporator steam and vapor spaces and air leaks in the evaporator cause losses of capacity and economy. Tube leaks in the distilling condenser, vapor feed heater or condensate cooler cause leakage of salt water into the condensate. Air leaks in the shells of distilling condenser unit cause loss of vacuum and capacity. Air leaks in the casings, glands or suction piping of the brine discharge or the condensate pump affect the proper operation of the pump, and therefore, the operation of the distilling plant. In order to insure the proper operation of these pumps, the glands should be properly packed and sealed at all times. The gland of the condensate pump receives its sealing water from the discharge of that pump; the gland of the brine discharge pump receives its sealing water from the circulating water pump discharge; and the first effect drain pump gland receives its sealing water from its own discharge. Compound gauges located in the discharge lines of these pumps give visual indication of the operation of these units. When the pumps are operating properly, pressures above atmospheric are indicated; a pressure below atmospheric on any of these gauges is an indication of trouble in that particular pump, indicating air leakage into the pump impeller which may be due to improper packing or to the loss of sealing water.

Particular care should be taken to properly pack all gauge glass glands as this is a common source of air leakage into the distilling plant.

AIR EJECTORS - During the first few months of operation the steam strainers and nozzles should be inspected frequently and cleaned if necessary. If the steam supplied has a tendency to form a scale in the nozzle throats, they can be cleaned by means of the special nozzle reamers furnished each vessel for this purpose. The use of ordinary sharp edged tools when cleaning nozzles should be avoided as this may cause damage to the surfaces and impair the efficiency of the ejector. The diffusers seldom require cleaning but if this is found necessary, it is suggested that these parts be cleaned by using a cloth saturated with kerosene or alcohol which will usually soften the deposit which may have accumulated in the diffuser.

If it is found necessary to inspect or clean the nozzle of one ejector while the adjacent one is in operation, make sure that the corresponding air suction and steam stop valves are closed tight.

The ejectors are tested under the specified operating conditions at the factory prior to shipment and will continue to function properly as long as the various parts are in satisfactory working condition and steam of the proper pressure is supplied to the nozzles. A test orifice is provided on the suction chamber which is closed by a cap. On the head of this cap is stamped the absolute pressure in inches of mercury which was obtained during the shop test with the cap removed and the air suction valve closed.

The procedure for making a field check of the performance of the ejector is as follows:

Close the gate valve in the ejector suction and remove the test orifice cap. Observe the readings of the vacuum gauge and the barometer. The difference between these readings represents the absolute pressure and should correspond to the figure stamped on the orifice cap if the ejector is in first-class operating condition. In order to insure accuracy when making such a test a mercury column or absolute pressure gauge should be used in lieu of an ordinary dial vacuum gauge. When making an orifice test, it is important that steam of the proper pressure be supplied to the ejector nozzle.





| PIECE NO. | NAME | MATERIAL |
|---|---|---|
| 1 | SHELL | COPPER |
| 2 | FRONT HEAD | VALVE BRONZE |
| 3 | BACK HEAD | VALVE BRONZE |
| 4 | TUBE SHEET | COMPOSITION METAL |
| 5 | STIFFENING RING | NAVAL BRASS |
| 6 | TUBES | COPPER-NICKEL ALLOY |
| 7 | BAFFLE | COPPER |
| 8 | TUBE SUPPORT PLATE | NAVAL BRASS |
| 9 | SUPPORT PLATE | STEEL |
| 10 | GASKET | COMPRESSED ASBESTOS |
| 11 | GASKET | COMPRESSED ASBESTOS |
| 12 | GASKET | CANVAS |
| 13 | CONICAL BAFFLE | COPPER |
| 14 | PENCIL ZINC | ZINC |
| 15 | PIPE PLUG | BRASS |
| 16 | STUD BOLT | NICKEL COPPER |
| 17 | NUT | NAVAL BRASS |

CONDENSATE OUTLET

CONDENSATE INLET

CIRC WATER OUTLET

CIRC WATER INLET

"A"     "A"

SECTION "A-A"

FRONT VIEW

## DISTILLATE COOLER

THE GRISCOM-RUSSELL CO.
NEW YORK, N.Y.

NVC-4181          DATE: 5-8-41

4-5



| PIECE NO. | NAME | MATERIAL |
|---|---|---|
| 1 | STRAINER BODY | CAST STEEL |
| 2 | STRAINER COVER | CAST STEEL |
| 3 | STRAINER CAGE COMPLETE | NICKEL COPPER ALLOY |
| 4 | STEAM CHEST CAP | CAST STEEL |
| 5 | NOZZLE | CORROSION RES. STEEL |
| 6 | EJECTOR BODY | CAST STEEL |
| 7 | TEST ORIFICE | NAVAL BRASS |
| 8 | ORIFICE CAP | NAVAL BRASS |
| 9 | GASKETS | COPPER |
| 10 | SENTINEL RELIEF VALVE | VALVE BRONZE |
| 11 | COMBINING TUBE | VALVE BRONZE |

STEAM INLET

AIR SUCTION

DISCHARGE

DISTILLER EJECTOR

THE GRISCOM-RUSSELL CO.
NEW YORK, N.Y.

NYC-3800    10-16-42
DATE-10-25-39

4-6



| PIECE NO. | NAME | MATERIAL |
|---|---|---|
| 1 | SHELL | COPPER |
| 2 | COVER | VALVE BRONZE |
| 3 | TUBE SHEET | COPPER NICKEL ALLOY |
| 4 | STIFFENING RING | NAVAL BRASS |
| 5 | PENCIL ZINC | ZINC |
| 6 | TUBES | COPPER NICKEL ALLOY |
| 7 | GASKET | COMPRESSED ASBESTOS |
| 8 | SUPPORTS | STEEL |
| 9 | BAFFLE | COPPER |
| 10 | BAFFLE | COPPER |
| 11 | BAFFLE | COPPER |
| 12 | BAFFLE | COPPER |
| 13 | NOZZLE FLANGE | BRONZE |
| 14 | STUD BOLTS | NICKEL COPPER ALLOY |
| 15 | NUTS | NAVAL BRASS |
| 16 | PIPE PLUG | BRASS |
| 17 | GASKET | COMPRESSED ASBESTOS |
| | | |
| | | |
| | | |

EJECTOR EXHAUST INLET

VENT CONN.

DRAIN CONN.

FEED INLET

SECTION "A-A"

SHELL VENT CONN.

EJECTOR EXHAUST INLET "A"

DRAIN CONN.

EMERGENCY CIRC. WATER OVERBOARD CONN.

FEED OUTLET

# AIR EJECTOR CONDENSER

THE GRISCOM-RUSSELL CO.
NEW YORK, N.Y.

NYC-4180          DATE: 5-8-41





| PIECE NO. | NAME | MATERIAL |
|---|---|---|
| 1 | EXPANDING ROLLER | TOOL STEEL |
| 2 | EXPANDING PIN | TOOL STEEL |
| 3 | CAGE | COLD DRAWN STEEL |
| 4 | NUT | CLASS C STEEL |
| 5 | ADJUSTING NUT | COLD DRAWN STEEL |
| 6 | CHECK NUT | COLD DRAWN STEEL |
| 7 | PIN FOR HAND ROLLING | COLD DRAWN STEEL |
|  |  |  |
|  |  |  |
|  |  |  |

#1 - THE TUBE EXPANDER CONSISTS OF A CAGE, THREE ROLLER PINS AND ONE MANDREL. (SEE ILLUSTRATION).

#2 - SELECT AN EXPANDER CONSTRUCTED FOR THE SAME BWG AS THE TUBE TO BE EXPANDED. PROPER ALLOWANCE MUST BE MADE FOR VARIOUS TUBE GAUGES. OTHERWISE, THE ROLLER PINS MAY BE FORCED THROUGH THE OPENING IN THE CAGE RESULTING IN DAMAGE TO THE EXPANDER, ALSO, IMPROPER ROLLING OF THE TUBE JOINT.

#3 - IF A TUBE IS ROLLED SEVERAL TIMES, OR IF A TUBE IS OVER-ROLLED, THE CAGE WILL THEN BE CONSIDERABLY SMALLER THAN THE INSIDE DIAMETER OF THE TUBE ITSELF AND THIS WILL RESULT IN UNDUE DAMAGE TO THE EXPANDER, AS WELL AS DAMAGING THE TUBE METAL SO THAT THE TUBE JOINT WILL BE WEAKER THAN THE ORIGINAL TUBE WALL.

#4 - WHEN ROLLING TUBES IN A UNIT THAT HAS BEEN IN OPERATION EVERY PRECAUTION MUST BE TAKEN TO THOROUGHLY CLEAN THE TUBE ENDS OF SCALE OR DIRT ACCUMULATION. ALSO, THE EXPANDER SHOULD BE FREQUENTLY WASHED IN GASOLINE AND THEN DIPPED IN LUBRICATING OIL. THIS WILL PREVENT DIRT AND SCALE FROM IN-TERFERING WITH FREE MOVEMENT OF THE ROLLER PINS WITHIN THE CAGE. UNDER ALL CONDITIONS THE EXPANDER SHOULD BE THOROUGH-LY LUBRICATED.

#5 - NEVER ROLL A TUBE ALL THE WAY THROUGH THE TUBE SHEET. THIS NOT ONLY TENDS TO CUT THE TUBE WALL AT THE TUBE SHEET EDGE BUT WILL ENLARGE THE OUTSIDE TUBE DIAMETER BACK OF THE TUBE SHEET SO THAT THE TUBE CANNOT BE AGAIN REMOVED THROUGH THE TUBE HOLE. STOP THE TUBE EXPANDER WITHIN 1/8" OF THE IN-SIDE EDGE OF THE TUBE SHEET. THE CHECK NUT CAN BE SET FOR THE PROPER ROLLING DEPTH WHICH WILL DEPEND UPON THE THICK-NESS OF THE TUBE SHEET.

#6 - TO REMOVE AN OLD TUBE FROM THE TUBE SHEET USE A STANDARD DRILL OF THE EXACT DIAMETER AS ORIGINAL OUTSIDE DIAMETER OF THE TUBE. DRIVE THE DRILL BY A HAND BRACE OR A SLOW SPEED POWER MOTOR AND DRILL BOTH ENDS ONLY TO DEPTH THE TUBE HAS BEEN ROLLED. THE TUBE SHOULD THEN BE LOOSE AND WILL PASS THROUGH THE TUBE HOLE.

#7 - PASS A ROD THROUGH THE OLD TUBE BEFORE REMOVING IT. THE ROD WILL THEN SERVE TO GUIDE THE NEW TUBE THROUGH INTERNAL BAF-FLE PLATES AND INTO THE OPPOSITE TUBE SHEET.

#8 - DO NOT ATTEMPT TO DRIVE A TUBE OUT OF THE TUBE SHEET UNTIL YOU ARE SURE IT IS LOOSE AT BOTH ENDS. ANY DRIVING ACTION PERFORMED BEFORE THE TUBE IS ENTIRELY LOOSE WILL STOVE THE TUBE WALL AND ENLARGE THE OUTSIDE DIAMETER TO A DIMENSION LARGER THAN THE TUBE HOLES. TUBE HOLES ARE SLIGHTLY LARGER IN DIAMETER THAT THE ORIGINAL OUTSIDE TUBE DIAMETER, AND, THEREFORE, ANY CONSIDERABLE ENLARGEMENT OF THE TUBE DIAM-ETERS INSIDE THE TUBE SHEET WOULD PREVENT REMOVAL OF THE TUBE THROUGH THE HOLE IN TUBE SHEET.

#9 - EXPANDERS ARE CONSTRUCTED FOR HAND OPERATION ALSO WITH A TAPER SHAFT FOR USE WITH AN AIR MOTOR. AN AIR MOTOR FOR OPERATION OF TUBE EXPANDERS SHOULD BE SLOW SPEED AND REVERS-IBLE.

#10 - WITH REASONABLE CARE THE TUBE EXPANDER SHOULD REMAIN IN GOOD CONDITION FOR THE ROLLING OF MANY HUNDREDS OF TUBES.

# TUBE EXPANDER

### THE GRISCOM-RUSSELL CO.
### NEW YORK, N.Y.

Figure 2                    Date 12-21-38



LENGTH TO SUIT TUBE BUNDLE

$\frac{1}{4}$" DIA.

$\frac{1}{2}$" DIA.

$\frac{3}{8}$" R.

$\frac{1}{2}$"

$\frac{15}{16}$"

$1\frac{9}{16}$"

$\frac{3}{8}$"

$\frac{1}{2}$"

MATERIAL— TOOL STEEL

PROPOSED TOOL
FOR CLEANING
EVAPORATOR TUBES

THE GRISCOM-RUSSELL CO.
NEW YORK, N.Y.

NYC-4008    DATE-10-3-40
10-16-42

4—10

## STEAM TABLES

| GAUGE PRESSURE lbs/sq.in. | ABSOLUTE PRESSURE lbs/sq.in. | SATURATED TEMPERATURE Deg.F. | GAUGE READING inches vacuum | ABSOLUTE PRESSURE lbs/sq.in. | SATURATED TEMPERATURE Deg.F. | GAUGE READING inches vacuum | ABSOLUTE PRESSURE lbs/sq.in. | SATURATED TEMPERATURE Deg.F. |
|---|---|---|---|---|---|---|---|---|
| 5 | 19.696 | 227 | 11 | 9.31 | 189.8 | 22¾ | 3.52 | 147.9 |
| 4 | 18.696 | 225 | 11½ | 9.08 | 188.6 | 23 | 3.40 | 146.4 |
| 3 | 17.696 | 222 | 12 | 8.81 | 187.3 | 23¼ | 3.28 | 145.0 |
| 2 | 16.696 | 219 | 12½ | 8.57 | 186.0 | 23½ | 3.16 | 143.5 |
| 1 | 15.696 | 216 | 13 | 8.32 | 184.6 | 23¾ | 3.03 | 141.9 |
| 0 | 14.696 | 212 | 13½ | 8.08 | 183.3 | 24 | 2.91 | 140.3 |
| inches vacuum | | | 14 | 7.83 | 181.9 | 24¼ | 2.78 | 138.5 |
| ½ | 14.47 | 211.2 | 14½ | 7.58 | 180.4 | 24½ | 2.66 | 136.8 |
| 1 | 14.23 | 210.4 | 15 | 7.33 | 178.9 | 24¾ | 2.53 | 134.9 |
| 1½ | 13.98 | 209.5 | 15½ | 7.09 | 177.4 | 25 | 2.41 | 133.1 |
| 2 | 13.73 | 208.6 | 16 | 6.85 | 175.9 | 25¼ | 2.29 | 131.1 |
| 2½ | 13.49 | 207.7 | 16½ | 6.60 | 174.2 | 25½ | 2.17 | 129.1 |
| 3 | 13.24 | 206.8 | 17 | 6.35 | 172.5 | 25¾ | 2.05 | 127.0 |
| 3½ | 13.00 | 205.9 | 17½ | 6.11 | 170.8 | 26 | 1.93 | 124.7 |
| 4 | 12.75 | 204.9 | 18 | 5.86 | 169.0 | 26¼ | 1.81 | 122.3 |
| 4½ | 12.50 | 203.9 | 18½ | 5.62 | 167.2 | 26½ | 1.68 | 119.7 |
| 5 | 12.26 | 203.0 | 19 | 5.37 | 165.3 | 26¾ | 1.55 | 117.0 |
| 5½ | 12.01 | 202.0 | 19½ | 5.12 | 163.2 | 27 | 1.43 | 114.1 |
| 6 | 11.77 | 200.8 | 20 | 4.88 | 161.1 | 27¼ | 1.31 | 111.0 |
| 6½ | 11.52 | 199.7 | 20½ | 4.63 | 159.0 | 27½ | 1.19 | 107.6 |
| 7 | 11.27 | 198.9 | 20¾ | 4.51 | 157.9 | 27¾ | 1.087 | 103.9 |
| 7½ | 11.03 | 197.9 | 21 | 4.39 | 156.6 | 28 | .944 | 99.8 |
| 8 | 10.78 | 196.8 | 21¼ | 4.26 | 155.5 | 28¼ | .821 | 95.2 |
| 8½ | 10.54 | 195.7 | 21½ | 4.14 | 154.4 | 28½ | .698 | 89.9 |
| 9 | 10.29 | 194.6 | 21¾ | 4.01 | 153.1 | 28¾ | .575 | 83.9 |
| 9½ | 10.04 | 193.5 | 22 | 3.89 | 151.8 | 29 | .452 | 76.5 |
| 10 | 9.80 | 192.4 | 22¼ | 3.77 | 150.5 | 29¼ | .329 | 67.1 |
| 10½ | 9.55 | 191.0 | 22½ | 3.65 | 149.2 | 29½ | .206 | 54.0 |



| PIECE NO. | NAME | MATERIAL |
|---|---|---|
| 1 | BODY CASTING | GUN METAL |
| 2 | CONNECTING LINK | GUN METAL |
| 3 | PIN FOR 2 AND 4 | NICKEL COPPER ALLOY |
| 4 | PISTON VALVE | GUN METAL |
| 5 | FLOAT ARM | GUN METAL |
| 6 | COTTER PIN | BRASS |
| 7 | SHAFT. | NICKEL COPPER ALLOY |
| 8 | NUT FOR 7 | NAVAL BRASS |
| 9 | VALVE CONTROL STEM | NICKEL COPPER ALLOY |
| 10 | BONNET | VALVE BRONZE |
| 11 | GLAND NUT | VALVE BRONZE |
| 12 | HAND WHEEL | MALLEABLE IRON |
| 13 | NUT FOR STEM | STEEL |
| 14 | GLAND | VALVE BRONZE |
| 15 | STUFFING BOX PACKING | ASBESTOS |
| 16 | COVER OF BODY | GUN METAL |
| 17 | GASKET-3/16 THICK | COMPRESSED ASBESTOS |
| 18 | GASKET-1/32 THICK | COPPER |
| 19 | BALL FLOAT-6" O.D. | COPPER |
| 20 | AIR VENT PLUG | VALVE BRONZE |
| 21 | STUDS FOR 1 & 16 | STEEL |
| 22 | NUTS FOR 21 | STEEL |

CONDENSATE INLET

BRAZED

CONDENSATE DISCHARGE

GAUGE GLASS CONN.

BLOW CONN.

SALINITY CELL CONN.

**DRAIN REGULATOR**
**STYLE "F"**

THE GRISCOM-RUSSELL CO.
NEW YORK, N.Y.

10-21-42

MAX. TEST PRESSURE 50#/SQ. IN.

NYC-3779          DATE: 9-18-39

4-12



| PIECE NO. | NAME | MATERIAL |
|---|---|---|
| 1 | DRAINER BODY | GUN METAL |
| 2 | COVER FOR 1 | NAVAL BRASS |
| 3 | BALL FLOAT - 6" O.D. | COPPER |
| 4 | FLOAT ARM | BRASS |
| 5 | SHAFT | NICKEL COPPER ALLOY |
| 6 | SHAFT SLEEVE | GUN METAL |
| 7 | LINK | NICKEL COPPER ALLOY |
| 8 | CLEVIS | " |
| 9 | ARM GUIDE | NAVAL BRASS |
| 10 | PIN | NICKEL COPPER ALLOY |
| 11 | SHOULDER PLUG | NAVAL BRASS |
| 12 | TAP BOLT | " " |
| 13 | COTTER PIN | BRASS |
| 14 | " " | " |
| 15 | PIN | NAVAL BRASS |
| 16 | SPRING WASHER | PHOS. BRONZE |
| 17 | GASKET | COMPRESSED ASBESTOS |
| 18 | " | " |
| 19 | " | COPPER |
| 20 | VALVE BODY | GUN METAL |
| 21 | VALVE TOP FLANGE | " " |
| 22 | VALVE BOTTOM GUIDE | " " |
| 23 | VALVE BOTTOM SEAT RING | " " |
| 24 | VALVE TOP SEAT RING | " " |
| 25 | VALVE PLUG | " " |
| 26 | PIPE PLUG | BRASS |
| 27 | GASKET | COMPRESSED ASBESTOS |
| 28 | COTTER PIN | BRASS |
| 29 | STUDS | STEEL |
| 30 | NUTS FOR 29 | " |
| 31 | STUDS | " |
| 32 | " | " |
| 33 | NUTS FOR 31 & 32 | " |
| 34 | COTTER PIN | BRASS |

VALVE OUTLET

VALVE INLET

EQUALIZER CONN.

EQUALIZER CONN.

MAX. TEST PRESSURE 50 #/SQ. IN.

DRAIN REGULATOR
STYLE "B"
THE GRISCOM-RUSSELL CO.
NEW YORK, N.Y.

NYC-4194          DATE- 5-26-41

4-13

## IMPORTANT INSTALLATION DETAILS

If the distilling plant and auxiliaries are installed in accordance with the diagrammatic arrangement plan and if the foregoing operating instructions are carefully followed (with special attention given to such matters as fouled pipe lines and strainers described under "Care and Maintenance") the full capacity and purity required of the distilling plant should be readily obtained. However, if difficulty is still experienced in obtaining desired results, this may be due to any of the following installation faults, each of which has been reported as an actual experience and none of which should be overlooked.

### PUMPS

1. Have been wired up to run backwards.

2. May not be up to speed because of:
    (a). Wrong rheostats on variable speed motors.
    (b). Impeller rubbing on casing.
    (c). Foreign matter in casing.
    Speed should be checked by means of tachometer.

3. Pumps taking suction under vacuum must have water sealed glands. Sealing water for the brine pump should be obtained from the circulating water pump discharge and for the first effect drain and condensate pumps should be taken from their own discharges.

4. Pumps taking suction under vacuum must be properly vented from the pump suction to the shell from which the water is taken, by a short and direct pipe arranged to slope upwards from the pump so as to avoid pockets.

5. Pumps are often improperly packed, or not packed at all, thus preventing water from reaching the pump suction due to air leakage through the gland. A good grade of packing (John Crane Superseal #1, or Allpax Style #1) should be used. Each ring of packing should be properly and carefully cut with square ends. The rings should then be inserted with the joints staggered. Lantern rings for water sealing should be used in all glands of pumps taking suction under vacuum and installed so as to come directly under the sealing line connection.

On most pumps, two rings of packing must be placed in the gland, to be followed by the lantern ring, and then two or more rings of packing.

6. Improper piping of suction lines to condensate and brine pumps interferes with proper pump operation. These lines should always be as direct and installed with as few sharp turns as possible. Pumps should not be located closer to the vessel being drained than the minimum submergence given on the pump name plate. Greater suction heads, of course, are more desirable where room is available.

7. The sea water circulating pump has, in some cases, been installed too high. This pump should be placed below minimum water level on the hull. The sea chest should be below the minimum level on the hull under maximum roll of ship.

### PIPE LINES

8. Small air leaks in tubing leading to vacuum gages, at the suction to vacuum pumps, around relief valve connections, at unions, and flanged joints have caused difficulty in obtaining proper distilling plant vacuum.

9. The check valve in the brine overboard line has been installed backwards and prevented brine removal from evaporator shell.

10. The back pressure valve in the circulating water overboard line has been installed backwards and prevented circulating sufficient amount of sea water through the distilling condenser.

11. Improper drainage of the first effect coils has been caused by the drain line being shut off in the boiler room; or, when operating without the first effect drain pump, drains were sent to a point of higher pressure (such as an atmospheric drain tank) without the knowledge of the evaporator operator. Flooding of the first effect tube nest has been caused by air leaks in the suction to the drain pump and in the drain line to the main or auxiliary condenser.



*THE GRISCOM-RUSSELL COMPANY*      *OPERATING INSTRUCTIONS*

12. The lower equalizer line on the first effect style "B" regulator has been installed so as to slope upward from the regulator to the drain line instead of horizontally or sloping downward thus resulting in improper functioning of the regulator. The drain line must be carried to a point lower than the bottom of the regulator body.

13. The flow of feed between evaporators has been reduced as a result of air leaks.

14. The Macomb strainer in the brine pump suction has become clogged with scale, thereby reducing pump capacity and permitting last effect brine concentration to become excessive, because strainer baskets with too small mesh were used.

15. Blind gaskets or blanking-off plates, used for hydrostatic test purposes, have been left in position between pipe flanges.

16. Pipe plugs have been discovered in the air vent at the top of the fresh water test tanks, preventing discharge of condensate into tank as pressure built up.

### ELECTRICAL SALINITY INDICATORS

17. Protective paper wrapping on the electrodes of the salinity cells have sometimes not been removed before installing cell.

18. Leads from the cells have sometimes been connected to incorrect points on the indicator panel.

### AIR EJECTORS

19. The pressure gage in the air ejector steam supply line has been located too far away from the ejector. This does not take into account the line pressure drop between the gage and the ejector nozzle. The pressure at the ejector must not be less than the minimum specified. Pressure at the air ejector nozzle from 10 to 15 lbs. above that specified is not objectionable.

20. Pressure gages for the air ejector steam line are sometimes improperly calibrated.

21. Wet steam is often supplied to the air ejectors. Slugs of water, formed in steam line, are carried over into the ejectors, thus causing breaks in vacuum, and a rapid change in vapor pressure will result in impure vapor. The steam supply lines should be well insulated and all unnecessary bends and pockets eliminated. If necessary, a drain line with steam trap should be installed at the lowest point in the line, close to the ejectors.

### REDUCING VALVE & ORIFICE PLATES

22. The weight loaded reducing valve in the supply line to the first effect evaporator may become inoperative if the vent in the space above the piston is plugged, thus preventing free movement of this piston. A wide open vent line must be installed at this point to remove the small amount of steam leaking past the piston.

23. When the stem of the weight loaded reducing valve is not centered properly, it binds in some positions.

24. Improper orifice plates or two orifice plates, one for normal load and one for overload, have been installed in the steam line to the first effect evaporator. The diagrammatic arrangement plan should be consulted for the proper orifice size.

25. If the orifice plate is located close to an elbow or a sharp turn, it is possible that the expected flow will not be realized, necessitating increasing the area of the orifice opening.

26. Under some conditions, especially in port, there may be insufficient auxiliary exhaust for the evaporators, hence, tending to cause vacuum in auxiliary exhaust line. All possible sources of air leakage into this steam line (such as vacuum breakers, etc.) should be eliminated.

### GAGE GLASSES

27. Gage glasses, when improperly packed, have allowed air to leak into the vacuum system. Also, the material of the gasket at the gage flanges has been found to be of such a hard material that it was extremely difficult to make a tight joint. Gasket material of Durabla or equal should be used.



# M E M O R A N D A

**EXHIBIT "I"**

REPRODUCED AT   .NATIONAL ARCHIVES

ADVANCE COPY

MIL-M-15071D(SHIPS)
6 June 1961
SUPERSEDING
MIL-M-15071C(SHIPS)
10 September 1957

MILITARY SPECIFICATION

MANUAL, SERVICE (INSTRUCTION BOOKS) FOR SHIPBOARD

ELECTRICAL AND MECHANICAL EQUIPMENT

## 1.  SCOPE

1.1  Scope. - This specification sets forth Bureau of Ships requirements
for classes and general contents of manuals necessary for the satisfactory
operation, maintenance, installation, overhaul and repair, without the
services of manufacturer's representative, of electrical, mechanical, hull,
interior communication and fire control shipboard equipment.  This specifi-
cation also includes procedures for submission, review, approval and
revision of the service manual.  The intent is to accept the manufacturer's
commercial type of manual or one prepared in accordance with his commercial
practice whenever it is roughly equivalent to the detail requirements included
herein.

1.2  Classification. - Service manuals shall be of the following classes:

Class A manual - A basic manual covering a family of equipment
        of the same basic design and one which can be made applicable
        to a specific equipment manufactured to that basic design by
        completing sheets and blanks.
Class B manual - A manual covering a specific equipment for which
        a class A approval has not been obtained.

## 2.  APPLICABLE DOCUMENTS

2.1  The following documents, of the issue in effect on date of invitation
for bids, form a part of this specification to the extent specified herein.

SPECIFICATIONS

    MILITARY
        MIL-D-963 - Drawing, Electrical, Hull and Mechanical Equipment
                for Naval Shipboard Use.

FSC 7610

REPRODUCED AT THE NATIONAL ARCHIVES

MIL-M-15071D(SHIPS)

PUBLICATIONS

DEPARTMENT OF DEFENSE
DD Form 441 (Attachment) - Industrial Security Manual for
Safe-guarding Classified Information.

(Copies of specifications and publications required by contractors in connection with specific procurement functions should be obtained from the procuring activity or as directed by the contracting officer.)

2.2  The following document forms a part of this specification to the extent specified herein.  Unless otherwise indicated, the issue in effect on date of invitation for bids shall apply.

OFFICIAL CLASSIFICATION COMMITTEE
Uniform Freight Classification Rules.

(Application for copies should be addressed to the Official Classification Committee, 1 Park Avenue at 33rd Street, New York 16, N.Y.)

3.  REQUIREMENTS

3.1  Media for final manuals and approval. -

3.1.1  Class A manuals. - Whenever a manufacturer's equipment lends itself to the preparation of a manual covering a family of equipments of the same basic design and one which can be made applicable to specific equipments of that design by completing sheets and blanks, the manufacturer may submit to the Bureau of Ships four copies of the basic manual together with examples of the sheets and blanks which will represent the detailed information to be provided for a specific equipment.  Approval of a class A manual will be by the Bureau of Ships only and, once approved, the basic manual shall not be modified without the approval of the Bureau of Ships.  At the time of class A manual approval, the Bureau will assign a NAVSHIPS number to the basic manual and forward one copy to the cognizant inspection for future comparison inspection with manuals furnished for specific equipments.

2

REPRODUCED AT THE NATIONAL ARCHIVES

MIL-M-15071D(SHIPS)

3.1.1.1  Once approval of a class A manual is granted for a particular basic design of equipment (and size range, if appropriate), the basic manual with the specific detailed information required for the unit of the family being furnished on a contract or order may be supplied by the manufacturer, in the quantities required by that order, without further approval. Copies of the manual prepared for the specific equipments shall be marked by the manufacturer with the NAVSHIPS number of the basic manual followed by "-1", "-2" or higher.  Each dash number shall be assigned numerically by the manufacturer for each specific equipment of that family.

3.1.2  Class B manuals. - Class B manuals cover a specific equipment for which class A approval has not been obtained.  Once a class B manual has been approved by the Bureau or its field representative, the manual shall not be modified without approval of the Bureau of Ships.  (NOTE:  Bureau of Ships field representative - Where the term "field representative" is used in this specification, it is limited to field representative of the Bureau of Ships, i.e. Supervisors of Shipbuilding, USN, U.S. Naval Shipyards and Industrial Manager, USN.)  Whenever a manual for a specific equipment has not been approved previously, for this or a previous issue of this specification, prior to preparing final manuals, the manufacturer shall prepare and submit a sample manual for approval to one of the following activities, as appropriate:

(a) Manuals procured on Bureau of Ships contracts - Contractor shall forward four sample copies to the Bureau of Ships for approval and assignment of a NAVSHIPS number with a copy of the forwarding document to the cognizant Government inspector.
(b) Manuals procured on contracts issued by Naval activities other than Bureau of Ships - Contractor shall forward four sample copies to the Naval activity for approval.
(c) Manuals procured for the Navy by a commercial activity (such as a private shipbuilder) - Contractor shall forward five sample copies to the commercial activity for approval of both the commercial activity and the cognizant Bureau representative.

3.1.2.1  The Bureau will assign a NAVSHIPS number to each different class B manual as follows:

(a) Manuals procured on contracts issued by the Bureau of Ships - The NAVSHIPS number will be included in the approval letter.
(b) Manuals procured on contracts issued by other activities.

3

REPRODUCED AT THE NATIONAL ARCHIVES

MIL-M-15071D(SHIPS)

The field approving activities may obtain NAVSHIPS numbers from the Bureau of Ships by one of the following methods:

(a) Submit two copies of the manual prior or subsequent to the review and approval.
(b) Permit the manufacturer to forward two copies of the manual to the Bureau simultaneously with the copies for approval.
(c) In urgent cases, submit a letter containing the nameplate data of the equipment, the ship applicability and contract or order number.

3.1.2.2  Regardless of the method used for obtaining NAVSHIPS numbers, the letter request shall state the expected delivery date of the manuals and the quantity of manuals being furnished for stock.

3.1.3  Emphasis. - The Bureau of Ships is mainly interested in the adequacy and completeness of contents and the clarity and readability of the information rather than the format.  The manual shall be oriented toward operation, maintenance and repair of the equipment by the forces afloat, without the services of a manufacturer's representative.  The portions devoted to descriptive matter and theory shall be limited to those which are essential to a proper understanding of the equipment for satisfactory operation, maintenance and repair.  The text need not duplicate information which is adequately shown on the photographs, drawings and illustrations incorporated in the manual. (A class A or B manual may be the manufacturer's commercial manual, or one prepared in accordance with his commercial practice whenever it will be suitable for the service intended as determined by the approving activity.)

3.1.4  Security classification. - The security classification of manuals shall be as designated by the bureau or agency concerned.  If classifed, the security guide issued by DD form 254, forming a part of the contract shall be followed.  All pages shall be marked in accordance with the requirements of the Industrial Security Manual for Safeguarding Classified Information (DD 441 (Attachment)).  Where a minor amount of classified information is involved, two volumes - one  unclassified and one classified shall be provided.  The word ''UNCLASSIFIED'' need not appear on each page of unclassified portions of classified manuals.  Revisions shall be classified as required by their subject matter.  Regardless of the overall classification of a classified publication, an unclassified title shall be assigned whenever possible and consistent with security and clarity.  In all cases, however, if a classified manual is involved, the initials of the classification assigned to the title, standing alone, shall be indicated in parentheses immediately following the title, using one of the following notation (U), (C), (S), (TS).  In addition, the covers of classified manuals shall include the markings as indicated on figure 1.

4

REPRODUCED AT THE NATIONAL ARCHIVES

MIL-M-15071D(SHIPS)

3.1.5  Detail requirements. -

3.1.5.1  Contents. - Manuals shall contain the following information, arranged in an order appropriate to provide adequate instruction for operation and maintenance of each unit in the equipment and the complete assembly: No particular arrangement, format or chapter titles are required as long as the information is suitably presented.

> Front Matter
> General Information
> Installation
> Principles of Operation
> Operating Instructions
> Maintenance and Repair
> Parts Lists

3.1.5.2  Front matter. - The front matter shall consist of the following:

> (a) Cover
> (b) Title page (for classified manuals only)
> (c) Approval and procurement record page
> (d) List of effective pages
> (e) Table of contents
> (f) List of figures
> (g) List of tables

3.1.5.2.1  Cover and title page. - The cover shall contain the information on figure 1.  The title page for classified manuals shall conform to figure 2.

3.1.5.2.2  Approval and procurement record page. - The approval and procurement record (APR) page shall be the first page of unclassified manuals and shall follow the title page of classified manuals and shall conform to figure 3.

3.1.5.2.3  List of effective pages. - A list of effective pages shall be included.  In multiple volume manuals, the list of effective pages shall be included in volume 1 only.  The list of effective pages shall be modified whenever revisions are incorporated in copies of the manual.

5

REPRODUCED AT THE NATIONAL ARCHIVES

MIL-M-15071D(SHIPS)

3.1.5.2.4  <u>Table of contents.</u> - The table of contents shall list all primary divisions and secondary subdivisions such as chapters, sections and pages with their corresponding numbers. Where sub-manufacturers are furnishing associated equipment and a separate manual is not provided, it shall be the responsibility of the prime contractor to integrate and reflect the information provided by the sub-manufacturers within the table of contents. In multiple volume publications, a table of contents shall be prepared for each volume.

3.1.5.2.5  <u>List of figures.</u> - A list of figures shall be prepared listing all figures, their titles and numbers. In multi-volume publications, a list of figures shall be prepared for each volume.

3.1.5.2.6  <u>List of tables.</u> - A list of tables shall be prepared listing all tables, their titles and numbers. In multi-volume publications, a list of tables shall be prepared for each volume.

3.1.6  <u>General information.</u> - General information shall consist of general data, a general description and detailed descriptions, as necessary to supplement data included in drawings and photographs.

3.1.6.1  <u>General data.</u> - General data shall consist of the following data for each component or unit:

    (a) Descriptive (name plate) data necessary to identify manufacturer, type, model and performance or design characteristics.
    (b) Principal overall dimensions.
    (c) Weight.
    (d) Allowable capacities, temperatures, pressures, settings, tolerances or other salient features as appropriate to the item shall be shown.

3.1.6.2  <u>General description.</u> - General description shall consist of a short general description of the equipment; explain briefly what it is, what it will do, and the general overall and interrelated operation of the various units. All information of a general character applicable to the complete equipment shall also be given. Where the text contains terms or symbols not commonly used, definitions or explanatory notes shall be included.

3.1.6.3  <u>Detailed description.</u> - Detailed description shall contain a complete detailed description of units and assemblies which comprise the complete equipment; for example: ship service turbo generator: the turbine, reduction gear, generator and exciter.

6

REPRODUCED AT THE NATIONAL ARCHIVES

MIL-M-15071D(SHIPS)

3.1.7 <u>Installation.</u> - Instructions, if necessary to supplement the installation drawings supplied (in accordance with Specification MIL-D-963), shall consist of methods of installation; including packing or unpacking, handling, preparation of foundation, alignment, precautions, mounting instructions, bolting diagrams, safety guards, grounding or bonding, clearances for access, ventilation, motion under shock, and methods of testing to assure satisfactory installation.

3.1.8 <u>Principles of operation.</u> - Figures, sketches, performance curves, and schematic wiring diagrams shall be included to the extent necessary to provide satisfactory operation, maintenance and repair. Operating sequences of automatic and semi-automatic equipment shall be indicated.

3.1.9 <u>Operating instructions.</u> - Information shall include routine and emergency procedures, and safety precautions; maximum and minimum loads; normal temperatures or pressure limits or both; transfer from manual to automatic operation (or the reverse), to be observed in the starting, operating, stopping, and shutting down of the equipment. In addition, action(s) which should be taken in the event of power failure; control air failure; lube-oil failure; partial failure of equipment; and similar conditions shall be described. Action(s) described in the event of partial failure shall include, where practicable, those procedures necessary to provide continued service of the equipment until time is available to repair the equipment. Where operating procedures are to be performed in specific sequence, step-by-step procedures shall be given. Operations shall be numbered in the order in which they are performed. Tables and charts shall be used for the presentation of these instructions where varying operating conditions are encountered.

3.1.10 <u>Maintenance and repair.</u> -

3.1.10.1 <u>Preventive maintenance.</u> - Instructions shall include all maintenance procedures, inspections, tests, and adjustments which should be performed periodically under shipboard conditions for the purpose of preventing failure or impairment of the equipment. A one page summary and time schedule for maintenance procedures, including a check-off table where appropriate, shall be provided. The summary sheet shall identify any items required by the Navy, as indicated at time of approval action, to be included in the ship's permanent history cards. Where necessary instructions shall include procedures for obtaining access to the sub-components for maintenance. Maintenance instructions shall include, where appropriate, but shall not be limited to the following:

7

REPRODUCED AT THE NATIONAL ARCHIVES

MIL-M-15071D(SHIPS)

(a) A tabulation of periodic, routine, mechanical, and electrical tests and checks which should be accomplished regularly to show that sub-components are operating properly and to insure continuity of service at optimum performance.

(b) Table or charts, including "wear-limit" charts when appropriate, to indicate what is to be done, when it is to be done based on inspection, and how to do it.

(c) Utilization of the test facilities which may be incorporated in the various components.

(d) Instructions for the care, inspection, and cleaning of all pertinent parts.

(e) Instructions stressing the importance of properly maintaining all safety devices and interlocks provided to prevent damage to equipment or injury to personnel.

(f) Instructions on lubrication at shipboard operating temperatures shall be provided as applicable, preferably in chart form. They shall include information regarding lubrication recommended by the manufacturer and the type of lubricant to be used. Lubricants shall be described by symbol number, Federal stock number, Military specification and industry standard numbers where applicable and known.

(g) Instructions on in-place-balancing or other means of reducing noise level if equipment specifications and shipboard application require quiet operation.

3.1.10.2  Trouble shooting, overhaul and repair. - Instructions shall include all information necessary to permit a technician to locate trouble, and to make repairs, adjustments and conduct tests of each component, assembly or sub-assembly of the equipment.  The following shall be included:

(a) Trouble shooting guides for the localization of faults giving possible sources of trouble, the symptons, probable cause, and instructions for remedying the faults.

(b) Complete instructions on signal tracing for electric circuits, use of special test instruments and unusual  servicing techniques.

(c) Ample figures and sectional views giving details of mechanical assemblies, and simplified schematic diagrams of electrical, mechanical, hydraulic and pneumatic circuits.  Figures contained elsewhere in the manual may be used and referred to under this heading without duplicating them.

8

REPRODUCED AT THE NATIONAL ARCHIVES

MIL-M-15071D(SHIPS)

3.1.11  Parts list. - The parts list shall include identification data covering all repair parts to facilitate ready identification of parts for replacement and ordering purposes. Standard hardware, structural parts, or other parts which have no maintenance significance shall not be listed.

3.1.12  Special tools. - A separate list of "special tools" which are supplied with the equipment shall immediately follow the parts tabulation; this list shall contain only tools that are peculiar to the equipment showing the quantity, unit of issue (each, pair, set), description, and manufacturer's identification number. A photograph or sketch showing each special tool as it is being used, shall be included in the manual.

3.1.13  Photographs and drawings. - As the preferred alternate to lengthy, detailed discussions, the manual shall make maximum use of shop photographs, with parts annotated for identification. Photographs may be half-tones or glossy prints. Manuals shall contain reproductions of drawings, additional block diagrams and schematic drawings as necessary to supplement the descriptive matter contained in the text. In every case, a drawing or photograph of the assembly shall be included. Diagrams of switches and relays used in the system showing the terminal numbering shall be inserted as additional drawings. Photographs and sketches shall be included wherever necessary for identification of the parts in the "parts list". Other figures shall be included to supplement or extend the information contained in the photographs and drawings as required for further identification of parts and explanation of the descriptive information contained in the text.

3.2  Format. -

3.2.1  Volumes. - Manuals shall be divided into volumes and by chapters or sections as necesary to provide ready handling and to present orderly instructions for operation and maintenance of the equipment, depending on the size and complexity of the manual.

3.2.2  Numbering. - Any section, chapter, page and paragraph numbering system which facilitates adequate indexing and rapid location of pertinent information is acceptable.

9

REPRODUCED AT THE NATIONAL ARCHIVES

MIL-M-15071D(SHIPS)

### 3.3 Text. -

3.3.1 Wording. - The text shall be factual, specific, concise, and clearly worded to be readily understandable by personnel involved in the operation, repair, overhaul and maintenance of the equipment, and to provide sufficient information for technicians to install, operate, service; and maintain the equipment at peak performance without the services of a manufacturer's representative. Technical phraseology requiring a specialized knowledge shall be avoided except where no other wording will convey the intended meaning, in which case the technical term shall be defined.

3.3.2 Level of writing. - As a general guide, the level of writing should be that for a high school graduate having specialized training as a technician through Navy training courses.

3.3.3 Figures. - Sectional views of assemblies, sub-assemblies and the component parts thereof shall be shown as necessary to supplement the text, photographs, and drawings and aid in the identification of parts. Identification of illustrated parts with listed parts shall be facilitated by the use of index (or piece) numbers and arrows which will identify assemblies, sub-assemblies and component parts thereof.

3.3.4 Indexing and referencing of figures. - Significant features or components of figures shall be identified by brief applicable nomenclature with arrows. Index (or piece) numbers may be used on figures when an extremely large amount of nomenclature is required.

3.3.5 Deleted figures. - When a change requires deletion of a figure without substitution of another, the following sentence shall be inserted "Figure _____ deleted" in or near the place of deletion.

3.3.6 Notes, cautions and warnings. - Notes, cautions and warnings should be used to emphasize important and critical instructions. The use should be as sparing as is consistent with real need. When used, notes, cautions and warnings should immediately precede the applicable instructions and shall be selected in accordance with the following definitions:

    (a) "NOTE" - An operating procedure, condition, etc., which it is essential to highlight.
    (b) "CAUTION" - Operating procedures, practices, etc., when if not strictly observed, will result in damage or destruction of equipment.
    (c) "WARNING" - Operating procedures, practices, etc., which will result in personal injury or loss of life if not correctly followed.

10

REPRODUCED AT THE NATIONAL ARCHIVES

MIL-M-15071D(SHIPS)

3.4  Applicability of manuals. -

3.4.1  Identical. - When a class A manual covering a specific equipment or a class B manual which is already available, is applicable in its entirety to the equipment being procured, the applicability is to be extended to include the additional ships by the manufacturer issuing an approval and procurement record page.  Copies of the manual required for the ship(s) and local use may be requisitioned from stock by the cognizant Naval supervising activity.

3.4.2  Identical except for minor modifications. - When a class A manual covering a specific equipment or a class B manual is applicable to the equipment being procured except for minor differences, the manufacturer shall modify the manual to cover the differences by the issue of revised or supplementary pages.  All revisions to an existing manual shall be approved by the Bureau of Ships, shall require the assignment of a change number, assigned by the Bureau of Ships, and shall be issued by the manufacturer with an approval and procurement record page.

3.5  Revisions. - Revisions to manuals which have been previously distributed shall be prepared as follows:

> (a) New pages - New pages shall be issued when it is found necessary to include new information to augment the content of the original manual.
> (b) Revised pages - Revised pages shall be issued to make changes which apply uniformly to all equipments covered by the manual.
> (c) Supplementary pages - Supplementary pages shall be issued when necessary to provide alternate instructions applicable only to a portion of the total equipments covered by the manual because of minor modifications or minor differences in related components.

3.5.1  Legend for revisions. - All new, revised or supplementary pages shall include the words "new", "revised" or "supplementary", the date and a change number.

3.5.2  Submission for approval. - Four copies of each revision shall be submitted to the Bureau for approval and assignment of a change number.  The forwarding letter shall include the number of stock copies and the estimated delivery date of the final copies.

11

REPRODUCED AT THE NATIONAL ARCHIVES

MIL-M-15071D(SHIPS)

3.6 <u>Production requirements.</u> - Detail materials, printing procedures and assembly for each manual shall be as approved at time of class A or B manual approval. An acceptable arrangement is set forth in the appendix of this specification. Alternate arrangements will be approved if equivalent performance is provided.

3.7 <u>Distribution requirements.</u> - Unless otherwise specified in the contract or order, distribution of all manuals not exactly identical to one previously procured and assigned a NAVSHIPS number shall be as follows:

(a) Two copies for each equipment shall be packed with the equipment when the equipment is shipped to stock.
(b) Two copies for each equipment shall be shipped separately to the cognizant Naval supervising activity marked for each ship on which the equipment is to be installed.
(c) Two copies to the Bureau of Ships.
(d) Three copies to the cognizant Supervisor of Shipbuilding when the equipment is to be installed by a private shipyard. (These copies are in addition to the copies for placement on board the ship.)
(e) Two copies to the Naval shipyard when the equipment is to be installed by that activity. (These copies are in addition to the copies for placement on board the ship.)
(f) One copy to each U.S. Naval Shipyard except Pearl Harbor and Portsmouth Naval Shipyard (total of nine).
(g) Two copies to Pearl Harbor Naval Shipyard (for submarine and surface ship equipment).
(h) Two copies to Portsmouth Naval Shipyard (for submarine equipment only).
(i) One copy to all active submarine tenders (submarine equipment only).
(j) One copy to Submarine Bases, New London and Pearl Harbor (submarine equipment only).
(k) Two copies to Commanding Officer, Ships Parts Control Center, Mechanicsburg, Penn.
(l) One copy to Naval Supply Centers, Norfolk and Oakland.
(m) One copy to Naval Supply Depot, Clearfield, Ogden, Utah.
(n) One copy to Forms and Publications Supply Office, Byron, Georgia.

12

REPRODUCED AT THE NATIONAL ARCHIVES

MIL-M-15071D(SHIPS)

(o) Manuals for stock shall be in the following quantities:

| Number of equipments | Number of copies |
| --- | --- |
| 1 to 25 | 25 |
| 26 to 99 | 50 |
| 100 and over | 100 |

These manuals shall be shipped to:
Receiving Officer, Naval Supply Depot, Mechanicsburg, Penn. Marked for COG I stock.

(p) Copies of approval and procurement record pages in accordance with paragraph 3.10.

3.8 Unless otherwise specified in the contract or order, (where manuals are not to be drawn from stock, see 3.4.1) distribution of all manuals exactly identical to ones previously approved shall be as follows:

(a) Two copies for each equipment shall be packed with the equipment when the equipment is shipped to stock.

(b) Two copies for each equipment shall be shipped separately to the cognizant Naval supervising activity marked for each ship on which the equipment is to be installed.

(c) Copies of approval and procurement record pages in accordance with 3.10.

3.9 Revisions. - Revision pages shall be distributed to all activities receiving the original manual, and in the same quantity.

3.10 Approval and procurement record page. - This page shall be included in all copies of the manuals and additional copies distributed as follows:

(a) Two copies to Bureau of Ships.

(b) One copy to Forms and Publications Supply Office, Byron, Georgia.

(c) One copy to Ships Parts Control Center, Mechanicsburg, Penn.

13

REPRODUCED AT THE NATIONAL ARCHIVES

MIL-M-15071D(SHIPS)

3.11 Military Assistance Program Ships. - Unless otherwise specified in the contract or order, distribution of all final manuals for ships being constructed, reactivated, converted or otherwise readied for transfer under the Military Assistance Program (MAP) shall be as follows:

    (a) Two copies for each equipment shall be shipped separately to the cognizant Naval supervising activity marked for each ship on which the equipment is to be installed.

    (b) Six copies per equipment for each ship to be transferred under MAP to a foreign government. These copies shall be sent to the Military Assistance Advisory Group (MAAG) of the recipient country for delivery to the foreign government which is to receive the ships.

    (c) One copy to the Washington, D.C. Naval Attache of the foreign government to receive the ships.

    (d) Two copies to the Bureau of Ships.

    (e) One copy to the cognizant Supervisor of Shipbuilding when the equipment is to be installed at a private yard.

    (f) One copy to the Commanding Officer, U.S. Navy Forms and Publications Supply Office, Byron, Georgia.

    (g) Twelve copies to Receiving Officer, U.S. Naval Supply Depot, Mechanicsburg, Penn., marked for COG I stock.

4. QUALITY ASSURANCE PROVISIONS

4.1 Contractor responsibility. - The supplier is responsible for the performance of all inspection requirements as specified herein. Except as otherwise specified, the supplier may utilize his own or any other inspection facilities and services acceptable to the Government. Inspection records of the examinations shall be kept complete and available to the Government as specified in the contract or order. The Government reserves the right to perform any of the inspections set forth in the specification where such inspections are deemed necessary to assure supplies and services conform to prescribed requirements.

4.2 Inspection. - Sample copies shall be inspected to determine compliance with the requirements of this specification and for equivalence with the approved (when applicable) sample or basic manual. (If any subsequent issue of manuals is not equivalent to or better than an approved class A manual, class A approval may be withdrawn.)

14

REPRODUCED AT THE NATIONAL ARCHIVES

MIL-M-15071D(SHIPS)

4.3  Content. - The content of the manual shall be checked against the equipment being furnished to assure that it depicts accurately and adequately the equipment and the operating and maintenance procedures required.  The NAVSHIPS number on the manual shall be checked for agreement with the NAVSHIPS number on the equipment identification plate where specified.

5.  PREPARATION FOR DELIVERY

5.1  Packaging and packing. -

5.1.1  Individual and multi-volume manuals. - Individual copies and multi-volume manuals shall be packed to preclude damage to material. Multi-volume manuals shall be furnished as complete sets.

5.1.2  Manuals shipped with equipment. - When two copies of the manual are packed with the equipment they shall be packed within the shipping container holding the main unit of equipment.  The manual(s) shall be so placed that they are readily accessible prior to removing the equipment and shall not be placed within the vaporproof barrier material used to enclose the equipment.  Manuals accompanying equipment shall be packaged in a water-proof container.  The invoice packing list or bill of lading shall include the NAVSHIPS number of the manual,  the quantity and shall indicate which container includes the manuals.

5.1.3  Bulk shipment. - Manuals shipped in bulk shall not be individually wrapped.  Containers shall comply with the Uniform Freight Classification Rules or other carrier regulations as applicable to the mode of transportation.

5.2  Marking. - On bulk shipments, interior packages and exterior shipping containers shall be marked with the following information for each item enclosed, except for shipment of an individual copy or an individual set of manuals:

> Box (number) of (number)  (to be listed on multiple container shipments)
> NAVSHIPS number           (manual number)
> Quantity                  (in package)

The words "FOR STOCK" shall be endorsed on the package or packages destined for stock, unless otherwise specified.  NAVSHIPS numbers shall be indicated on the shipping documents.  When a contract or order requires manuals having different NAVSHIPS manual numbers, the stock copies of each manual number shall be shipped separately.

15

REPRODUCED AT THE NATIONAL ARCHIVES

MIL-M-15071D(SHIPS)

6. NOTES

6.1 Ordering data. - Equipment specifications and procurement documents shall specify the following:

(a) Title, number and date of this specification.
(b) Quantity of manuals or APR pages required, delivery date and delivery destinations (see 3.7 through 3.11 inclusive).

6.2 Classes of manuals. - The class of manual need not be specified in equipment specifications or procurement documents. The intent is that the manufacturer shall supply class A manuals for any equipment for which he has received class A manual approval. He shall supply class B manuals wherever he has not been granted class A approval.

6.3 Use of term "Service Manual". - Manuals to this issue of the specification are identified as "Service Manuals", instead of "Technical Manuals" since past use of the work "Technical" tended to denote a comprehensive, expensive, theoretical and engineering document whereas all that is necessary is a document that provides for satisfactory operation, maintenance and repair.

6.4 Elimination of types. - Previous issues of this specification have established different types for manuals. Types have been eliminated from this issue. The content and make-up of each manual should be tailor-made to delineate the particular operation and maintenance procedures required.

6.5 Rights in data. - Wherever unlimited rights in data are not obtained, the manual should eliminate all proprietary information if operation and maintenance suitability is not thereby reduced. If proprietary information is required to be included and only limited rights in data are obtained, a restrictive clause per ASPR Section 9 should be included on the cover of each manual for ready identification.

16

REPRODUCED AT THE NATIONAL ARCHIVES

MIL-M-15071D(SHIPS)

Notice. - When Government drawings, specifications or other data are used for any purpose other than in connection with a definitely related Government procurement operation, the United States Government thereby incurs no responsibility nor any obligation whatsoever, and the fact that the Government may have formulated, furnished, or in any way supplied the said drawings, specifications, or other data is not to be regarded by implication or otherwise as in any manner licensing the holder or any other person or corporation, or conveying any rights or permission to manufacture, use, or sell any patented invention that may in any way be related thereto.

Preparing activity:
Navy - Ships
(Project 7610-N014Sh)

17

REPRODUCED AT THE NATIONAL ARCHIVES

MIL-M-15071D(SHIPS)

## APPENDIX

10.  SCOPE

10.1  This appendix covers the requirements for the production of service manuals.

20.  REQUIREMENTS

20.1  Quality. - All manuals furnished will be subject to 35-mm microfilming.  Letters, lines and symbols shall be of a uniform contrast throughout the documents.  Blurred or smudged printing or drop out of characters or lines shall be cause for rejection of the publication.  Characters shall be no smaller than 8 point type.

20.2  Typography. - Preferred typography is set forth in table I. When revisions are made to the basic manual, the typography shall conform as nearly as possible to the original manual.

Table I - Typography for 8-1/2 by 11-inch manual.

| Use | Type style and size | Capitalization | Leading | Spacing between units |
|---|---|---|---|---|
| Security classification A condensed | Gothic 14 pt.* | Capitals | 6 pt. | |
| Chapter or section titles | Same type as text | Capitals | 6 pt. | 48 pt. Following marginal copy, text of illustration 18 pt. Preceding text or illustration |
| Primary side heads | Same type as text | Capitals | 2 pt. | 6 pt. Preceding or following text |
| Subordinate side heads | Same type as text | Capitals | 1 pt. | 6 pt. Preceding or following text |
| Figure and table titles | Same type as text | Capitals and lower case | 2 pt. | 6 pt. Following illustration |

*If 14 pt. is not available, next smaller size shall be permitted.

18

REPRODUCED AT THE NATIONAL ARCHIVES

MIL-M-15071D(SHIPS)

Table I - Typography for 8-1/2 by 11 inch manual. (cont'd)

| Use | Type style and size | Capitalization | Leading | Spacing between units |
|---|---|---|---|---|
| Notes and cautions | Same type as text | Capitals centered | ------ | 4 pt. Preceding and following text |
| Warnings | Same type as text | Capitals centered | ------ | 4 pt. Preceding and following text |
| Text, table of contents, list of illustrations etc. | Book face (roman) bold 10 pt. | Capitals and lower case | 1 pt. | 12 pt. Preceding illustration or following figure title 6 pt Preceding or following notes, cautions, warnings |
| Keys or legends | Book face (roman) italics 8 pt. | Capitals and lower case | 1 pt. | 6 pt. Preceding figure title or following illustration 12 pt. Preceding text |
| Parts breakdown listings | Book face (roman) 8 pt. | Capitals and lower case | 1 pt. | 6 pt. Preceding bottom rule or following headings |
| Footnotes | Book face (roman) bold 8 pt. | Capitals and lower case | 1 pt. | |

NOTES

1. It is not the intent of this appendix to qualify the methods or composing equipment to be used, but to specify results required.
2. Leading and spacing may be relaxed where circumstances require such alterations.
3. The above requirements are for type that will reproduce same size. When oversize pages are used, type shall reduce to approximately these sizes.
4. All type specified may be plus or minus 1 point, except that 8 point type shall be the minimum allowable size.

19

REPRODUCED AT THE NATIONAL ARCHIVES

MIL-M-15071D(SHIPS)

## NOTES TO TABLE I (cont'd)

5. The type faces listed below are the most preferred. They are available in linotype or can be closely matched on office composing machines.

<u>Book face (Roman)</u>
Garamond
Modern
Bookman
Tribune News
Times Roman
Antique
Baskerville
Century

6. Type sizes as indicated in the requirements were selected for conservation of space and legibility and should not be changed except:

   (a) When oversize pages are prepared.
   (b) When unusual copy fitting problems arise.

20.3 <u>Layout.</u> -

20.3.1 <u>Text pages.</u> - The preferred layout of 8-1/2 inches by 11 inches text pages is two columns 20 picas wide and 54 picas deep, making an overall page image size of 42 by 60 picas. The text and illustration areas shall conserve space without lessening clarity or legibility. Blanks and spaces shall be avoided, except on fold-ins, and the first major division of the manual (chapter or section) shall be a new odd page.

20.3.2 <u>Fold-ins.</u> - Fold-in pages shall be used only for diagrams, drawings or charts which cannot be reduced for satisfactory presentation on a single page, or when frequent reference is required from other pages of the book. Aprons are required. When fold-in pages are used, they should be held to a two-page fold-in whenever practicable and shall not exceed an overall length of 34 inches from the binding edge including the apron. The apron may contain information pertaining to the diagram, drawing or chart.

20

REPRODUCED AT THE NATIONAL ARCHIVES

MIL-M-15071D(SHIPS)

20.4  Form-punching and drilling. - Service manuals shall be prepared in looseleaf form unless otherwise specified or approved.  Looseleaf publications and revisions shall be punched for looseleaf binding with three holes one-fourth inch in diameter and four and one-fourth inches center to center (for 8-1/2 by 11 inch pages) or with such other drilling or punching as specified.  Punching of revision pages shall be the same as punching of the original manuals.

20.5  Size. - Suggested sizes for final trim of service manuals follow:

    4-3/8 by 6-3/4
    8-1/2 by 11

All dimensions are in inches.

20.6  Paper stock. -

20.6.1  Text pages. - Paper stock for text pages shall be as specified in 20.6.1.1 or 20.6.1.2.

20.6.1.1  Lithography. - Paper stock shall be white offset book free from unbleached or ground woodpulp and shall have a substance weight of not less than 100 pounds per 1,000 sheets, basis 17 by 22 inches.

20.6.1.2  Letterpress. - Paper stock shall be equivalent to white super-calendered book containing not to exceed 5 percent unbleached chemical wood or ground woodpulp, the remainder to be bleached chemical woodpulp, and shall have a substance weight of not less than 90 pounds per 1,000 sheets, basis 25 by 38 inches.

20.6.2  Fold-ins. - Paper stock for fold-in pages shall be equivalent to high wet strength lithographic map, free from unbleached or ground woodpulp, and shall have a substance weight of not less than 48 pounds per 1,000 sheets, basis 17 by 22 inches.

20.6.3  Binders. - Binders shall be of plastic or pressboard and shall accommodate looseleaf manuals punched or drilled as specified in 20.4 and shall facilitate insertion of replacement pages.  Commercial type fasteners are to be used.  Information to be included on the binders shall not be stamped with gold or any other metal foil.  Binder colors for unclassified manuals shall be any color except yellow or red.  Binders for confidential manuals shall be red.  Binders for secret and top secret manuals shall be yellow.

21

REPRODUCED AT THE NATIONAL ARCHIVES

MIL-M-15071D(SHIPS)

NAVSHIPS 000-00
SECURITY CLASSIFICATION

VOLUME I OF III

NAV
SEC

NAV
SEC

NAV

# TITLE OF

# MANUAL

# (U)

GROUP CLASSIFICATION MARKING (for classified manuals. See DD254)

SECURITY CLASSIFICATION

22                    Figure 1 - Cover.

Case 3:08-cv-03013-JSW    Document 11-5    Filed 07/03/2008    Page 54 of 57

REPRODUCED AT THE NATIONAL ARCHIVES

# TITLE OF
# MANUAL
# (U)

**WARNING:**  *This document contains information affecting the national defense of the United States within the meaning of the Espionage Laws, Title 18, U.S.C., Sections 793 and 794. The transmission or the revelation of its contents in any manner to an unauthorized person is prohibited by law.*

SECURITY CLASSIFICATION

Figure 2 - Title page.

REPRODUCED AT THE NATIONAL ARCHIVES

MIL-M-15071D(SHIPS)

Approval Authority shall include the applicable letters or correspondence granting approval in conformance with approval procedures.

Remarks space shall be used for necessary comments and the inclusion of information regarding the extension of a manual by minor revisions.

Certification: One of the following certification paragraphs shall be typed in this space, as appropriate.

For Class A manuals covering specific equipments.

It is hereby certified that NAVSHIPS ___ is identical to the basic manual NAVSHIPS ___ approved by the approval data shown above except for the detailed information required for the equipment provided under contract or purchase order.

For original Class B manuals.

It is hereby certified that NAVSHIPS ___ to be provided under contract or purchase order ___ has been approved by the approval data shown above.

For identical Class A manuals and Class B manuals covering specific equipment and Class B manuals.

It is hereby certified that the manuals to be provided under contract or purchase order ___ are exactly identical to NAVSHIPS ___ approved by authority of approval data shown above.

For Class A manuals covering specific equipment which have been previously distributed but required minor modification.

It is hereby certified that the manuals to be provided under contract or purchase order ___ are exactly identical to NAVSHIPS ___ except for the necessary modification as shown in the above remarks space.

NOTE: This page may be typed and reproduced by any economical method and shall be included in Class B manuals and copies of final manuals.

24

APPROVAL AND PROCUREMENT RECORD PAGE

APPROVAL DATA FOR: NAVSHIPS
TITLE OF MANUAL: ___

APPROVAL AUTHORITY: ___

| CONTRACT OR PURCHASE ORDER | SHIPS APPLICABLE | QUANTITY OF MANUALS | QUANTITY OF EQUIPMENT | BUILDING YARD |
|---|---|---|---|---|

REMARKS:

CERTIFICATION:

CHANGE NO.                                    DATE

MANUFACTURER'S SIGNATURE
MANUFACTURER'S NAME AND ADDRESS
FEDERAL CODE NUMBER (HOME OFFICE)

Figure 3   Approval and procurement record page

REPRODUCED AT THE NATIONAL ARCHIVES

SPECIFICATION ANALYSIS SHEET

Instructions

This sheet is to be filled out by personnel either Government or contractor, involved in the use of the specification in procurement of products for ultimate use by the Bureau of Ships.

procured with a minimum amount of delay and at the least cost.

Comments and the return of this form will be appreciated.

This sheet is provided for obtaining information on the use of this specification which will insure that suitable products can be

Fold on dotted lines on reverse side, staple in corner, and send to Bureau of Ships, Specifications and Standardization Branch, Washington 25, D.C.

| Specification | | |
|---|---|---|
| Organization | City | State |
| Contract No. | | |
| Quantity of Items Procured | | Dollar Amount $ |

Material procured under a direct Government contract [    ]  or a subcontract [    ]

1. Has any part of the specification created problems or required interpretation in procurement?
   a. Give paragraph number and wording



   b. Recommendations for correcting the deficiencies



2. Comment on any specification requirement considered too rigid



3. Is the specification restrictive?          If the answer is "Yes", in what way?
   [    ]  Yes     [    ]  No



4. Remarks (Attach any pertinent data which may be of use in improving this specification. Place this form and papers in an envelope and send to the Bureau

| Submitted by (Print name and activity) | Date |
|---|---|

REPRODUCED AT THE NATIONAL ARCHIVES

Fold

------------------------------------------------------------

DEPARTMENT OF THE NAVY
BUREAU OF SHIPS
WASHINGTON 25, D. C.

OFFICIAL BUSINESS

POSTAGE AND FEES PAID
NAVY DEPARTMENT

CHIEF, BUREAU OF SHIPS
SPECIFICATIONS AND STANDARDIZATION BRANCH
DEPARTMENT OF THE NAVY
WASHINGTON 25, D.C.

------------------------------------------------------------

Fold

1   Dean A. Hanley, Esq.   (State Bar No. 169507)
    Deborah R. Rosenthal, Esq. (State Bar No. 184241)
2   PAUL AND HANLEY LLP
    1608 Fourth Street, Suite 300
3   Berkeley, California 94710
    Telephone:  (510) 559-9980
4   Facsimile:   (510) 559-9970
    dhanley@paulandhanley.com
5   drosenthal@paulandhanley.com

6   Attorneys for Plaintiffs

7

8

9                   UNITED STATES DISTRICT COURT

10              NORTHERN DISTRICT OF CALIFORNIA

11                   SAN FRANCISCO DIVISION

12  JERI REDMAN, individually and as        )   Case No.: 08-cv-03013-BZ
    successor-in-interest to RONALD REDMAN, )
13  deceased; and JERI REDMAN, AMY          )   **EXHIBIT H TO THE DECLARATION OF**
    REDMAN, DAVID C. REDMAN, MARK           )   **DEBORAH R. ROSENTHAL IN**
14  REDMAN and PAUL REDMAN, as legal        )   **SUPPORT OF PLAINTIFFS' MOTION**
    heirs of RONALD REDMAN, deceased,       )   **FOR REMAND AND FOR COSTS AND**
15                                          )   **EXPENSES INCURRED AS A RESULT**
                                            )   **OF REMOVAL**
16          Plaintiffs,                     )   _____
                                            )   [28 U.S.C. § 1447(c); FRCP 7(b); ND CA Local Rules
17  vs.                                     )   7-2, 7-4 & 7-5]
                                            )
18  A.W. CHESTERTON, et al.,                )   Date:        September 5, 2008
                                            )   Time:        9:00 a.m.
19          Defendants.                     )   Courtroom:   2, 17th Floor
                                            )   Judge:       Jeffrey White
20  _____ )

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

---

**EXHIBIT H TO THE DECLARATION OF DEBORAH R. ROSENTHAL IN SUPPORT OF PLAINTIFFS' MOTION FOR REMAND AND FOR COSTS AND EXPENSES INCURRED AS A RESULT OF REMOVAL**
S:\Clients\Plaintiffs\R\Redman, Ronald 10267\Fed Court Action\VIAD remand motion - Exh A-C.doc

**EXHIBIT "H"**



# INSTRUCTIONS
### for
## Operation, Care and Maintenance
## of Griscom-Russell Navy Type
## Low Pressure Distilling Plants



Published by
## THE GRISCOM-RUSSELL COMPANY
285 MADISON AVENUE          NEW YORK CITY

EXHIBIT 2
12/13/05
Danielle Grant

DEFENDANT'S
EXHIBIT
GRS 75

BULLETIN 316 No. **1175**

SIR:

    KINDLY FILL IN THE SPACES BELOW ON THIS
CARD, AS A RECEIPT, AND MAIL

DATE RECEIVED

SIGNATURE:



( THIS SIDE OF CARD IS FOR ADDRESS )

GRISCOM-RUSSELL CO.

285 MADISON AVE.

NEW YORK 17, N. Y.

ATT. MR. S. F. MAURY

No. 1175

This book is loaned to

_____

_____

_____

with the understanding that it remains the property of The Griscom-Russell Co. and is to be considered as restricted information for the exclusive use of users of Navy Type Low Pressure Distilling Plants.

Copyrighted 1945, The Griscom-Russell Co.          Printed in U.S.A.

# CONTENTS

| | Page |
|---|---|
| INTRODUCTION | 1 |
| INSTALLATION | 2 |
| OPERATION | 7 |
| Last Effect Shell Vacuum | 7 |
| First Effect Tube Nest Vacuum | 10 |
| Feed and Brine Density | 14 |
| Feed Treatment and Chill Shocking | 17 |
| CARE AND MAINTENANCE | 20 |
| Salinity Indicator | 20 |
| Salinometers | 21 |
| Cleaning Bottom of Evaporator Shells | 22 |
| Hydrostatic Tests | 22 |
| Salt Water Leakage | 23 |
| Strainers | 25 |
| Air Ejectors | 26 |
| Zincs | 27 |
| Pumps and Pump Piping | 27 |
| Cleaning Evaporator Tubes | 29 |
| Cleaning Inside Surfaces of Heat Exchanger Tubes | 31 |
| Miscellaneous Cleaning | 33 |
| Tube Expanding | 34 |
| Re-Tubing | 35 |
| Expansion Joints | 38 |
| ILLUSTRATIONS | |
| Steam Separator for Air Ejectors | 2 |
| Check Valve for Air Ejector Suction | 3 |
| Schematic Diagram for Two Effect Distilling Plant | 4 |
| Schematic Diagram for Three Effect Distilling Plant | 5 |
| Full Output Pictograph | 6 |
| Air Ejector | 8 |
| Venting Water Side of Heat Exchangers | 9 |
| Extension Pipe for Gage Glass Fitting | 12 |

Surface Salinity of Ocean Waters . . . . . 13
Scale Inside Vapor Feed Heater Tubes . . . 14, 31
Vacuum Test Pot . . . . . . . . 15
Feed Treatment Chart . . . . . . . 19
Salinity Cell . . . . . . . . . 20
Cleaning Bottom of Evaporator Shells . . . 22
Macomb Strainer . . . . . . . . 25
Air Ejector Steam Strainer . . . . . . 26
Air Ejector Nozzle and Nozzle Reamer . . . 26
Pencil Zinc . . . . . . . . . 27
Pump Gland . . . . . . . . . 28
Evaporator Tube Nest . . . . . 29, 30, 31
Scale from Evaporator Tubes . . . . . 30
Vapor Feed Heater and Cleaning Tools . . . 32
Cleaning Air Ejector Condenser Tubes . . . 32
Interior of Soloshell Unit . . . . . . 33
Tube Expander . . . . . . . . 34
Expanding Air Ejector Condenser Tubes . . . 34
Tube Removal Tools . . . . . . . 36
Belling Tool . . . . . . . . . 37
Corrugated Type Expansion Joint . . . . 38
Diaphragm Type Expansion Joint . . . . 38
Test Ring . . . . . . . . . 39
Cleaning Tool for Evaporator Tubes . . . 40
Cleaning Tool for Heat Exchanger Tubes . . 41
Diagrammatic Arrangement Plan for Two Effect
    Soloshell Distilling Plant . . . . . 43
Diagrammatic Arrangement Plan for Two Effect
    Improved G-R Distilling Plant . . . . 45
Diagrammatic Arrangement for Three Effect
    Improved G-R Distilling Plant . . . . 47
SERVICE . . . . . . . . . . 42

# INTRODUCTION

Operation, Care and Maintenance of distilling plants are closely inter-related. Proper operation reduces maintenance; a plant maintained in good condition is operated more easily than one which is not. The purpose of these instructions is to show how the plant can be kept in good operating condition with a minimum of care.

This booklet is intended to supplement "Confidential Instructions for Installation and Initial Operation of G-R Navy Type Low Pressure Distilling Plants," bulletin 315 series. It is, therefore, not a complete operating instruction book although certain details of installation and operation have been repeated for convenience.

Typical diagrammatic arrangement plans for both two and three effect plants are included.

Proper operation is summarized in a pictograph which shows the effect of each factor on other factors, and ultimately on the distilling plant output. Typical schematic diagrams for a two and a three effect distilling plant show the operating cycle.

The subject of feed and brine density is discussed in detail, and a chart giving data on the salt content of water in the oceans is included. A typical analysis of tropical sea water is also given.

Complete instructions are given for mixing and injecting a solution of boiler compound and corn starch into the first effect shell.

Photographs showing the effects of improper operation are presented.

Special emphasis is placed on those parts of the plant which require frequent inspection, replacement, and which may require periodic cleaning and overhaul.

Photographs showing interior details are included.

Cleaning methods and tools are described.

Instructions are given for tube expanding and for removal of tubes from expanded joints.

1

## INSTALLATION

Individual installations differ somewhat in minor details but should be basically in accordance with the diagrammatic arrangement plans at the back of this book.

Operating troubles frequently are the direct result of improper installation. Some of the more important details are:

1. Circulating pump must be below ship's minimum load water line.

2. Vacuum pumps must be vented and sealed in accordance with the diagrammatic arrangement plans.

3. Vacuum pumps must have proper submergence.

4. Pump suction and vent lines must be as nearly vertical as possible. All pockets and unnecessary bends and fittings must be eliminated.

5. Brine pump suction strainer must be readily accessible for cleaning.

6. Brine lines should be removable for cleaning.

7. The air ejector steam supply line should be free of pockets and unnecessary fittings. It should be of ample size and should be taken from a line at a sufficiently high pressure to insure that the pressure at the air ejector nozzle never drop below the required operating pressure stamped on the ejector name plate. Higher pressures are satisfactory. 

8. If wet steam is supplied to the air ejector, or if there is an unavoidable pocket in the air ejector steam line, a separator together with an automatic drainer should be installed in the steam supply line close to the ejectors. A separator of ample size is required, and a float type drainer is preferred.

2

9. If momentary drops in air ejector steam pressure below the operating pressure cannot possibly be avoided (as on ships provided with relatively low pressure boilers subject to rapidly fluctuating loads), the installation of a special check valve in the air ejector suction line will prevent violent fluctuations in last effect shell vacuum and will permit satisfactory distilling plant operation. Install the valve in one ejector suction only and clearly label it.



10. Brazing or gas welding extra fittings or parts to bronze castings must not be attempted.

11. Feed treatment tanks should be installed in accordance with the chart given elsewhere in this book.

12. Flushing pipes over the first effect tube nest for chill-shocking should be in accordance with plans usually available in Navy yards and bases. (This equipment has been generally installed after the units were built and delivered). Many outstanding instructions and charts indicate that the flushing pipes are connected to a fire main by a temporary hose connection. It is preferable to supply spray water from the distiller circulating pump discharge, (retaining the temporary hose connection) as this avoids all possibility of building up an excessive pressure in the evaporator shell.

5



Schematic Diagram for Two Effect Plant

4



Schematic Diagram for Three Effect Plant

5



## OPERATION

...ncipal factors upon which the distilling plant output ...are summarized in the pictograph. This pictograph ...the manner in which these factors affect one an... ...how they affect the distilling plant output. Thus, ...to maintain full output over long periods of time, ...um in the last effect shell must be at least 26"; the ...above the orifice must be maintained at the appro... ...lue (preferably 5#) and the factors determining the ...in the first effect tubes must be given careful atten... ...location of the factors on the pictograph does not ...indicate relative importance. For example, proper ...of the condensate pump affects the output directly ...affecting condenser vacuum) as undrained distil... ...shells can spill back into the last effect shell where ...vaporated. Also, brine density is so important that ...ttention is given to this subject. Feed treatment is ...used in detail.

...e charts as a guide to good operation and as an aid ...tection and correction of operating faults should ...educe care and maintenance work to a minimum.

...s of necessity do not give the "proper" quantities. ..."proper" must be determined from these and other ...s. The operator should acquaint himself with ...e items so that he may quickly detect an improper ...when it arises.

### ...ICT SHELL VACUUM

...atic diagrams and other instructions indicate that ...of approximately 26" should be obtained in the ...shell when the initial temperature of the circulat... ...is 85°F., and that the vacuum should be higher ...circulating water is colder. The pictograph shows ...vacuum depends directly upon:

7



## OPERATION

The principal factors upon which the distilling plant output depends are summarized in the pictograph. This pictograph indicates the manner in which these factors affect one another, and how they affect the distilling plant output. Thus, in order to maintain full output over long periods of time, the vacuum in the last effect shell must be at least 26"; the pressure above the orifice must be maintained at the appropriate value (preferably 5#) and the factors determining the vacuum in the first effect tubes must be given careful attention. The location of the factors on the pictograph does not necessarily indicate relative importance. For example, proper operation of the condensate pump affects the output directly (as well as affecting condenser vacuum) as undrained distillate in soloshells can spill back into the last effect shell where it is re-evaporated. Also, brine density is so important that special attention is given to this subject. Feed treatment is also discussed in detail.

Use of the charts as a guide to good operation and as an aid in the detection and correction of operating faults should serve to reduce care and maintenance work to a minimum.

The charts of necessity do not give the "proper" quantities. What is "proper" must be determined from these and other instructions. The operator should acquaint himself with each of the items so that he may quickly detect an improper condition when it arises.

### LAST EFFECT SHELL VACUUM

The schematic diagrams and other instructions indicate that a vacuum of approximately 26" should be obtained in the last effect shell when the initial temperature of the circulating water is 85°F., and that the vacuum should be higher when the circulating water is colder. The pictograph shows that this vacuum depends directly upon:

7



1. Elimination of air leaks.

2. Proper operation of air ejectors.

3. Sufficient flow of circulating water.

4. Effective use of heat transfer surface in distilling condenser.

Failure to obtain a vacuum of 26″ or more should first be traced to one of these factors, then to one of the items affecting this factor and so on until the cause is discovered and corrected.

Air leakage may be detected by hydrostatically testing the entire system. A quick method of making such a test by means of the circulating water pump is described in other instructions. **When this test is made in contaminated water, great care must be exercised when restarting the plant to prevent any discharge of contaminated water into the ship's fresh water tanks.**

The operation of the ejector may be checked as follows:—

1. Close the air ejector suction valve.

2. Remove the cap over the test orifice. Note the absolute pressure (ins. Hg) stamped on this cap.



3. Install a vacuum gage on the ejector mixing chamber and admit steam to the ejector. The difference between the vacuum indicated and the barometer reading should be the same as the figure stamped on the test orifice. A greater difference indicates either a leak at the air ejector suction, or improper operation of the ejector.

Faulty air ejector operation is most frequently caused by insufficient steam pressure or wet steam at the air ejector nozzle. A clogged strainer or nozzle may also be responsible.

8



Faulty operation of air ejectors due to wet steam can be corrected by means of a separator and drainer in the steam supply line and troubles due to occasional drops in pressure can be avoided by the use of a check valve in the air ejector suction line. Both of these fittings are described in this booklet in the section on "Installation." It is important to note that the check valve will not prevent troubles due to a continued low pressure.

The flow of circulating water is insufficient if the temperature rises more than 20°F. in passing through the condensing section of the distilling condenser.

Venting of the vapor side of the distilling condenser is continuously accomplished by the air ejector. Venting of the salt water side of this and other units need not be continuous. Upon starting the plant, and once every watch thereafter, the petcock vents on all salt water heads should be opened until all air is expelled and a solid stream of water appears when they may be closed. 

Failure to produce normal full load output when the pressure above the orifice is 5#/sq. in. gauge and the first effect tube nest vacuum is several inches or more is always an indication of improper draining of the condenser or of one of the evaporator tube nests subsequent to the first effect.

Complete flooding of the flash chamber gage glass is also a positive indication of improper draining of the condenser, but the fact that the level appears to be in the gage glass or below it is not necessarily an indication of proper drainage because air leaks at the gage glass fittings may result in a false liquid level.

9

A temperature difference of more than 5 to 10 degrees between the second effect shell temperature and the temperature of the condensate at the condensate cooler inlet is another indication of improper drainage, but here again the fact that this difference is in the proper range is not necessarily an indication of proper drainage.

Deposits inside distilling condenser tubes are unlikely to occur if the plant is properly operated and full flow of circulating water is always maintained. However, if scale deposits do occur, refer to section on "Care and Maintenance" for cleaning instructions.

## FIRST EFFECT TUBE NEST VACUUM

The vacuum in the first effect tube nest must be as high as possible in order to insure minimum scale and to maintain full output for maximum periods. The pictograph shows that the factors which affect this vacuum directly are:

1. Air Leakage.
2. Draining of all evaporator tube nests.
3. Venting of all evaporator tube nests.
4. Water levels in evaporator shells.
5. Deposits on evaporator tubes.

Reduction in first effect tube nest vacuum due to any factor other than deposits on tube surfaces can and must be eliminated. This, in turn, will reduce deposits and greatly prolong the periods between cleanings.

The schematic diagrams and other instructions indicate that when starting with clean surfaces the first effect tube nest vacuum should be about 16" at normal load. This vacuum will then gradually fall off as deposits accumulate on the tubes. When it is reduced to 1" or 2", the deposits must be removed in order to prevent a rapid reduction in output.

10



Loss of first effect tube nest vacuum due to deposits on evaporator tubes should be very slow and gradual. There should be no perceptible change in any one day's operation. A sudden drop, or failure to obtain a vacuum of approximately 14" to 16" when the tubes are clean and with the plant operating at rated capacity, must be traced to one or more of the other causes.

Insufficient venting or incomplete draining of any evaporator tube nest will reduce the first effect tube nest vacuum.

Flooding of the gage glass on any tube nest drainer is a positive indication of poor drainage of that tube nest, but the fact that there is a level in the gage glass is not necessarily an indication of proper drainage because air leaks at the gage glass fittings can result in the indication of a false liquid level. When a tube nest is properly drained, the temperature of the drains is within 10° to 15° of the saturated steam temperature in the tube nest.

It is particularly important to guard against poor drainage of evaporator tube nests because in addition to causing a reduction in first effect tube nest vacuum and consequently greater scale formation requiring more frequent cleaning, there may also be a loss of condensate through the tube nest vent lines. Improper drainage of the first effect tube nest can result in a loss of steam condensate and, therefore, in increased boiler feed makeup.

A reduced first effect tube nest vacuum can result from too low a water level in any evaporator shell. On most Griscom-Russell distilling plants, the water levels are controlled by hand regulation of the feed valves. Inability to feed the first effect shell is usually due to scale deposits in the air ejector condenser and vapor feed heater or obstructions in the feed line. Inability to feed subsequent effects is due to air leakage or deposits in the feed lines between effects.

It is important that the upper and lower gage glass fittings be free of scale as plugging of these lines will result in the indication of false liquid levels. Air leaks around the gage glasses will also result in false levels in the gage glass.

11

In some cases, the upper gage glass fitting is connected to a trough formed within the shell by one of the vapor baffles and the shell. Notches at the ends of the baffle, or drain pipes are provided to keep the trough drained. If these become clogged with scale, water will accumulate to the level of the gage glass opening and drain back to the shell through the gage glass connection. This will result either in making it impossible to read the water level or in the indication of a false level. It can be prevented by keeping the drain lines or slots clear of scale.

As an additional precaution, some plants are equipped with an extension pipe attached to the upper gage glass fitting as illustrated. In most designs this is not necessary and is not




provided. There are a few older designs in operation, however, which were not originally equipped with extension pipes but which would be benefitted by their addition.

12



## FEED AND BRINE DENSITY

It is common practice to assume that sea water has a density of one thirty-second, i.e., thirty-two pounds of sea water contain one pound of dissolved salts. Actually the density of ocean waters is not constant but varies from less than 1 to about 1.2 thirty-seconds as indicated on the accompanying chart. When inland seas and sheltered bays are included the variation is much greater.

The density of the brine in the last effect shell depends upon the initial density of the feed and upon the amount which is pumped overboard by the brine pump. Except for some plants equipped with overflow weir type level controllers, the brine density is controlled by regulating the small by-pass valve in the brine overboard line at the brine pump discharge. Where weir level controllers are provided the brine density is controlled by regulating the feed to the distilling plant.

The brine density in the last effect shell must never be allowed to exceed 1½ thirty-seconds. Higher brine densities will result in greater scale deposits on evaporator tubes, in feed and brine lines and in the brine pump. In fact, deposits inside the vapor feed heater and air ejector condenser tubes will also be increased because there is a lesser flow and consequently a higher temperature of feed through these tubes than when the brine density is maintained at 1½ thirty-seconds. Lower brine densities will result in somewhat less scale but may result in excessive heat loss and in a marked reduction in output.



Vapor feed heater tube completely plugged with scale. Unusual case resulting from reduced flow and improper maintenance.

14



In order to maintain the same last effect brine density it is necessary to increase the flow of brine overboard when the feed density increases. The brine density must be checked at hourly intervals and the brine regulating and feed control valves must be adjusted as necessary to maintain the brine density at $1\frac{1}{2}$ thirty-seconds.

Feed and brine density are measured by means of salinometers. It is important that these instruments be tested for accuracy periodically.

Samples of the brine are usually obtained through a sampling cock at the brine pump discharge. In order to obtain a sample truly representative of the brine in the last effect shell, the brine pump must be functioning properly at the time and there must be no dilution between the shell and the sampling cock. Dilution or improper pump operation should be suspected when the temperature of the sample is several degrees below that in the last effect shell.

If the pump gland is on the same side as the pump inlet, the brine may be diluted by sealing water. Normally dilution due to this cause is not very great and can be neglected. In some cases a brine diluting line is provided at the pump suction to improve the operation of the pump. This diluting line is not considered necessary, and unless the flow through it is very carefully adjusted, the flow of brine from the last effect shell to the brine pump may be stopped altogether.

A true sample can always be obtained by means of a vacuum sampling pot connected to the last effect shell. Such a sampling pot is not as convenient as a sampling cock on the discharge side of the brine pump, but is recommended where the danger of dilution exists because of the type of pump used or because of the installation of the separate brine diluting line.



15



On some plants all evaporator shells are connected to the brine pump suction to permit them to be pumped out rapidly when chill-shocking the tubes. These drain lines must be closed tightly when the plant is in operation. Leakage past these valves dilutes the brine from the last effect so that the density at the brine pump discharge will not represent the density in the last effect. Furthermore, if the leakage is excessive, the flow of brine from the last effect shell to the brine pump may be stopped entirely and the brine pump may "lose its suction."

It should be noted that even though the same last effect brine density is always maintained when the plant is properly operated, the brine density in preceding effects will vary with changes in the initial feed density. Hence, there usually is greater scale formation in regions of high feed density than in those where the feed density is low.

The rate of scale formation is also affected by the nature of the solids in the water. When the plant is properly operated at high vacuum and with a last effect brine density of 1½ thirty-seconds, none of the major constituents of ocean waters forms scale. Scale results primarily from calcium carbonate and other minor constituents. While it is a fact that regardless of changes in total solids content, the relative amount of any of the major constituents to the total remains substantially constant, this is not true of the minor scale forming solids. Hence, it does not follow that two waters having the same density will always result in the same amount of scale under the same operating conditions.

#### ANALYSIS OF OCEAN WATER NEAR BERMUDA

|  | Grains/Gal. | % of Total Solids |
|---|---|---|
| Sodium Chloride | 1840 | 77.4 |
| Magnesium Chloride | 250 | 10.5 |
| Magnesium Sulphate | 107 | 4.5 |
| Calcium Sulphate | 85.3 | 3.6 |
| Potassium Sulphate | 51.7 | 2.2 |
| Calcium Carbonate | 8.6 | .4 |
| Siliceous Matter | 15.9 | .7 |
| Iron and Aluminum Oxides | 15.9 | .7 |
| **Total:** | 2374.4 | 100.0 |

16



The analysis given above is typical of tropical waters except for the siliceous matter and iron and aluminum oxides which are due to local effects and are generally present only in much smaller amounts. The scale produced on evaporator tubes by this water was nearly 95% calcium carbonate, the remainder consisting of silica and iron and aluminum oxides. Tests in other parts of the oceans showed scale of nearly 100% calcium carbonate. The carbonate content of the water is, therefore, a better index of its scale forming properties in low pressure distilling plants than the total solids or "density." Tropical waters generally have both a higher density and a higher carbonate content than northern ocean waters.

Some river and bay waters with a low total solids content may actually result in more scale in low pressure plants than sea water because the carbonate content is higher. A typical analysis of one such river water is given below:

| | |
|---|---|
| Calcium Carbonate | 11.3 Gr/Gal. |
| Magnesium Sulphate | 5.8 |
| Sodium Chloride | 3.3 |
| Calcium Sulphate | 12.6 |
| Silica | .2 |
| Sodium Sulphate | 1.2 |
| Iron and Aluminum Oxides | .2 |
| | |
| **Total Solids:** | 34.6 |

This water contains 11.3 grains/gallon of calcium carbonate compared to 8.6 grains/gallon in tropical sea water and less than 6 grains/gallon in some northern ocean waters.

## FEED TREATMENT AND CHILL-SHOCKING

Vacuum type distilling plants can be operated in some waters for long periods of time without overhaul and without feed treatment if properly handled. A brittle scale will gradually form on the evaporator tubes and chill-shocking will partially remove this scale if practiced daily.

17

In tropical waters, especially near coral islands where the water is super-saturated with calcium carbonate, it has been determined that the continuous injection of a mixture of boiler compound and cornstarch into the first-effect shell reduces the deposit on evaporator tubes and in the brine lines. The deposit is in the nature of a powder. It builds up very slowly, but does not crack as readily. Instructions for mixing and injecting such a mixture, as well as the proper arrangement of the necessary equipment, are given on the accompanying chart.

Under the most adverse circumstances plants have been operated for 6 to 8 months without complete overhaul. Some plants have been operated 18 months.

The amount of boiler compound and cornstarch required varies with the character of sea water. However, it is doubtful that any increase in the quantities given on the chart will ever be required since the treatment recommended was found to be effective in waters where maximum or near-maximum treatment is required. Over treatment may lead to an increase in deposits on the tubes. The use of cornstarch alone is not recommended.

The mixing tank should be readily accessible and suitably located for convenient mixing. It must be elevated sufficiently to permit gravity flow through a basket type strainer into the supply tank.

The rate of injection of the feed treatment solution is adjusted by hand regulating the control valve so as to obtain a steady drop in level in the supply tank. A vertical supply tank with as long a gage glass as possible is therefore much better than a shallow tank.

If boiler compound-cornstarch feed treatment is not used, the distilling plant should be chill-shocked daily following the procedure given in other instructions. For operation with feed treatment, a daily period may be beneficial. A longer interval may be satisfactory.

18

Case 3:08-cv-03013-JSW    Document 11-6    Filed 07/03/2008    Page 27 of 56



## CARE AND MAINTENANCE

Full output can be maintained for relatively long periods without interruption only if every part of the plant is maintained in proper operating condition. This can be insured by periodic inspections and tests, cleaning or replacing parts as necessary. Some parts require more attention than others. The schedule suggested below may be modified slightly as experience with a particular installation may indicate.

## SALINITY INDICATOR

The salinity cells should be inspected monthly or whenever an incorrect reading is suspected. Soft deposits may be cleaned off by using soft absorbent cotton dipped in benzene followed by thorough flushing with water. Never use abrasive material for cleaning the electrodes.



20

The cell may be tested for accuracy by applying the test resistor supplied with the spares across the electrodes. Then, with the temperature compensator adjusted to 110°F., the meter should indicate a reading of 1 grain per gallon. Broken leads or poor contact at joints will result in a lower reading, while poor insulation, or leakage of water into the salinity cell tube, will result in a higher reading. Incorrect readings may also be due to an increase or decrease in the gap between the electrodes or to corrosion of the electrodes from improper cleaning.

The meter itself should be tested for accuracy frequently. The test is very simple and should, therefore, be performed when log readings are taken at hourly intervals. Simply set the temperature compensator dial to 110°F. and push the button at the center of the panel. The meter should then read 1 grain per gallon. Any other reading indicates either a faulty meter or a faulty meter test resistor at the back of the panel door. If the resistor is found to be correct, the meter should be replaced. A spare meter is provided.

Any impurity in the water which increases the electrical conductivity of the water will be registered as "sea salt" by the indicator. It is possible, therefore, to obtain a relatively high reading on the electrical indicator when actual salt content is very low. This frequently happens in harbors and rivers where the feed water contains considerable quantities of carbon dioxide and ammonia. When the water is boiled, these gases are driven out of solution even though there is no priming. They flow along with the vapor and are partially re-dissolved when the vapor is condensed. In solution, they increase the conductivity and are registered as "sea salt" by the indicator.

## SALINOMETERS

Test the salinometers at monthly intervals by measuring the "density" of distilled water. A sample at the proper temperature may be obtained by temporarily by-passing the condensate cooler, or the sample may be heated. The instrument should read zero. At least one extra salinometer should always be kept on hand.

21

## CLEANING BOTTOM OF EVAPORATOR SHELLS

When boiler compound-cornstarch feed treatment is not used, chill-shocking cracks fairly large particles of scale from the tubes. These particles collect at the bottom of evaporator shells and must be removed regularly. After removing the cleanout covers at the bottom of the evaporator shells, the scale is removed by means of a rake similar to that shown.



In most cases, this should be done once a week. When boiler compound-cornstarch feed treatment is properly used, there is practically no accumulation at the bottom of the shells. Monthly inspections and cleaning will probably suffice.

## HYDROSTATIC TESTS

A hydrostatic test of 8 to 10#/sq. in. should be applied at least once a month, and at all other times when the pictograph indicates that air leakage is a possible cause of an operating difficulty. A hydrostatic test should also be applied after re-assembly when the plant has been dismantled for cleaning.

22

## SALT WATER LEAKAGE

Contamination of the distillate may be due to priming or to salt water leakage.

When a high salt content in the distillate cannot be traced to faulty operation, it is first necessary to check the accuracy of the salinity indicator. If the indicator is found to be accurate, the high salt content may be due to leakage of salt water into the condensate. However, it may also be due to organic matter or other impurities in the feed water which produce a foam in the evaporator or which give off carbon dioxide or ammonia gas upon heating.

In order to ascertain the cause, the following test should be made:

1. Observe the salt content of the distillate.

2. Close down on the steam supply valve to the weight loaded regulating valve until there is a vacuum of 8 to 10″ above the orifice. This greatly reduces the distilling plant output.

3. Observe the salt content of the distillate after the plant has been stabilized at the new conditions. If the salt content remains the same as before or is reduced, the trouble is due to an operating condition; if the salt content is higher at the lower output, the trouble is definitely due to a salt water leak.

If the leak is in a vapor feed heater, the bundle should be withdrawn and a hydrostatic test at the full test pressure—50#/sq. in.—should be applied on the tube side. When a leak occurs in the distilling condenser, the salt water condenser heads should be removed and a hydrostatic test at full test pressure—30#/sq. in.—should be applied on the shell side. A test ring described in the section on "Expansion Joints" will be required for this purpose when the distilling condenser is equipped with a diaphragm type expansion joint.



A high salt content at the air ejector condenser drains may be due to high gas content of the feed water, to priming of the boiler, or to salt water leakage. Leakage may be detected by removing the heads, plugging the shell openings and applying a hydrostatic test of 50#/sq. in. on air ejector condenser shell. Be sure that the air ejector suction and steam supply valves are closed.

Leaks in the evaporator tube nests will not cause contamination of the condensate when the plant is in operation because the vacuum inside the tubes is always less than that in the shell. Therefore, any leakage would result in a flow of steam into the brine. However, when the pressure inside the tubes is the same as that in the shell (as when the plant is secured) salt water from the shell will leak into the tube nest. If the drains from an evaporator tube nest are regularly found to be contaminated after the plant has been secured, leakage is indicated. The tube bundle should be withdrawn and a hydrostatic test at 50#/sq. in. should be applied on the tube side.

Leaky tube joints may be repaired by expanding; leaky tubes may be replaced with new tubes or plugged temporarily. Tube expanders are provided in the spare parts box with every distilling plant. Instructions for tube expanding and re-tubing are given elsewhere in this book.

24

## STRAINERS

Quick opening flanged basket type strainers are required in the brine and circulating pump suction lines for satisfactory operation of the distilling plant.



The brine pump suction strainer should be inspected daily and replaced with a clean basket when necessary. Clogging of this strainer will interfere with the operation of the pump and will make it impossible to maintain the brine density at 1½ thirty-seconds. Heavy coatings of hard scale in strainer baskets can best be removed by chemicals when in repair yards.

The circulating pump suction strainer should be inspected about once a week when at sea, and more frequently—possibly every twenty-four hours—when in port. Clogging of this strainer, even partially, will result in a reduction in the flow of circulating water, which in turn results in a reduced vacuum. Scale will then form more rapidly on evaporator tubes and inside Vapor Feed Heater and air ejector condenser tubes.

25

## AIR EJECTORS

The air ejector steam strainer is usually an integral part of the air ejector inlet. It should be inspected regularly and cleaned whenever necessary. When a new plant is first started up, the strainer may require cleaning every day or even more frequently, but once the lines have been thoroughly cleaned out, monthly inspections should suffice. Failure to keep the strainer clean will cause a reduced and fluctuating vacuum. If a strainer is damaged, it should be replaced with a new one. Spare strainer baskets are provided with each plant.



Clogging or scoring of the air ejector nozzle will result in the same unsatisfactory operation as clogging of the strainer.



The nozzle is cleaned by means of a nozzle reamer provided for this purpose. **Never use a file or other sharp instrument for cleaning, as this will score and ruin the nozzle.**



The nozzle may be removed for cleaning and inspection, but cleaning alone can be accomplished with the nozzle in place. The reamer can be turned by hand exerting a moderate pressure.

If the nozzle is found to be scored it must be replaced with a new one. At least one spare nozzle is supplied each vessel.

26



### ZINCS

Zinc rods or zinc plates are usually provided in all salt water units (except evaporators) in order to reduce the effects of galvanic action on structural parts. The zincs should be inspected regularly about once a month and cleaned. When the zinc is more than half eaten away, a new zinc should be installed.



Refer to appropriate plans for the location of zinc "pencils" or plates. Note that zincs at the return head of vapor feed heaters (where these are within the evaporator shells) can only be inspected when the vapor feed heater bundles are withdrawn. This is also the case with zincs at the return head of distilling condensers on Soloshell End-Pull Distilling Plants. It is satisfactory to replace these relatively inaccessible zincs only when the plant is dismantled for de-scaling purposes.



### PUMPS AND PUMP PIPING

Proper operation of all pumps is essential for successful operation of low pressure distilling plants. Faulty pump operation is frequently the unsuspected cause of excessive scale formation and reduced output.

The speed and direction of rotation of each pump should be checked when first starting up a new plant **and at all times when electrical work has been done.** Flow should not be controlled by regulating the speed. The pumps should always be run at full speed, (See pump name plate) and if control of the flow is required, as in the case of the Brine Pump, such control should be obtained by regulating the pump discharge valve.

27



All pump piping must be air tight. Even the slightest air leak-
age, particularly on the suction side, at the tube nest drain,
condensate, and brine pumps will result in improper opera-
tion. In looking for air leaks, do not overlook gage and vent
lines. The monthly hydrostatic test of the distilling plant
should include pump piping.

Pumps must be packed in accordance with the manufacturer's
instructions. A good grade of packing per N.D. Spec. 55P25,
Symbol 1433, must be used. All vacuum pumps must be pro-
vided with gland water seals in accordance with the diagram-
matic arrangement plans in this book. **The lantern ring must
come directly under the seal connection when the gland is
adjusted for operation.**



EXTERNAL
WATER SEAL

LANTERN RING

The number of rings of packing which must precede the
lantern ring in order to accomplish this is not standard
and must be checked on each pump. **At least once every six
months (preferably every 3 months) the pump should be
completely dismantled, wearing ring clearances should be
checked, and the pump completely repacked.** It is not satis-
factory to keep adding additional rings of packing indefi-
nitely as this will cause gradual displacement of the lantern
ring until eventually it is no longer directly below the exter-
nal water seal connection.

28

## CLEANING EVAPORATOR TUBES

The output of the plant is not reduced appreciably by scale deposits on the evaporator tubes until the deposits have caused a reduction in first effect tube nest vacuum to 1" or 2". When the first effect tube nest vacuum is lost entirely, the reduction in output becomes very great. Assuming the reduction in vacuum is due to scale, and is not the result of improper operating conditions, the evaporator tubes must be cleaned when the tube nest vacuum approaches zero. When the plant is properly operated, and when the evaporator feed is treated, the interval between cleaning should be six months or more. The evaporator bundle must be withdrawn for cleaning. Lifting gear for pulling the bundles is not provided by the Griscom-Russell Company. The installing yard provides the type best suited to a particular installation. In some cases, there are overhead trolleys from which the bundles may be suspended. In other cases, roller brackets which may be bolted to the front head are provided together with tracks. For small bundles, special external lifting gear is sometimes omitted, as the bundles can be handled easily with an ordinary chain fall, or by several men.





When the bundle has been withdrawn beyond the support plate, the tube nest stop should be bolted in place to prevent accidental dropping of the rear head. The tube nest stop can be removed when support for the rear head has been provided by men or lifting gear. The bundle should then be withdrawn and laid on the deck or on a suitable platform.



It is important that the bundle be turned on its side so as to permit cleaning the bottom as well as the top of the tubes. The accompanying photograph shows scale that accumulated at the bottom of tubes which were regularly cleaned only from the top. This scale accumulated while a feed treatment of cornstarch alone was in use.



The cleaning tool is operated by a light air hammer. It should be held against the tube with moderate pressure, and moved over the entire length of the tube. Every tube in the bundle must be cleaned.

Details of the tool and information regarding the air hammers are given elsewhere in this book.

**Never use a torch for de-scaling any tube nest made up of straight tubes.**

After cleaning, a hydrostatic test of 50#/sq. in. should be applied to the bundle before replacing it within the shell.



### CLEANING INSIDE SURFACES OF HEAT EXCHANGER TUBES

Salt water flows inside the tubes of the distilling condenser, air ejector condenser, and vapor feed heaters. Under some operating conditions, scale deposits may accumulate inside these tubes, particularly in the air ejector condenser and first effect feed heater. Every six months, or whenever the plant is secured for de-scaling evaporator tubes, the inside surfaces of these heat exchanger tubes should be inspected and cleaned if necessary. Neglect can lead to thick scale deposits which will then be difficult to remove.



51



Cleaning is accomplished by means of a drill driven by a reversible motor at 250 to 300 RPM. Details of the drill are given elsewhere in this book. The vapor feed heater bundle and the distilling condenser bundle on soloshell end-pull distilling plants must be removed for cleaning.



All air ejector condensers and most distilling condensers can be cleaned in place by simply removing the heads at both ends.



32

## MISCELLANEOUS CLEANING

When the distilling plant is dismantled for cleaning evaporator tubes, a number of interior parts should also be cleaned.



The feed distributing pipes, flushing pipes and separator drain lines should be removed and any scale deposits cleaned off. The baffle hooks and the troughs formed by the baffles and the shell are drained by gaps or slots at the ends. Scale deposits at these points should be removed so as to insure proper drainage. The upper and lower gage glass equalizer lines, the gage glass fittings, gage glasses and sight glasses, feed lines between effects, brine lines, brine pump impeller, etc., should all be inspected and cleaned if necessary. If this work is done at a Navy Yard or base, any parts which can be removed from the ship may be cleaned by dipping in weak acid solutions followed by thorough flushing. Otherwise the scale must be removed mechanically.

33

## TUBE EXPANDING

All tubes in Griscom-Russell low pressure distilling plants are expanded into tube sheets at both ends. Allowance is made for differential expansion either by the use of "floating heads" or by expansion joints on the shell side. Leaky tube joints may be repaired by re-expanding. The evaporator tubes are 5/8" O.D., 16 ga. Admiralty metal and all other tubes are 5/8" O.D., 18 ga. copper nickel alloy. Tube expanders for both sizes are provided with both distilling plants.



To expand a tube, the adjusting nut and check nut must be set so that the forward end of the rollers extend out from the adjusting nut a distance which is slightly (approximately 1/8") less than the thickness of the tube sheet. The expander cage is then inserted in the tube to be expanded and the cage firmly held in a position so that the portion of the rollers outside the adjusting nut is slightly more than half way within the tube. While holding the cage firmly in this position with one hand, the mandrel is pushed forward until it is in firm contact with the rollers so that there will be no slip between them.

The tube may now be expanded by rotating the mandrel clockwise. As it is rotated, the expander will gradually feed



itself forward into the tube. As soon as the adjusting nut comes in contact with the tube sheet, expanding must be stopped. Damage to the expander will result from continuing clockwise rotation after the adjusting nut has reached the tube sheet. Turn the expander counter-clockwise to withdraw it from the tube. The process may now be repeated, if necessary.

34



Do not over-expand a tube, as this results in damage to the expander and the tube wall. Never roll a tube all the way through the tube sheet.

The expander should be washed in gasolene and then dipped in lubricating oil frequently to prevent dirt and scale from interfering with the free movement of the rollers within the cage.

The expander may be driven by hand when only a few tubes are to be rolled, or by a slow speed, reversible motor when many tubes are involved, as when re-tubing a unit.

## RE-TUBING

Old tubes may be removed without damaging the tube sheets by following the procedure outlined on another page. The necessary tubes are not supplied with the distilling plant, but may be procured from the Griscom-Russell Company.

Do not attempt to drive the tube out before both ends have been loosened from the tube sheets. Any attempt to do so may result in enlarging the tube diameter so that it will not pass through the holes in support plates or in the other tube sheet.

After the tubes have been removed, the tube sheet holes should be carefully inspected and all foreign matter removed. If necessary, use a reamer of slightly larger diameter to re-finish or to remove imperfections of the tube hole.

The ends of the new tubes should be thoroughly cleaned. They should extend out about ¼" from the tube sheets at both ends. A drop or two of lubricating oil should be placed inside each tube to help lubricate the expander rolls.

PROCEDURE FOR REMOVING TUBE FROM TUBE SHEET
36



One end of each tube should be lightly "drifted" in place to keep the tube from rolling with the expander. The forward rolling procedure outlined above may now be followed at this end. At the opposite end, a "step back rolling" procedure must be followed. The adjusting nut is set in the same manner as in the forward rolling procedure. For the first rolling, the cage should be set so that the forward end of the rolls is about ¼″ from the inboard face of the tube sheet, the mandrel then tightened and turned in a clockwise direction until the adjusting nut comes into contact with the tube sheet. This procedure will expand the tube sufficiently to prevent it from "growing" between the tube sheets during the next rolling operation. The mandrel should then be loosened by counter-clockwise rotation and the cage pulled back until the portion of the rolls outside the adjusting nut is just slightly over half way inside the tube. After tightening the mandrel, the tube is expanded by clockwise rotation. This completes the rolling operations.

The rolling operation should be performed by first expanding a few tubes around the outer periphery and a few near the center of the tube sheet. It is then desirable to work from the center outward until all tubes are expanded.

The tube ends are belled by means of a belling tool as illustrated.



"A" = .534" FOR ⅝ O.D. 18 BWG TUBES

"A" = .502" FOR ⅝ O.D. 18 BWG TUBES

This tool is simply hammered into the tube end either by hand or by an air hammer.

A disk sander or grinder may be used to machine the ends of the tubes flush with the tube sheets after expanding and belling.

Copper nickel alloy tubes may be substituted for the evaporator tubes, but Admiralty metal tubes should not be substituted for copper nickel.

37

## EXPANSION JOINTS

Some distilling plants were equipped with distilling condensers having a copper corrugated type expansion joint as shown. This joint is fitted between the main evaporator shell and the rear tube sheet of the condenser. If it fails, it cannot be replaced without retubing the entire distilling condenser. Temporary repairs may be effected at sea by applying paint, shellac or other filler to the crack while the distilling plant is under a high vacuum. Several coats should be applied, allowing a few hours for drying between applications. The expansion joint can then be replaced when the ship is in port.





When a condenser having a corrugated type expansion joint must be re-tubed either because of tube failures or because of failure of the expansion joint, the corrugated type of joint must be replaced by the diaphragm type. The necessary new parts required to effect this change may be obtained from stock at most Navy Yards or bases, or from the Griscom-Russell Company.

After re-tubing, the tube joints may be tested for tightness before the distiller condenser heads are bolted in place. This requires the use of a test ring in place of the rear head.

38



A hydrostatic test of 30#/sq. in. should be applied on the shell side and all tube joints carefully inspected. At the same time, leakage at the gasketed joints between the expansion member neck and shell cover, the neck and expansion member and its backing up ring should be eliminated. **Never take up on a gasketed joint while under test pressure.** Always relieve the pressure before tightening bolts and then reapply the pressure.

When assured of tight tube and gasket joints, remove the test ring and attach the distilling condenser heads. A hydrostatic test of 50#/sq. in. should now be applied to the tube side only. It is very important to insure a tight joint at the rear head between the expansion member and rear tube sheet, as leakage at this point can cause contamination of the distilling condenser drains. It is good practice to apply a second hydrostatic test at 50#/sq. in. pressure on the tube side only after the plant has been in operation a few days to make certain that no leakage has developed under the cap nuts or at the joint between the expansion member and the rear head.

| SIZE AND TYPE OF UNIT | | | | NUMBER & LENGTH (L) RECOMMENDED PER SHIP |
|---|---|---|---|---|
| 4000 GAL.PER DAY | SOLOSHELL | | | 2 - 18" |
| 8000 GAL.PER DAY | SOLOSHELL | | | |
| 10000 | " | " | " | 1 - 18" |
| 12000 | " | " | VERTICAL | 1 - 24" |
| 20000 | " | " | (ALL) | |
| 10000 GAL. PER DAY | SEPARATE SHELL | | | 1 - 18" |
| 12000 | " | " | SOLO SHELL | 1 - 30" |
| 30000 | " | " | IMPROVED 6-R | |
| 40000 | " | " | SEPARATE SHELL | 1 - 24"<br>1 - 42" |

NOTE:- A LIGHT AIR HAMMER (SIMILAR TO THOR MODEL MM, PISTOL GRIP, 5 LBS MANUFACTURED BY THE INDEPENDENT PNEUMATIC TOOL CO. OF CHICAGO, ILL.) SHOULD BE USED. IT IS RECOMMENDED THAT THE TUBE BUNDLE BE TURNED ON ITS SIDE (IF POSSIBLE) TO PERMIT CLEANING FROM THE TOP AND BOTTOM OF THE BUNDLE.



MATERIAL – COLD DRAWN STEEL CASE HARDENED AT BOTH ENDS

**Cleaning Tool for Evaporator Tubes**

40



#2 MORSE
TAPER

NOTES
1: THE LENGTH "L" MUST BE GREATER THAN
THE OVERALL TUBE LENGTH.
(a) FOR ALL SOLOSHELL DISTILLING PLANTS,
A TOOL LENGTH, "L" OF 6'-6" IS SUFFICIENT.
(b) A TOOL LENGTH OF 7'-0" IS REQUIRED
FOR ALL OTHER GRISCOM- RUSSELL
DISTILLING PLANTS.

2: DRIVE WITH REVERSIBLE MOTOR
APPROX. 300 R.P.M.

$\frac{3}{8}$ DIA.
TOOL STEEL

SILVER
BRAZED

DRILL SHANK
GROUND DOWN
TO $\frac{3}{8}$" SO AS
TO OPEN
FLUTES
AT BACK

$\frac{1}{2}$" DRILL
(HIGH
SPEED
MATERIAL)

Cleaning Tool for
Heat Exchanger Tubes

41

## *Service*

The Griscom-Russell Company does not install Distilling Plants. However, this company has a limited number of engineers to assist shipyards and ships' officers in an advisory capacity when such service is required. These men are based at New York, San Francisco and Houston, Texas.

It is necessary that requests for the assistance of service engineers be made as far in advance as possible in order that conflicting schedules can be adjusted and in order that transportation can be obtained.

When air travel is necessary, priority should be established by the activity requesting assistance.

It is requested that quarters be reserved, except in the base areas mentioned above.

Requests for field service must include the following information:

1. Identification of **MATERIAL** by **SERIAL NUMBER** on manufacturer's nameplate.
2. Brief description of difficulties encountered.
3. Maximum time available.
4. Where and to whom should man report?
5. List of repair parts needed, if any.
6. Advise if unit can be operated for trial purposes.

42



*Memoranda*



*Memoranda*





THE GRISCOM-RUSSELL CO. 3 EFFECT L.P. DIST

FROM VALVES MARKED "A"
USED ONLY WHEN CHILL SHOCKING

1  Dean A. Hanley, Esq.   (State Bar No. 169507)
   Deborah R. Rosenthal, Esq. (State Bar No. 184241)
2  PAUL AND HANLEY LLP
   1608 Fourth Street, Suite 300
3  Berkeley, California 94710
   Telephone:  (510) 559-9980
4  Facsimile:   (510) 559-9970
   dhanley@paulandhanley.com
5  drosenthal@paulandhanley.com

6  Attorneys for Plaintiffs

7

8

9                    UNITED STATES DISTRICT COURT

10                 NORTHERN DISTRICT OF CALIFORNIA

11                     SAN FRANCISCO DIVISION

12  JERI REDMAN, individually and as        )  Case No.: 08-cv-03013-BZ
    successor-in-interest to RONALD REDMAN, )
13  deceased; and JERI REDMAN, AMY          )  **EXHIBIT I TO THE DECLARATION OF**
    REDMAN, DAVID C. REDMAN, MARK           )  **DEBORAH R. ROSENTHAL IN**
14  REDMAN and PAUL REDMAN, as legal        )  **SUPPORT OF PLAINTIFFS' MOTION**
    heirs of RONALD REDMAN, deceased,       )  **FOR REMAND AND FOR COSTS AND**
15                                          )  **EXPENSES INCURRED AS A RESULT**
                                            )  **OF REMOVAL**
16           Plaintiffs,                    )  _____
                                            )
17  vs.                                     )  [28 U.S.C. § 1447(c); FRCP 7(b); ND CA Local Rules
                                            )  7-2, 7-4 & 7-5]
18  A.W. CHESTERTON, et al.,                )
                                            )  Date:        September 5, 2008
19           Defendants.                    )  Time:        9:00 a.m.
                                            )  Courtroom:   2, 17th Floor
20  _____ )  Judge:       Jeffrey White
    / / /
21
    / / /
22
    / / /
23
    / / /
24
    / / /
25
    / / /
26
    / / /
27
    / / /
28
    **EXHIBIT I TO THE DECLARATION OF DEBORAH R. ROSENTHAL IN SUPPORT OF PLAINTIFFS' MOTION FOR REMAND**
    **AND FOR COSTS AND EXPENSES INCURRED AS A RESULT OF REMOVAL**
    S:\Clients\Plaintiffs\R\Redman, Ronald 10267\Fed Court Action\VIAD remand motion - Exh A-C.doc

**EXHIBIT "I"**

ADVANCE COPY

MIL-M-15071D(SHIPS)
6 June 1961
SUPERSEDING
MIL-M-15071C(SHIPS)
10 September 1957

## MILITARY SPECIFICATION

## MANUAL, SERVICE (INSTRUCTION BOOKS) FOR SHIPBOARD

## ELECTRICAL AND MECHANICAL EQUIPMENT

1. SCOPE

1.1 Scope. - This specification sets forth Bureau of Ships requirements for classes and general contents of manuals necessary for the satisfactory operation, maintenance, installation, overhaul and repair, without the services of manufacturer's representative, of electrical, mechanical, hull, interior communication and fire control shipboard equipment. This specification also includes procedures for submission, review, approval and revision of the service manual. The intent is to accept the manufacturer's commercial type of manual or one prepared in accordance with his commercial practice whenever it is roughly equivalent to the detail requirements included herein.

1.2 Classification. - Service manuals shall be of the following classes:

Class A manual - A basic manual covering a family of equipment
of the same basic design and one which can be made applicable
to a specific equipment manufactured to that basic design by
completing sheets and blanks.
Class B manual - A manual covering a specific equipment for which
a class A approval has not been obtained.

2. APPLICABLE DOCUMENTS

2.1 The following documents, of the issue in effect on date of invitation for bids, form a part of this specification to the extent specified herein.

SPECIFICATIONS

MILITARY
MIL-D-963 - Drawing, Electrical, Hull and Mechanical Equipment
for Naval Shipboard Use.

FSC 7610

REPRODUCED AT THE NATIONAL ARCHIVES

MIL-M-15071D(SHIPS)

PUBLICATIONS

DEPARTMENT OF DEFENSE
DD Form 441 (Attachment) - Industrial Security Manual for
Safe-guarding Classified Information.

(Copies of specifications and publications required by contractors in connection with specific procurement functions should be obtained from the procuring activity or as directed by the contracting officer.)

2.2 The following document forms a part of this specification to the extent specified herein. Unless otherwise indicated, the issue in effect on date of invitation for bids shall apply.

OFFICIAL CLASSIFICATION COMMITTEE
Uniform Freight Classification Rules.

(Application for copies should be addressed to the Official Classification Committee, 1 Park Avenue at 33rd Street, New York 16, N.Y.)

3. REQUIREMENTS

3.1 <u>Media for final manuals and approval.</u> -

3.1.1 <u>Class A manuals.</u> - Whenever a manufacturer's equipment lends itself to the preparation of a manual covering a family of equipments of the same basic design and one which can be made applicable to specific equipments of that design by completing sheets and blanks, the manufacturer may submit to the Bureau of Ships four copies of the basic manual together with examples of the sheets and blanks which will represent the detailed information to be provided for a specific equipment. Approval of a class A manual will be by the Bureau of Ships only and, once approved, the basic manual shall not be modified without the approval of the Bureau of Ships. At the time of class A manual approval, the Bureau will assign a NAVSHIPS number to the basic manual and forward one copy to the cognizant inspection for future comparison inspection with manuals furnished for specific equipments.

2

MIL-M-15071D(SHIPS)

3.1.1.1  Once approval of a class A manual is granted for a particular basic design of equipment (and size range, if appropriate), the basic manual with the specific detailed information required for the unit of the family being furnished on a contract or order may be supplied by the manufacturer, in the quantities required by that order, without further approval. Copies of the manual prepared for the specific equipments shall be marked by the manufacturer with the NAVSHIPS number of the basic manual followed by "-1", "-2" or higher.  Each dash number shall be assigned numerically by the manufacturer for each specific equipment of that family.

3.1.2  Class B manuals. - Class B manuals cover a specific equipment for which class A approval has not been obtained.  Once a class B manual has been approved by the Bureau or its field representative, the manual shall not be modified without approval of the Bureau of Ships.  (NOTE: Bureau of Ships field representative - Where the term "field representative" is used in this specification, it is limited to field representative of the Bureau of Ships, i.e. Supervisors of Shipbuilding, USN, U.S. Naval Shipyards and Industrial Manager, USN.)  Whenever a manual for a specific equipment has not been approved previously, for this or a previous issue of this specification, prior to preparing final manuals, the manufacturer shall prepare and submit a sample manual for approval to one of the following activities, as appropriate:

    (a) Manuals procured on Bureau of Ships contracts - Contractor shall forward four sample copies to the Bureau of Ships for approval and assignment of a NAVSHIPS number with a copy of the forwarding document to the cognizant Government inspector.
    (b) Manuals procured on contracts issued by Naval activities other than Bureau of Ships - Contractor shall forward four sample copies to the Naval activity for approval.
    (c) Manuals procured for the Navy by a commercial activity (such as a private shipbuilder) - Contractor shall forward five sample copies to the commercial activity for approval of both the commercial activity and the cognizant Bureau representative.

3.1.2.1  The Bureau will assign a NAVSHIPS number to each different class B manual as follows:

    (a) Manuals procured on contracts issued by the Bureau of Ships - The NAVSHIPS number will be included in the approval letter.
    (b) Manuals procured on contracts issued by other activities.

3

REPRODUCED AT THE NATIONAL ARCHIVES

MIL-M-15071D(SHIPS)

The field approving activities may obtain NAVSHIPS numbers from the Bureau of Ships by one of the following methods:

    (a) Submit two copies of the manual prior or subsequent        to the review and approval.

    (b) Permit the manufacturer to forward two copies of the manual to the Bureau simultaneously with the copies for approval.

    (c) In urgent cases, submit a letter containing the nameplate data of the equipment, the ship applicability and contract or order number.

3.1.2.2 Regardless of the method used for obtaining NAVSHIPS numbers, the letter request shall state the expected delivery date of the manuals and the quantity of manuals being furnished for stock.

3.1.3 Emphasis. - The Bureau of Ships is mainly interested in the adequacy and completeness of contents and the clarity and readability of the information rather than the format. The manual shall be oriented toward operation, maintenance and repair of the equipment by the forces afloat, without the services of a manufacturer's representative. The portions devoted to descriptive matter and theory shall be limited to those which are essential to a proper understanding of the equipment for satisfactory operation, maintenance and repair. The text need not duplicate information which is adequately shown on the photographs, drawings and illustrations incorporated in the manual. (A class A or B manual may be the manufacturer's commercial manual, or one prepared in accordance with his commercial practice whenever it will be suitable for the service intended as determined by the approving activity.)

3.1.4 Security classification. - The security classification of manuals shall be as designated by the bureau or agency concerned. If classifed, the security guide issued by DD form 254, forming a part of the contract shall be followed. All pages shall be marked in accordance with the requirements of the Industrial Security Manual for Safeguarding Classified Information (DD 441 (Attachment)). Where a minor amount of classified information is involved, two volumes - one unclassified and one classified shall be provided. The word "UNCLASSIFIED" need not appear on each page of unclassified portions of classified manuals. Revisions shall be classified as required by their subject matter. Regardless of the overall classification of a classified publication, an unclassified title shall be assigned whenever possible and consistent with security and clarity. In all cases, however, if a classified manual is involved, the initials of the classification assigned to the title, standing alone, shall be indicated in parentheses immediately following the title, using one of the following notation (U), (C), (S), (TS). In addition, the covers of classified manuals shall include the markings as indicated on figure 1.

4

REPRODUCED AT THE NATIONAL ARCHIVES

MIL-M-15071D(SHIPS)

3.1.5 <u>Detail requirements.</u> -

3.1.5.1 <u>Contents.</u> - Manuals shall contain the following information, arranged in an order appropriate to provide adequate instruction for operation and maintenance of each unit in the equipment and the complete assembly: No particular arrangement, format or chapter titles are required as long as the information is suitably presented.

Front Matter
General Information
Installation
Principles of Operation
Operating Instructions
Maintenance and Repair
Parts Lists

3.1.5.2 <u>Front matter.</u> - The front matter shall consist of the following:

(a) Cover
(b) Title page (for classified manuals only)
(c) Approval and procurement record page
(d) List of effective pages
(e) Table of contents
(f) List of figures
(g) List of tables

3.1.5.2.1 <u>Cover and title page.</u> - The cover shall contain the information on figure 1. The title page for classified manuals shall conform to figure 2.

3.1.5.2.2 <u>Approval and procurement record page.</u> - The approval and procurement record (APR) page shall be the first page of unclassified manuals and shall follow the title page of classified manuals and shall conform to figure 3.

3.1.5.2.3 <u>List of effective pages.</u> - A list of effective pages shall be included. In multiple volume manuals, the list of effective pages shall be included in volume 1 only. The list of effective pages shall be modified whenever revisions are incorporated in copies of the manual.

5

REPRODUCED AT THE NATIONAL ARCHIVES

MIL-M-15071D(SHIPS)

3.1.5.2.4  Table of contents. - The table of contents shall list all primary divisions and secondary subdivisions such as chapters, sections and pages with their corresponding numbers.  Where sub-manufacturers are furnishing associated equipment and a separate manual is not provided, it shall be the responsibility of the prime contractor to integrate and reflect the information provided by the sub-manufacturers within the table of contents.  In multiple volume publications, a table of contents shall be prepared for each volume.

3.1.5.2.5  List of figures. - A list of figures shall be prepared listing all figures, their titles and numbers.  In multi-volume publications, a list of figures shall be prepared for each volume.

3.1.5.2.6  List of tables. - A list of tables shall be prepared listing all tables, their titles and numbers.  In multi-volume publications, a list of tables shall be prepared for each volume.

3.1.6  General information. - General information shall consist of general data, a general description and detailed descriptions, as necessary to supplement data included in drawings and photographs.

3.1.6.1  General data. - General data shall consist of the following data for each component or unit:

    (a) Descriptive (name plate) data necessary to identify manufacturer, type, model and performance or design characteristics.
    (b) Principal overall dimensions.
    (c) Weight.
    (d) Allowable capacities, temperatures, pressures, settings, tolerances or other salient features as appropriate to the item shall be shown.

3.1.6.2  General description. - General description shall consist of a short general description of the equipment; explain briefly what it is, what it will do, and the general overall and interrelated operation of the various units.  All information of a general character applicable to the complete equipment shall also be given.  Where the text contains terms or symbols not commonly used, definitions or explanatory notes shall be included.

3.1.6.3  Detailed description. - Detailed description shall contain a complete detailed description of units and assemblies which comprise the complete equipment; for example: ship service turbo generator: the turbine, reduction gear, generator and exciter.

6

REPRODUCED AT THE NATIONAL ARCHIVES

MIL-M-15071D(SHIPS)

3.1.7 Installation. - Instructions, if necessary to supplement the installation drawings supplied (in accordance with Specification MIL-D-963), shall consist of methods of installation; including packing or unpacking, handling, preparation of foundation, alignment, precautions, mounting instructions, bolting diagrams, safety guards, grounding or bonding, clearances for access, ventilation, motion under shock, and methods of testing to assure satisfactory installation.

3.1.8 Principles of operation. - Figures, sketches, performance curves, and schematic wiring diagrams shall be included to the extent necessary to provide satisfactory operation, maintenance and repair. Operating sequences of automatic and semi-automatic equipment shall be indicated.

3.1.9 Operating instructions. - Information shall include routine and emergency procedures, and safety precautions; maximum and minimum loads; normal temperatures or pressure limits or both; transfer from manual to automatic operation (or the reverse), to be observed in the starting, operating, stopping, and shutting down of the equipment. In addition, action(s) which should be taken in the event of power failure; control air failure; lube-oil failure; partial failure of equipment; and similar conditions shall be described. Action(s) described in the event of partial failure shall include, where practicable, those procedures necessary to provide continued service of the equipment until time is available to repair the equipment. Where operating procedures are to be performed in specific sequence, step-by-step procedures shall be given. Operations shall be numbered in the order in which they are performed. Tables and charts shall be used for the presentation of these instructions where varying operating conditions are encountered.

3.1.10 Maintenance and repair. -

3.1.10.1 Preventive maintenance. - Instructions shall include all maintenance procedures, inspections, tests, and adjustments which should be performed periodically under shipboard conditions for the purpose of preventing failure or impairment of the equipment. A one page summary and time schedule for maintenance procedures, including a check-off table where appropriate, shall be provided. The summary sheet shall identify any items required by the Navy, as indicated at time of approval action, to be included in the ship's permanent history cards. Where necessary instructions shall include procedures for obtaining access to the sub-components for maintenance. Maintenance instructions shall include, where appropriate, but shall not be limited to the following:

7

REPRODUCED AT THE NATIONAL ARCHIVES

MIL-M-15071D(SHIPS)

(a) A tabulation of periodic, routine, mechanical, and electrical
tests and checks which should be accomplished regularly to
show that sub-components are operating properly and to
insure continuity of service at optimum performance.

(b) Table or charts, including "wear-limit" charts when appropriate,
to indicate what is to be done, when it is to be done based on
inspection, and how to do it.

(c) Utilization of the test facilities which may be incorporated in
the various components.

(d) Instructions for the care, inspection, and cleaning of all
pertinent parts.

(e) Instructions stressing the importance of properly maintaining
all safety devices and interlocks provided to prevent damage
to equipment or injury to personnel.

(f) Instructions on lubrication at shipboard operating temperatures
shall be provided as applicable, preferably in chart form.
They shall include information regarding lubrication recommended
by the manufacturer and the type of lubricant to be used. Lubri-
cants shall be described by symbol number, Federal stock
number, Military specification and industry standard numbers
where applicable and known.

(g) Instructions on in-place-balancing or other means of reducing
noise level if equipment specifications and shipboard application
require quiet operation.

3.1.10.2  Trouble shooting, overhaul and repair. - Instructions shall
include all information necessary to permit a technician to locate trouble,
and to make repairs, adjustments and conduct tests of each component,
assembly or sub-assembly of the equipment.  The following shall be included:

(a) Trouble shooting guides for the localization of faults giving possible
sources of trouble, the symptons, probable cause, and instructions
for remedying the faults.

(b) Complete instructions on signal tracing for electric circuits, use
of special test instruments and unusual servicing techniques.

(c) Ample figures and sectional views giving details of mechanical
assemblies, and simplified schematic diagrams of electrical,
mechanical, hydraulic and pneumatic circuits.  Figures contained
elsewhere in the manual may be used and referred to under this
heading without duplicating them.

8

REPRODUCED AT THE NATIONAL ARCHIVES

MIL-M-15071D(SHIPS)

3.1.11 Parts list. - The parts list shall include identification data covering all repair parts to facilitate ready identification of parts for replacement and ordering purposes. Standard hardware, structural parts, or other parts which have no maintenance significance shall not be listed.

3.1.12 Special tools. - A separate list of "special tools" which are supplied with the equipment shall immediately follow the parts tabulation; this list shall contain only tools that are peculiar to the equipment showing the quantity, unit of issue (each, pair, set), description, and manufacturer's identification number. A photograph or sketch showing each special tool as it is being used, shall be included in the manual.

3.1.13 Photographs and drawings. - As the preferred alternate to lengthy, detailed discussions, the manual shall make maximum use of shop photographs, with parts annotated for identification. Photographs may be half-tones or glossy prints. Manuals shall contain reproductions of drawings, additional block diagrams and schematic drawings as necessary to supplement the descriptive matter contained in the text. In every case, a drawing or photograph of the assembly shall be included. Diagrams of switches and relays used in the system showing the terminal numbering shall be inserted as additional drawings. Photographs and sketches shall be included wherever necessary for identification of the parts in the "parts list". Other figures shall be included to supplement or extend the information contained in the photographs and drawings as required for further identification of parts and explanation of the descriptive information contained in the text.

3.2 Format. -

3.2.1 Volumes. - Manuals shall be divided into volumes and by chapters or sections as necesary to provide ready handling and to present orderly instructions for operation and maintenance of the equipment, depending on the size and complexity of the manual.

3.2.2 Numbering. - Any section, chapter, page and paragraph numbering system which facilitates adequate indexing and rapid location of pertinent information is acceptable.

9

REPRODUCED AT THE NATIONAL ARCHIVES

MIL-M-15071D(SHIPS)

### 3.3 Text. -

3.3.1 Wording. - The text shall be factual, specific, concise, and clearly worded to be readily understandable by personnel involved in the operation, repair, overhaul and maintenance of the equipment, and to provide sufficient information for technicians to install, operate, service; and maintain the equipment at peak performance without the services of a manufacturer's representative. Technical phraseology requiring a specialized knowledge shall be avoided except where no other wording will convey the intended meaning, in which case the technical term shall be defined.

3.3.2 Level of writing. - As a general guide, the level of writing should be that for a high school graduate having specialized training as a technician through Navy training courses.

3.3.3 Figures. - Sectional views of assemblies, sub-assemblies and the component parts thereof shall be shown as necessary to supplement the text, photographs, and drawings and aid in the identification of parts. Identification of illustrated parts with listed parts shall be facilitated by the use of index (or piece) numbers and arrows which will identify assemblies, sub-assemblies and component parts thereof.

3.3.4 Indexing and referencing of figures. - Significant features or components of figures shall be identified by brief applicable nomenclature with arrows. Index (or piece) numbers may be used on figures when an extremely large amount of nomenclature is required.

3.3.5 Deleted figures. - When a change requires deletion of a figure without substitution of another, the following sentence shall be inserted "Figure _____ deleted" in or near the place of deletion.

3.3.6 Notes, cautions and warnings. - Notes, cautions and warnings should be used to emphasize important and critical instructions. The use should be as sparing as is consistent with real need. When used, notes, cautions and warnings should immediately precede the applicable instructions and shall be selected in accordance with the following definitions:

> (a) "NOTE" - An operating procedure, condition, etc., which it is essential to highlight.
>
> (b) "CAUTION" - Operating procedures, practices, etc., when if not strictly observed, will result in damage or destruction of equipment.
>
> (c) "WARNING" - Operating procedures, practices, etc., which will result in personal injury or loss of life if not correctly followed.

MIL-M-15071D(SHIPS)

3.4  Applicability of manuals. -

3.4.1  Identical. - When a class A manual covering a specific equipment or a class B manual which is already available, is applicable in its entirety to the equipment being procured, the applicability is to be extended to include the additional ships by the manufacturer issuing an approval and procurement record page.  Copies of the manual required for the ship(s) and local use may be requisitioned from stock by the cognizant Naval supervising activity.

3.4.2  Identical except for minor modifications. - When a class A manual covering a specific equipment or a class B manual is applicable to the equipment being procured except for minor differences, the manufacturer shall modify the manual to cover the differences by the issue of revised or supplementary pages.  All revisions to an existing manual shall be approved by the Bureau of Ships, shall require the assignment of a change number, assigned by the Bureau of Ships, and shall be issued by the manufacturer with an approval and procurement record page.

3.5  Revisions. - Revisions to manuals which have been previously distributed shall be prepared as follows:

> (a) New pages - New pages shall be issued when it is found necessary to include new information to augment the content of the original manual.
> (b) Revised pages - Revised pages shall be issued to make changes which apply uniformly to all equipments covered by the manual.
> (c) Supplementary pages - Supplementary pages shall be issued when necessary to provide alternate instructions applicable only to a portion of the total equipments covered by the manual because of minor modifications or minor differences in related components.

3.5.1  Legend for revisions. - All new, revised or supplementary pages shall include the words "new", "revised" or "supplementary", the date and a change number.

3.5.2  Submission for approval. - Four copies of each revision shall be submitted to the Bureau for approval and assignment of a change number.  The forwarding letter shall include the number of stock copies and the estimated delivery date of the final copies.

11

MIL-M-15071D(SHIPS)

3.6 <u>Production requirements</u>. - Detail materials, printing procedures and assembly for each manual shall be as approved at time of class A or B manual approval. An acceptable arrangement is set forth in the appendix of this specification. Alternate arrangements will be approved if equivalent performance is provided.

3.7 <u>Distribution requirements</u>. - Unless otherwise specified in the contract or order, distribution of all manuals not exactly identical to one previously procured and assigned a NAVSHIPS number shall be as follows:

(a) Two copies for each equipment shall be packed with the equipment when the equipment is shipped to stock.
(b) Two copies for each equipment shall be shipped separately to the cognizant Naval supervising activity marked for each ship on which the equipment is to be installed.
(c) Two copies to the Bureau of Ships.
(d) Three copies to the cognizant Supervisor of Shipbuilding when the equipment is to be installed by a private shipyard. (These copies are in addition to the copies for placement on board the ship.)
(e) Two copies to the Naval shipyard when the equipment is to be installed by that activity. (These copies are in addition to the copies for placement on board the ship.)
(f) One copy to each U.S. Naval Shipyard except Pearl Harbor and Portsmouth Naval Shipyard (total of nine).
(g) Two copies to Pearl Harbor Naval Shipyard (for submarine and surface ship equipment).
(h) Two copies to Portsmouth Naval Shipyard (for submarine equipment only).
(i) One copy to all active submarine tenders (submarine equipment only).
(j) One copy to Submarine Bases, New London and Pearl Harbor (submarine equipment only).
(k) Two copies to Commanding Officer, Ships Parts Control Center, Mechanicsburg, Penn.
(l) One copy to Naval Supply Centers, Norfolk and Oakland.
(m) One copy to Naval Supply Depot, Clearfield, Ogden, Utah.
(n) One copy to Forms and Publications Supply Office, Byron, Georgia.

12

REPRODUCED AT THE NATIONAL ARCHIVES

MIL-M-15071D(SHIPS)

(o) Manuals for stock shall be in the following quantities:

| Number of equipments | Number of copies |
| --- | --- |
| 1 to 25 | 25 |
| 26 to 99 | 50 |
| 100 and over | 100 |

These manuals shall be shipped to:
Receiving Officer, Naval Supply Depot, Mechanicsburg, Penn. Marked for COG I stock.

(p) Copies of approval and procurement record pages in accordance with paragraph 3.10.

3.8 Unless otherwise specified in the contract or order, (where manuals are not to be drawn from stock, see 3.4.1) distribution of all manuals exactly identical to ones previously approved shall be as follows:

(a) Two copies for each equipment shall be packed with the equipment when the equipment is shipped to stock.

(b) Two copies for each equipment shall be shipped separately to the cognizant Naval supervising activity marked for each ship on which the equipment is to be installed.

(c) Copies of approval and procurement record pages in accordance with 3.10.

3.9 Revisions. - Revision pages shall be distributed to all activities receiving the original manual, and in the same quantity.

3.10 Approval and procurement record page. - This page shall be included in all copies of the manuals and additional copies distributed as follows:

(a) Two copies to Bureau of Ships.

(b) One copy to Forms and Publications Supply Office, Byron, Georgia.

(c) One copy to Ships Parts Control Center, Mechanicsburg, Penn.

13

MIL-M-15071D(SHIPS)

3.11 Military Assistance Program Ships. - Unless otherwise specified in the contract or order, distribution of all final manuals for ships being constructed, reactivated, converted or otherwise readied for transfer under the Military Assistance Program (MAP) shall be as follows:

(a) Two copies for each equipment shall be shipped separately to the cognizant Naval supervising activity marked for each ship on which the equipment is to be installed.

(b) Six copies per equipment for each ship to be transferred under MAP to a foreign government. These copies shall be sent to the Military Assistance Advisory Group (MAAG) of the recipient country for delivery to the foreign government which is to receive the ships.

(c) One copy to the Washington, D. C. Naval Attache of the foreign government to receive the ships.

(d) Two copies to the Bureau of Ships.

(e) One copy to the cognizant Supervisor of Shipbuilding when the equipment is to be installed at a private yard.

(f) One copy to the Commanding Officer, U. S. Navy Forms and Publications Supply Office, Byron, Georgia.

(g) Twelve copies to Receiving Officer, U. S. Naval Supply Depot, Mechanicsburg, Penn., marked for COG I stock.

## 4. QUALITY ASSURANCE PROVISIONS

4.1 Contractor responsibility. - The supplier is responsible for the performance of all inspection requirements as specified herein. Except as otherwise specified, the supplier may utilize his own or any other inspection facilities and services acceptable to the Government. Inspection records of the examinations shall be kept complete and available to the Government as specified in the contract or order. The Government reserves the right to perform any of the inspections set forth in the specification where such inspections are deemed necessary to assure supplies and services conform to prescribed requirements.

4.2 Inspection. - Sample copies shall be inspected to determine compliance with the requirements of this specification and for equivalence with the approved (when applicable) sample or basic manual. (If any subsequent issue of manuals is not equivalent to or better than an approved class A manual, class A approval may be withdrawn.)

14

REPRODUCED AT THE NATIONAL ARCHIVES

MIL-M-15071D(SHIPS)

4.3 Content. - The content of the manual shall be checked against the equipment being furnished to assure that it depicts accurately and adequately the equipment and the operating and maintenance procedures required.   The NAVSHIPS number on the manual shall be checked for agreement with the NAVSHIPS number on the equipment identification plate where specified.

5.   PREPARATION FOR DELIVERY

5.1 Packaging and packing. -

5.1.1 Individual and multi-volume manuals. - Individual copies and multi-volume manuals shall be packed to preclude damage to material. Multi-volume manuals shall be furnished as complete sets.

5.1.2 Manuals shipped with equipment. - When two copies of the manual are packed with the equipment they shall be packed within the shipping container holding the main unit of equipment.   The manual(s) shall be so placed that they are readily accessible prior to removing the equipment and shall not be placed within the vaporproof barrier material used to enclose the equipment.   Manuals accompanying equipment shall be packaged in a waterproof container.   The invoice packing list or bill of lading shall include the NAVSHIPS number of the manual,  the quantity and shall indicate which container includes the manuals.

5.1.3 Bulk shipment. - Manuals shipped in bulk shall not be individually wrapped.   Containers shall comply with the Uniform Freight Classification Rules or other carrier regulations as applicable to the mode of transportation.

5.2 Marking. - On bulk shipments, interior packages and exterior shipping containers shall be marked with the following information for each item enclosed, except for shipment of an individual copy or an individual set of manuals:

> Box (number) of (number)  (to be listed on multiple container shipments)
> NAVSHIPS number          (manual number)
> Quantity                 (in package)

The words "FOR STOCK" shall be endorsed on the package or packages destined for stock, unless otherwise specified.  NAVSHIPS numbers shall be indicated on the shipping documents.  When a contract or order requires manuals having different NAVSHIPS manual numbers, the stock copies of each manual number shall be shipped separately.

15

REPRODUCED AT THE NATIONAL ARCHIVES

MIL-M-15071D(SHIPS)

6.  NOTES

6.1  <u>Ordering data.</u> - Equipment specifications and procurement documents shall specify the following:

(a) Title, number and date of this specification.
(b) Quantity of manuals or APR pages required, delivery date and delivery destinations (see 3.7 through 3.11 inclusive).

6.2  <u>Classes of manuals.</u> - The class of manual need not be specified in equipment specifications or procurement documents.  The intent is that the manufacturer shall supply class A manuals for any equipment for which he has received class A manual approval.  He shall supply class B manuals wherever he has not been granted class A approval.

6.3  <u>Use of term "Service Manual".</u> - Manuals to this issue of the specification are identified as "Service Manuals", instead of "Technical Manuals" since past use of the work "Technical" tended to denote a comprehensive, expensive, theoretical and engineering document whereas all that is necessary is a document that provides for satisfactory operation, maintenance and repair.

· 6.4  <u>Elimination of types.</u> - Previous issues of this specification have established different types for manuals.  Types have been eliminated from this issue.  The content and make-up of each manual should be tailor-made to delineate the particular operation and maintenance procedures required.

6.5  <u>Rights in data.</u> - Wherever unlimited rights in data are not obtained, the manual should eliminate all proprietary information if operation and maintenance suitability is not thereby reduced.  If proprietary information is required to be included and only limited rights in data are obtained, a restrictive clause per ASPR Section 9 should be included on the cover of each manual for ready identification.

16

REPRODUCED AT THE NATIONAL...

MIL-M-15071D(SHIPS)

Notice. - When Government drawings, specifications or other data are used for any purpose other than in connection with a definitely related Government procurement operation, the United States Government thereby incurs no responsibility nor any obligation whatsoever, and the fact that the Government may have formulated, furnished, or in any way supplied the said drawings, specifications, or other data is not to be regarded by implication or otherwise as in any manner licensing the holder or any other person or corporation, or conveying any rights or permission to manufacture, use, or sell any patented invention that may in any way be related thereto.

Preparing activity:
Navy - Ships
(Project 7610-N014Sh)

17

REPRODUCED AT THE NATIONAL ARCHIVES

MIL-M-15071D(SHIPS)

APPENDIX

### 10. SCOPE

10.1 This appendix covers the requirements for the production of service manuals.

### 20. REQUIREMENTS

20.1 Quality. - All manuals furnished will be subject to 35-mm microfilming. Letters, lines and symbols shall be of a uniform contrast throughout the documents. Blurred or smudged printing or drop out of characters or lines shall be cause for rejection of the publication. Characters shall be no smaller than 8 point type.

20.2 Typography. - Preferred typography is set forth in table I. When revisions are made to the basic manual, the typography shall conform as nearly as possible to the original manual.

Table I - Typography for 8-1/2 by 11 inch manual.

| Use | Type style and size | Capitalization | Leading | Spacing between units |
|---|---|---|---|---|
| Security classification A condensed | Gothic 14 pt.*¹ | Capitals | 6 pt. | |
| Chapter or section titles | Same type as text | Capitals | 6 pt. | 48 pt. Following marginal copy, text of illustration 18 pt. Preceding text or illustration |
| Primary side heads | Same type as text | Capitals | 2 pt. | 6 pt. Preceding or following text |
| Subordinate side heads | Same type as text | Capitals | 1 pt. | 6 pt. Preceding or following text |
| Figure and table titles | Same type as text | Capitals and lower case | 2 pt. | 6 pt. Following illustration |

*If 14 pt. is not available, next smaller size shall be permitted.

18

REPRODUCED AT THE NATIONAL ARCHIVES

MIL-M-15071D(SHIPS)

Table I - Typography for 8-1/2 by 11 inch manual. (cont'd)

| Use | Type style and size | Capitalization | Leading | Spacing between units |
|---|---|---|---|---|
| Notes and cautions | Same type as text | Capitals centered | ------ | 4 pt. Preceding and following text |
| Warnings | Same type as text | Capitals centered | ------ | 4 pt. Preceding and following text |
| Text, table of contents, list of illustrations etc. | Book face (roman) bold 10 pt. | Capitals and lower case | 1 pt. | 12 pt. Preceding illustration or following figure title 6 pt Preceding or following notes, cautions, warnings |
| Keys or legends | Book face (roman) italics 8 pt. | Capitals and lower case | 1 pt. | 6 pt. Preceding figure title or following illustration 12 pt. Preceding text |
| Parts breakdown listings | Book face (roman) 8 pt. | Capitals and lower case | 1 pt. | 6 pt. Preceding bottom rule or following headings |
| Footnotes | Book face (roman) bold 8 pt. | Capitals and lower case | 1 pt. | |

NOTES

1. It is not the intent of this appendix to qualify the methods or composing equipment to be used, but to specify results required.

2. Leading and spacing may be relaxed where circumstances require such alterations.

3. The above requirements are for type that will reproduce same size. When oversize pages are used, type shall reduce to approximately these sizes.

4. All type specified may be plus or minus 1 point, except that 8 point type shall be the minimum allowable size.

REPRODUCED AT THE NATIONAL...

MIL-M-15071D(SHIPS)

## NOTES TO TABLE I (cont'd)

5. The type faces listed below are the most preferred. They are available in linotype or can be closely matched on office composing machines.

<u>Book face (Roman)</u>
Garamond
Modern
Bookman
Tribune News
Times Roman
Antique
Baskerville
Century

6. Type sizes as indicated in the requirements were selected for conservation of space and legibility and should not be changed except:

    (a) When oversize pages are prepared.
    (b) When unusual copy fitting problems arise.

20.3 <u>Layout.</u> -

20.3.1 <u>Text pages.</u> - The preferred layout of 8-1/2 inches by 11 inches text pages is two columns 20 picas wide and 54 picas deep, making an overall page image size of 42 by 60 picas. The text and illustration areas shall conserve space without lessening clarity or legibility. Blanks and spaces shall be avoided, except on fold-ins, and the first major division of the manual (chapter or section) shall be a new odd page.

20.3.2 <u>Fold-ins.</u> - Fold-in pages shall be used only for diagrams, drawings or charts which cannot be reduced for satisfactory presentation on a single page, or when frequent reference is required from other pages of the book. Aprons are required. When fold-in pages are used, they should be held to a two-page fold-in whenever practicable and shall not exceed an overall length of 34 inches from the binding edge including the apron. The apron may contain information pertaining to the diagram, drawing or chart.

20

REPRODUCED AT THE NATIONAL ARCHIVES

MIL-M-15071D(SHIPS)

20.4 <u>Form-punching and drilling.</u> - Service manuals shall be prepared in looseleaf form unless otherwise specified or approved. Looseleaf publications and revisions shall be punched for looseleaf binding with three holes one-fourth inch in diameter and four and one-fourth inches center to center (for 8-1/2 by 11 inch pages) or with such other drilling or punching as specified. Punching of revision pages shall be the same as punching of the original manuals.

20.5 <u>Size.</u> - Suggested sizes for final trim of service manuals follow:

    4-3/8 by 6-3/4
    8-1/2 by 11

All dimensions are in inches.

20.6 <u>Paper stock.</u> -

20.6.1 <u>Text pages.</u> - Paper stock for text pages shall be as specified in 20.6.1.1 or 20.6.1.2.

20.6.1.1 <u>Lithography.</u> - Paper stock shall be white offset book free from unbleached or ground woodpulp and shall have a substance weight of not less than 100 pounds per 1,000 sheets, basis 17 by 22 inches.

20.6.1.2 <u>Letterpress.</u> - Paper stock shall be equivalent to white super-calendered book containing not to exceed 5 percent unbleached chemical wood or ground woodpulp, the remainder to be bleached chemical woodpulp, and shall have a substance weight of not less than 90 pounds per 1,000 sheets, basis 25 by 38 inches.

20.6.2 <u>Fold-ins.</u> - Paper stock for fold-in pages shall be equivalent to high wet strength lithographic map, free from unbleached or ground woodpulp, and shall have a substance weight of not less than 48 pounds per 1,000 sheets, basis 17 by 22 inches.

20.6.3 <u>Binders.</u> - Binders shall be of plastic or pressboard and shall accommodate looseleaf manuals punched or drilled as specified in 20.4 and shall facilitate insertion of replacement pages. Commercial type fasteners are to be used. Information to be included on the binders shall not be stamped with gold or any other metal foil. Binder colors for unclassified manuals shall be any color except yellow or red. Binders for confidential manuals shall be red. Binders for secret and top secret manuals shall be yellow.

REPRODUCED AT THE NATIONAL...

MIL-M-15071D(SHIPS)

NAVSHIPS 000-00
SECURITY CLASSIFICATION

VOLUME I OF III

NAV
SEC

NAV
SEC

NAV

# TITLE OF

# MANUAL

# (U)

GROUP CLASSIFICATION MARKING *(for classified manuals. See DD254)*

SECURITY CLASSIFICATION

22                     Figure 1 - Cover.

REPRODUCED AT THE NATIONAL...

NAVSHIPS 000-000
SECURITY CLASSIFICATION

MIL-M-15071D(SHIPS)
**VOLUME I OF III**

# TITLE OF

# MANUAL

# (U)

*WARNING:  This document contains information affecting the national defense of the United States within the meaning of the Espionage Laws, Title 18, U.S.C., Sections 793 and 794.  The transmission or the revelation of its contents in any manner to an unauthorized person is prohibited by law.*

SECURITY CLASSIFICATION

Figure 2 - Title page.

23

REPRODUCED AT THE NATIONAL ARCHIVES

MIL-M-15071D(SHIPS)

APPROVAL AND PROCUREMENT RECORD PAGE

APPROVAL DATA FOR:  NAVSHIPS
TITLE OF MANUAL:

APPROVAL AUTHORITY:

Approval Authority shall include the applicable letters
or correspondence granting approval in conformance with
approval procedures.

Remarks space shall be used for necessary comments and
the inclusion of information regarding the extension of
a manual by minor revisions.

| CONTRACT OR PURCHASE ORDER | SHIPS APPLICABLE | QUANTITY OF MANUALS | QUANTITY OF EQUIPMENT | BUILDING YARD |
|---|---|---|---|---|

Certification:  One of the following certification
paragraphs shall be typed in this space, as appropriate.

For original Class B manuals.

It is hereby certified that NAVSHIPS _____
is identical to the basic manual NAVSHIPS _____
approved by the approval data shown above except for the
detailed information required for the equipment provided
under contract or purchase order.

For Class A manuals covering specific equipments.

REMARKS:

It is hereby certified that NAVSHIPS _____
provided under contract or purchase order _____
has been approved by the approval data shown above
to be _____

For identical Class A manuals covering specific
equipment and Class B manuals.

It is hereby certified that the manuals to be
provided under contract or purchase order.
are exactly identical to NAVSHIPS _____ approved
by authority of approval data shown above.

For Class A manuals covering specific equipment and
Class B manuals which have been previously distributed
but required minor modification.

CERTIFICATION:                          DATE

It is hereby certified that the manuals to be
provided under contract or purchase order _____ approved
are exactly identical to NAVSHIPS _____ approved
by the approval data shown above except for the neces-
sary modification as shown in the above remarks space.

NOTE:  This page may be typed and reproduced by any
economical method and shall be included in _____
Class B manuals and copies of final manuals.

| MANUFACTURER'S SIGNATURE |
|---|
| MANUFACTURER'S NAME AND ADDRESS |
| FEDERAL CODE NUMBER (HOME OFFICE) |

CHANGE NO.

24

Figure 3   Approval and procurement record page

## SPECIFICATION ANALYSIS SHEET

### Instructions

This sheet is to be filled out by personnel either Government or contractor, involved in the use of the specification in procurement of products for ultimate use by the Bureau of Ships.

This sheet is provided for obtaining information on the use of this specification which will insure that suitable products can be procured with a minimum amount of delay and at the least cost.

Comments and the return of this form will be appreciated.

Fold on dotted lines on reverse side, staple in corner, and send to Bureau of Ships, Specifications and Standardization Branch, Washington 25, D.C.

| Specification | | |
|---|---|---|
| Organization | City | State |

Contract No.

| Quantity of Items Procured | Dollar Amount $ |
|---|---|

Material procured under a direct Government contract [    ] or a subcontract [    ]

1. Has any part of the specification created problems or required interpretation in procurement?
   a. Give paragraph number and wording

b. Recommendations for correcting the deficiencies

2. Comment on any specification requirement considered too rigid

3. Is the specification restrictive?    If the answer is "Yes", in what way?

   [    ] Yes    [    ] No

4. Remarks (Attach any pertinent data which may be of use in improving this specification. Place this form and papers in an envelope and send to the Bureau

| Submitted by (Print name and activity) | Date |
|---|---|

REPRODUCED AT THE NATIONAL ARCHIVES

Fold

------------------------------------------------------------------------

DEPARTMENT OF THE NAVY
BUREAU OF SHIPS
WASHINGTON 25, D. C.

OFFICIAL BUSINESS

POSTAGE AND FEES PAID
NAVY DEPARTMENT

CHIEF, BUREAU OF SHIPS
SPECIFICATIONS AND STANDARDIZATION BRANCH
DEPARTMENT OF THE NAVY
WASHINGTON 25, D.C.

------------------------------------------------------------------------

Fold

1  Dean A. Hanley, Esq.   (State Bar No. 169507)
   Deborah R. Rosenthal, Esq. (State Bar No. 184241)
2  PAUL AND HANLEY LLP
   1608 Fourth Street, Suite 300
3  Berkeley, California 94710
   Telephone:  (510) 559-9980
4  Facsimile:  (510) 559-9970
   dhanley@paulandhanley.com
5  drosenthal@paulandhanley.com

6  Attorneys for Plaintiffs

7

8

9              UNITED STATES DISTRICT COURT

10            NORTHERN DISTRICT OF CALIFORNIA

11               SAN FRANCISCO DIVISION

12  JERI REDMAN, individually and as          )  Case No.: 08-cv-03013-BZ
    successor-in-interest to RONALD REDMAN,   )
13  deceased; and JERI REDMAN, AMY            )  **EXHIBITS J THROUGH O TO THE**
    REDMAN, DAVID C. REDMAN, MARK             )  **DECLARATION OF DEBORAH R.**
14  REDMAN and PAUL REDMAN, as legal          )  **ROSENTHAL IN SUPPORT OF**
    heirs of RONALD REDMAN, deceased,         )  **PLAINTIFFS' MOTION FOR REMAND**
15                                            )  **AND FOR COSTS AND EXPENSES**
                                              )  **INCURRED AS A RESULT OF**
16          Plaintiffs,                       )  **REMOVAL**
                                              )
17  vs.                                       )  [28 U.S.C. § 1447(c); FRCP 7(b); ND CA Local Rules
                                              )  7-2, 7-4 & 7-5]
18  A.W. CHESTERTON, et al.,                  )
                                              )  Date:        September 5, 2008
19          Defendants.                       )  Time:        9:00 a.m.
                                              )  Courtroom:   2, 17th Floor
20  _____  )  Judge:       Jeffrey White

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

**EXHIBIT "J"**

POS-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address) | FOR COURT USE ONLY |
|---|---|
| PAUL AND HANLEY, LLP<br>1608 FOURTH STREET, #300<br>BERKELEY, CA 94710<br>TELEPHONE NO. 510-559-9980  FAX NO. (Optional)<br>E-MAIL ADDRESS (Optional)<br>ATTORNEY FOR (Name) PLAINTIFF | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN FRANCISCO
STREET ADDRESS 400 McALLISTER STREET
MAILING ADDRESS
CITY AND ZIP CODE SAN FRANCISCO, CA 94102
BRANCH NAME

| PLAINTIFF/PETITIONER: JERI REDMAN | CASE NUMBER |
|---|---|
| DEFENDANT/RESPONDENT: A. W. CHESTERTON COMPANY, et al. | 274617 |

| PROOF OF SERVICE OF SUMMONS | Ref No or File No |
|---|---|

*(Separate proof of service is required for each party served.)*

1. At the time of service I was at least 18 years of age and not a party to this action.

2. I served copies of:
   a. ☐ summons
   b. ☐ complaint
   c. ☐ Alternative Dispute Resolution (ADR) package
   d. ☐ Civil Case Cover Sheet *(served in complex cases only)*
   e. ☐ cross-complaint
   f. ☑ other *(specify documents):* SEE ATTACHMENT

3. a. Party served *(specify name of party as shown on documents served):*
      VIAD CORPORATION fka and as SII to DIAL CORPORATION and GRISCOM RUSSELL

   b. ☑ Person (other than the party in item 3a) served on behalf of an entity or as an authorized agent (and not a person under item 5b on whom substituted service was made) *(specify name and relationship to the party named in item 3a):*
      CT CORPORATION, AGENT FOR SERVICE - RECEIVED BY NANCY FLORES

4. Address where the party was served:
   818 WEST 7th STREET, 2nd FLOOR, LOS ANGELES, CA 90017

5. I served the party *(check proper box)*
   a. ☑ **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on *(date):* 5/23/2008     (2) at *(time):* 1:15 PM

   b. ☐ **by substituted service.** On *(date):*    at *(time):*    I left the documents listed in item 2 with or in the presence of *(name and title or relationship to person indicated in item 3):*

      (1) ☐ **(business)** a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served. I informed him or her of the general nature of the papers.

      (2) ☐ **(home)** a competent member of the household (at least 18 years of age) at the dwelling house or usual place of abode of the party. I informed him or her of the general nature of the papers.

      (3) ☐ **(physical address unknown)** a person at least 18 years of age apparently in charge at the usual mailing address of the person to be served, other than a United States Postal Service post office box. I informed him or her of the general nature of the papers

      (4) ☐ I thereafter mailed (by first-class, postage prepaid) copies of the documents to the person to be served at the place where the copies were left (Code Civ. Proc., § 415.20). I mailed the documents on *(date):*    from *(city):*    or ☐ a declaration of mailing is attached.

      (5) ☐ I attach a declaration of diligence stating actions taken first to attempt personal service.

Page 1 of 2

**PROOF OF SERVICE OF SUMMONS**

Code of Civil Procedure, § 417.10
American LegalNet, Inc.
www.FormsWorkflow.com

| PLAINTIFF/PETITIONER: JERI REDMAN | CASE NUMBER |
|---|---|
| DEFENDANT/RESPONDENT: A. W. CHESTERTON COMPANY, et al. | 274617 |

5. c. [ ] **by mail and acknowledgment of receipt of service.** I mailed the documents listed in item 2 to the party, to the address shown in item 4, by first-class mail, postage prepaid,

    (1) on *(date)*:                        (2) from *(city)*.

    (3) [ ] with two copies of the *Notice and Acknowledgment of Receipt* and a postage-paid return envelope addressed to me. *(Attach completed* Notice and Acknowledgement of Receipt*.) (Code Civ. Proc., § 415 30.)*

    (4) [ ] to an address outside California with return receipt requested. (Code Civ. Proc., § 415 40.)

  d. [ ] **by other means** *(specify means of service and authorizing code section):*

    [ ] Additional page describing service is attached.

6. The "Notice to the Person Served" (on the summons) was completed as follows:
  a. [ ] as an individual defendant.
  b. [ ] as the person sued under the fictitious name of *(specify)*:
  c. [ ] as occupant.
  d. [✓] On behalf of *(specify)*: VIAD CORPORATION fka and as SII to DIAL CORPORATION and GRISC
    under the following Code of Civil Procedure section:

| | |
|---|---|
| [✓] 416.10 (corporation) | [ ] 415.95 (business organization, form unknown) |
| [ ] 416.20 (defunct corporation) | [ ] 416.60 (minor) |
| [ ] 416.30 (joint stock company/association) | [ ] 416.70 (ward or conservatee) |
| [ ] 416.40 (association or partnership) | [ ] 416 90 (authorized person) |
| [ ] 416.50 (public entity) | [ ] 415.46 (occupant) |
| | [ ] other: |

7. **Person who served papers**
  a. Name: EDDY LANUZA
  b. Address: 525 CAMERON CREST DRIVE, DIAMOND BAR, CA 91765
  c. Telephone number: 714-854-7240
  d. The fee for service was: $ 45.00
  e. I am:
    (1) [✓] not a registered California process server.
    (2) [ ] exempt from registration under Business and Professions Code section 22350(b).
    (3) [ ] a registered California process server:
      (i) [ ] owner [ ] employee [ ] independent contractor.
      (ii) Registration No.:
      (iii) County:

8. [✓] I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

    or

9. [ ] I am a California sheriff or marshal and I certify that the foregoing is true and correct.

Date: 5/25/2008

EDDY LANUZA
  (NAME OF PERSON WHO SERVED PAPERS/SHERIFF OR MARSHAL)            ▶                      (SIGNATURE)

# ATTACHMENT TO PROOF OF SERVICE

1.   SUMMONS AND COMPLAINT

2.   CIVIL CASE COVER SHEET

3.   NOTICE OF CASE MANAGEMENT CONFERENCE

4.   ADR INFORMATION PACKAGE

5.   AMENDED GENERAL ORDER NO. 158

6.   PLAINTIFF'S RESPONSE TO DEFENDANT'S STANDARD REQUEST FOR PRODUCTION AND

     IDENTIFICATION OF DOCUMENTS AND THINGS

7.   PLAINTIFF'S RESPONSE TO DEFENDANT'S STANDARD INTERROGATORIES - SET ONE

8.   PLAINTIFF'S RESPONSE TO DEFENDANT'S STANDARD INTERROGATORIES - SET TWO

9.   PLAINTIFF'S RESPONSE TO DEFENDANTS' STANDARD INTERROGATORIES TO HEIR(S) AND OR

     LEGAL REPRESENTATIVE(S) OF DECEDENT – JERI LINDA REDMAN

10.  PLAINTIFF'S RESPONSE TO DEFENDANTS' STANDARD INTERROGATORIES TO HEIR(S) AND OR

     LEGAL REPRESENTATIVE(S) OF DECEDENT – DAVID C. REDMAN

11.  PLAINTIFF'S RESPONSE TO DEFENDANTS' STANDARD INTERROGATORIES TO HEIR(S) AND OR

     LEGAL REPRESENTATIVE(S) OF DECEDENT – AMY L. REDMAN

12.  PLAINTIFF'S RESPONSE TO DEFENDANTS' STANDARD INTERROGATORIES TO HEIR(S) AND OR

     LEGAL REPRESENTATIVE(S) OF DECEDENT – PAUL WILSON REDMAN

**EXHIBIT "K"**

# CHARTER ❖ DAVIS LLP

## TRIAL ATTORNEYS

1730 I Street, Suite 240
Sacramento, California 95814
Tel: (916) 448-9000
Fax: (916) 448-9009

June 2, 2008

*VIA FACSIMILE (510) 559-9970 AND U.S. MAIL*

Carlos J.E. Guzman
PAUL & HANLEY LLP
1608 Fourth Street Ste. 300
Berkeley, CA 94710

Re:    *Jeri Redman et. al. vs. AW Chesterton et. al.*
*San Francisco Superior Court No. CGC-08-274617*
*Our Client: VIAD CORP*

Dear Mr. Guzman:

Viad Corp is in receipt of the above captioned lawsuit. On behalf of Viad Corp, we offer the following:

First, we offer a waiver of costs in exchange for a dismissal. Alternatively, to the extent your office does not issue a dismissal, we ask that you please sign and return the enclosed stipulation agreeing to exclude any and all federal or other governmental job sites from this matter. To that end, please contact me within four (4) days if you have any questions regarding the stipulation. Please forward the executed stipulation to our office within seven (7) days from today.

To the extent our client is neither dismissed nor do we receive any executed stipulation, please be advised that our client intends to remove the above-referenced action to United States District Court, whereupon Viad Corp will then transfer the action to the MDL matter styled *In Re Asbestos Products Liability Litigation* (No. VI), MDL-875 (E.D. PA.).

Very truly yours,

CHARTER DAVIS, LLP

MIA S. ROSENFELD
WHITNEY A. DAVIS

1  WHITNEY A. DAVIS, SBN 149523
   MARIA S. ROSENFELD, SBN 186116
2  **CHARTER DAVIS, LLP**
   Attorneys at Law
3  1730 I Street, Suite 240
   Sacramento, CA 95814
4  Telephone:    (916) 448-9000
   Facsimile:    (916) 448-9009
5
   Attorneys for Defendant VIAD CORP,
6  individually and as alleged successor-in-interest to
   GRISCOM-RUSSELL COMPANY
7

8

           **SUPERIOR COURT OF THE STATE OF CALIFORNIA**
9
        **COUNTY OF SAN FRANCISCO – UNLIMITED JURISDICTION**
10

11  JERI REDMAN, individually and as          )   San Francisco County Superior Court
    successor-in-interest to RONALD           )   Case No. CGC-08-274617
12  REDMAN, deceased; and JERI REDMAN,        )
    AMY REDMAN, DAVID C. REDMAN,              )
13  MARK REDMAN and PAUL REDMAN,              )
    as legal heirs of RONALD REDMAN,          )
14  deceased                                  )
                                              )   **STIPULATION RE GOVERNMENT**
15                Plaintiffs,                 )   **SITES**
                                              )
16         v.                                 )
                                              )
17  A.W. CHESTERTON COMPANY et. al.           )
                                              )
18                                            )
                  Defendants.                 )
19

20       Plaintiffs JERI REDMAN, individually and as successor-in-interest to RONALD

21  REDMAN, deceased; and JERI REDMAN, AMY REDMAN, DAVID C. REDMAN, MARK

22  REDMAN and PAUL REDMAN, as legal heirs of RONALD REDMAN, deceased, and

23  Defendant VIAD CORP, individually and as alleged successor-in-interest to Griscom-Russell

24  Company (hereinafter "VIAD") hereby stipulate that:

25       WHEREAS, Plaintiffs filed their Complaint in this matter on April 16, 2008;

26       WHEREAS, Plaintiffs named defendant VIAD CORP. Individually and as alleged

27  Successor-in-Interest to Griscom-Russell Company;

28       NOW, THEREFORE, the parties stipulate that Plaintiffs' claims against Defendant

1  VIAD CORP, exclude claims for alleged asbestos exposure:

2      1. At any and all military, Navy, or other federal shipyards or governmental job sites;

3      2. At all Federal Enclaves;

4      3. Due to work performed upon any Navy or other U.S. Military vessel at privately

5  held shipyards, work performed at sea upon Navy tenders, or work performed on Navy

6  equipment on shore at a non-federal job-site;

7      4. Upon any vessel built for the Navy or the U.S. military wherever located;

8      5. From any equipment originally placed upon any vessel owned or formerly owned

9  by any branch of the U.S. military.

10

11  Dated:_____          PAUL & HANLEY LLP

12

13                      By: _____

14                          CARLOS J.E. GUZMAN
                            Attorneys for Plaintiffs

15

16  Dated: _____          CHARTER DAVIS, LLP

17

18                      By: _____

19                          WHITNEY A. DAVIS
                            MARIA S. ROSENFELD
20                          Attorneys for Defendant
                            VIAD CORP

21

22

23

24

25

26

27

28

2

STIPULATION RE: CONFIDENTIALIT...

**EXHIBIT "L"**



**Jerry Neil Paul**
**Dean A. Hanley**

David L. Amell
Gloria C. Amell
Robert L. Barrow
Carole M. Bosch
Langston M. Edwards
Benjamin D. Goldstein
Carlos J. Guzmán
Jason E. Hasley
Stephen J. Healy
Rohit S. Kodical
Young S. Lee
Selby Lighthill
J. Rae Lovko
Jennifer A. Maier
Kelly A. McMeekin
Jon R. Neumann
Donald R. Oder
Deborah R. Rosenthal
Carolin K. Shining
Mark A. Swanson
Joseph L. Urbanski
Wes W. Wagnon

*of counsel*
Anthony E. Vieira

# PAUL & HANLEY LLP

*Trial Lawyers for Injured Workers and Their Families.*

June 16, 2008

SENT VIA FACSIMILE ONLY

Mia Rosenfeld
Charter Davis LLP
1730 I Street, Suite 240
Sacramento, CA  95814

> Re:  *Jeri Redman, et. al. v. A.W. Chesterton Co., et. al.*
> San Francisco Superior Court Case No. 274617
> Your Client:  VIAD CORP. as S-I-I to Griscolm Russell

Dear Ms. Rosenfeld:

I write in response to your letter threatening removal of this case to federal court based on decedent's alleged exposure to VIAD products aboard Navy ships.

Plaintiffs' interrogatory responses, served on your client along with plaintiffs' summons and complaint, identify that decedent Ronald Redman was exposed to asbestos from Griscolm-Russell distilling plants aboard the USS John King, (See Plaintiff's Responses to Defendants' Standard Interrogatories – Set Two (Wrongful Death) at 99:14-16), the USS DuPont (233:10-11), the USS Ingraham (244:17-19), the USS Kearney (251:1-2), and the USS Reuben James (300:14-15).

Plaintiffs' investigation is ongoing; however, **at this time plaintiffs' allegations against Griscolm-Russell consist entirely of failure to warn theories of liability arising out of Ronald Redman's exposure to asbestos from Griscolm-Russell distilling plants, evaporators, and associated distilling plant pumps, including asbestos-containing gaskets, packing, and insulation from distilling plants and component parts.**

During the relevant time period, Griscolm-Russell widely sold marine distilling units, evaporators, and associated parts to private industry for commercial use. Accordingly, the products at issue are not specialized military equipment, a necessary prerequisite to application of the government contractor immunity defense set forth in *Boyle v. United Technologies Corp.* (1987) 487 U.S. 500.

In *Boyle*, the U.S. Supreme Court found that where a "'significant conflict' exists between an identifiable 'federal policy or interest and the [operation] of state law,'

**Northern California**

1608 Fourth Street, Suite 300
Berkeley, California 94710
Telephone: (510) 559-9980
Facsimile:  (510) 559-9970
www.PaulandHanley.com

**Southern California**

**Westlake Village**
Telephone: (818) 865-2807
Facsimile: (818) 865-0805

**Los Angeles**
Telephone: (213) 689-3278
Facsimile: (213) 689-4309

[citation] or the application of state law would 'frustrate specific objectives' of federal legislation," then the defendant that designed a product according to federal government specifications may invoke the government contractor defense. *Id.* At 507.

However, where the state-imposed duty of care that is the asserted basis of the contractor's liability does not significantly conflict with the duty imposed by government contract, the manufacturer has no basis for asserting the defense:

If, for example, the United States contracts for the purchase and installation of an air-conditioning unit, specifying the cooling capacity but not the precise manner of construction, a state law imposing upon the manufacturer of such units a duty of care to include a certain safety feature would not be a duty identical to anything promised the Government, but neither would it be contrary. The contractor could comply with both its contractual obligations and the state-prescribed duty of care. **No one suggests that state law would generally be pre-empted in this context.**

*Id.* at 509 (emphasis added).

Thus, where as here the product at issue that was sold to the U.S. Navy pursuant to contract also was sold commercially for private use, defendant can point to nothing contrary in the government contract that would pre-empt the manufacturer's duty under state law, and the manufacturer is not entitled to invoke the government contractor defense.

The Ninth Circuit Court of Appeals addressed this precise issue in *In Re Hawaii Federal Asbestos Cases* (1992) 960 F.2d 806. In that case, the Court of Appeals upheld the district court's rejection of the government contractor defense where, as here, the product at issue was an asbestos-containing product (in that case, insulation) that the manufacturer sold both commercially and to the military. The Court considered the rationale behind the military contractor defense—that contractors should be immunized for equipment they produce for the United States Navy because the Navy "makes highly complex and sensitive decisions regarding the development of new equipment for military usage [and a]llowing the contractors who are hired to manufacture that equipment to be sued for the injuries caused by it would impinge unduly on the military's decision making process" and discourage contractors from manufacturing equipment for the military." 960 F.2d at 811.

The Court went on to find that where a manufacturer makes the same products readily available on the commercial market, "[t]hese same concerns do not exist." *Id.* Thus:

We agree with the district court that the asbestos insulation alleged to have caused plaintiff's injuries does not represent military equipment entitling its manufacturers to the protection of the military contractor defense …

960 F.2d at 812.

In the pending matter, plaintiffs' claims against your client are limited to failure to warn. Furthermore, plaintiffs' claims against your client are limited to injuries arising out of decedent's

PAUL & HANLEY LLP
PAGE 3

work with and around marine distilling units that Griscolm-Russell sold not only to the U.S. Navy but also widely sold commercially.

Accordingly, you have no valid basis for removal at this time. If you remove the case without proper grounds, we will seek immediate remand pursuant to 28 USC § 1447(c), as well as fees and costs incurred as a result of your improvident removal.

Very truly yours,

Deborah R. Rosenthal

## Deborah R. Rosenthal (DRR)

| | |
|---|---|
| **From:** | Anne M. Scott (AMS) |
| **Sent:** | Thursday, June 26, 2008 9:39 AM |
| **To:** | Deborah R. Rosenthal (DRR) |
| **Subject:** | FW: Redman Ronald D.  - Attn: Mia Rosenfield |

Fax confirmation below.

---

**From:** System Administrator
**Sent:** Monday, June 16, 2008 1:29 PM
**To:** Anne M. Scott (AMS)
**Subject:** Delivered: Redman Ronald D. - Attn: Mia Rosenfield

Your message

| | |
|---|---|
| To: | 'CHARTER DAVIS LLP Sacramento@1-916-448-9009 /b=10267' |
| Subject: | Redman Ronald D.  - Attn: Mia Rosenfield |
| Sent: | 6/16/2008 1:25 PM |

was delivered to the following recipient(s):

'CHARTER DAVIS LLP Sacramento@1-916-448-9009 /b=10267' on 6/16/2008 1:26 PM

1

**<u>EXHIBIT "M"</u>**



Log

M 6F V66Y DW
UNIV-OF DETROIT
LIBRARY MCNICHOLS RD.
4001 W MCNICHOLS RD.
DETROIT 21 MICH

*BLH answers pertinent questions on the acquisition of Griscom-Russell and C. H. Wheeler*

# "We are now in the marine field with both feet—adding deck machinery, steering gear, distilling plants, condensers, heat exchangers and cranes to the BLH line."



*"BLH has the plant capacity to make this changeover with a minimum of delay."*

J. J. Bolton, manager of marine sales, Industrial Equipment Division, Baldwin-Lima-Hamilton Corp., discusses the recent acquisition of Griscom-Russell and C.H. Wheeler. He points up the company's new capabilities available to the marine field, answering questions on products, quality, services, delivery and prices.

**Q. Will BLH now make the same products as Griscom-Russell produced?**

**A.** Yes, but these products will now be manufactured and marketed by the Industrial Equipment Division of BLH, at Eddystone, Pa. We have the plant capacity to make this changeover with a minimum of delay, and every effort is being made to maintain good service to customers.

**Q. Will BLH also make the same basic products as C. H. Wheeler produced?**

**A.** Yes, BLH will independently produce products similar to those which were manufactured by C. H. Wheeler, including its American Engineering Division.

**Q. What are some of the products BLH will now produce for the marine field?**

**A.** A few of the major ones are distilling plants, steering gear, tele-



*"We certainly intend to be competitive in prices."*

**Q. Will BLH provide field service engineering and supervision?**

**A.** Absolutely. This is an essential BLH service in any field where it is required. Here again the former personnel of Griscom-Russell, C. H. Wheeler, American Engineering and our own experienced staff should make for even better field service.

**Q. Will BLH supply replacement and repair parts for existing vessels?**

**A.** Yes. We have on file all drawings and records of Griscom-Russell, C. H. Wheeler, and American Engineering marine equipment. Key personnel who handled this work at these companies are now at BLH.

**Q. Then it is true that BLH is now solidly in the marine field?**

**A.** Yes, with both feet!

motors, condensers, heat exchangers, pumps, capstans, winches, windlasses, hoists, cargo cranes and elevators . . . plus, of course, the BLH line of propellers and shafting.

**Q. Will these products be the same high quality as previously marketed?**

**A.** No question about it. Former customers can anticipate the same quality, features and custom-engineered advantages as before. Of course, there will be improvements because of the extended capabilities and modern facilities of BLH.

**Q. What about prices?**

**A.** We certainly intend to be com-

petitive. If anything, customers will get more for their money through product and service improvements. When you have the best engineering talent, machinery and equipment and combine them with modern, straight-flow production techniques, you are bound to come out better than with scattered facilities and limited production and engineering personnel.

**Q. How will BLH sell these new products?**

**A.** The experienced sales personnel are joining the established BLH sales force, both direct and representatives, now located throughout the nation. In effect, this means an expansion of sales offices in major cities to provide better customer service on all products.



*"Replacement parts and field service are available."*

# BALDWIN · LIMA · HAMILTON

## Industrial Equipment Division · Philadelphia 42, Pa.



SS African Comet
SS American Challenger
Barge Angela
SS California
HS Denison
MV Esso Pennsylvania

DECEMBER 1962 • 75¢ ...

# Marine Engineering Log

A SIMMONS-BOARDMAN TIME-SAVER PUBLICATION

SS Export Banner
MV L.A. City No. 4
SS Manhattan
NMS Aluminum 1202
MV Oliver C. Shearer
MV Orco
MV Patricia Moran
SS Philippine Bear
SS President Roosevelt
NS Savannah
MV Shelter Island
SS Washington Mail

UNIV. OF DETROIT
LIBRARY
4001 W MCNICHOLS RD.
DETROIT 21, MICH
60 1'01 VM



J. J. Bolton, Manager of Marine Sales
Industrial Equipment Division
Baldwin-Lima-Hamilton Corporation

**"We are now in the marine field with both feet.** Technical service is expanded along with our product line. We are prepared to meet your complete requirements in a far greater range of applications. Furthermore, we are maintaining our traditional quality standards while improving production efficiency . . . thus giving you more value per dollar."



BLH propellers



Steering gear



Winches



Windlasses



Griscom-Russell seawater distillation plants



Griscom-Russell heat exchangers

Cranes



Steam jet ejectors

Pumps



Hydrapilots®



Steam condensers

# BALDWIN · LIMA · HAMILTON



Industrial Equipment Division · Philadelphia 42, Pa.

52

- ▸ Integrated bridge control console
- ▸ Coming: Nuclear merchantman for Britain
- ▸ Another automated tanker for Japan
- ▸ CAB: High speed on captured air

*University of Detroit*

# Marine Engineering

INCORPORATING "RIVERS & HARBORS"

**Log**

## MV MALASPINA
### Superferry for State of Alaska

M N1V4 6D 176Y DM
UNIV. OF DETROIT
LIBRARY
4001 W MCNICHOLS RD.
DETROIT 21 MICH



Windlasses

Steering gear

Capstans

Cargo winches

Mooring winches

Steam jet ejectors

Steam condensers

Distilling units

Cargo cranes

Propellers

Oil heaters and coolers



## You're looking at
## 11 good reasons
## for relying on BLH



And there are more where they come from. In fact, no other company offers so broad a line of marine equipment. And with this extraordinary range come important engineering advances. Like our in-plane steam condenser. It permits lowering the ship's center of gravity, simplifies the structural foundation, saves valuable engine room space. It was designed by specialists alert to your needs.

Your aim is to ship cargo with maximum efficiency—turn to BLH today. And keep your eye on BLH tomorrow for new developments that are now on the drawing boards. BALDWIN-LIMA-HAMILTON, Industrial Equipment Division, Philadelphia 42, Pa.

# BALDWIN ■ LIMA ■ HAMILTON

New York · Schenectady · Philadelphia · Washington · Pittsburgh · Birmingham
Indianapolis · Chicago · St. Louis · Houston · Los Angeles · San Francisco



**EXHIBIT "N"**

# Naval Machinery

Part I
NAVAL BOILERS

Part II
NAVAL AUXILIARY MACHINERY

Part III
NAVAL RECIPROCATING ENGINES

Part IV
NAVAL TURBINES



THE UNITED STATES NAVAL INSTITUTE

ANNAPOLIS, MARYLAND

Copyright, 1935, 1937 and 1941

BY

U. S. Naval Institute

PRINTED IN THE UNITED STATES OF AMERICA

GEORGE BANTA PUBLISHING COMPANY, MENASHA, WISCONSIN

## PREFACE TO 1941 EDITION

*Naval Machinery*, 1941, consists of an extensive revision and rearrangement of the textbook of the same title which was published first in 1935 and reprinted with minor corrections in 1937.

The work of revision has been carried on, over a period of approximately two years, by officers attached to the Department of Marine Engineering.

T. J. KELEHER
*Captain, U. S. Navy,*
*Head of Department of Marine Engineering*

v

## ACKNOWLEDGMENTS

While the major work of revision of this text has been accomplished by officers attached to the Department of Marine Engineering, considerable assistance has been rendered by the following persons attached to the Bureau of Ships, Navy Department:

1. Mr. Howard J. Ball, through valuable advice and by assistance on technical points covered in "Naval Turbines," and for assistance in procuring illustrations of modern turbine equipment.
2. Commander T. J. Bay, U.S.N., whose paper on "Feed Systems for Naval Vessels" forms the basis of the description of modern feed systems, presented in Chapter IX of "Naval Boilers."
3. Commander E. P. Kransfelder, U.S.N., through help in revision of "Naval Boilers," and in procuring illustrations for that part of the book.

Acknowledgment is also made of descriptions and illustrations furnished by the following manufacturers:

American Engineering Co.
Babcock and Wilcox Corp.
Bailey Meter Co.
Bethlehem Ship Building Corp.
Brown Instrument Co.
Buffalo Meter Co.
Cochrane Corp.
Consolidated Ashcroft Hancock Co., Inc.
DeLaval Separator Co.
DeLaval Steam Turbine Corp.
Ford-Siemens Co.
Foster Wheeler Corp.
Frick Co.
Frigidaire Corp.
General Electric Corp.
Gould Pump Co.
Griscom Russell Co.
Grove Regulator Co.
Hays Corp.
Johns-Manville Corp.
Kinetic Chemicals, Inc.
Kingsbury Machine Works
Kinney Manufacturing Corp.

Leslie Co.
Northern Pump Co.
Permutit Corp.
Pneumercator Corp.
Quimby Pump Co.
Reading Steel Casting Co.
Sarco Co.
Schutte & Koerting Co.
Sharples Specialty Co.
Sperry Gyroscope Co.
Strong Carlisle & Hammond Co.
B. F. Sturtevant Co.
Swager Combustion Indicator Co.
Taylor Instrument Co.
Terry Turbine Corp.
Texaco Co.
Walworth Corp.
Waterbury Tool Co.
Westinghouse Electric and Manufacturing Corp.
C. H. Wheeler Corp.
Worthington Pump & Machinery Corp.
York Ice Machinery Corp.

# INTRODUCTION

An engineering plant is an assembly of a number of machines of various types which may be classified broadly as driving units and driven units. Machines of the first classification are steam turbines and reciprocating engines, electric motors, and internal-combustion engines, while the second classification includes such units as pumps, compressors, and electric generators. In addition to these two main groups, the plant must have also a number of supplementary devices whose functions are, generally speaking, auxiliary to those of the principal machinery units.

As the primary source of all power is heat, which may be converted into useful work by various means, so the primary source of energy in an engineering plant is the fuel, which, by being burned, is made to give up its stored heat energy, and this, in turn, is converted into mechanical energy or work. In a steam plant, the conversion of the heat energy of the fuel to a form which can be utilized in machines is accomplished by means of steam generating units, commonly called boilers. The steam produced by the boiler serves merely as a vehicle or carrier of the heat energy of the fuel to the engine.

Since the subject matter of this text has to do only with steam engineering plants, no mention will be made, herein, of internal-combustion engines or electric generators and motors, although it should be noted that they are also machines for the transformation of heat energy into work.

The steam engineering plant consists, then, of the following major groups of units:

(1) Boilers, for releasing the stored heat energy of fuel and making this energy available for conversion to mechanical energy by means of the carrier, steam;

(2) Prime movers, or driving units, turbines and reciprocating engines, which convert the heat energy carried by the steam to mechanical energy, which is utilized for the performance of work;

(3) Driven units, which perform work in various ways, as, for example, by propelling vessels, pumping liquids, compressing air and generating electricity;

(4) Miscellaneous heat-transfer apparatus, whose functions are, in general, supplementary to those of the machinery with which they are associated.

To these may be added, as a fifth group, the various piping systems through which are carried, to the appropriate parts of the plant, the different fluids required for its operation, such as steam, fresh and salt water, fuel and lubricating oils, compressed air, and refrigerating fluids.

These piping systems will be discussed, in this text, under the general heading of "Auxiliaries," since their functions are to serve the machinery with which they are connected.

It is the purpose of this book to familiarize the student with the general types of machinery installed in vessels of the U. S. Navy, placing major emphasis on construction and discussing only briefly the fundamental principles of operation. The complete theory of operation is left, thus, for treatment in the later course in Thermodynamics. It should be recognized that this text is only general in scope, and that no attempt is made to describe every type of machinery which is found on naval vessels. For more detailed descriptions, and for complete information on operation and maintenance of naval machinery, the student is referred to the working drawings and instruction books of individual ships, and to the U. S. Navy *Manual of Engineering Instructions*. This more advanced study will be facilitated, however, by a thorough familiarity with basic types and fundamental principles which can be gained from this book.

# CONTENTS

## PART I, NAVAL BOILERS

| CHAPTER | | PAGE |
|---|---|---|
| I. | Elementary Principles | 3 |
| II. | Descriptive Classification | 17 |
| III. | Limitations on Boiler Capacity | 24 |
| IV. | Header Type Water-Tube Boilers | 31 |
| V. | Three-Drum Express Boilers | 40 |
| VI. | Superheat and Superheat Control | 69 |
| VII. | Forced Circulation Boilers | 78 |
| VIII. | Boiler Fittings | 85 |
| IX. | Feed Water and Feed Water Systems | 104 |
| X. | Fuel Oil and Fuel Oil Systems | 123 |
| | Index | 147 |

## PART II, NAVAL AUXILIARY MACHINERY

| CHAPTER | | PAGE |
|---|---|---|
| I. | Blowers | 3 |
| II. | Piping, Flanges, Joints, Packing and Valves | 15 |
| III. | Heat Insulation | 46 |
| IV. | Pumps | 57 |
| V. | Heat Exchanger Equipment | 86 |
| VI. | Distilling Plants | 97 |
| VII. | Refrigeration | 105 |
| VIII. | Compressed Air Systems | 114 |
| IX. | Lubricating Oil Purifiers | 120 |
| X. | Auxiliary Machinery Outside the Engineering Spaces | 127 |
| XI. | Instruments | 148 |
| XII. | Fire-Fighting Equipment | 168 |

## PART III, NAVAL RECIPROCATING ENGINES

| CHAPTER | | PAGE |
|---|---|---|
| I. | Function and Operation of the Slide Valve | 3 |
| II. | Valve Gear and Reversing Arrangements | 16 |
| III. | The Indicator Diagram | 25 |
| IV. | Multiple-Expansion Engines | 44 |
| V. | Cylinders and Pistons—Details and Attachments | 59 |
| VI. | Crosshead, Connecting Rod, Crankshaft | 76 |

## PART IV, NAVAL TURBINES

| CHAPTER | | PAGE |
|---|---|---|
| I. | Elementary Principles | 3 |
| II. | Descriptive Classification | 14 |
| III. | Details of Construction | 42 |
| IV. | Turbine Accessories | 76 |
| V. | Measurement and Adjustments | 102 |
| VI. | Cruising Arrangements | 118 |
| VII. | Auxiliary Turbines | 122 |
| VIII. | Control Apparatus | 131 |
| IX. | Lubrication | 154 |
| X. | Condensing Systems | 165 |

xi

# PART II
## NAVAL AUXILIARY MACHINERY

CHAPTER                                                                     PAGE

I. Blowers.................................................................    3

II. Piping, Flanges, Joints, Packing and Valves.......................   15

III. Heat Insulation..................................................   46

IV. Pumps.............................................................   57

V. Heat Exchanger Equipment......................................   86

VI. Distilling Plants.................................................   97

VII. Refrigeration....................................................  105

VIII. Compressed Air Systems........................................  114

IX. Lubricating Oil Purifiers........................................  120

X. Auxiliary Machinery Outside the Engineering Spaces...............  127

XI. Instruments......................................................  148

XII. Fire Fighting Equipment........................................  168

# CHAPTER VI

## DISTILLING PLANTS

### 6-1. GENERAL

An evaporator is a heat exchanger designed to evaporate sea water by the transfer of heat from steam. The resulting vapor when condensed in the distilling condensers furnishes the fresh water for boiler feed and for general ship's use.

Not only are distilling plants a necessity for naval vessels, to make them independent of outside sources of fresh water so that they may be self-sustaining for long periods under war conditions; but they also produce water that is far superior for feed purposes to water that is obtained ashore, resulting in an increase of reliability and prolongation of the life of the entire engineering plant.

### 6-2. HIGH-PRESSURE DISTILLING PLANT

Up to 1920 the type of distilling plant in general use throughout the service was the high-pressure type, in which the steam was taken direct from the boilers and reduced to various working pressures up to as high as 150 pounds. Great trouble was experienced in the evaporators of these plants with the formation of scale upon the tubes, and it became necessary to raise the steam pressure day by day until, to get the capacity of the plant, the limiting pressure on the coil was reached. At this point the plant had to be shut down, the coils pulled out and the scale removed from the tubes. This scale was very difficult to remove, so that the operation of scaling was very tedious and frequently resulted in injury to the tubes.

The *Manual of Engineering Instructions* is an excellent source for detailed, practical operating instructions for any type of distilling plant. The student of marine evaporating systems, however, should approach the subject of distilling from its thermodynamic aspect, rather than to attempt to memorize the intimate details of any or all plants, in order later to handle properly and to evaluate this information. In this chapter there will be presented certain fundamental thermodynamic conceptions which must be understood, and brief descriptions of the constructional features of type plants.

When considering operation or alteration in operation, the following facts must be kept in mind:

(1) The rate at which water will be evaporated depends upon the rate at which heat is transferred to it.

(2) The rate at which heat will be transferred to the water depends upon:
    (a) the temperature difference between the substance giving up and that receiving heat;
    (b) the available surface area through which the heat may flow;
    (c) the coefficient of heat transmission.

(3) The distilling plant is a very important heat consuming unit of an engineering plant and, therefore, warrants intelligent investigation as to how the heat units absorbed in it are distributed.

(4) The low-pressure, multiple-effect plant has been proved most advantageous, thermodynamically, economically, and practically.

## 6-3. LOW-PRESSURE MULTIPLE-EFFECT SYSTEM—GENERAL

In 1920 the low-pressure vacuum distilling plant was developed, and all vessels built since that time are equipped with this type of distilling plant. It is called the low-pressure type, because the primary effects operate under a low pressure and the later effects under progressively lower pressures. In it the primary heating agent, instead of being high-pressure steam from the boilers, is auxiliary exhaust steam which has already given up a great deal of its heat in the work it has done in various auxiliary machinery, such as the pumps, blowers, and other units. If this steam were sent to the condenser, its heat units would be lost. By sending it to the evaporators, fresh water is obtained by the utilization of heat units which in the old high-pressure distilling plants were lost. The advantages of the low-pressure system are:

(1) No demand is made upon the boiler for high-pressure steam.

(2) The low pressures and temperatures characteristic of this plant prevent the precipitation of the various solids in sea water. In this connection, it might be mentioned that the most harmful of these is the sulphate deposit which precipitates at about 245°F., a temperature not readily attained in a well-operated plant. Below 245°F., only carbonate scale is formed, and the amount of this decreases rapidly with decrease in temperature. It is obvious, therefore, that this increases the efficiency of heat transfer and the time between successive overhaul periods.

(3) The fittings, flanges, and joints are less expensive, easier to make, and not so difficult to maintain.

(4) The temperature range permits the plant to be designed for triple- or quadruple-effect operation, whereas high-pressure plants were seldom designed for more than double-effect operation.

(5) The over-all cost of maintenance and operation is decidedly less than that of the high-pressure plant.

The low-pressure system has one disadvantage in that, when distilling water in contaminated areas, such as closed harbors, the temperatures existing in the evaporators are not sufficiently high to kill any bacteria

which may be present in the water, with the result that the distilled water is not fit for drinking purposes.

## 6-4. LOW-PRESSURE MULTIPLE-EFFECT SYSTEM—OPERATION

A type plan of a low-pressure vacuum distilling plant is shown in Fig. 81. The description which follows should give the student a knowledge of the general principles of any installation. This plan will naturally vary from that of many ships; but, in general, the principles emphasized and the features described apply to all plants, with minor variations.

(a) **Steam system.** The auxiliary exhaust for the operation of the plant is led into the coil of the first effect evaporator. Here the steam gives up heat to the brine surrounding the tubes, and condenses. This condensate is quite hot, being nearly at the temperature of the entering steam. The heat in this condensate would be lost if it were returned direct to the condensers and would overheat the feed tanks if led direct to them. To take out all possible heat in the condensate, it is run through the coil drain feed heater through which the salt water feed for the evaporators is passed also. In order to use a feed heater with this condensate and also to prevent the steam from blowing through the coil before it has given up its latent heat, a trap called the tube nest drain regulator is put in the line to the condensers beyond the feed heater. This regulator, by means of a ball float mechanism, maintains a water seal on the first effect tube nest. From the tube nest drain regulator the condensate returns to the feed tank, either directly or via the main or auxiliary condenser, and is used over again in the boilers.

(b) **Vapor and fresh water system.** Steam made by the evaporation of salt water is referred to as vapor to differentiate it from the primary heating steam. This vapor upon disengaging itself from the salt water is apt to carry over small drops of brine, particularly if the rate of ebullition is high or if the ship is rolling or pitching badly. For this reason a system of baffling is installed within the evaporators to minimize this tendency to prime. Next the vapor passes through a vapor separator where any remaining drops of brine are removed and drain back to the shell from which they have come. The first effect vapor after passing through the vapor separator passes through the vapor feed-water heater, where part of the vapor is condensed, giving up its latent heat to the feed water passing through the water side of the heater. The remaining vapor and condensate pass together into the second effect coil where the vapor is condensed, giving up its latent heat to the water in the second effect shell. The condensate from the second effect coil passes through a tube nest drain regulator to the third effect coil where it gives up some of its remaining heat.

The second effect vapor passes through a separator and vapor feed-water heater to the third effect coil, where it is condensed, giving up its



LOW PRESSURE-VACUUM SYSTEM
DISTILLING PLANT
(TYPE PLAN-1 UNIT-TRIPLE EFFECT)

SALT WATER
BRINE
AUXILIARY EXHAUST
COIL DRAIN-1ST EFFECT
VAPOR
COIL DRAINS-2ND & 3RD EFFECTS
FRESH WATER

FIG. 81. Type plan, one-unit, triple effect low-pressure distilling plant.

heat to vaporize the water in the shell. Its condensate passes through a tube nest drain regulator and goes to the distilling condenser.

The third effect vapor passes through a separator and then goes to the distilling condenser.

The fresh water from the distilling condenser goes to a condensate cooler, the function of which is to cool the condensate so that it will not have a tendency to flash into vapor when the air pump applies a suction. The condensate is drawn from the condensate cooler by the air pump which discharges to the test tank, from which it is pumped by the fresh water pump to the reserve feed bottoms, the ship's tanks, or to the bilges in case the water is of too high salinity to be used for either boiler feed or general ship's service. The function of the air pump is not only to draw the condensate from the condensate cooler, but also to create a vacuum (i.e., a pressure below atmospheric) in the shells of all three effects and in the second and third effect coils. These low pressures result in correspondingly low temperatures (see paragraph 6-3 (2) above).

(c) **Salt water system.** Circulating water for the distilling condenser is taken from the sea by the distilling condenser circulating pump, sent to the distilling condenser and discharged overboard. Inside of the overboard discharge, connection is taken off the discharge line from the distilling condenser, and, through this line, salt water at a higher temperature than raw sea water is obtained for evaporator feed. A regulating valve is fitted on the overboard discharge so that the temperature of the feed may be kept as high as possible. (The latest distilling condensers are fitted with extra passes to heat that portion of the circulating water which is to be used for evaporator feed to approximately the temperature of the vapor from the last effect evaporator. These extra passes constitute the inner heater.) From the distiller the feed is taken by the evaporator feed pump. On its way to the first effect shell the feed water passes through the second effect vapor feed heater, then through the first effect vapor feed heater, then the first effect coil drain feed heater.

At first glance, the use of vapor feed-water heaters would seem to be a case of lifting oneself by one's boot straps. The gain obtained comes through the heating of the water in the first effect shell to a higher temperature than it would otherwise have, and at the same time lowering the vapor temperatures within the coils of the subsequent effects. By these two results a better distribution of heat transfer throughout the three effects is obtained, with the first effect doing the most work, the second effect less work and the third effect the least. An over-all gain in capacity of around 17 per cent is obtained by the use of vapor feed-water heaters. Also, by reducing the load on the third effect, the purity of the water is much improved. This is due to reducing the velocity of the vapor from the third effect shell to the distilling condenser, and so reducing the

tendency of the vapor to pick up the highly concentrated brine of the third effect and carry it over unevaporated.

After going through the heaters, the feed passes to the shell of the first effect evaporator. After being partially evaporated within the first effect shell the salinity of the sea water is increased. It will henceforth be referred to as brine. From the bottom of the first effect shell the brine flows in series through the shells of the second and third effects and is discharged overboard by the brine overboard pump at a salinity of 1.5/32 (1.5 times normal salinity of sea water).

(d) **Air venting system.** Unless means were provided for the escape of air entrained with the auxiliary exhaust, it would be trapped in the first effect coil by the water seal maintained by the tube nest drain regulator. Similarly, air entrained with the salt water feed would be trapped in the coils of the second and third effects. Thus, if no system were provided by which to vent the air, the pressures would build up gradually within all coils and by backing up would build up also within all shells and the plant would become "air bound." This condition would prohibit the proper flow of steam and vapor and at the same time raise the temperatures of evaporation within the several effects. This would result in a marked decrease in the efficiency of the plant. To rid the several effects of air, vents are installed on the coils of all evaporators, by which the air is led to the distilling condenser by a common vent line.

## 6-5. LOW-PRESSURE MULTIPLE-EFFECT SYSTEM—GENERAL CONSTRUCTION

The distilling plant auxiliaries of the latest installations are all motor driven. The distilling condenser circulating, brine, feed, and fresh water pumps are single-stage centrifugal pumps directly connected to motors.

**Brine pumps** are installed as far below the level of the evaporators as practicable, in order that the head of brine within the suction line will help offset the effect of the vacuum within the last effect shell, and thus lessen the load on the pumps.

**The air pumps** are reciprocating and are connected to the motors by spur or worm gearing.

**The distilling condensers** are two-pass horizontal-shell condensers, built along the same lines as main and auxiliary condensers, except for the inner heater mentioned above. The salt water heads of the distilling condensers and of the inner heater are fitted with vent connections to the bilges to keep the distillers from becoming air bound.

**The air separating and test tank** is fitted with a ball float and electric switch control for regulation of the fresh water pump.

**Shell and coil water gauge glasses** are fitted with air cocks at the top and drain cocks at the bottom, so that the water in the individual coils or shells may be drawn off for test.

DISTILLING PLANTS          **103**

**Vapor separators** are constructed with a vertical hooked baffle arrangement whereby the drops of brine which may be carried over with the vapor are caught by the small hooks when making the right angle turns. The brine drains to the bottom and thence back to the shell from which it came.

**Electrically operated salinity indicators** are fitted on the fresh water lines and on the brine discharge line, giving instantaneous readings of the salinity of the fresh water or of the brine. Connections are made from the salinity indicators to automatic signal lights. In the case of the fresh water indicator the usual settings for various numbers of grains of chlorine per gallon are as follows:

   (a) White light, 0 to 0.3 (fit for boiler feed);

   (b) Green light, 0.3 to 5.0 (fit for ship's service, unfit for boiler feed);

   (c) Red light, over 5.0 (unfit for any use).

**6-6. TYPES AND CONSTRUCTIONAL FEATURES OF EVAPORATORS**

   (a) **Types.** Shipboard evaporator installations are subject to steady alteration in design, assembly, and their manner of operation. Nevertheless they may be grouped in two general classes:

   (1) **Submerged tube type** in which tubes or coils carrying steam are immersed in the feed.

   (2) **Film type** in which tubes or coils carrying steam are sprayed with the feed.

Figure 82 illustrates the design features of the submerged tube type. The film type will not be shown, as principal differences in the types may be grasped readily once the features of the former are mastered. It should be borne in mind that in either type the feed is pumped successively to units operating in a declining temperature and pressure range. In the film type, "flash" evaporation is obtained as the feed is sprayed over the hot tubes. Part of each individual drop of the feed, upon striking the hot tubes, flashes into vapor and the remainder of the drop washes the resulting salt to the bottom of the shell. Thus, there is a tendency for the tubes to keep themselves relatively free from scale and to promote plant efficiency.

   (b) **Features of construction.** All parts are of composition or copper.

   (1) **Tube nest.** The tube nest consists of an upper set of horizontal vapor tubes and a lower set of inclined drain tubes, expanded into the front and rear tube sheets. They are of special composition to withstand the corrosive action of the brine. The rear steam head is secured by stud bolts to the rear tube sheet and is free to move back and forth with expansion and contraction of the tubes; in other words, it is "floating." The front tube sheet is bolted by means of stud bolts to a ring which is cast integral with the front head of the evaporator. By removing these stud

bolt nuts the tube nest may be hauled out for inspection, after first removing the front steam head.

(2) **Baffling.** An elaborate system of baffling is fitted in this design, to limit the tendency to prime with high rates of ebullition and when the ship is rolling and pitching badly. Baffles are fitted with drain pipes as shown.

(3) **Internal feed pipe.** An internal feed pipe, closed at one end and perforated on the lower side, is fitted to distribute the salt water feed evenly.

(4) **Vents.** In the rear steam head there is fitted a horizontal pipe closed at both ends and perforated with small holes. Connection is made from this pipe to the front by a pipe (shown in Fig. 82 by a center line) led through the tube nest and connecting at the front to the vent line. A vent connection is also made at the front head to a similar perforated tube.

In order to conserve space the first effect and second effect vapor feed-water heaters are installed on top of the steam heads of the second and third effects, respectively.

Sheet asbestos gaskets are fitted to flanged joints between both evaporator heads, both steam heads, and where the front tube sheet is bolted to the ring.

This type of evaporator is operated in two double-effect units in light cruiser distilling plants and two triple-effect units aboard battleships.

**EXHIBIT "O"**

1  Dean A. Hanley, Esq.  (State Bar No. 169507)
   Deborah R. Rosenthal, Esq.  (State Bar No. 184241)
2  PAUL & HANLEY LLP
   1608 Fourth Street, Suite 300
3  Berkeley, California 94710
   Telephone:  (510) 559-9980
4  Facsimile:  (510) 559-9970
   dhanley@paulandhanley.com
5  drosenthal@paulandhanley.com

6  Attorneys for Plaintiff(s)

7

8

9                    UNITED STATES DISTRICT COURT

10                 NORTHERN DISTRICT OF CALIFORNIA

11                    SAN FRANCISCO DIVISION

12

13  JERI REDMAN, individually and as        )  Case No.:  08-cv-03013-BZ
    successor-in-interest to RONALD REDMAN, )
14  deceased; and JERI REDMAN, AMY          )  **DECLARATION OF DEAN A. HANLEY**
    REDMAN, DAVID C. REDMAN, MARK           )  **IN SUPPORT OF PLAINTIFFS' MOTION**
15                                          )  **FOR REMAND AND FOR COSTS AND**
    REDMAN and PAUL REDMAN, as legal        )  **EXPENSES INCURRED AS A RESULT**
16  heirs of RONALD REDMAN, deceased,       )  **OF REMOVAL**
                                            )
17          Plaintiffs,                     )
                                            )
18  vs.                                     )
                                            )
19  A.W. CHESTERTON, et al.,                )
                                            )  Date:        September 5, 2008
20          Defendants.                     )  Time:        9:00 a.m.
                                            )  Courtroom:   2, 17th Floor
21                                          )  Judge:       Jeffrey White
                                            )
22

23       I, Dean A. Hanley, declare as follows:

24       1.  I am an attorney admitted to practice law before the United States District Court for

25  the Northern District of California and all the courts of the State of California and am a partner in

26  the firm of Paul & Hanley LLP, counsel of record for plaintiffs.  The matters stated herein are

27

28

1    true to my own personal knowledge unless specifically stated otherwise.  If called upon as a

2    witness, I could and would testify to the following facts.

3          2.   I was admitted to practice law in 1993.  My professional practice since that time

4    primarily has involved handling asbestos personal injury and wrongful death cases in California.

5    I have participated in asbestos litigation in many jurisdictions throughout California and the

6    United States and have been either the primary attorney or supervising attorney in several

7    hundred asbestos cases litigated in California courts.

8          3.   In addition to being personally familiar with the facts and pleadings in this case, I am

9    familiar, upon information and belief, with the communications between attorneys in this office

10   and counsel for defendant VIAD CORPORATION leading up to VIAD's removal of this case to

11   federal court on June 17, 2008.

12         4.   I spent approximately .4 hours on June 4, 2008; .5 hours on June 20, 2008; and .8

13   hours on June 25, 2008, reviewing the records and files pertaining to the state court action,

14   discussing the legal and factual aspects of the removal and remand motions with my colleagues,

15   and reviewing and executing the Declaration of Dean A. Hanley In Support of Plaintiffs' Motion

16   for Remand and exhibits attached thereto.

17         5.   My hourly rate is $650 per hour.

18         I declare under the penalty of perjury under the laws of the State of California and of the

19   United States of America that the foregoing is true and correct.  Executed on July 3, 2008, in

20   Berkeley, California.

21   _____
     Dean A. Hanley

22

23

24

25

26

27

28

---

**DECLARATION OF DEAN A. HANLEY IN SUPPORT OF PLAINTIFFS' MOTION FOR REMAND AND FOR COSTS AND
EXPENSES INCURRED AS A RESULT OF REMOVAL**                                                              PAGE 2
S:\Clients\Plaintiffs\R\Redman, Ronald 10267\Fed Court Action\VIAD remand motion - DAH dec.doc