1   WHITNEY A. DAVIS, SBN 149523
    MARIA S. ROSENFELD, SBN 186116
2   CHARTER DAVIS, LLP
    1730 I Street, Ste. 240
3   Sacramento, CA 95814
    (916) 448-9000
4   (916) 448-9009

5   Attorneys for Defendant VIAD CORP,
    individually and as alleged successor-in-interest to
6   GRISCOM-RUSSELL COMPANY and alleged
    successor-in-interest to DIAL CORPORATION

7

8

9

10           UNITED STATES DISTRICT COURT

11       FOR THE NORTHERN DISTRICT OF CALIFORNIA

12            SAN FRANCISCO DIVISION

13

| | |
|---|---|
| JERI REDMAN, individually and as successor-in-interest to RONALD REDMAN, deceased; and JERI REDMAN, AMY REDMAN, DAVID C. REDMAN, MARK REDMAN and PAUL REDMAN, as legal heirs of RONALD REDMAN, deceased, <br><br> Plaintiffs, <br><br> v. <br><br> A.W. CHESTERTON COMPANY et. al. <br><br> Defendants. | Case No. 08-CV-03013-JSW <br><br> **DECLARATION OF WHITNEY A. DAVIS IN SUPPORT OF VIAD CORP'S OPPOSITION TO PLAINTIFFS' MOTION FOR REMAND** |

I, Whitney A. Davis, upon oath, declare as follows:

1. I am an attorney, licensed to practice law in the State of California and am a shareholder in the law firm of Charter Davis LLP, attorneys of record for defendant VIAD CORP, individually and as successor in interest to Griscom Russell Company/Dial Corporation, one of the defendants in this matter.

2.    Attached hereto as Exhibit 1 is a true and correct copy of excerpts from the trial testimony of Peter J. Novak taken in the case of *Payne vs. Saberhagen Holdings et. al. Washington State*, King County Civil Action No. 05-2-35924-2 SEA.

3.    Attached hereto as Exhibit 2 is a true and correct copy of excerpts from the Deposition Transcript of Henry Rentschler, Volume II, *Payne vs. Saberhagen Holdings et. al. Washington State*, King County Civil Action No. 05-2-35924-2 SEA.

4.    Attached hereto as Exhibit 3 is a true and correct copy of excerpts from the deposition testimony of Peter J. Novak taken in the case of *Andregg v. A.W. Chesterton Company*, San Franciso Case No. 274208.

5.    Attached hereto as Exhibit 4 is a true and correct copy of the slip opinion in *Reaser v. Allis Chalmers Corporation Product Liability Trust et. al.*2:08-cv-01296-SVW-SS (C.D. Cal. June 23, 2008.)

I declare, under penalty of perjury, under the laws of the State of California, that the foregoing is true and correct and that this declaration was signed on July 30, 2008 in Sacramento, California.

WHITNEY A. DAVIS

DECLARATION OF WHITNEY A. DAVIS IN SUPPORT OF OPPOSITION TO MOTION FOR REMAND
CASE NO. 08-CV-03013-JSW

# EXHIBIT 1

1

```
 1        IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

 2              IN AND FOR THE COUNTY OF KING

 3     --------------------------------------------------------

 4     HAROLD F. PAYNE and ELIZABETH )

 5     PAYNE, husband and wife,      )

 6                    Plaintiffs,    )

 7        vs.                        )   No. 05-2-35924-2 SEA

 8     SABERHAGEN HOLDINGS, INC.,    )

 9     et al.,                       )

10                    Defendants.    )

11     --------------------------------------------------------

12                    Testimony Of

13                 PETER J. NOVAK

14     --------------------------------------------------------

15                  May 16, 2006

16           BEFORE THE HON. SHARON ARMSTRONG

17

18

19

20

21

22     REPORTED BY:      Audiotape DR 201

23     TRANSCRIBED BY:    Karen L. Larsen, RPR, CCR 2215

24

25
```

1    I know I talked to Mr. McCardle, Mr. Liston, attorneys for

2    the law firm of Morgan Lewis were involved in this

3    transaction at the time.  I'm sure there were many more.  I

4    just can't recall those.  I talked to a number of people.

5        Q.   Okay.  And the only thing that you could determine

6    based on these conversations was speculation that BLH

7    acquired the Griscom Russell name; is that correct?

8        A.   I may have concluded that.  I could find no

9    evidence after January 30th, 1962, of any Griscom Russell

10   product that was manufactured by BLH, and that was what I

11   was really looking for, to see if there was a product line

12   that we could sell.  I went through the production logs.  I

13   went through the books and records of the company.  I did a

14   number of things then and tried to identify.  I found very

15   little information.

16       Q.   But that conclusion was speculation on your part,

17   was it not, sir?

18       A.   Yes, it was -- it was in part speculation on my

19   part, but it was the only reasonable conclusion I could come

20   to.

21       Q.   Based on the individuals that you spoke to.

22       A.   Based upon all the work I did.

23       Q.   Okay.  In addition to individuals that you spoke

24   to, what documents did you review?

25       A.   Well, I just explained some of them.  I went

13

1     through the production logs in each of the product lines to

2     see how many of this or that were being manufactured so we

3     could eventually put a value on those product lines for

4     sale.  I could not find any production logs for Griscom

5     Russell.

6              Q.    And you could not determine in the course of this

7     investigation that you conducted in 1970 whether Griscom

8     Russell was a division or subsidiary of Baldwin Lima

9     Hamilton; is that correct?

10             A.    In 1970 I could not determine that.

11             Q.    I want to make clear that we're on the same page

12    here, Mr. Novak, and establish that, once again, just to

13    make very clear, that the information that you had regarding

14    Griscom Russell's operations was based on interviews with

15    individuals and documents that you reviewed in 1970.

16             A.    I wanted to know what Griscom Russell was, and so

17    I was trying to get to the bottom of it.  I thought I did a

18    very thorough investigation at the time by looking at both

19    documents and talking to individuals that should know.

20             Q.    And the basis on which you're testifying today

21    regarding what Griscom Russell acquired is individuals that

22    you spoke to in 1970 and the documents that you've referred

23    to; is that correct?

24             A.    Yes.  There may have been other things, but I

25    can't recall at this time.

1    was prior to 1962 or after 1962 -- I just don't recall at

2    this time -- was a 2 and a half million gallon a day

3    desalinization plant for Qiryat (phonetic), Israel.  In

4    addition we built some huge desalinization plants for the

5    government of the Mexico, one in Tijuana, one in Ensenada.

6    We built a desalinization plant for the government of

7    Nigeria.  The Virgin Island Water and Power Authority had us

8    build a desalinization plant.  So BLH was very large in

9    desalinization on land based units.

10           Q.   Did you find any indication that they were making

11   marine desalinization or distilling units for use on

12   shipboard?

13           A.   I found no indication that BLH manufactured any

14   marine units.  As a matter of fact, the contrary information

15   came out.  In interviewing the people at BLH, they said that

16   that was a dead business.

17               MR. BERGMAN:  Your Honor, I'm going to have to

18   interpose a hearsay objection in so far as Mr. Novak is

19   relying on information provided by other individuals besides

20   his personal observations in 1970.

21               THE COURT:  Sustained as appeared to be offered

22   for the truth.

23           Q.   Let me ask you this.  You mentioned the production

24   logs that you actually examined during the course of this

25   research.  How far back did the production logs go?

# EXHIBIT 2

Payne v. Saberhagen Holdings, et al    May 22, 2006                Henry A. Rentschler

SUPERIOR COURT OF WASHINGTON FOR KING COUNTY

- - -

HAROLD F. PAYNE and      :   CIVIL ACTION

ELIZABETH PAYNE,         :

husband and wife         :

     Plaintiffs,        :

                :

     VS.               :

                :

SABERHAGEN HOLDINGS       :

INC., et al.,             :

     Defendants.        :   NO. 05-2-35924-2 SEA

- - -

VIDEOTAPED DEPOSITION OF

HENRY A. RENTSCHLER CONTINUED FROM MAY 4, 2006

TAKEN VIA VIDEOTELECONFERENCE

- - -

VOLUME TWO, MAY 22, 2006

- - -

Irving L. Starkman Associates

Registered Professional Reporters

1601 Walnut Street, Suite 200

Philadelphia, Pa.  19102

Phone (215) 568-5313

Irving L. Starkman Associates  (215) 568-5313          irvstark@aol.com
Reported by:  Robin Frattali

0dc83a27-5711-4d5f-8b18-434194980b38

Payne v. Saberhagen Holdings, et al    May 22, 2006                    Henry A. Rentschler

Page 54

1  were -- that you can think of, sitting here today,
2  who were with Griscom-Russell prior to the
3  acquisition by BLH and then came over to BLH?
4      A.  Not particularly, no.
5      Q.  How about from C. H. Wheeler, any
6  individuals come to mind besides Mr. Bolton?
7      A.  A man named Lee Yetter, Y-E-T-T-E-R.
8      Q.  What was his position at C. H. Wheeler?
9      A.  I don't know what it was at C. H.
10 Wheeler.
11     Q.  Okay.  What was his position at BLH?
12     A.  He was an assistant sales manager.
13     Q.  Okay.  So to go back to Mr. Bolton,
14 Mr. Bolton came over from C. H. Wheeler, according
15 to your recollection, to BLH and that was in
16 conjunction with the acquisition of C. H. Wheeler
17 in 1962; correct?
18              MR. GARDNER:  Object to the
19     form of the question.
20              You may answer.
21              THE WITNESS:  I said Mr. Bolton
22     came from C. H. Wheeler.
23              - - -
24 BY MR. FROCKT:

Page 55

1      Q.  And his position at BLH was -- after
2  that was what?
3      A.  An assistant sales manager.
4      Q.  Mr. Bolton, to your recollection, was
5  an assistant sales manager at -- at BLH?
6      A.  He and these --
7      Q.  Is that correct?
8      A.  -- other men would have been in
9  comparable positions.
10     Q.  Okay.  Okay.
11              MR. FROCKT:  Let the record
12     reflect that my partner, Matthew Bergman,
13     has come into the room.
14              - - -
15 BY MR. FROCKT:
16     Q.  Sir, I want to go back for a minute and
17 kind of change gears, if I could.
18              My understanding from your
19 previous -- from your testimony of May 4th is
20 that you worked at Eddystone from 1954 to '57 as
21 an inside salesman, hydraulic press and power tool
22 department; is that right?
23     A.  Yes, sir.
24     Q.  And is it true that between 1954 and

Page 56

1  1957 the Eddystone facility had no role in
2  manufacturing evaporators, heat exchangers or
3  distilling plants or distilling units during that
4  period.
5              Is that right?
6      A.  Yes, sir.
7      Q.  Sir, is it your understanding -- it's
8  your understanding that a desalination unit is the
9  same thing as a distilling plant.
10             Isn't that right?
11     A.  Yes.
12     Q.  Okay.  So a marine desalination unit,
13 at least according to your understanding, is the
14 same thing as a marine distilling plant.
15             Is that correct?
16     A.  You put the marine in there.  That
17 would have to do with usage.  It could have been
18 land based.  It could have been on a ship, which
19 would connote marine.
20     Q.  Okay.  But my question is a little more
21 limited.
22              A desalination plant is the
23 same thing as a desal -- a desalination unit is
24 essentially the same thing as a distilling plant.

Page 57

1              Is that right?
2      A.  I don't have a whole lot of knowledge
3  there, but the terms could be used in the same
4  context, yes.
5      Q.  Okay.  And sir, between 1954 and '57,
6  Eddystone didn't manufacture fuel oil heaters
7  during that period, did it?
8      A.  No, sir.
9      Q.  It didn't manufacture heat exchangers
10 during that period, did it?
11     A.  It could have made some heat exchangers
12 for the atomic energy use.
13     Q.  Okay.  Between 1954 and '57, Eddystone
14 did not manufacture any heat exchangers for marine
15 applications.
16             Is that a fair statement?
17     A.  That's a fair statement.
18     Q.  Okay.  Sir, when you came back to
19 Eddystone in 1962, Baldwin-Lima-Hamilton had its
20 own sales force, it's own in-house sales force, at
21 that time.
22             Is that right?
23     A.  Yes, sir.
24     Q.  Okay.  And according to your testimony

15  (Pages 54 to 57)

Reported by:  Robin Frattali

0dc83a27-5711-4d5f-8b18-434194980b38

Payne v. Saberhagen Holdings, et al    May 22, 2006                    Henry A. Rentschler

---

Page 58

1  this morning, that sales force was augmented by
2  sales personnel from Griscom-Russell, among other
3  companies.
4            Is that -- is that true?
5      A.  Those were inside salespeople, not
6  outside salespeople.
7      Q.  Okay.
8      A.  They were in the office.
9      Q.  All right. But Mr. Bolton, who you
10  said was an assistant sales manager at
11  Baldwin-Lima-Hamilton, was in a managerial
12  position, correct?
13      A.  They would all be managerial positions
14  for their particular products.
15      Q.  Okay. Sir, and your testimony is that
16  after the acquisition of Griscom-Russell, none of
17  the Griscom-Russell sales force was incorporated
18  into BLH's to sell the G -- the Griscom-Russell
19  product line; correct?
20            MR. GARDNER: Object to the
21      form of the question.
22            You may answer.
23            THE WITNESS: That's a little
24      broad.

---

Page 59

1            Griscom-Russell depended on
2      manufacturer's reps for their selling and it
3      took a while for them to be phased out.
4                - - -
5  BY MR. FROCKT:
6      Q.  Okay. Sir, you had testified that only
7  BLH products could be manufactured at Eddystone
8  because of what you described as the ASME
9  certification, which, as you described it, had the
10  force of law.
11            Do you recall that part of your
12  testimony from May 4th?
13      A.  Yes, sir.
14      Q.  And I guess based on that it was your
15  opinion or recollection that products could not be
16  transferred from one plant to another; is that
17  true?
18      A.  No, it's not a question of opinion or
19  recollection, it's a question of fact.
20      Q.  Okay. Sir, you're not a lawyer, are
21  you?
22      A.  No, sir.
23      Q.  Okay. You were in sales at BLH between
24  1962 and '65, you weren't in the legal department,

---

Page 60

1  correct?
2      A.  Correct.
3      Q.  And sir, nowhere in your January 5
4  of -- January 2005 deposition did you mention --
5  I'm sorry, your January 7th, 2005 deposition did
6  you mention anything about ASME certification, did
7  you?
8            MR. GARDNER: Object to the
9      form of the question.
10            You may answer.
11            THE WITNESS: I don't recall
12      whether it's mentioned or not, but that
13      would be an important part of my testimony
14      after I was sent out to the shop.
15            MR. GARDNER: David, we have
16      only three minutes left on the videotape, so
17      we need to go off the record to change the
18      tape within that time.
19            MR. FROCKT: Okay. My only
20      request would be that we don't leave the
21      room and we just stay present. We'd like to
22      continue with the examination as soon as the
23      tape's changed.
24            MR. GARDNER: That's fine.

---

Page 61

1            MR. FROCKT: Okay.
2            MR. SMITH: Off the record.
3      Twelve-o-four.
4                - - -
5            (Discussion off the record)
6                - - -
7            MR. FROCKT: Could I just note
8      for the record what the time is? I want to
9      make sure that we can adhere to the ninety
10      minutes.
11            MR. SMITH: On the record.
12      Twelve-o-six.
13                - - -
14  BY MR. FROCKT:
15      Q.  Sir, you testified that, and I'm
16  quoting from your deposition at page seventeen,
17  the May 4th deposition, "I know of no Navy
18  distilling plants built or sold at Eddystone while
19  I was there," and then you qualified that, quote,
20  "under the BLH name."
21            Is that your testimony?
22      A.  Yes.
23      Q.  Sir, you don't have any specific
24  knowledge of what a difference between a Navy type

---

16 (Pages 58 to 61)

Payne v. Saberhagen Holdings, et al    May 22, 2006    Henry A. Rentschler

---

Page 62

1  distilling plant and a non-Navy type distilling
2  plant would be, do you'?
3       A.  No, sir.
4       Q.  You were not an engineer built in the
5  design process -- or involved in designing what
6  you described as Navy distilling plants versus
7  non-Navy distilling plants, correct?
8       A.  Correct.
9       Q.  Sir, I'd like you to unseal Exhibit --
10  what is envelope -- should be envelope 13.
11           MR. GARDNER:  Is there an extra
12  copy?
13           MR. FROCKT:  There was supposed
14  to be.  I don't know if it's not in.
15           MR. GARDNER:  It's probably in
16  this one here.
17           - - -
18  BY MR. FROCKT:
19       Q.  Sir, just to make sure, since we are on
20  two different cities, the document that you should
21  have in front of you has a note on the bottom that
22  says July 1960.
23           Is that -- do you see that?
24       A.  Yes, sir.

---

Page 63

1       Q.  Sir, what I've handed you is an
2  advertisement from a magazine called Marine
3  Engineering/Log and that magazine was -- this
4  issue was July 1960.
5           Sir, are you familiar with the
6  magazine Marine Engineering/Log?
7       A.  No, sir.
8       Q.  Have you ever seen this document
9  before?
10       A.  No, sir.
11       Q.  Sir, on the page -- the second page
12  where it's demarcated number seventy, do you see
13  that, on the bottom, the left hand corner?
14       A.  Yes.
15       Q.  Sir, please take a moment to look at
16  the ad.
17           Have you reviewed it, sir?
18       A.  I've looked at it.
19       Q.  Okay.  Sir, would you agree with me
20  that this would appear to be an ad from the
21  Griscom-Russell Company describing some of their
22  distilling plants?
23       A.  You could read it as well as I can.
24  I'm not going to get involved in that.  I didn't

---

Page 64

1  see the ad.  I didn't see the magazine.  I wasn't
2  at BLH at that time.
3       Q.  All right.  Well, sir, would you agree
4  with me that this ad describes at least two types
5  of distilling plants that Griscom-Russell
6  manufactured?
7       A.  If you want somebody to read the ad,
8  we'll let the Court Recorder do it.  I'm not going
9  to.
10       Q.  I'd like you to, please.
11       A.  Why?  I don't -- I don't have to.  I'm
12  not here to review ads from 1960.
13       Q.  Okay.  Well, sir, you've been offered
14  as a witness in this case.  I don't mean to offend
15  you in any way, but I think that I'm entitled to
16  ask you some questions about something that you
17  testified about in your previous deposition.
18       A.  I never testified about an ad in 1960.
19           MR. GARDNER:  There's no -- I'm
20  going to object to the form of the question
21  and move to strike the answer as
22  non-responsive.  I don't think there's a
23  question pending.
24           Why don't we -- why don't we

---

Page 65

1  just start with a question, David.
2           MR. FROCKT:  Sure.
3           MR. GARDNER:  And if it
4  requires Mr. Rentschler to read the ad, then
5  we'll deal with that.
6           - - -
7  BY MR. FROCKT:
8       Q.  All right.  Well, let me just ask it
9  this way.
10           Sir, do you -- you don't know
11  the difference between a Navy distilling plant and
12  a non-Navy distilling plant, do you?
13       A.  I do not know the difference.
14       Q.  I take it you do not know the
15  difference between a flash type and submerged tube
16  saltwater distilling plant, do you?
17       A.  I don't know the difference.
18           MR. GARDNER:  Let me -- just
19  for the record, I'm not sure the Court
20  Reporter heard that question.
21           Flash type and submerged tube.
22           MR. FROCKT:  Okay.
23           - - -
24  BY MR. FROCKT:

---

17 (Pages 62 to 65)

Payne v. Saberhagen Holdings, et al    May 22, 2006                    Henry A. Rentschler

---

Page 74

1      form of the question.
2              You may answer.
3              THE WITNESS:  I would hope not.
4              - - -
5      BY MR. FROCKT:
6          Q.  Sir, when was the last time you saw
7      this ad before today?
8          A.  The last time I saw it?
9          Q.  Yes, sir.
10         A.  I don't think I ever saw it.
11         Q.  Oh.  I thought you said you were
12     involved in its development.
13         A.  Oh, but not in August of -- oh, I was
14     not involved in the -- in the development.  I made
15     that very clear.
16         Q.  I'm sorry.
17         A.  In August of 1962, I was manager of
18     agency relations.  I had only been back to
19     Eddystone about sixty days.
20         Q.  Okay.  But you have seen this ad
21     before, prior today -- to today, correct?
22         A.  I probably saw it back in 1962.
23         Q.  Okay.  I take it you have not seen the
24     ad before today in the last two years?

Page 75

1          A.  No, sir.
2          Q.  Sir, do you agree with me that the ad
3      at page twenty-four indicates that one of the
4      major products that BLH was going to produce after
5      the acquisition of Griscom-Russell was distilling
6      plants?
7              MR. GARDNER:  Object to the
8      form of the question.
9              You may answer.
10             THE WITNESS:  The headline
11     lists a lot of products.  Some of them,
12     because it was possible to have made those
13     at Eddystone, doesn't mean they were made.
14             We never made any deck
15     machinery at Eddystone.
16             - - -
17     BY MR. FROCKT:
18         Q.  Okay.
19         A.  We never made any steering gear.
20         Q.  Sir, your testimony on May 4th was
21     that you were not aware of any marine distilling
22     plants ever being manufactured at Eddystone after
23     1962; is that correct?
24         A.  Yes, sir.

Page 76

1          Q.  Does this change your recollection --
2      this ad change your recollection in any way?
3          A.  No, sir.
4          Q.  So I take it that your testimony is
5      that the ad that BLH was putting into Marine
6      Engineering/Log, which I take it you would
7      agree -- would you agree with me that Marine
8      Engineering/Log, by its very name, is an ad that
9      was designed to go for the shipping industry --
10     that was a magazine that was designed to be read
11     for people in the shipping industry?
12         A.  Well, I would guess so, given the name.
13     I'm not familiar with the magazine, though.
14         Q.  So, it's your testimony -- sorry.
15     Don't want to miss -- is your opinion, then,
16     that the ad that BLH put out in 1962 that refers
17     to the production of distilling plants was
18     inaccurate at that time?
19             MR. GARDNER:  Object to the
20     form of the question.
21             You may answer.
22             THE WITNESS: No, sir.
23             - - -
24     BY MR. FROCKT:

Page 77

1          Q.  So it was not inaccurate.
2              Is that your testimony?
3              MR. GARDNER:  Same objection.
4              THE WITNESS:  All I'm saying is
5      it lists products that might have been
6      manufactured at BLH, Eddystone.  That
7      doesn't mean they were.
8              We never made deck machinery or
9      steering gear at Eddystone.
10             - - -
11     BY MR. FROCKT:
12         Q.  Did you ever make marine distilling
13     plants at Eddystone?
14         A.  No, sir.
15         Q.  Okay.  So the ad is wrong, according to
16     your testimony today?
17             MR. GARDNER:  Same objection --
18             THE WITNESS:  No.
19             MR. GARDNER:  -- as I made
20     earlier, plus asked and answered.
21             You may answer.
22             THE WITNESS:  The ad is not
23     wrong.
24             - - -

20  (Pages 74 to 77)

Irving L. Starkman Associates  (215) 568-5313                    irvstark@aol.com
Reported by:   Robin Frattali

0dc83a27-5711-4d5f-8b18-434194980b38

**EXHIBIT 3**

SUPERIOR COURT OF THE STATE OF CALIFORNIA
COUNTY OF SAN FRANCISCO
LIMITED JURISDICTION

JON ANDREGG and JANICE            )
ANDREGG,                          )
                                  )
          Plaintiffs,             )
                                  )
     vs.                          )        No. 274208
                                  )
A.W. CHESTERTON COMPANY,          )
et al,                            )
                                  )
                                  )
          Defendants.             )

DEPOSITION OF PETER J. NOVAK

San Francisco, California

Tuesday, October 16, 2007

Reported By:
MARY F. NELSON
CSR No. 3553
Job No. 77120



Esquire Deposition Services        505 Sansome Street, Suite 502        San Francisco, California 94111
Phone (415) 288.4280                    800.770.3363                         Fax (415) 288.4286

ed35c7cb-e488-4249-940e-1329f5c3903

PETER J. NOVAK

```
1              THE WITNESS:  Can I have the question again?

2              (Record read.)

3              THE WITNESS:  At some time.

4    BY MR. WAGNON:

5         Q    Within a year or two?

6         A    No.

7         Q    How soon?

8         A    Probably 15 or more years later.

9         Q    And at that time did Armour merge into a

10   Greyhound entity?

11        A    At some time there was a merger.  I don't

12   recall the entities.

13        Q    Let's go back to the time of your

14   investigation of the Baldwin-Lima-Hamilton Corporation.

15   At the time of your investigation did

16   Baldwin-Lima-Hamilton own the rights to the

17   Griscom-Russell name?

18        A    I believe so.

19        Q    At that time did Baldwin-Lima-Hamilton have

20   any involvement with any manufacturing of equipment for

21   ships?

22        A    Yes.

23             MR. DAVIS:  Can I have the -- go ahead.

24   BY MR. WAGNON:

25        Q    What involvement did they have with
```

ed35c7cb-e488-4249-940e-1329f5c3903

PETER J. NOVAK

```
1    manufacturing of equipment for ships?

2        A    They built propellers for ships, replacement

3    propellers, they made drive shafts for nuclear

4    submarines.  They made insulating neoprene bearings for

5    submarines.  That's all I can recall right now.  But

6    I'm sure there were other products I can't recall.

7        Q    After the acquisition of, at some point after

8    the acquisition of 80 percent of the stock of Armour

9    Corporation, was there a dissolution of the

10   Baldwin-Lima-Hamilton Delaware entity?

11       A    At some time, yes.

12       Q    Prior to the dissolution of the entity was

13   there a divestiture of some of the some of the

14   equipment or assets of the Baldwin-Lima-Hamilton

15   entities?

16           MS. MARGOLIS:  Object to the form.

17           THE WITNESS:  Yeah, I'd like a time frame.

18   BY MR. WAGNON:

19       Q    Sure.  Do you know when the dissolution was?

20       A    I think so.

21       Q    When?

22       A    November 1975 seems to jump in my head.  But it

23   may have been 1967.

24       Q    In my notes I have '75.

25       A    What's that?
```

ed35c7cb-e488-4249-940e-1329f5c39037

1      Q    I have '75.  But I wasn't there.  Prior --

2  were you involved in dissolving that corporate entity?

3      A    Yes.

4      Q    What was your involvement in the dissolution

5  of Baldwin-Lima-Hamilton?

6      A    Filing the papers.

7      Q    Okay.  Did you prepare the papers?

8      A    Yes.

9      Q    Did this require a vote of the board of

10 directors of Baldwin-Lima-Hamilton?

11     A    Yes.

12     Q    And did you make sure that vote happened?

13          MR. DAVIS:  Object to the form.

14          THE WITNESS:  Did I make sure that it happened?

15 BY MR. WAGNON:

16     Q    Yes.

17     A    I can't answer that.  I don't understand it.

18     Q    Did you tell somebody on the board of

19 directors that they needed to vote to dissolve the

20 corporate entity?

21     A    Oh, no, the board had decided to dissolve the

22 company.  And they acted to do so.

23     Q    This board that made this decision, were any

24 of the board members also members of the board of

25 Armour?

Esquire Deposition Services          505 Sansome Street. Suite 502      San Francisco. California 94111
Phone (415) 288.4280                    800.770.3363                    Fax (415) 288.4286

ed35c7cb-e488-4249-940e-1329f5c3903

PETER J. NOVAK

1    insurance purchased?

2        A    No.

3        Q    Do you know if there had been product

4    liability insurance the company maintained either

5    directly or through its subsidiaries?

6            MR. DAVIS:  Assumes facts.

7            THE WITNESS:  I don't recall.

8    BY MR. WAGNON:

9        Q    Do you know if there was any product liability

10   insurance coverage that was providing coverage on a

11   products basis rather than a claims-made basis?

12       A    I have no idea.

13       Q    As part of your investigation of the company

14   did you ever investigate the extent of the insurance

15   coverage that Baldwin-Lima-Hamilton had?

16           MS. MARGOLIS:  Object to the form.

17           THE WITNESS:  Not what you're referring to.

18   BY MR. WAGNON:

19       Q    Same question with respect to

20   Baldwin-Lima-Hamilton subsidiaries, any investigation

21   as to their product liability insurance?

22       A    Same answer.

23       Q    Prior to the dissolution of

24   Baldwin-Lima-Hamilton were the assets of the company

25   sold?

ed35c7cb-e488-4249-940e-1329f5c3903

PETER J. NOVAK

```
1      A     Yes.

2      Q     Were you involved in the sale of those assets?

3      A     Not all.

4      Q     Which ones were you involved?

5      A     I don't recall.

6      Q     The proceeds of the sale of those assets,

7  where did the proceeds go, did they go to

8  Baldwin-Lima-Hamilton?

9      A     Of course.

10     Q     When Baldwin-Lima-Hamilton ultimately

11 dissolved in 1975 did it have at that time remaining

12 liquid assets?

13     A     Yes.

14     Q     And where did those go?

15     A     They were exchanged for the stock owned by

16 Armour & Company.

17     Q     So who ended up being the owner of record of

18 such stock?

19     A     Who ended up what?

20     Q     Being the owner of record of that stock?

21           MS. MARGOLIS:  Object to the form.

22           THE WITNESS:  I just can't follow that.

23 BY MR. WAGNON:

24     Q     Okay.  I guess I'm confused.  When the company

25 was dissolved did it have money in the bank?
```

ed35c7cb-e488-4249-940e-1329f5c3903

**EXHIBIT 4**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

ROBERT REASER, et al.                )    CV 08-1296-SVW (SSx)
                                     )
                    Plaintiffs,      )    ORDER DENYING PLAINTIFFS'
                                     )    MOTION FOR REMAND [18]
          v.                         )
                                     )
ALLIS CHAMBERS CORPORATION, et       )
al.                                  )
                    Defendants.      )
                                     )
                                     )
                                     )
                                     )

## I.    Statement of Facts

Plaintiffs Robert and Christine Reaser brought this action against General Electric Company ("GE"), Viad Corporation ("Viad")[1], and other Defendants in Los Angeles Superior Court on January 25, 2008.  (Motion for Remand, at 1 ("Motion").)  Plaintiffs allege that Robert Reaser ("Reaser") developed malignant mesothelioma as a result of exposure from Defendants' asbestos or asbestos-containing products aboard United States naval ships.  (Complaint, at ¶ 3 ("Complaint").) Reaser served in the U.S. Navy from 1951 to 1964, during which he was allegedly exposed to asbestos while working on the *U.S.S Shea*, *U.S.S. Boston*, *U.S.S. Providence*, and the *U.S.S. Wilkinson*.  (Defendant Viad Notice of Removal, at 3.)  Plaintiffs allege that Defendants violated their state law duties to warn Reaser about the dangers of asbestos

---

[1] Defendants Viad and GE were the only defendants who removed the case and filed oppositions to the Motion for Remand.

1 | exposure from equipment found on naval vessels.  (Motion, at 1.)
2 | Viad, later joined by GE, removed the case to federal court based on
3 | the federal officer removal statute, which provides federal
4 | jurisdiction over claims against "any officer (or any person acting
5 | under that officer) of the United States or of any agency     thereof
6 | . . . for any act under color of such office . . ."  28 U.S.C.  §
7 | 1442(a)(1).  This statute does not require all Defendants to consent
8 | to removal.  See Durham v. Lockheed Martin Corp., 445 F.3d 1247, 1253
9 | (9th Cir. 2006) ("Whereas all defendants must consent to removal
10 | under section 1441 . . . a federal office or agency defendant can
11 | unilaterally remove a case under section 1442.")

12 |  Plaintiffs, clearly anticipating that one or more Defendants
13 | would attempt to remove the case to federal court, included a
14 | disclaimer in the Complaint which attempts to waive any cause of
15 | action arising from exposure to asbestos dust that occurred in a
16 | federal enclave, expressly excluding from the disclaimer U.S. Navy
17 | vessels.  Plaintiffs also disclaim any cause of action resulting from
18 | exposure to asbestos dust caused by any acts or omissions of
19 | Defendants committed at the direction of a U.S. officer.  (Complaint,
20 | at ¶ 4.)  On April 14, 2008, Plaintiffs filed a motion for remand to
21 | state court on the ground that this Court lacks subject matter
22 | jurisdiction.  (Motion, at 2.)
23 | ///
24 | ///
25 |
26 | **II.   Analysis**
27 |
28 |

Three main issues must be addressed in examining Plaintiffs'
Motion.  The first is whether the standard of review includes a
requirement that Defendants meet a "special burden" in showing that
federal officer jurisdiction is proper.  The second is whether
Defendants meet the elements of federal officer jurisdiction.  The
third is whether Plaintiffs' disclaimer should be determinative as to
the question of remand.

### A.    Standard of Review

A party seeking removal under § 1442(a)(1) must demonstrate that
(a) it is a person within the meaning of the statute; (b) it can
assert a "colorable federal defense"; and (c) there is a causal nexus
between its actions, taken pursuant to a federal officer's
directions, and the plaintiff's claims.  Durham, 445 F.3d at 1251.
Defendants Viad and GE assert that they must prove only by a
preponderance of the evidence that removal to federal court is
proper, as typically required. (See Defendant Viad Opposition Motion,
at 3.)

Plaintiffs argue, however, that Defendants have a "special
burden" in showing that federal officer jurisdiction is proper.
(Motion, at 3.)  Plaintiffs assert that the special burden requires
Defendants to present concrete, verifiable evidence regarding
satisfaction of federal officer jurisdiction, particularly with
respect to satisfying the existence of a colorable federal defense.
This burden would create a higher standard for Defendants at this
stage of the litigation process.  Citing to Williams v. General
Electric Co., Plaintiffs allege that because § 1442(a)(1) is

3

"predicated on the protection of federal activity and an
anachronistic mistrust of state courts' ability to protect and
enforce federal interests and immunities from suit, private actors
seeking to benefit from its provisions bear a special burden in
establishing the official nature of their activities." (Motion, at
3) (quoting Williams v. General Electric Co., 418 F. Supp. 2d 610,
614 (M.D. PA. 2005)). Furthermore, Plaintiffs rely on Hilbert v.
McDonnell Douglas Corp. in arguing for a heightened burden in
satisfying the three prongs of § 1442(a)(1). 529 F. Supp. 2d 187 (D.
Mass. 2008). In Hilbert, the defendants claimed that the military,
through its contracts, exercised its discretion in such a way as to
prevent them from warning the plaintiff about the dangers of
asbestos, similar to the present assertions by Viad and GE. Id. at
199. The court required that the defendants submit actual citations
to regulations or contracts evidencing the government's alleged
control over asbestos warnings. Because the defendants did not
produce such evidence, the court held that this "sort of speculation
is not remotely adequate" to satisfy federal officer jurisdiction and
remanded the case. Id. at 202-203.

The Ninth Circuit, however, has rejected the notion that
defendants must meet a special burden in order to satisfy the three
prongs of federal officer jurisdiction. In Durham, the Ninth Circuit
noted that, while removal under § 1441 is to be strictly construed,
the federal officer removal statute is to receive a generous
interpretation. According to the Ninth Circuit, "the Supreme Court
has held that the right of removal is absolute for conduct performed
under color of federal office, and has insisted that the policy

4

favoring removal should not be frustrated by a narrow, grudging interpretation of § 1442(a)(1)." Durham, 445 F.3d at 1252 (citing Arizona v. Manypenny, 451 U.S. 232, 242 (1981)).  Therefore, when federal officers and their agents are seeking a federal forum, the Court is to interpret § 1442 broadly in favor of removal.  Id.  In following the Supreme Court's broad interpretation of § 1442 and rejecting the need for a special burden, the Ninth Circuit has maintained that Defendants must simply make an adequate showing that the requirements of federal office jurisdiction are met to support removal to federal court.  Id. at 1252-1253.  Therefore, to qualify for removal, Defendants must be a person under the statute, raise a colorable federal defense, and present a basis for a causal connection between the charged conduct and the asserted government authority.  Willingham v. Morgan, 395 U.S. 402, 409 (1969) (citing Maryland v. Soper (No. 1), 270 U.S. 9, 33 (1926)).  Defendants need not prove their federal defense or a causal nexus to justify removal.

**B.    Three Prongs of Removal under § 1442(a)(1)**

1.    Person

As corporations, Defendants Viad and GE meet the preliminary requirement that the party seeking removal is a person within the meaning of § 1442(a)(1).  See Fung v. Abex Corp., 816 F. Supp. 569, 572 (N.D. Cal. 1992).  There is no dispute between the parties as to this prong.

2.    Colorable Federal Defense

Defendants seek removal under the government or military contractor defense, which protects a government contractor from liability for acts done by him while complying with government specifications during execution of performance under a contract with the United States. McKay v. Rockwell Intern. Corp., 704 F.2d 444, 448 (9th Cir. 1983). The Supreme Court recognized the contractor defense in Boyle v. United Technologies Corp., where it held that liability for design defects in military equipment could not be imposed on a private government contractor under state law where: (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier, but not to the United States. Boyle v. United Technologies Corp., 487 U.S. 500, 512 (1988). This defense has been extended to failure to warn cases; however, it is inapplicable in the absence of evidence that the defendants' decision to not provide a warning was "in compliance with reasonably precise specifications imposed on it by the United States." Butler v. Ingalls Shipbuilding, Inc., 89 F.3d 582, 586 (9th Cir. 1996). Where there is no conflict between requirements imposed under a federal contract and a state law duty to warn, the Court should defer to state law. Id.

///

///

### a.    Reasonably Precise Specifications

1    To illustrate that reasonably precise specifications set forth
2    by the Navy exist and that these specifications conflict with the
3    state law duty to warn, Defendants rely on the declarations of Dr.
4    Cushing and Admiral Lehman.  Dr. Cushing, President of C.R. Cushing &
5    co., Inc., Naval Architects, Marine Engineers and Transportation
6    Consultants, notes that the U.S. government was intimately involved
7    in the manufacture of any contractors' equipment used in U.S.
8    vessels, "as the equipment manufactured for those vessels was
9    designed and built to meet precise and exacting specifications of the
10   U.S. Navy." (Cushing Dec., at 4.)  Furthermore, Dr. Cushing asserts
11   that "[w]hether certain equipment used aboard U.S. Naval vessels
12   should have warnings, and the content and format of any such warning,
13   was determined solely by the U.S. Navy." (Id. at 5.)  Admiral
14   Lehman, a retired Rear Admiral of the U.S. Navy, states that
15   "equipment suppliers were prohibited from providing any warnings on
16   or to accompany equipment supplied to the Navy without the consent
17   and approval of the Navy." (Lehman Dec., at 5.)  Moreover, Admiral
18   Lehman claims that certain types of warnings were simply not approved
19   by the Navy, such as any warnings associated with hazards from
20   asbestos.  (Id.)  Plaintiffs argue that these declarations do not
21   refer to actual contracts or any personal knowledge of contractual
22   obligations owed by Defendants, but rather are mere speculations
23   about what the Navy would have permitted. (Plaintiffs' Reply, at 6.)
24   Essentially, Plaintiffs assert that Defendants have not adequately
25   shown that the Navy set forth reasonably precise specifications, such
26   that Defendants fail to raise a colorable federal defense.[2]

27
28   [2]    Plaintiffs further argue that Admiral Lehman and Dr. Cushing lack
        personal knowledge and that their declarations lack foundation and

7

Plaintiffs' argument relates to their assertion that Defendants must prove their case in order to satisfy the three prongs for removal under § 1442. (Motion, at 3.) Because the Supreme Court and the Ninth Circuit has declined to require that any such burden be placed on defendants in federal officer removal cases, the argument that actual contracts are required to illustrate reasonably precise specifications at this stage of the litigation process necessarily fails. See Willingham, 395 U.S. at 407 (noting that to be colorable, the defense does not need to be clearly sustainable, as the purpose of § 1442 is to secure that the validity of the defense will be tried in federal court). Defendants need not establish the validity of their federal defense in order to justify removal. Rather, they must only raise a colorable federal defense. The declarations made by Admiral Lehman and Dr. Cushing describe general naval policies and shipbuilding practices, and illustrate the lack of discretion given to government contractors in supplying equipment to naval vessels. As Plaintiffs point out, the declarations do not reference any specific contractual provisions that prohibit Defendants from placing warnings on naval equipment about the dangers of asbestos exposure.

are speculative. These arguments lack merit because Admiral Lehman and Dr. Cushing's declarations are based on years of experience and training in regard to the design and operation of U.S. Navy vessels. Both declarants state that they are personally familiar with the degree of supervision and control of the Navy over the actions of its contractors. The declarations describe typical Navy specifications and offer explanations as to why warnings about asbestos would not have been permitted. (See Lehman Dec., at 2-3; Cushing Dec., at 2, 5.) Additionally, Plaintiffs claim the declarations are inadmissible per the "best evidence rule." Fed. R. Evid. 1002. This argument also lacks merit because Admiral Lehman and Dr. Cushing are not trying to "prove the content of a writing," but rather they are relying on their independent knowledge and familiarity regarding Navy specifications in making their assertions. Id.

1　The absence of specific prohibitions, however, does not render these

2　declarations useless; rather, the declarations provide Defendants

3　with a basis for asserting a colorable federal defense, which is all

4　that is needed at the removal stage.   A central district court

5　similarly determined that Admiral Lehman's declaration created an

6　inference that military contractors did not provide a warning

7　concerning the dangers of asbestos because the Navy did not permit

8　any such warning.   Oberstar v. CBS Corp., No. CV 08-118 PA, at 5

9　(C.D. Cal. Feb. 11, 2008) (citing Nesbiet v. General Electric Co.,

10　399 F. Supp. 2d 205, 208 (S.D.N.Y. 2005)).   Once again, the court

11　noted that defendants must only show a colorable federal defense at

12　this stage of the litigation process, not one that will ultimately

13　prevail.   Id.   Additionally, a Northern District of California court

14　has specifically rejected the argument that a defendant must produce

15　actual contractual documentation in order to demonstrate that it

16　worked under reasonably precise specifications.   See Ballenger v.

17　Agco Corp., 2007 WL 1813821, at *3 (N.D. Cal. June 22, 2007) (stating

18　that to require past contracts would frustrate the purpose of §

19　1442).   In this action, based on the declarations of Admiral Lehman

20　and Dr. Cushing, it is possible to find that the Navy set forth

21　reasonably precise specifications regarding the use of warnings, such

22　that Defendants have a basis for asserting a colorable federal

23　defense.

24

25　　　　　　　　b.　　Conformity to Reasonably Precise Specifications

26　　　　As to the second element of the government contractor defense,

27　Defendants must show that the products supplied to the U.S. Navy

28

1  conformed to the reasonably precise specifications set forth by the
2  Navy.  Essentially, Defendants must show that the Navy received what
3  it sought.  Based on the declarations by Admiral Lehman and Dr.
4  Cushing, it can be inferred that any deviation from the Navy's
5  specifications would have resulted in rejection of the equipment.
6  (See Cushing Dec., at 4-5; Lehman Dec., at 4.)  Thus, if Plaintiff
7  Reaser had been exposed to asbestos on naval vessels where Defendants
8  had supplied asbestos-containing equipment, it is likely that this
9  equipment conformed to the detailed specifications set forth by the
10  Navy.  Had this equipment not complied with the Navy's specifications
11  regarding design, installation, and warnings, it is a fair inference
12  that the equipment would not have been placed on the ships.  (Lehman
13  Dec., at 4-5.)

14
15              c.    **Warnings by Defendants**

16      Finally, the third element of the military contractor defense
17  requires that Defendants did not fail to warn the Navy of any dangers
18  associated with asbestos that were known by Defendants but not the
19  government.  As the Supreme Court in Boyle noted, "[t]he third
20  condition is necessary because, in its absence, the displacement of
21  state tort law would create some incentive for the manufacturer to
22  withhold knowledge of risks, since conveying that knowledge might
23  disrupt the contract but withholding it would produce no liability."
24  Boyle, 487 U.S. at 512.  Dr. Lawrence Betts, a retired Navy captain,
25  states in his declaration that the Navy's knowledge regarding the
26  dangers of asbestos and its health effects represented the state of
27  the art.  (Betts Dec., at 18.)  Furthermore, he notes that "[d]uring
28

                                    10

1  the period from the early 1920s to the late 1960s, there was nothing
2  about the hazards associated with the use of asbestos-containing
3  products . . . on United States Navy ships known by a manufacturer .
4  . . that was not known by the United States and the United States
5  Navy."  (Id.)  Based on this evidence, it seems possible to find that
6  the information possessed by the Navy exceeded any information that
7  could have been provided by Defendants, such that the third element
8  is sufficiently satisfied for raising a defense.  Therefore, it
9  appears that Defendants have raised a colorable federal defense.

10

11              **3.   Causal Nexus**

12      The final prong necessary to satisfy federal officer removal
13  requires Defendants to demonstrate that the Navy controlled the
14  warnings Defendants could place on its equipment and that this
15  control prevented Defendants from fulfilling its alleged state law
16  duty to warn of the dangers associated with asbestos exposure.
17  Essentially, there must be a causal nexus between the claims against
18  Defendants and the acts they performed under color of federal office.
19  Ballenger, 2007 WL 1813821at *3-4.  Similar to the second prong,
20  Defendants must simply show the existence of a likely causal
21  connection, not prove such a connection.  See Jefferson County v.
22  Acker, 527 U.S. 423, 432 (1999) ("Just as requiring a clearly
23  sustainable defense rather than a colorable defense would defeat the
24  purpose of the removal statute . . . so would demanding an airtight
25  case on the merits in order to show the required causal connection.")
26  Again, as shown above by the declarations of Lehman, Cushing, and
27  Betts, the Navy had direct control over all aspects of the equipment

28

1  supplied to its ships.  It can therefore be inferred that the reason

2  why Defendants did not place warnings on their equipment was because

3  such warnings were precluded by the Navy's detailed specifications.

4  (See Lehman Dec., at 4.)  Plaintiffs allege that Defendants failed to

5  warn of asbestos dangers, yet this alleged failure to warn,

6  Defendants assert, resulted from the Navy's prohibitions and/or

7  control over any such warning.  Therefore, Defendants adequately show

8  a causal nexus between Plaintiffs' claims and Defendants' actions.

9      Because Defendants have adequately asserted a colorable federal

10  defense and a causal nexus between Plaintiffs' claims and Defendants'

11  acts performed under the direction of the Navy, it appears that

12  Defendants satisfy the three prongs of § 1442(a)(1).

13

14      **C.   Disclaimer**

15      Plaintiffs additionally argue that removal is improper because

16  of disclaimers appearing in the Complaint. Plaintiffs include two

17  disclaimers in the Complaint. The first disclaimer does not operate

18  to disclaim any cause of action subject to federal officer removal.

19  (Complaint, at ¶ 4.) The second disclaimer, however, specifically

20  disclaims "any cause of action or recovery for any injuries resulting

21  from exposure to asbestos dust caused by any acts or omissions of a

22  party Defendant committed at the direction of an officer of the

23  United States Government." (Id.) However, because removal pursuant to

24  the federal officer removal statute is premised on the existence of a

25  colorable federal defense, rather than the manner in which a

26  plaintiff's complaint is constructed, courts have found that neither

27  a plaintiff's disclaimer nor its characterization of his claims is

28

determinative.  See Oberstar, No. CV 08-118 PA at 3.  See also Durham,
445 F.3d at 1253 ("[R]emovals under section 1441 are subject to the
well-pleaded complaint rule, while those under section 1442 are
not."); Ballenger, 2007 WL 1813821 at *2 ("Under the federal office
removal statute, suits against federal officers may be removed
despite the nonfederal cast of the complaint.")  The Court takes a
similar view.  Plaintiffs' second disclaimer effectively mirrors
Defendants' federal contractor defense and so in no way prevents
litigation of the applicability of that defense in state court, which
is precisely what the federal officer removal statute seeks to avoid.
To grant a plaintiff's motion for remand based on such a disclaimer
would, therefore, render the federal officer removal statute
completely ineffectual in the face of an "artfully constructed"
complaint.  Oberstar, No. CV 08-118 at 3.  The Court cannot allow
Plaintiffs to evade federal officer removal in such a fashion.

Plaintiffs rely on Westbrook v. Asbestos Defendants, where the
court, when faced with similar facts and evidence, found the
plaintiffs' disclaimer to be determinative and remanded the case back
to state court. 2001 WL 902642 at *3 (N.D. Cal. July 31, 2001).
However, Westbrook is distinguishable from the present case in that
the plaintiffs in Westbrook disclaimed "any claims arising out of
work done on United States Navy ships." Id. at *2.  In other words,
the plaintiffs in Westbrook specifically waived any causes of action
stemming from asbestos exposure on naval vessels; instead premising
their claims on injuries arising from work done on private ships.
Id.  As a result, unlike in the present case, the parties in
Westbrook had no need to litigate any issue resembling the federal

13

contractor defense in order to determine the applicability of the
plaintiffs' disclaimer.  Therefore, remand in that case did not
undermine the purposes of § 1442(a)(1), as remand here would, and so
was appropriate.

**III. Conclusion**

Based on the foregoing reasons, Plaintiffs Robert and Christine
Reaser's Motion for Remand is DENIED.

IT SO ORDERED.

DATED:_____June 23, 2008_____        _____
                                                STEPHEN V. WILSON
                                           UNITED STATES DISTRICT JUDGE

14